# ORIGINAL

FILED

OCT  3 2006

U.S. COURT OF
FEDERAL CLAIMS

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BERES, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | No. 03-785L, as Related to **SCHROEDER (No. 04-1456 L), KLEIN (No. 04-1458L), LANE (No. 04-1468L), MANNING (No. 04-1466L), MOREL No. 04-1467L, NELSON (No. 04-1465L), PETERSON (No. 04-1459L), RAY (No. 04-1457L), RITZEN (No. 04-1469L), SPENCER (No. 04-1463L) and COLLINS (No. 04-1472L).**<br><br>Honorable Marian Blank Horn |

### PLAINTIFFS' MOTION FOR PARTIAL JUDGMENT
### REGARDING FEE/EASEMENT DETERMINATION

Pursuant to this Court's scheduling order filed September 25, 2006, Plaintiff landowners from the above-referenced consolidated cases in *Schroeder, Ray, Klein, Peterson, Spencer, Nelson, Manning, Lane,* and *Collins* ("Landowners") hereby file their motion for partial judgment concerning the interests conveyed by their predecessors in interest in the railroad right-of-way source deeds at issue in this action. For the reasons explained in the accompanying brief filed in support of this motion, the Landowners' predecessors in interest conveyed merely easement interests – not fee simple absolute – in these railroad right-of-way deeds.



WHEREFORE, Landowners respectfully request their motion be granted, and that the

Court find each of the railroad right-of-way deeds at issue pertaining to Landowners'

properties conveyed merely easements to the railroad company for its railway line.

RESPECTFULLY SUBMITTED this 3rd day of October, 2006.

By: *John M. Groen / by CPet*
    John M. Groen
    Attorneys for Plaintiffs

By: *Cecilia Fex*
    Cecilia C. Fex
    Attorneys for Plaintiffs

GROEN STEPHENS & KLINGE LLP
11100 NE 8th Street, Suite 750
Bellevue, WA 98004
Telephone (425) 453-6206
Fax (425) 453-6224

ACKERSON KAUFFMAN FEX, P.C.
1250 H Street N.W., Suite 850
Washington, DC 20005
Telephone (202) 833-8833
Fax (202) 833-8831

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BERES, et al.,<br><br>   Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>   Defendant. | ) No. 03-785L, as Related to<br>) **SCHROEDER (No. 04-1456 L)**,<br>) **KLEIN (No. 04-1458L), LANE (No.**<br>) **04-1468L), MANNING (No. 04-**<br>) **1466L), MOREL No. 04-1467L,**<br>) **NELSON (No. 04-1465L),**<br>) **PETERSON (No. 04-1459L), RAY**<br>) **(No. 04-1457L), RITZEN (No. 04-**<br>) **1469L), SPENCER (No. 04-1463L)**<br>) **and COLLINS (No. 04-1472L).**<br>)<br>)<br>) Honorable Marian Blank Horn<br>) |

# PLAINTIFFS' OPENING BRIEF ON MOTION FOR PARTIAL JUDGMENT
## REGARDING FEE/EASEMENT DETERMINATION

John M. Groen
GROEN STEPHENS & KLINGE LLP
11100 NE 8th Street, Suite 750
Bellevue, WA 98004
Telephone (425) 453-6206
Fax (425) 453-6224

Cecilia C. Fex
ACKERSON KAUFFMAN FEX, P.C.
1250 H Street N.W., Ste. 850
Washington, DC 20005
Telephone (202) 833-8833
Fax (202) 833-8831

Attorneys for Plaintiffs

Dated this 3rd day of October, 2006

**Table of Contents**

INTRODUCTION ............................................................................................ 1

HISTORICAL SETTING ............................................................................... 2

I      SEATTLE'S BATTLE WITH NORTHERN PACIFIC TO SECURE A
RAILROAD ............................................................................................ 2

II     THOMAS BURKE, DANIEL GILMAN AND THE SEATTLE, LAKE SHORE
& EASTERN RAILWAY COMPANY ......................................................... 7

III    THE RIGHT OF WAY DEEDS ................................................................ 9

ARGUMENT AND EVIDENCE ................................................................... 10

I      THE PARTIES INTENDED TO CONVEY A MERE EASEMENT ........................... 10

      A.    Any Ambiguities In the Deeds Must Be Construed Against the Railroad ........ 10

            1.    Identical Language in Multiple Deeds Is Evidence of a
Common Author ................................................................................ 11

            2.    The Existence of Pre-Printed Deeds Corroborates that the
Railroad Drafted the Deed Language .................................................. 12

            3.    The Court of Appeals in *Ray v. King County* Stated Several
Assumptions of Fact that Are Not True ............................................... 15

      B.    The Form of the Deed Provides Compelling Evidence that the Intent was
Not to Convey Fee Simple Absolute ..................................................... 17

      C.    The Language of the Granting Clause Presumptively Shows Intent To
Convey An Easement .......................................................................... 20

      D.    The Term "Right of Way" Was Commonly Understood In Seattle In
1887 To Mean An Easement ................................................................. 24

            1.    The Term "Right of Way" Was Commonly Understood In
Seattle In 1887 to Mean An Easement ................................................. 24

            2.    The Common Understanding Of "Right of Way" Was An
Easement ......................................................................................... 25

3.  The Use of the Term "Right of Way" In The Granting Clause of the Subject Deeds Must Also Be Understood As Referring to an Easement ................................................................................... 27

E.  The Burke Deed Is Conclusive Evidence of Intent To Convey An Easement ....................................................................................... 29

F.  The Minimal Consideration Evidences Intent to Convey an Easement ............ 31

G.  A Grant of Fee Title to the Railroad Would Have Risked Forfeiture of George Davis' Homestead Claim .................................................. 31

H.  The Deed By J.D. Reeves in 1904 Conveys Only An Easement ...................... 35

CONCLUSION ................................................................................... 36

**Table of Authorities**

## Cases

*Anderson v. Carkins,*
    135 U.S. 483 (1890) ......................................................................................................... 32

*Brown v. State,*
    130 Wn. 2d. 430 (1996) ............................................................................................... passim

*Biles v. Tacoma,*
    *O & G.H.R. Co.*, 5 Wash. 509 (1893) ................................................................................ 23

*Burmeister v. Howard,*
    1 Wash. Terr. 207 (1867) ................................................................................................... 26

*Corbray v. Stevenson,*
    98 Wn.2d 410 (1982) ......................................................................................................... 27

*Finch v. Matthews,*
    74 Wn.2d 161 (1968) ......................................................................................................... 26

*Great Northern Ry. Co. v. United States,*
    315 U.S. 262 (1942) ........................................................................................................... 33

*Guy Stickney, Inc. v. Underwood,*
    67 Wn.2d 824 (1966) ......................................................................................................... 10

*Hanson Indus., Inc. v. County of Spokane,*
    114 Wn. App. 523 (2002) ....................................................................................... 10, 12, 30

*Harris v. Ski Park Farms,*
    *120 Wn. 2d 727 (1993)* ........................................................................................................ 1

*Hay v. Chehalis Mill Co.,*
    172 Wash. 102 (1933) ........................................................................................................ 30

*Kershaw Sunnyside Ranches v. Yakima Interurban Lines Ass'n,*
    156 Wn.2d 253, 272 n.15 (2006) ....................................................................... 1, 22, 31, 36

*King County v. Squire,*
    59 Wn. App. 888 (1990) (same), *rev. denied,* 116 Wn.2d 1021 (1991) .............................. 23

*Lawson v. Reynolds,*
    28 Pub. Lands Dec. 155 (1899) ......................................................................................... 35

*Mains Farm Homeowners Assoc. v. Worthington,*
    121 Wn.2d 810 (1993) ...................................................................................................... 27

*McKillop v. Crown Zellerbach,*
    46 Wn.App. 870 (1987) .................................................................................................... 27

*Minidoka & Southwestern R.R. Co. v. United States,*
    235 U.S. 211 (1914) .......................................................................................................... 32

*Morsbach v. Thurston County,*
    152 Wash. 562 (1929) ............................................................................................ 20, 21, 22, 23

*Pacific Iron Works v. Bryant Lumber,*
    60 Wash. 502 (1910) ................................................................................................ 23, 29, 30

*Rainier Ave. Corp. v. Seattle,*
    80 Wn.2d 362 (1972) ........................................................................................................ 26

*Ray v. King County,*
    120 Wn. App. 564 (2004) .......................................................................................... 15, 16, 18, 23

*Reichenbach v. Washington Short Line R.R.,*
    101 Wash. 375 (1894) ....................................................................................................... 23

*Ritchie v. Griffiths,*
    1 Wash. 429 (1890) ............................................................................................................ 14

*Robinson v. Missisquoi R. Co.,*
    59 Vt. 426, 10 Atl. 522 ....................................................................................................... 29

*Roeder Co. v. Burlington Northern, Inc.,*
    105 Wn.2d 567 (1986) ................................................................................................. 20, 23

*Rouse v. Glascam Builders, Inc.,*
    101 Wn.2d 127 (1984) ...................................................................................................... 10

*Scott v. Wallitner,*
    49 Wn.2d 161 (1956) ........................................................................................................ 23

*South Perry Townsite v. Reed,*
    28 Pub. Lands Dec. 561 (1899) ......................................................................................... 34

*Swan v. O'Leary*,
  37 Wn.2d 533 (1950) ................................................................................ 20, 21, 22, 23

*Veach v. Culp*,
  92 Wn.2d 570 (1979) .......................................................................................... passim

*Zobrist v. Culp*,
  95 Wn.2d 556 (1981) .................................................................................................. 27

**Statutes**
RCW 64.40.040 .............................................................................................................. 14

**Other Authorities**
Black's Law Dictionary (1st ed. 1891) .................................................................... 27, 28

Black's Law Dictionary (4th ed. 1951) ............................................................................ 30

Cong. Globe, 42d Cong,. 2d Sess,. 1585 (1972) ............................................................ 34

History of King County, by Clarence Bagley published in 1929 ............................................. 18

History of Seattle From the Earliest Settlement to the Present Time, by Clarence B. Bagley .. 2

Laws of 1886, § 3, pp.177-78 ........................................................................................ 17

Seattle City Ordinance No. 804 (Jan. 25, 1887) ....................................................... 25

Seattle City Ordinance No. 806 (Jan. 27, 1887) ....................................................... 25

Session Laws of 1869, page 313 ................................................................................ 14

Thompson on Real Property, § 421 .............................................................................. 21

## INTRODUCTION

At issue are certain deeds by homesteaders conveying a right of way to the Seattle, Lake Shore and Eastern Railway Company. The question is whether these 1887 deeds conveyed fee simple absolute to the railroad, or merely an easement.

To resolve this issue, the Court will need to determine the intent of the parties to the deeds. *Brown v. State*, 130 Wn.2d 430, 437 (1996) ("intent of the parties is of paramount importance"). The court should "construe a deed grant in a manner which gives effect to the intent of the parties." *Harris v. Ski Park Farms*, 120 Wn.2d 727, 739 (1993).

The United States has at times characterized this hearing as a summary judgment proceeding. That is not correct. Summary judgment may be granted only where there is no dispute of fact. The litigants here obviously disagree as to the intent of the parties to the deeds. Accordingly, this Court must make a factual finding regarding intent.

> It is a **factual question** to determine the **intent** of the parties. Then we must apply the rules of law to determine the legal consequences of that intent.

*Veach v. Culp*, 92 Wn.2d 570, 573 (1979) (emphasis added).

To determine intent, the Court will certainly look to the language of the deeds. However, extrinsic evidence of the circumstances surrounding the transfer and subsequent conduct of the parties is also relevant in Washington to determine intent. *Kershaw Sunnyside Ranches v. Yakima Interurban Lines Ass'n*, 156 Wn.2d 253, 272 n.15 (2006).

In this case, the plaintiffs will show that the intent of the railroad and the homesteaders was to convey an easement. This will be established in two ways. **First**, the language of the granting clause specifically, and also the purpose of deed as a whole, shows that the term "right of way" was used as a limitation on the interest conveyed. **Second**, the plaintiffs will

demonstrate through circumstantial evidence that the parties to these deeds intended and understood that the deeds conveyed only a right to locate, construct and operate a railroad through the property.   Such a limited right is the conveyance of an easement, not conveyance of fee title to the land itself.

## HISTORICAL SETTING

It is a rare case that invites the parties to dig into the history of a city and some of its most influential characters.  The construction in 1887-88 of the Seattle, Lake Shore and Eastern Railway (the "Railway") played a crucial role in Seattle's development as a prominent west coast city.  The Railway's chief proponent, Judge Thomas Burke, embodied what became known as the "Seattle Spirit."  But the story of the Railway actually begins about 20 years earlier.

I

## SEATTLE'S BATTLE WITH
## NORTHERN PACIFIC TO SECURE A RAILROAD

The following historical background derives primarily from the 1916 publication called History of Seattle From the Earliest Settlement to the Present Time, by Clarence B. Bagley.  The cited excerpts are found at Joint Appendix (JA) 145.[1]

In his preface, Bagley points out that his work is an "account of events" and is the product of "research and careful investigation."  JA 145 at 25851.[2]  The account is also based on his personal knowledge.  *Id.*

---

[1] JA 145 was submitted by plaintiffs.  The same volume was also submitted by the United States at JA 9.

[2] The form of citation will be to the Joint Appendix number, followed by page references within that exhibit according to the Bates numbers stamped on the individual pages.

A biography of Bagley is found at JA 137, beginning at page 25628. The biographical sketch of Bagley includes the following statement from the Seattle Daily Times, December 1, 1927:

> Mr. Bagley, who has spent all but seventeen years of his long life in this city, is a walking compendium of knowledge of Seattle and Washington. His keen mind has taken note of every change and improvement here since Seattle was a struggling saw mill town.

JA 137 at 25631. The biography next quotes the Journal of Commerce from that same day, stating, "There is perhaps no pioneer better versed in the history of western Washington." *Id.* The concluding paragraph of the biography states:

> All through the years Mr. Bagley has been a collector of data concerning the history of the state and has written perhaps more extensively for publication along historical lines than any other resident of Washington. His opinions are **regarded as authority** upon any question relating to the progress of this state.

JA 137 at 25632 (emphasis added).

The Court is directed to Chapter XIII of Bagley's work, entitled "Railroads," located at JA 145, beginning at page 25868. The Court might be best served by simply reading the first nine pages of this historical account (pages 25868 – 25876). Your undersigned will attempt to draw out the most relevant highlights of that history.

From Seattle's beginning, the early settlers talked of the possibility of a transcontinental railroad having its terminus in Seattle. JA 145 at 25868. In 1864, the Northern Pacific Railroad received a charter to build a line from Lake Superior to the Puget Sound, and the result was to throw the whole region into a state of excitement. *Id.* at 25868. But Seattle would suffer a series of setbacks at the hands of Northern Pacific.

3

> Seattle's first disappointment lay in the refusal of the company
> to build through Snoqualmie Pass, for, had that natural pass for
> a railway been followed, Seattle would have become the
> western terminus without a struggle.

*Id.* at 25869.

A number of towns on Puget Sound all had hopes of being selected as the terminus for

the railroad and each community made its bid.

> This demonstrates the value the towns attached to the coming of
> the railroad, for every citizen was persuaded that the town
> chosen as the terminus would for all time be the great city of
> Puget Sound.

*Id.*

Unfortunately for Seattle, on July 14, 1873, a telegram announced that

Commencement Bay in Tacoma was selected rather than Seattle. *Id.* at 25869 – 70.

> Picture, if you can, the little town clustered around
> Yesler's mill; one day strong in the conviction that its future
> was assured by the coming of a great transcontinental railroad,
> the next cast down by the news that it had lost the prize.  It was
> a stunning blow … Some of the more easily discouraged
> citizens closed their shops and forthwith moved to Tacoma,
> being firmly convinced that any prospect of Seattle developing
> into anything beyond a small mill town had disappeared.
> Among the rest the "Seattle Spirit" was born.

*Id.* at 25870.

Within days, the citizens of Seattle decided that if a railroad would not come to it, they

would build a railroad of their own to the outside world.  *Id.*  The plan was to build the line

through Snoqualmie Pass.  *Id.*  Leading citizens organized a company called the Seattle &

Walla Walla Railroad and issued stock to raise capital.  However, outside help was not

forthcoming.

> By next spring, however, the circle of enthusiasm narrowed
> until nearly all of it was back at the starting point, Seattle, and it
> became apparent that if anything were to be done Seattle must
> do it alone and unassisted. … [T]he people of Seattle were
> undaunted and never for a moment relinquished the idea that the
> town was to have a railroad.

*Id.*

In a remarkable display of fortitude and unity, the people of Seattle decided to actually

build the railroad with their own hands.

> To overcome the lack of capital they decided to do the work
> themselves, and wrote May 1, 1874, in large letters into the
> history of Seattle.
>     On that day the entire population of Seattle moved to
> Steele's landing on the Duwamish River and with their own
> hands commenced to build the road. All day the men and boys
> worked, encouraged at noon with a tremendous meal prepared
> and served by the women, and by night quite a respectable lot of
> grading had been done.

*Id.* at 25870 – 71.

While the "picnic beginning advertised Seattle and stories of her pluck and

determination reached the outside world," the volunteer effort only achieved grading twelve

miles by October. *Id.* at 25871.  Ultimately, fifteen miles of railroad was completed and

provided access to the coal mines in Renton and Newcastle.  *Id.* at 25871 and 25872.

Throughout this effort, the Northern Pacific was set in opposition to Seattle.  The historian

Clarence Bagley explains:

> In every possible way the Northern Pacific did all it could to
> defeat the end Seattle was endeavoring to accomplish and it was
> disheartening work.
> …
> [The Northern Pacific] always had time to make it as
> uncomfortable as possible for Seattle.  Anyone going from this
> city to Portland had to stay over night in Tacoma both going
> and coming, as the Northern Pacific controlled the steamers on
> the Sound and arranged their schedules with a view of forcing

> every possible point, no matter how small, in favor of Tacoma,
> the city owned by the officers of the company.

*Id.* at 25871 – 72.

Some hope came to Seattle in 1881 when Henry Villard became president of the

Northern Pacific.  Villard was considered friendly toward Seattle.  *Id.* at 25872.  He soon

acquired the Seattle & Walla Walla Railroad and then built an extension called the Puget

Sound Shore Line.  The extension ended at Stuck Junction.  From there, a seven-mile spur

line was built to connect with the Northern Pacific terminus in Tacoma.  This was Seattle's

first direct railroad connection with the outside world.  *Id.* at 25872.

Nevertheless, Clarence Bagley points out:

> There was something grimly suggestive in the name Stuck
> Junction, for Seattle's railroad hopes stuck there for many a
> weary year.

*Id.* at 25873.

> In 1884 Villard was forced to retire ... and the [Northern
> Pacific] was again in the hands of Seattle's old enemies.  The
> branch to Stuck Junction was not operated, and it was
> commonly known as the "Orphan Road," for no one seemed to
> own it.

*Id.* Eventually, the Northern Pacific was forced to begin operations of the branch to Stuck

Junction or lose the line to condemnation.  Nevertheless, "the service it provided was

wretched."  *Id.*

> Seattle merchants could secure goods only in carload lots and
> extra charges were made on the slightest pretext.  Trains never
> connected with those on the main line.  Seattle received no
> recognition in the company's literature, and everything which
> had a tendency to injure the city's interests was done by the
> railroad company.

*Id.*

6

Out of this background, the people of Seattle embarked on one more attempt to build a railroad that would provide a connection with the East.

II

## THOMAS BURKE, DANIEL GILMAN AND THE SEATTLE, LAKE SHORE & EASTERN RAILWAY COMPANY

Despite the treatment handed to Seattle by the Northern Pacific, there remained in the mid 1880's a vision for a meaningful railroad connection.

> Still the men with a vision realized that the city must have railroad connection that would mean something, so the advisability of making a fresh start was discussed.

JA 145 at 25873. The two men who would strive to deliver that vision were Judge Thomas Burke and Daniel Gilman. As described by Clarence Bagley:

> In 1883 there came to Seattle Daniel Hunt Gilman, and he was not here long until it developed that he was not only possessed of a vision, but that he also loved a fight for the sake of it, had good connections in the East and believed in Seattle.

*Id.* Regarding Thomas Burke, Bagley wrote:

> Thomas Burke, an attorney, had quickly become prominent after his arrival in 1875, and in every moment for the advancements of the interests of the town his voice was heard and his financial assistance ready.

*Id.*

Seattle, Lake Shore & Eastern Railway was incorporated on April 15, 1885. The incorporators were twelve Seattle men including Judge Thomas Burke, Daniel Gilman, David T. Denny, and G. M. Haller. *Id.* Burke was named as secretary, auditor, and attorney for the railroad. *Id.* G. M. Haller was Burke's partner in the law firm Burke & Haller. JA 137 at 25627.

7

> This was entirely a Seattle enterprise, and it introduces
> into the history of the city several new names, representing
> chiefly what might be termed the second division of the
> pioneers. All of them realized that the only way to bring the
> Northern Pacific to time was to make an aggressive stand, as a
> decade of appealing to that company had gained Seattle
> nothing. It was proposed to obtain all the money in the East and
> to Judge Burke was assigned the duty of going east to assist
> Gilman. The judge found that Gilman had tilled the field well
> ...

JA 145 at 25874.

Coal deposits in Issaquah at the south end of Lake Sammamish and iron deposits near

the summit of Snoqualmie Pass were significant inducements for financing the railroad.

> That transportation was the main problem confronting the coal
> mine operators in King County is shown by the history of the
> Issaquah field. It was from this mine that L. B. Andrews dug
> the first flour sack of really good coal ever brought into Seattle.
> This was in 1863, but it was not until the building of the Seattle,
> Lake Shore & Eastern ... in 1888, that this immense body of
> coal was made available to the market. The Seattle Coal & Iron
> Company was organized in 1887, ... D. H. Gilman was
> president. ... The object of the company was the development
> of the Issaquah Mine, also the iron prospects on the south fork
> of the Snoqualmie River near the summit.

*Id.* at 25863 – 64.

> The first division of the road was to be pushed to Issaquah,
> where a coal deposit had long been known to exist, and its
> development would provide traffic for the road. The $500,000
> [raised from Eastern sources] was expected to take care of that
> much construction. In the future it was planned that a line
> would be built eastward to Spokane to meet any road that came
> from the East, and another line north to Sumas, on the Canadian
> boundary, where the Canadian Pacific Railway would meet it.

*Id.* at 25874.

Having successfully raised the initial capital, one of the next immediate steps was to

acquire the right of way along the proposed route.

III

THE RIGHT OF WAY DEEDS

At this stage in 1887, Thomas Burke was the railroad's most active officer. JA 145 at

page 25875. His law firm (Burke & Haller) represented the railroad company on right of way

acquisitions in 1887. This is evidenced by numerous right of way deeds executed in 1887

where either Thomas Burke or his partner G.M. Haller is identified as a witness to the

grantor's signature. *See, e.g.,* Stipulation of Fact, Exhibits A, C, D, E, and F. Likewise, all of

the right of way deeds in 1887 were recorded at the request of the Burke & Haller law firm.

*Id.*

Included in the Stipulation of Facts are transcriptions of deeds by George Davis, Bill

Sbedzue, Louis Takalthkut, Jim Yonderpump, Alfred Palmberg, and Bill Hilchkanum. These

deeds all contain the identical granting clause. They all were executed in May, 1887, except for

Alfred Palmberg which was executed on June 13, 1887. Each of the grantors was a homesteader

and granted the right of way through their respective lands along the east shoreline of Lake

Sammamish.

The granting clause for each deed states as follows:

> In consideration of the benefits and advantages to accrue to us from
> the **location construction and operation** of the Seattle Lake Shore
> and Eastern Railway in the County of King in Washington territory
> we do hereby donate grant and convey unto said Seattle Lake Shore
> and Eastern Railway Company **a right of way** one hundred (100) feet
> in width **through our lands** in said County. . .

Emphasis added. The next clause describes the location of the right of way, and states:

> **Such right of way** strip to be fifty (50) feet in width on each side of
> the center line of the railway track as located across **our said lands**
> … to wit:

Emphasis added.

9

As stated previously, the precise question is whether this deed language granted the railroad an easement to lay track and operate a railroad through the land, or whether it instead granted the railroad fee simple absolute to the land itself. The evidence will show that the use of the term "right of way" in the granting clause was intended and understood by the parties to be a limitation on the interest conveyed.

## ARGUMENT AND EVIDENCE

### I

### THE PARTIES INTENDED TO CONVEY A MERE EASEMENT

A.    Any Ambiguities In the Deeds Must Be Construed Against the Railroad

Washington law holds that ambiguities in an agreement are construed against the party that drafted the agreement. *Rouse v. Glascam Builders, Inc.*, 101 Wn.2d 127, 135 (1984); *Guy Stickney, Inc. v. Underwood*, 67 Wn.2d 824, 827 (1966). This rule has been expressly applied to a railroad right of way deed. *Hanson Indus., Inc. v. County of Spokane*, 114 Wn. App. 523, 531 (2002). In *Hanson Industries*, the railroad drafted the right of way deed and, therefore, ambiguities were construed against the railroad. *Id.*

All available evidence will show that the Seattle Lake Shore & Eastern Railroad drafted the deeds at issue in this case. Accordingly, any ambiguities in the deed must be construed against the railroad, not the homesteaders.

10

1.     Identical Language in Multiple Deeds Is Evidence of a Common Author

It is undisputed that identical wording is used in the deeds at issue.[3]  A side-by-side comparison of the deeds shows that each deed contains the exact same granting clause. Each deed follows the same format and includes identical provisions.  The only differences between the deeds are the names of the grantors and the specific descriptions of the parcels to which the deeds apply.

A reasonable inference is that identical deeds are likely to have a common author. Indeed, it would truly be an amazing coincidence for six homesteaders, George Davis, Bill Sbedzue, Louis Takhalthkut, Jim Yonderpump, Alfred Palmberg, and Bill Hilchkanum to each write their own deed and, by coincidence, end up with the exact same language.

Such a coincidence is even more unbelievable because there are actually many more deeds that are also identical in form. *See, e.g.,* JA 60 (Right of Way Deed by John McRedmond); JA 68 (Right of Way Deed of Inglebright Wold); JA 164 (Right of Way Deed of Joe Ferris); JA 167 (Right of Way Deed of John Perry); JA 168 (Right of Way Deed of W.W. Perrigo); JA 169 (Right of Way Deed of John Ladlenken); JA 171 (Right of Way Deed of Ernest Schwarz); JA 174 (Right of Way Deed of Lars Wold).  Again, a side-by-side comparison of these deeds shows in each instance the identical conveyance of a right of way to the Seattle Lake Shore & Eastern Railway in 1887.  The granting clause and form of these deeds match the six deeds at issue in this case.

---

[3] This court previously conducted a comparison of the deeds and concluded as follows: "The plaintiffs allege, and this court's independent review affirms, that the relevant portions of the right-of-way deeds for each of the plaintiffs contain identical language." Order, Certification to State Supreme Court; Railroad Right-of-Way; Easement versus Fee Simple, June 23, 2005.

In fact, there are dozens more deeds that are all identical to the deeds at issue in this case. Your undersigned simply selected the above referenced deeds as examples to cite because these are the more legible copies.

The reasonable inference is that these numerous identical deeds could **not** have been separately drafted. They must have been drafted by a common author. The obvious answer is that the railroad company, as the common party to all the deeds, was the source of the deed language.

This conclusion makes sense because it was the railroad that was seeking to acquire these deeds. The railroad, not the homesteader, was the party who had a reason to draft a deed to be used for its acquisition of the right of way. Common sense and efficiency would cause the railroad to draft a deed to be used generally in its pursuit of the right of way.

This conclusion is supported by *Hanson Industries*. In that case, the Court of Appeals agreed that where **only three** railroad right of way deeds were identical in language, the railroad was clearly the common drafter of the deeds.

> [T]he three deeds at issue here are virtually indistinguishable and were clearly prepared by the railroad, not by the grantors. The wording is identical, except for the details of monetary consideration and property descriptions.

*Hanson Indus.*, 114 Wn. App. at 531. The same conclusion is warranted here.

2.   The Existence of Pre-Printed Deeds Corroborates that the Railroad Drafted the Deed Language

Additional compelling evidence corroborates that the railroad was the drafter of the right of way deeds. At JA 97, there is a copy of a **pre-printed** form of a right of way deed. A review of the document shows that this deed was executed by George Davis and Elizabeth Davis, his

12

wife, on May 6, 1887. Three days later, on May 9, 1887, the deed was recorded with the King County Auditor, Lyman Wood. JA 97 at 23610.

This **printed** deed is **identical** in language to the **handwritten version** of the George Davis deed photocopied from the King County Auditor's office. A copy of the handwritten version is also located at JA 97 at pages 23611 – 612, but a more readable copy is at JA 163. The Court should compare the printed deed and the handwritten version side by side. The Court will see that the text is identical.

The Court will also notice that the pre-printed deed has blanks to be filled in. The apparent purpose of the blanks was so that the deed could be used as a form that could easily accommodate the name of the specific individual grantor and also identify the specific property through which the right of way would be granted.

In contrast to the blank spaces for filling in the grantor's name, the name of the railroad, *Seattle Lake Shore and Eastern Railway Company*, is pre-printed in italics (see clause near the bottom of the deed referencing removal of dangerous trees). Likewise, the pre-printed caption of the deed has a blank space for the grantor, but the grantee is identified by the pre-printed initials "S., L. S. and E. R'Y CO." which obviously stands for the Seattle, Lake Shore and Eastern Railway Company.

The question must be raised, why is there a pre-printed version and a handwritten version of the same deed? The answer is that the handwritten version is merely the King County Auditor's handwritten copy of the original deed. In 1887, King County did not have photocopy machines. All documents brought for recording had to be copied into the books by hand. This procedure for recording was spelled out in the Territorial laws in effect at that time.

13

> Sec. 18.  The auditor of each county in this territory shall record
> in a fair and legible hand-writing, in books to be by him provided
> for that purpose, at the expense of the county, all deeds,
> mortgages and other instruments of writing required by law to be
> recorded ...

*Ritchie v. Griffiths*, 1 Wash. 429, 436 (1890) (quoting Session Laws of 1869, page 313).  Of

course, the statute was eventually amended to acknowledge that modern copying equipment may

now be used "in lieu of transcription" for the recording of instruments.  RCW 64.40.040.

The United States has agreed that the versions of the deeds from the King County

Auditor's Office are not the original deeds.  They are just the hand copied versions transcribed

into the bound volumes when the originals were presented to the Auditor for recording.

Stipulation of Facts.

As further corroborating evidence, the Court is directed to JA 74 at pages 20942 - 43.

This is a copy of another pre-printed deed.  This one is for homesteader Alfred Palmberg,

another one of the subject deeds at issue.  As with George Davis' deed, the King County Auditor

has a hand copied version of the Palmberg deed which is reproduced at JA 16, and a more

readable, larger print version at JA 143.

The Court will again see that the Palmberg deed in pre-printed form is exactly the same

form as that used for the George Davis deed.  And in both cases, the King County Auditor has

transcribed by hand a version for purposes of recording.

The reasonable inference is that the Seattle, Lake Shore & Eastern created these printed

forms to be used by the railroad representative when requesting a right of way from the various

homesteaders.  Accordingly, this evidence strongly corroborates that the railroad drafted these

deeds.

14

In short, the evidence points to the conclusion that the railroad used the pre-printed form when securing the signatures of the homesteaders. King County staff in the Auditor's office then hand copied those deeds for the County records. This explains why the deeds are all identical. This also would have been the most efficient way for the railroad to proceed in attempting to secure rights of way from numerous homesteaders.

3.   The Court of Appeals in *Ray v. King County* Stated Several Assumptions of Fact that Are Not True

There are several key assumptions of fact made by the Court of Appeals in *Ray v. King County*, 120 Wn. App. 564 (2004) that are not correct. For example, the Court of Appeals states "The Hilchkanum deed is entirely handwritten." *Ray*, 120 Wn. App. at 571. The Court of Appeals then asserts that the deed was written by a person named B.J. Tallman. The Court stated:

> [E]xamination of the deed shows that it is entirely handwritten, apparently by the same person. Both the language of the main part of the deed, as well as the acknowledgment, is in the handwriting of the notary who acknowledged the signatures of the Hilchkanums, B.J. Tallman. Nothing in the record indicates he was the agent of the Railway.

*Ray*, 120 Wn. App. at 586.

From this misunderstanding of the facts, the Court of Appeals concluded that it would construe ambiguities in the deed against Hilchkanum, rather than against the railroad.

This Court should immediately notice that there are no citations to the record as the basis for these assumptions of fact. These so-called facts were simply assertions by the Court of Appeals with no supporting evidence other than its own conjecture.

Of course, as explained above, in 1887 the King County Auditor's office hand copied all deeds into the books for recording. There simply was no other way to make a copy of the

15

original for recording. That is why the Hilchkanum deed reviewed in *Ray v. King County* was "entirely handwritten."

The Court of Appeals in *Ray* next leaps to the remarkable conclusion that the deed from the King County Auditor's Office is in the handwriting of B.J. Tallman. There is no evidence to support that conclusion. Rather, the above evidence and discussion shows that the handwriting is that of either Lyman Wood (the County Auditor) or a staff member. *See also* JA 21 at 20224 (Hilchkanum deed).

The Court of Appeals also implied that B.J. Tallman was the agent of Hilchkanum. Again, there is no evidence to support that assumption.

In contrast, substantial evidence shows that B.J. Tallman worked for Burke & Haller, the attorneys for the railroad. First, the grant of a right of way was to the railroad. It was therefore in the interest of the railroad to make sure that the grantor's signature was notarized so that the deed would be legally defensible. Accordingly, it would make sense for the railroad, not the homesteader, to arrange for the presence of a notary.

Second, the evidence shows that B.J. Tallman did other notary work for the Burke & Haller law firm. The Court is directed to JA 69. These are copies of a Washington Territorial District court case file derived from Washington State Archives. *Id.* The case was a lawsuit against the Seattle Lake Shore and Eastern Railway Company. Within JA 69, at page 20898, there is a typed affidavit by John Scurry dated July 27, 1887, and notarized by B.J. Tallman. The second page shows that this affidavit was filed by Burke & Haller. The same pattern is seen on **five more** affidavits within JA 69 at pages 20904 – 20915, all notarized by B.J. Tallman and all filed by Burke & Haller.

16

Third, B.J. Tallman was the notary on many more right of way deeds than just Hilchkanum's deed. *See, e.g.,* JA 60, JA 68, JA 169, JA 174 and *see also* Stipulation of Fact, Exhibits A, B, C, D, E, and F.  This repeated use of B.J. Tallman as the notary supports the inference that he was employed by the common party to these deeds, *i.e.,* the railroad.  In contrast, the United States will offer no evidence that B.J. Tallman was hired by the homesteaders.

In summary, the only reasonable inference from numerous pieces of circumstantial evidence is that the railroad is the party that drafted the right of way deeds.  B.J. Tallman was often used by the railroad to notarize the signatures on the deeds, but he did not draft the deeds and he was not the agent of the homesteaders.

The Court is urged to enter a **finding of fact** that the railroad drafted the deeds at issue. Accordingly, applying Washington law to that finding of fact, the Court should construe any ambiguities in the deeds against the railroad, not the homesteaders.

B.    The Form of the Deed Provides Compelling Evidence that the Intent was Not to Convey Fee Simple Absolute

In 1887, Washington territorial law provided that a deed in the statutory warranty form was "deemed to convey fee simple title." *Brown v. State*, 130 Wn.2d at 437, n.2 (citing Laws of 1886, § 3, pp. 177-78).

The Court in *Brown* explained the benefits of using this warranty form of deed.

> The statutory form alleviated drafting and interpretation problems
> manifest under the prior system, especially in cases like this where the
> parties to the deeds are deceased...

*Brown*, 130 Wn.2d at 437 n.2.

Significantly, the deeds at issue here are **not** in the warranty form. This is evident because the granting clause in the right of way deed does not "convey and **warrant** … the following described real estate." *See id.* (providing the warranty form of deed).

Even the Court of Appeals in *Ray* recognized that the granting clause of the Hilchkanum deed was not in the warranty form. *Ray*, 120 Wn. App. at 575-76 ("their deed is not substantially in the form of either a statutory warranty deed or a bargain and sale deed").

Unfortunately, the Court of Appeals in *Ray* quickly dismissed this fact without any discussion of its impact. *Id* at 576. Plaintiffs here will take the evidence and analysis a step further.

First, as already established, Thomas Burke was the attorney for the railroad in 1887. Accordingly, it was his responsibility to review and approve legal documents. It is also known that Burke and his law firm was directly involved in the acquisition of the right of way along the proposed route. *See, e.g.,* JA 74 at page 20942 (Burke signature as witness to the Palmberg deed).

The evidence shows that Burke was a very sharp lawyer. Joint Appendix 137 is a copy of a volume authored by Clarence Bagley entitled History of King County, published in 1929. A biography of Thomas Burke is provided at JA 137 beginning at page 25605. At page 25608, the historian Clarence Bagley writes:

> It was not long before he [Burke] had given demonstration of his
> ability to cope with intricate and complex problems of law and
> within a comparatively brief period he had come to recognized as
> one of the strongest members of the Seattle bar.

JA 137 at 25608. Bagley continued: "his clients numbered many of the leading corporations and business firms of the city." *Id.*

> In 1889 he accepted an appointment as chief justice of the
> Washington supreme court … and measured up to the fullest
> requirements of the office, taking his place among the eminent
> jurists of the northwest.

*Id.* Bagley described Thomas Burke as having a "profound knowledge of the law" and a "keen

and analytical mind. *Id.* at page 25609.

As an accomplished attorney active in real estate, Burke certainly was aware of the law

providing that use of the warranty deed was deemed to convey fee simple title. Indeed, in his

own personal transactions, Burke had used the warranty deed to convey fee title. *See, e.g.,* JA

150. This evidence is sufficient to infer that Burke knew the benefits of utilizing the statutory

form.

As the attorney for the railroad, Burke had a responsibility to draft a deed that met the

intent of the railroad. For example, if the intent was to acquire fee simple title from the

homesteaders, Burke should have drafted a deed that clearly conveyed fee title. Use of the

warranty deed would have been a significant step to accomplish that intent.

However, Burke decided not to utilize a warranty deed for the right of way

acquisitions. Because Burke must have known the benefits of the warranty deed, the

deliberate choice not to use a warranty deed is strong evidence that Burke, as representative

for the railroad, did not intend to acquire fee simple title for the railroad.

This conclusion is also corroborated by Burke's public statement regarding what the

railroad sought from the landowners. The December 25, 1886, edition of the Seattle Daily

Post Intelligencer reported on an excursion led by Thomas Burke to show investors the area

along the Lake Sammamish where the future train would run. Burke was quoted as stating:

19

> These people are here asking no donation at our hands.  All they
> ask is a **right to lay their track** …

JA 133 at page 25594 (middle column, second paragraph) (emphasis added).

The Burke quote captures the reality that the railroad was not seeking to acquire

everybody's land in fee along the proposed route.  Rather, it was merely seeking a "right."

Burke's public statement was consistent with an intent to acquire a mere easement, *i.e.* a right

to pass through the property.  This statement is also consistent with a choice to deviate from

the warranty form of deed.

C.   The Language of the Granting Clause Presumptively Shows Intent To Convey An
     Easement

The granting clause for each deed states as follows:

> In consideration of the benefits and advantages to accrue to us from
> the **location construction and operation** of the Seattle Lake Shore
> and Eastern Railway in the County of King in Washington territory
> we do hereby donate grant and convey unto said Seattle Lake Shore
> and Eastern Railway Company **a right of way** one hundred (100) feet
> in width **through our lands** in said County.  . .

Stipulation of Fact, Exhibits A – F (emphasis added).

A long line of Washington cases hold that, *when used in the granting clause*, the

conveyance of a "right of way" is construed as limiting the property interest conveyed to a

mere easement.  The Supreme Court affirmed this rule is *Brown v. State*, 130 Wn.2d 430.

*Brown* cited with approval *Morsbach v. Thurston County*, 152 Wash. 562 (1929), *Swan v.*

*O'Leary*, 37 Wn.2d 533 (1950), *Veach v. Culp*, 92 Wn.2d 570 (1979), and *Roeder Co. v.*

*Burlington Northern, Inc.*, 105 Wn.2d 567 (1986).

> These cases are consistent with the majority of cases that hold the use
> of the term "right of way" as a limitation or to specify the purpose of
> the grant generally creates only an easement.

*Brown*, 130 Wn.2d at 439.  In *Morsbach*, the rule was established as follows:

20

> [I]t is elementary that, in cases where the **granting clause** of a deed
> declares the purpose of a grant to be a **right of way** for a railroad, the
> deed passes an easement only, not a fee.

*Morsbach*, 152 Wash. at 565 *citing* 1 Thompson on Real Property, § 421 (emphasis added).

This statement is recognized as a controlling rule.

> [I]t is clear that we **adopted the rule** that when the **granting clause**
> of a deed declares the purpose of the grant to be a **right of way** for a
> railroad the deed passes an easement only.

*Swan,* 37 Wn.2d at 537 (emphasis added).

The homesteaders' deeds in this case expressly meet this rule. The granting clause

limited the conveyance to a "right of way" for the "location, construction and operation" of the

railroad. The granting clause could not have been any clearer in setting forth its purpose and

intent to convey a "right of way" for a railroad line. Under the established rule, this deed passes

only an easement, not fee title.

In comparison, the language in the *Morsbach* deed stated:

> ...do by these presents give, grant, bargain, sell and convey unto said
> Northern Pacific Company, or its assigns, the following described
> premises, viz.: The **right of way** for the construction of said
> company's railroad in and over the south half of ...

*Morsbach*, 152 Wash. at 564 (emphasis added). Just as this language in *Morsbach* was held to

convey a mere easement, so also the language of the present deeds conveying a "right of way"

for "location construction and operation" of a railroad must be construed under the established

rule as conveying an easement.

Further comparison is found in *Veach v. Culp,* 92 Wn.2d 570. In *Veach*, the granting

clause was in the form of a quit claim deed ("remise, release and forever quit claim") and also

indicated that a "parcel of land" was being conveyed. The deed stated:

> Do by these presents **remise, release and forever quit claim** unto
> said party of the second part, and to its assigns, all that certain lot,
> piece, or parcel **of land** situate in Whatcom County ... to-wit: A

21

> **right of way** one hundred feet wide, being fifty feet on each side of
> the centerline.

*Veach*, 92 Wn.2d at 572 (emphasis added). This deed raises some ambiguity because it is in the

form of a quit claim deed and includes language purporting to convey a parcel "of land."

Nevertheless, the Washington Supreme Court concluded that the reference to "right of way" in

the granting clause meant only an easement was conveyed.

> Given the language of the deed explicitly describing the conveyance
> of a right of way and given the rule of *Swan v. O'Leary* and
> *Morsbach v. Thurston County*, we conclude the deed conveyed an
> easement, not fee title.

*Veach*, 92 Wn.2d at 574. The deeds here do not have the ambiguities contained in the *Veach*

deed and thus present an even more compelling case for conveyance of a mere easement, rather

than fee title to the land.

Most recently, the Washington Supreme Court again affirmed that the term "right of

way" when used in the granting clause presumptively operates to define the purpose of the

grant as a mere easement. In *Kershaw Sunnyside Ranches*, the deed conveyed "a strip of land

… to be used by said party of the second part as a right of way for a railway …" 156 Wn.2d at

257.

> Here, the 1905 deed states that the conveyance is "to be used by
> [the North Yakima & Valley Railway Company] *as a right of
> way for a railway*." Like the cases finding an easement, and
> unlike the deeds in *Brown*, the word "right of way" is used to
> establish the purpose of the grant and thus **presumptively**
> conveys an easement interest.

*Id.* at 266 (italics by the Court) (bold added). The same is true in the present case. The term

"right of way" in the granting clause is used to establish the purpose of the grant. The

purpose is not to convey land; it is to convey a right of way.

> The use of the "right of way" language to describe the purpose
> of the conveyance evinces an intent to convey an easement.

22

*Id.* at 267.

In contrast, the granting clause to the Seattle, Lake Shore & Eastern does not purport to convey real estate, or a parcel of land, or a strip of land. It purports by express terms to convey a right of way for the location, construction and operation of a railroad. This deed language presumptively shows an intent to convey an easement, not fee simple title to the land itself.

The application of Washington law is straightforward. With the exception of *Ray v. King County*, every Washington case, including *Brown*, follows the same approach. In each Washington case where the **granting clause** purported to convey a "strip of land" or "tract of land," the deed was held to convey fee simple title. *Scott v. Wallitner*, 49 Wn.2d 161, 163 (1956) (granting clause conveyed "strip of land fifty feet in width"); *Roeder Co. v. K & E Moving & Storage Co., Inc.*, 102 Wn. App. 49, 51 (2000) ("tract of land fifty (50) feet wide").

Conversely, in each Washington case where an easement has been found, the granting clause of the pertinent deed purported to convey a "right" or "right of way." *Biles v. Tacoma, O & G.H.R. Co.*, 5 Wash. 509 (1893), *Reichenbach v. Washington Short Line R.R.*, 101 Wash. 375 (1894) (granting clause referred to "right of way"); *Pacific Iron Works v. Bryant Lumber & Shingle Mill Co.*, 60 Wash. 502, 505 (1910) (same); *Morsbach v. Thurston County*, 152 Wash. 562, 564 (1929) (same); *Swan v. O'Leary*, 37 Wn.2d 533, 534 (1950) (same); *Veach v. Culp*, 92 Wn.2d 570, 572 (1979) (same); *Roeder Co. v. Burlington Northern, Inc.*, 105 Wn.2d 567, 572 (1986) (same); *King County v. Squire*, 59 Wn. App. 888, 890 (1990) (same), *rev. denied*, 116 Wn.2d 1021 (1991).

23

D.    The Term "Right of Way" Was Commonly Understood In Seattle In 1887 To Mean An Easement

The evidence will show that the term "right of way" was commonly used in the Seattle area in 1887. The evidence will also show that it was generally understood that granting a "right of way" was not the grant of fee title, but was merely a grant of a right to pass through the property, *i.e.* an easement.

1.    The Term "Right of Way" Was Commonly Used

A daily newspaper is written to communicate to the public generally. The paper will use the common language of the day. Various newspaper articles from the relevant 1887 time period demonstrate that the term "right of way" was in common usage.

Joint Appendix 121 is a copy of an article from the Seattle Post Intelligencer, dated March 6, 1887. At Bates jump page 25537, in the left hand column, there is an article called "Railroad Talk" discussing the beginning of construction of the Seattle, Lake Shore and Eastern. The article continues on the next page (25538) with a reference to Capt. Carr who had taken a contract on a portion of the construction. Approximately two-thirds down the column in this interview is this sentence: "They now have 75 men at work and have cleared the **right of way** for half a mile." JA 121 at page 25538 (emphasis added).

Joint Appendix 119 is a copy of an editorial from the Seattle Post Intelligencer dated January 22, 1887. The article discusses "Railroad Avenue" which was established by the City to provide a right of way along the Seattle waterfront for the Seattle, Lake Shore and Eastern. More discussion on this Railroad Avenue will come later. For purposes here, it is enough to point out that in the second full paragraph of the editorial, the term "right of way" is used twice. JA 119 at page 25525.

24

Joint Appendix 131 is another Seattle P.I. article, dated January 26, 1887. The fourth page of JA 131 (25585) has an enlarged close up of a section of the paper to ease readability. The middle column uses the heading "Right Of Way Matters." Under that heading, the term "right of way" is used five times, once in each of the succeeding paragraphs.

In none of these articles is the term "right of way" explained as to its meaning. The newspaper writer is simply using the term as though the reader understands its normal meaning. In short, the evidence shows that the term "right of way" was commonly used in Seattle in 1887.

2.   The Common Understanding Of "Right of Way" Was An Easement

In January of 1887, Judge Burke and the Seattle, Lake Shore and Eastern needed to secure a right of way along the Seattle waterfront at Elliott's Bay. The solution was to pass a City ordinance creating Railroad Avenue. *See generally,* JA 145 at page 25876.

The first step creating Railroad Avenue was accomplished by passage of Ordinance No. 804 on January 25, 1887. A copy of that Ordinance is located at JA 69 at page 20900 (Seattle P.I., January 28, 1887).

> An ordinance to lay off and establish a **public street** along the shore and over land covered by waters of Elliott's Bay, extending from the north boundary line of the City of Seattle to Columbia Street, in said city, to be known and called **Railroad Avenue**.

*Id.* (emphasis added).

The next step was for the City to grant the Seattle, Lake Shore and Eastern a 30 foot wide right of way within the 120 foot width of Railroad Avenue. This was accomplished by Ordinance No. 806, passed on January 27, 1887. A copy of that ordinance is at JA 128 and also at JA 129.

> An Ordinance granting to the Seattle, Lake Shore and Eastern Railway Company, its successors and assigns, **the right and authority** to locate, lay down, construct, maintain and operate a

Railway, consisting of one or more tracks in, along, upon, and over certain public streets and alleys of the City of Seattle.

JA 129 (emphasis added).

Significantly, the terms of the Ordinance are limited to granting a "right" to the railroad. For example, Section 1 reiterates the preamble granting the "right and authority" to lay down track and operate a railroad. *Id.* Section 3 states that the "rights herein granted …are upon the following conditions, …". Section 5 provides that other railroads "shall have the right to common use of said tracks over said right of way." Most significantly, Section 9 provides that if the railroad does not comply with the conditions of the Ordinance, the City Council may "declare by ordinance the forfeiture of all **rights** herein granted." *Id.* (emphasis added).

These terms indicate that the City was granting to the railroad a right to pass through the public street known as Railroad Avenue. Most importantly, this **right** could only be an **easement**. The reason is because in creating the public street—Railroad Avenue—the City did not acquire fee title to the land. *The City's interest in Railroad Avenue was only an easement.* Therefore, only an easement, not fee title, is all that could be granted to the Seattle, Lake Shore and Eastern. Washington law on this point is conclusive.

> Since *Burmeister v. Howard*, 1 Wash. Terr. 207 (1867), this court has not departed from the rule established in that case, that the fee in a public street or highway remains in the owner of the abutting land, and the public acquires only the right of passage, with powers and privileges necessarily implied in the grant of the easement.

*Rainier Ave. Corp. v. Seattle*, 80 Wn.2d 362, 366 (1972) (*quoting Finch v. Matthews*, 74 Wn.2d 161, 167 (1968)).

With that understanding, another review of Ordinance 806 reveals that in a variety of places, the City Ordinance itself refers to the right granted as being a "right of way." For

26

example, in the middle column at JA 129, the phrase "said right of way" is used several times. Again, at the top of the third column, the ordinance refers to "the right of way herein granted." Not surprisingly, the newspaper report on the passage of the ordinance also repeatedly refers to the right of way as the appropriate term to describe the grant.  JA 131 at page 25585.

In other words, while the City could only lawfully grant an easement, the City and the public considered the grant to be properly referred to as a grant of a right of way.  This evidence demonstrates that in 1887, in Seattle, the common and ordinary use of the term "right of way" was understood to mean the right to pass through the property, *i.e.* an easement.

3.   The Use of the Term "Right of Way" In The Granting Clause of the Subject Deeds Must Also Be Understood As Referring to an Easement

In construing the intent of the parties, words should be given their ordinary meaning. *Corbray v. Stevenson*, 98 Wn.2d 410, 415 (1982), *McKillop v. Crown Zellerbach*, 46 Wn. App. 870, 873 (1987).

The above evidence shows that the ordinary meaning of the term "right of way" in Seattle was an easement.  However, the ordinary meaning of words can also be found by reference to dictionary definitions.  "We usually divine the ordinary meaning of words by resort to dictionary definitions." *Mains Farm Homeowners Assoc. v. Worthington*, 121 Wn.2d 810, 829 (1993) (Durham, C.J. dissenting). *See, e.g., Corbray*, 98 Wn.2d at 415 (utilizing Black's Law Dictionary to provide ordinary meaning of term).

A dictionary definition contemporaneous to the time of the deeds in 1887 is most relevant. *See Zobrist v. Culp*, 95 Wn.2d 556, 560 (1981) (review circumstances "at the time of the grant").  Accordingly, the First Edition of Black's Law Dictionary, published in 1891, just 4 years after the subject deeds were signed, is particularly instructive.  That work provides the following definition:

27

> RIGHT OF WAY. The right of passage or of a way **is a servitude** imposed by law or by convention, and by virtue of which one has **a right to pass** on foot, or horseback, or in a vehicle, to drive beasts of burden or carts, **through the estate of another**.

Black's Law Dictionary p.1046 (1st ed.1891) (emphasis added) (copy provided at JA 180).

Accordingly, the ordinary meaning was that the term "right of way" described a right of passage,

a servitude, allowing one person to pass through the estate of another.

Black's Law Dictionary further clarified that the generally accepted meaning was a

"mere easement" and not fee simple, *even in a reference to a railway*:

> "Right of way," in its strict meaning, is the right of passage over another man's ground; and in its **legal** and **generally accepted meaning**, in reference to a railway, it **is a mere easement** in the lands of others, obtained by lawful condemnation to public use or by purchase. It would be using the term in an unusual sense, by applying it to an absolute purchase of the fee simple of lands to be used for a railway or any other kind of way.

*Id.* (emphasis added).

Accordingly, while railroads might at times purchase land in fee, and subsequently refer

to such lands as a right of way, the use of the term in this sense is unusual. In contrast, the

generally accepted meaning according to Black's Law Dictionary, and as used commonly in

Seattle in 1887, was that the term meant an easement, even with respect to a railroad right of

way.

Under these surrounding circumstances, there is sufficient evidence to conclude that in

the granting clauses of the subject deeds, the term "right of way" was intended to conform to the

ordinary meaning and thereby serve as a limitation on the right conveyed so that only an

easement was granted.

E.    The Burke Deed Is Conclusive Evidence of Intent To Convey An Easement

On September 6, 1887, the railroad promoter Thomas Burke also happened to convey

a "Right of Way Deed" to the Seattle, Lake Shore & Eastern Railway. JA 153. This right of

way was granted across property Burke and his wife owned along the shore of Lake Union.

The operative terms of the granting clause of Burke's deed are **identical** to the deeds at issue

here. *Compare* JA 153 to Stipulation of Facts, Exhibits A, B, C, D, E, and F.

Significantly, the Washington Supreme Court in *Pacific Iron Works*, 60 Wash. at 505

held that Burke's deed conveyed an "easement and nothing more." *Id.* at 506.

> [W]hen the instrument is construed as a whole and **in light of the**
> **purpose for which the grant was made**, it is a grant of a right of
> way or easement and nothing more.

*Id.* (emphasis added). The Court recognized that the clear purpose of the conveyance was the

grant of a right of way. Of course, that purpose must have been identical to the deeds at issue

here since these deeds used the **exact same words** in the granting clause to convey a "right of

way." As highlighted in *Pacific Iron Works*:

> The grant of a **right of way** to a railroad company is the grant of an
> easement merely and the fee of the soil remains in the grantor.

*Id.* at 506 (emphasis added) (quoting 14 Cyc. 1162; *Robinson v. Missisquoi R. Co.*, 59 Vt.

426, 10 Atl. 522).

The United States may argue that the Burke deed is different with respect to the

habendum clause. The United States may point out that Thomas Burke's deed included an

insertion to the habendum clause that "if it should cease to be used for a railway the said

premises shall revert to said grantors, their heirs, executors, administrators or assigns."

*Pacific Iron Works*, 60 Wash. at 505; *see also* JA 153.

29

As will be shown, this clarifying statement merely confirmed that the intent of the granting clause was to convey a mere easement.

The Court must understand the function of the "habendum clause." The habendum clause appears at the end of a deed and clarifies the "extent of the ownership" in the thing granted. Black's Law Dictionary, 838 (4th ed.1951). Significantly, the habendum clause cannot alter or contradict the interest that was conveyed by the granting clause, but may explain, clarify, or qualify the estate conveyed. *Id. See also Hay v. Chehalis Mill Co.*, 172 Wash. 102, 108 (1933) ("wording of habendum clause must give way to the manifest intention clearly expressed by the terms of the deed as a whole"). A habendum clause does not override the intent of the granting clause. *Hanson Indus.*, 114 Wn. App. at 532.

Accordingly, the insertion of additional language by Burke into his habendum clause does not operate to change the interest conveyed by the granting clause. Rather, the additional language clarifies Burkes' intent (and the railroad's intent) that if the railroad should cease, "the said premises shall revert to said grantors." This additional language in Burke's deed conclusively shows that Burke knew that the granting clause conveyed only an easement.

*Pacific Iron Works* conclusively establishes that Burke's deed conveyed an easement and nothing more. Since the same granting clause, for the same railroad, at the same time, is before this Court in the deeds at issue, the same conclusion should also be found. Moreover, even apart from the precedential value of *Pacific Iron Works*, Burke's conveyance with the clarification in the habendum clause that the right of way will revert if the railway ceases is undisputable evidence that Burke intended the deed to convey only an easement. When that evidence is combined with the choice to not utilize the statutory warranty form of deed, there is a compelling

30

basis to render a factual finding that the parties intended to convey a mere easement and not fee simple title.

F.    The Minimal Consideration Evidences Intent to Convey an Easement

The consideration for granting the deeds at issue was the location, construction and operation of the railroad through the subject property. No money was provided as consideration. This is shown by the recitation on the face of the deed, and also by the notations in the Seattle Post Intelligencer of the recorded deeds. Joint Appendix 193 is the Seattle P.I. dated May 10, 1887. On the second page of that exhibit, in the middle column, there is a section entitled "Real Estate." This lists a number of recorded real estate transactions and the dollar value of the transaction.

For Bill Hilchkanum, Louie Takhalthkut, Jim Yonderpump, and George Davis, the entries state the conveyance to the Seattle Lake Shore & Eastern for a right of way and no dollar value for the transaction is listed. This evidence is consistent with the face of the deed which does not state a monetary consideration. The reasonable inference is that no money was paid by the railroad for the right of way.

In *Kershaw Sunnyside Ranch*, the monetary consideration was $1,000. 156 Wn.2d at 257. Although the Court held that the deed granted an easement, the Court recognized that this was a substantial sum and therefore this factor favored finding a fee was conveyed. *Id*. at 268. Of course, the opposite conclusion must be rendered here where no monetary consideration was provided. This factor supports the inference of an easement.

G.    A Grant of Fee Title to the Railroad Would Have Risked Forfeiture of George Davis' Homestead Claim

When George Davis conveyed the right of way in 1887, he had not yet received a patent to his homestead claim. Significantly, any attempt to convey fee title to the yet unpatented

31

homestead claim would have worked a forfeiture of Davis' entire homestead claim. Under these circumstances, it is untenable to believe that Davis intended to jeopardize his homestead by illegally granting the railroad fee title to a portion of his claim. The following will explain.

The facts show that Davis conveyed a "right of way" by deed in May of 1887. At that time, Davis had not received the patent to his claim. In 1892, in providing his homestead proof to receive his patent, Davis signed an affidavit stating that he had not previously conveyed any portion of his claim. JA 77 at 20962.

The policy of the homestead laws was to provide exclusive benefit to the homesteader. *Anderson v. Carkins*, 135 U.S. 483, 487 (1890). Accordingly, the homesteaders were prohibited from alienating any part of the claim prior to receiving the patent.

> [T]he policy of the act of Congress granting homesteads on public lands ... is adverse to the right of a party availing himself of it to convey, or agree to convey, **the land**, before he receives the **patent** therefore.

*Id.* at 489 (emphasis added).

This prohibition on alienation created a problem for railroads seeking to build new lines in the expanding western states.

> [S]ettlers **without patent** were *not in a position to make deeds to rights of way* ... The consequence was that . . .it was practically impossible to construct railroads through territory which consisted partly of public lands and partly of that which was in possession of settlers.

*Minidoka & Southwestern R.R. Co. v. United States*, 235 U.S. 211, 215-16 (1914) (citations omitted) (emphasis added). Congress recognized this problem and therefore, in 1873, provided a legislative fix.

> [I]n order to meet this difficulty, Congress, on March 3, 1873, passed an act providing that any bona fide settler might convey ... 'part of

32

> his claim for church, school, and cemetery purposes and for right of
> way for railroads.'

*Id.* at 216 (quoting Rev. Stat. § 2288) (emphasis added).

Because George Davis had not yet received his patent, it is pursuant to this statutory

authority (Rev. Stat. § 2288) that he was able to convey a right of way to the railroad.

The question then arises whether Congress intended this authority allowing unpatented

homesteaders to convey a "right of way for railroads" to mean an easement, or to mean fee title

to the railroads. Fortunately, the Supreme Court has provided clear guidance.

In *Great Northern Ry. Co. v. United States*, 315 U.S. 262 (1942) the Court reviewed

whether a right of way through public lands established pursuant to the General Railroad Right

of Way Act of 1875 was a mere easement or a fee title. In addressing this issue, the Court

explained the purpose of Congress under the Act of 1875 was "to permit the construction of

railroads through public lands." *Id.* at 272. The Court further reasoned:

> The achievement of that purpose does not compel a construction of
> the right of way grant as conveying a fee title to the land . . . a railroad
> may be operated though its right of way be but an easement.

*Id.* The Court ultimately held the "Act of March 3, 1875, from which petitioner's rights stem,

clearly grants only an easement, and not a fee." *Id.* at 271.

In reaching this conclusion, the Supreme Court explained that in 1872 the prior policy of

lavish grants to railroads had come under criticism and the policy shifted in favor of public lands

to homesteaders.

> Beginning in 1850 Congress embarked on a policy of subsidizing
> railroad construction by lavish grants from the public domain. This
> policy incurred great public disfavor which was crystallized in the
> following resolution adopted by the House of Representatives on
> March 11, 1872: 'Resolved, that . . . granting subsidies in public
> lands to railroads and other corporations ought to be discontinued,
> and that every consideration of public policy and equal justice to the

33

> whole people requires that the public lands should be held for the
> purpose of securing homesteads to actual settler . . .

*Id.* at 273, (quoting Cong. Globe, 42d Cong,. 2d Sess,. 1585 (1972)   In following this

Congressional policy, the Supreme Court reasoned:

> Since it was a product of the sharp change in Congressional policy
> with respect to railroad grants after 1871, it is **improbable** that
> Congress intended by it to grant more than a right of passage.

315 U.S. at 275 (emphasis added).

Significantly, it is equally improbable that Congress in 1873, shortly after adopting the

House Resolution, would have intended the new authorization allowing homesteaders without a

patent to convey a "right of way for railroads" to mean anything more than a right of passage.

As stated in the House Resolution, "every consideration of public policy ... should be held for

the purpose of securing homesteads." The only interpretation of this authorization under § 2288

that is consistent with Congressional policy after 1871, and consistent with the Act of 1875, is

for the same term in 1873 to be similarly interpreted as referring to an easement only.

This conclusion is confirmed by the Department of Interior which issued a Public Lands

Decision that is directly on point. In *South Perry Townsite v. Reed*, 28 Pub. Lands Dec. 561

(1899), the agency considered whether an unpatented homesteader's grant to a railroad of a right

of way for stock yards was a prohibited alienation of land. The deed language stated: "as and for

a right of way upon which to construct and maintain stock yards." *Id.* at 561. The Department

ruled:

> The words "for the right of way of railroads," as used in section 2288
> of the Revised Statutes, are not limited to the width of the track and
> cars, but include such space as is necessary for side tracks, stock
> yards, or other purpose incident to the proper business of a railroad as
> a common carrier.

34

> The deed in this case provides for the **reversion of the land to Reed**
> should the railroad cease to use it for the purpose for which the
> purchase was made. The deed does not vitiate Reed's entry.

28 Pub. Lands Dec. at 562 (emphasis added). Accordingly, while the activities allowed within

the "right of way" are broad and include stock yards, the decision clearly requires the right of

way to **not be** conveyed as **fee title** but must be a right of way where reversionary rights are held

by the underlying owner—*i.e.* a mere easement. *See also, Lawson v. Reynolds*, 28 Pub. Lands

Dec. 155, 159-60 (1899) (grant of an easement is no bar to consummation of homestead entry).

Clearly, the federal statutory authority for George Davis to convey a right of way was

limited to allowing conveyance of an easement. Conveyance of a fee estate was a prohibited

alienation that would have jeopardized his entry on the land as a homesteader. Obviously, as

a homesteader, George Davis would never have intended to lose his claim by conveying a fee

title to the railroad. These circumstances show that Davis must have intended to convey a

mere easement, a right of way, as that term was commonly understood.

H.    The Deed By J.D. Reeves in 1904 Conveys Only An Easement

One final deed must be separately discussed. The 1904 deed by J.D. Reeves to the

Northern Pacific Railway Company is very different from the other subject deeds. This deed

is transcribed at Exhibit G to the Stipulation of Facts.

The primary factor that shows the intent was to convey a right of way for a railroad is

the express language contained in the second full paragraph of that deed. Specifically, the

deed states:

> ... the **intention** being to convey herein a **right of way** fifty feet
> on each side of said track through any lots or blocks ...

Stipulation of Facts, Exhibit G (emphasis added).

Under Washington law directing that the Court is to give effect to the intent of the parties, and given the decision in *Kershaw Sunnyside Ranches*, the conclusion must be that this deed conveys an easement. There can be no doubt that *the purpose*, the *intent*, was to convey a right of way to the railroad. The express language uses the term "right of way" to establish the purpose of the grant. Under *Kershaw Sunnyside Ranches*, this shows the intent to convey an easement.

> The use of the "right of way" language to describe the *purpose* of the conveyance evinces an intent to convey an easement.

*Kershaw Sunnyside Ranches*, 156 Wn.2d at 267 (italics in original).

Since the deed expressly states the intent, there is no need for the analysis to go further. The Court should make a finding that the parties intended to convey a right of way and, applying the law in *Kershaw Sunnyside Ranches*, thereby conclude that an easement was conveyed.

## CONCLUSION

The plaintiffs have shown that the intent of the railroad and the homesteaders was to convey an easement. The language of the granting clause specifically, and also the purpose of deed as a whole, shows that the term "right of way" was used as a limitation on the interest conveyed. Circumstantial evidence further corroborates that the parties to these deeds intended and understood that the deeds conveyed only a right to locate, construct and operate a railroad through the properties. Such a limited right is the conveyance of an easement, not conveyance of fee title to the land itself. To the extent there is any remaining ambiguity, the deed must be construed against the railroad because it drafted the deeds. Accordingly, the

plaintiffs respectfully request that the Court enter findings of fact and conclusion of law granting plaintiffs' motion for partial judgment on the fee/easement determination.

RESPECTFULLY SUBMITTED this 3rd day of October, 2006.

By:  *John M. Groen / by CFex*
John M. Groen
Attorneys for Plaintiffs

GROEN STEPHENS & KLINGE LLP
11100 NE 8th Street, Suite 750
Bellevue, WA 98004
Telephone (425) 453-6206
Fax (425) 453-6224

By:  _____
Cecilia C. Fex
Attorneys for Plaintiffs

ACKERSON KAUFFMAN FEX, P.C.
1250 H Street N.W., Ste. 850
Washington, DC 20005
Telephone (202) 833-8833
Fax (202) 833-8831

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 3rd day of October, 2006, Plaintiffs'

Motion and Opening Brief on Motion for Partial Judgment Regarding Fee/Easement

Determination was served upon the following party by First Class Mail and electronically:

Bruce Trauben
**United States Department Of Justice**
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, DC 20044-0663


Cecilia Fex