JA Ex. 221

For Opinion See 62 S.Ct. 529

U.S., 2006.

Supreme Court of the United States.
GREAT NORTHERN RAILWAY
COMPANY, a corporation, petitioner,
v.
United States of America.
No. 149.
October Term, 1941.
January 5, 1942.

On Writ of Certiorari to the United
States Circuit Court of Appeals for
the Ninth Circuit

Brief for the United States

**\*I** INDEX

Opinions below ... 1

Jurisdiction ... 1

Question presented ... 2

Statutes involved ... 2

Statement ... 2

Summary of argument ... 4

Argument

 I The right of way granted by the
act of March 3 1875, is in the na-
ture of an casement ... 8

 A The language of the 1875 Act
shows that only an easement was
granted ... 10

 B The legislative background and
history of the 1875 Act show that
the grant was of an casement rather
than a fee ... 15

 C Subsequent administrative and
congressional construction confirm
that only an casement was granted
... 20

 D Summary ... 29

 II Even if the right of was is a li-
mited fee it does not follow that the
railroad owns the minerals ... 35

Conclusion ... 38

Appendix ... 39

CITATIONS

Cases

Barden v. Northern Pacific Railroad
154 U. S. 288 ... 12

Blake v. Rich 34 N. H. 282 ... 34

Branson v. Studabaker 133 Ind 117
... 36

Brewster v. Gage 280 U. S. 327 ...
6, 21

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Caldwell v. United States* 250 U. S. 14 ... 5, 8, 12

*Charles River Bridge v. Warren Bridge,* 11 Pet 420 ... 12

*Choctaw, O & G R R Co. v. Mackey* 256 U. S. 531 ... 34

*Cooper v. Roberts* IS How 173 ... 31

*Cope v. Cope* 137 U. S. 682 ... 26

*East Alabama Railroad Company v. Doe* 111 U S 310 ... 34

*Fawcus Machine Co. v. United States* 282 U. S. 375 ... 21, 25

*Hall v. Boston & Maine Railroad* 211 Mass 174 ... 14

*Hall v. Turner* 110 N. C. 292 ... 36

*Hartley v. Commissioner* 295 U. S. 216 ... 25

*Hazen v. Boston and Maine Railroad* 2 Gray 574 ... 34

*Helvering v. Halloch* 309 U. S. 106 ... 25

**\*II** *Jordan v. Goldman,* 1 Okla 406 ... 8, 37

*Keown v. Brandon,* 206 Ky. 93 ... 14

*Kern River Co v. United States,* 257 U. S. 147 ... 35

*McCaughn v. Hershey Chocolate Co,*

283 U. S. 488 ... 26

*McFadden v. Mountain View Min & Mill. Co,* 97 Fed. 670 ... 7, 21, 26

*Magnolia Petroleum Co. v. Thompson,* 106 F. (2d) 217, reversed on other grounds, 309 U. S. 478 ... 14, 15

*Massachusetts Mutual Life Ins Co. v. United States,* 288 U. S. 269 ... 26

*Melder v. White,* 28 L. D. 412 ... 23

*Minidoka & S. W. R. Co. v. Weymouth,* 19 Idaho 234 ... 15

*Nadeau v. Union Pacific R. R. Co,* 253 U. S. 442 ... 13

*National Lead Co. v. United States,* 252 U. S. 140 ... 26

*Nellis v. Munson,* 108 N. Y. 453 ... 36

*New Mexico v. United States Trust Co,* 172 U. S. 171 ... 37

*Noble v. Oklahoma City,* 297 U. S. 481 ... 34

*Northern Pacific Railway v. Soderberg,* 188 U. S. 526 ... 7, 29, 31

*Northern Pacific Ry. v. Townsend,* 190 U. S. 267 ... 16, 22

*Norwegian Nitrogen Co. v. United States,* 288 U. S. 294 ... 21, 25

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Quick v. Taylor,* 113 Ind 540 ... 14

Railroad *Co. v. Schmuck,* 69 Kan 272 ... 14

*Oswald v. Wolf,* 126 Ill 542 ... 36

*Railway Co. v. Alling,* 99 U. S. 463 ... 33

*Rio Grande Ry v. Stringham,* 239 U. S. 44 ... 5, 7, 25, 29, 30, 31, 35

*Rio Grande Ry v. Stringham,* 38 Utah 113 ... 32

*Rio Grande Ry v. Stringham,* 39 Utah 236 ... 33

*Roberts v. Sioux City & P. R. Co,* 73 Nebr. 8 ... 14

*Sioux City &c Railroad v. United States,* 159 U. S. 349 ... 12

*Smith v. Townsend,* 148 U. S. 490 ... 15, 33

*Swendig v. Washington Co,* 265 U. S. 322 ... 21

*Taggart v. Great Northern Ry Co,* 208 Fed 455, affirmed 211 Fed 288 ... 21, 28

*Tiger v. Western Investment Co,* 221 U. S. 286 ... 7, 25

*Union Missionary Baptist Church v. Fyke,* 179 Okla 102 ... 8, 37

*United States v. Big Horn Land &*

*Cattle Co,* 17 F 2d 357 ... 35

*United States v. Denver &c Railway,* 150 U. S. 1 ... 13, 15

*United States v. Freeman,* 3 How 556 ... 7, 26

*United States v. Johnston,* 124 U. S. 236 ... 6, 21

*United States v. Minidoka & S. W. R. Co,* 190 Fed 491 ... 12

*United States v. Moore,* 95 U. S. 760 ... 6, 21

*United States v. Sweet,* 245 U. S. 563 ... 31

*United States v. Union Pacific R. R. Co,* 91 U. S. 72 ... 15

*Washington Cemetery v. P. P. & C. I. R. R. Co,* 68 N. Y. 591 ... 14

*Western Union Tel Co. v. Pennsylvania R. R,* 195 U. S. 540 ... 8, 37

*Winona & St Peter R. R. Co. v. Barney,* 113 U. S. 618 ... 15

*Wisconsin Central R'd v. United States,* 164 U. S. 190 ... 12

*Work v. Louisiana,* 269 U. S. 250 ... 31

**III** Statutes

Act of September 20, 1850, c 61 9 Stat 166 ... 15

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Act of July 2, 1864, c. 217, 13 Stat. 365 ... 16

Act of April 12, 1872, c 96, 17 Stat 52 ... 18

Act of May 23, 1872 c 205 17 Stat 159 ... 18

Act of May 27, 1872, c 220, 17 Stat 162 ... 18

Act of June 1, 1872

c 258, 17 Stat 202 ... 18, 20

c 261, 17 Stat 212 ... 18

Act of June 4, 1872, c 293, 17 Stat 224 ... 18

Act of June 7, 1872, c 323 17 Stat 280 ... 18

Act of June 8, 1872

c 354, 17 Stat 339 ... 19, 33

c 359, 17 Stat 340 ... 19

c 364, 17 Stat 343 ... 19, 20

Act of June 10, 1872, c 437, 17 Stat 393 ... 19

Act of March 3, 1873, c 291, 17 Stat 612 ... 19

Act of June 20, 1874, c 348 18 Stat 130 ... 19

Act of June 23, 1874 c 473 18 Stat 274 ... 19

Act of February 5 1875, c 35 18 Stat 306 ... 19

Act of March 3, 1875 c 152 18 Stat 482 ... 2, 3, 4, 10, 29, 39

Act of July 4 1884 c 179 23 Stat 73 ... 24, 33

Act of March 3 1891 c 561 26 Stat 1101 ... 22, 25

Act of March 6, 1896 c 12 29 Stat 41 ... 25

Act of June 26 1906

c 3548 34 Stat 481 ... 27

c 3550 34 Stat 482 ... 7, 26

Act of February 25 1909 c 191 35 Stat 647 ... 7, 27

Act of May 21 1930 c 307 46 Stat 373 ... 3, 28

Lands decisions

4 L. D. 523 (1884) ... 23

4 L. D. 525 (1886) ... 24

8 L. D. 115 (1889) ... 23

14 L. D. 105 (1892) ... 25

19 L. D. 386 (1894) ... 23

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1942 WL 54245 (U.S.)                                              Page 5

19 L. D. 588 (1894) ... 6, 23

20 L. D. 131 (1895) ... 6, 23

23 L. D. 67 (1896) ... 23

27 L. D. 430 (1898) ... 23

28 L. D. 412 (1899) ... 24

29 L. D. 478 (1900) ... 23

32 L. D. 33 (1903) ... 6, 23

32 L. D. 311 (1903) ... 24

35 L. D. 495 (1907) ... 24, 25

44 L. D. 552 (1916) ... 23

45 L. D. 473 (1916) ... 25

46 L. D. 429 (1918) ... 23

51 L. D. 27 305 (1925) ... 25

*IV 51 L. D. 131 (1925) ... 25

51 L D 604 (1926) ... 25

53 L. D. 270 (1931) ... 25

53 L. D. 339, 340 (1931) ... 25

56 L D 206 (1937) ... 3, 9

Miscellaneous

Bogart, *Economic History of the United States* (3d ed 1918) p 351 ... 17

Circular Instructions of March 9, 1878, 5 Copp's Land-Owner 35 (1878) ... 24

Circular Instructions of November 7, 1879, 6 Copp's Land-Owner 141 (1879) ... 24

Circular Instructions of August 29, 1885, 4 L D 150 ... 14

Circular Instructions of June 27, 1900, 30 L D 325 ... 22

Cong globe, 38th Cong, 1st sess 1698 (1864) ... 16

Cong Globe, 42d Cong, 2d sess 1585 (1872) ... 5, 17

Cong Globe, 42d Cong, 2d sess 1591 (1872) ... 18

Cong Globe, 42d Cong, 2d sess 2137 (1872) ... 12

Cong Globe, 42d Cong, 2d sess 2138 (1872) ... 20

Cong Globe, 42d Cong, 2d sess 2543, 4162 (1872) ... 18, 20

Cong Globe, 42d Cong, 2d sess 3913 (1872) ... 20

Cong Globe, 42d Cong, 2d sess 4134 (1872) ... 20

2 Cong Rec, pt 3, p 2898 (1874) ... 19

3 Cong Rec, pt 1, p 404 (1875) ...

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

18, 20

3 Cong Rec, pt 1, p 407 (1875) ... 5, 19

H Rept No 10, 43d Cong, 2d sess (1874) p 1 (Ser No 1656) ... 17

H Rept No 4777, 59th Cong, 1st sess (1906) p 2 (Ser No 4908) ... 28

Jones, *Easements* (1898) sec 16 ... 36

"Land Grants," 9 Encyclopacdia of the Social Sciences (1933), p 35 ... 17

"Land Grants to Railways," 3 Dictionary of American History (1940), p. 237 ... 16

Right of Way Regulations of January 13, 1888, 12 L D 423 ... 6, 21

Right of Way Regulations of March 21, 1892, 14 L D 338 ... 6, 22

Right of Way Regulations of November 4, 1898, 27 L D 663 ... 6, 22

Right of Way Regulations of February 11, 1904, 32 L D. 481 ... 6, 22

Right of Way Regulations of May 21, 1909, 37 L D 787 ... 6, 22

Sen Rept No 1417, 59th Cong, 1st sess (1906) p 2 (Ser. No 4904) ... 28

2 Tiffany, *Real Property* (2d ed 1920), p 1228 ... 36

1 Washburn, *Real Property* (6th ed. 1902), sec 146 ... 36

**\*1** OPINIONS BELOW

The opinion of the District Court (R. 60-76) is reported in 32 F. Supp. 651. The opinions of the Circuit Court of Appeals (R. 120-155) are reported in 119 F. (2d) 821

JURISDICTION

The judgment of the Circuit Court of Appeals was entered on May 8, 1941 (R. 156). The petition for a writ of certiorari was filed on June 9, 1941, and granted on October 13, 1941 (R. 159) The jurisdiction of this Court rests on Section 240 (a) of the Judicial Code, as amended by the Act of February 13, 1925.

QUESTION PRESENTED

Whether a railroad company has any right, title, or interest in the minerals underlying those portions of its right of way acquired under Section 1 of the Act of March 3, 1875, c. 152, 18 Stat. 482, 43 U. S. C. sec. 934.

STATUTES INVOLVED

The Right of Way Act of March 3, 1875, c. 152, 18 Stat. 482, 43 U. S. C. sees. 934-939, is printed as an appendix, pp. 39-41, *infra*. The provisions of other statutes, as far as relevant, are set out in the argu-

ment.

## STATEMENT

This is a suit instituted by the United States on March 23, 1939, to enjoin the Great Northern Railway Company[FN1] from drilling for or removing gas, oil, and other minerals underlying those portions of its right-of-way acquired under Section 1 of the Act of March 3, 1875, c. 152, 18 Stat. 482 (R. 2-7).

> FN1. Hereinafter sometimes referred to as the Railroad.

The facts alleged by the United States (R. 3-7) and admitted by the Railroad (R. 7-8) are as follows: The Great Northern Railway Company is a railroad corporation, organized under the laws of Minnesota (R. 3). In 1907 the Railroad acquired from the St. Paul, Minneapolis and Manitoba Railway all of the latter's property, including rights-of-way which it had been granted under the **\*3** Act of March 3, 1875 (R. 3-4) The complaint further alleged that under the Act of March 3, 1875, the Railroad acquired neither the right to use any portion of the right-of-way for the purpose of drilling for and removing subsurface oil and minerals, nor any right, title, or interest in or to the deposits underlying the right-of-way, but that the oils and minerals remained the property of the United States (R. 4-5), and that although no lease had been issued to the Railroad under the Act of May

21, 1930 (46 Stat 373), the Railroad claimed ownership of the oils and minerals underlying its right-of-way, and threatened to use the right-of-way to drill for and remove subsurface oil (R. 5).

In its answer the Railroad admitted the allegations of fact, claimed ownership of the subsurface minerals, and affirmatively stated that it proposed to drill three separate oil wells (R 7-10)[FN2] The oil from well number one was to be sold commercially: the oil from number two was to be refined, the more volatile portions to be sold and the residue used on its locomotives, and the oil from number three was to be used in its entirety by the Railroad as fuel oil (R. 9).

> FN2. In 1937 the Railroad had requested the Department of the Interior for an opinion in respect of its rights in the minerals underlying its right of way. That Department concluded that under the granting Act of March 3, 1875, the Railroad acquired "neither the right to use any portion of its right of way for the purpose of drilling for and removing subsurface oil nor any title or interest in or to such oil 56 I D 206, 214 (1937).

**\*4** On June 2, 1939, the United States filed a motion for judgment on the pleadings (R. 10).

The District Court on April 25,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1940, rendered an opinion holding that the 1875 Act did not convey the minerals to the Railroad (R. 60-76). On July 25, 1940, the court entered a final judgment enjoining the Great Northern Railway Company from drilling for or removing the oil, gas, and other minerals underlying its right of way (R. 99-101).

On appeal by the Railroad (R. 101), the court below, with Judge Wilbur dissenting, affirmed the judgment of the district court (R. 156).

SUMMARY OF ARGUMENT

I

A. An examination of the language of the 1875 Act shows that only an easement was granted. Section 1 refers to "the" right of way; Section 2 refers to "use and occupancy"; and Section 4 requires the location of each right of way to be noted on the plats in the local land office, and provides that "thereafter all such lands *over* which such right of way shall pass shall be disposed of *subject to* such right of way."[FN3] As the court below remarked (R. 129), "Apter words to indicate the intent to convey an easement would be difficult to find." Since "nothing passes but what is conveyed in clear and explicit language-- inferences being resolved not against but for the Government." it seems patent that the 1875 Act did not convey to the railroads the underlying minerals for fuel or other purposes *Caldwell*

*v. United States*, 250 U. S. 14, 20-21.

FN3. Italics are ours throughout this brief.

B. That the 1875 Act granted to the railroads an easement rather than a fee is further confirmed by the legislative background and history of the Act. The policy of granting land subsidies to the railroads was discontinued in 1871. "Land Grants." 9 Encyclopedia of the Social Sciences (1933). p. 35. Thereafter, the grants were restricted to a mere right of passage across the public domain, a right which could be acquired in no other way while large blocks of lands were held by a sovereign immune from suit. This shift in policy was formally crystallized by congressional resolution in 1872. House Resolution of March 11, 1872, Cong. Globe, 42d Cong., 2d sess., 1585. And the debates preceding the enactment of the 1875 Act show clearly that the grant in the Act was consonant with the new policy of strict limitation and of granting easements rather than fees Cf. 3 Cong. Rec. pt. 1, p. 407 (1875).

C. Both the subsequent administrative and legislative construction of the 1875 Act reinforce the conclusion that only an easement was granted

1. Until this Court uttered a contrary dictum in *Rio Grande Ry. v. Stringham*, 239 U. S. 44 (1915), the administrative officers of the Gov-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ernment consistently construed the 1875 Act as granting an easement rather than a fee. For example, the first general right of way circular of January 13, 1888 (12 L. D. 423, 428) expressly declared that "the Act of March 3, 1875, is not in the nature of a grant of lands; *it does not convey an estate in fee* * * * It is a *right of use* only, the *title* still remaining in the United States." Essentially similar statements are to be found in the railroad right of way regulations of March 21, 1892 (14 L. D. 338, 342), November 4, 1898 (27 L. D. 663, 664), February 11, 1904 (32 L. D. 481, 482-483), and May 21, 1909 (37 L. D. 787, 788). The contemporaneous decisions of the Land Department likewise refer to the 1875 grant as a "mere easement" (19 L. D. 588, 590), as "an incorporeal hereditament, an easement and not the land" (20 L. D. 131, 132), as "in the nature of a mere easement" (32 L. D. 33, 34). And, as this Court has said on more than one accasion, "the contemporaneous construction of a statute by those charged with its execution, especially when it has long prevailed, is entitled to great weight, and should not be disregarded or overturned except for cogent reasons, and unless it be clear that such construction is erroneous." *United States v. Johnston*, 124 U. S. 236, 253; *United States v. Moore*, 95 U. S. 760, 763; *Brewster v. Gage*, 280 U. S. 327, 336.

2. Congress, too, has construed the 1875 Act as granting an easement rather than a fee. For example the Acts of June 26, 1906. ?? 3550, 34 Stat 482, and February 25. 1909, ?? 191, 35 Stat 647, declaring a forfeiture of unused rights of way, state that the lands covered thereby shall be "freed and discharged from such easement" Such clear-cut legislative pronouncements on the meaning of the 1875 Act are aids to the construction of that Act. *Tiger v. Western Investment Co.* 221 U. S. 286, 309. *United States v. Freeman,* 3 How 556, 564-565; *McFadden v. Mountain View Min & Mill Co,* 97 Fed 670 677 (C. C. A. 9, 1899): *Northern Pacific Railway v. Soderberg.* 188 U. S. 526, 533-534.

D. Because of the distinctive language in the 1875 Act, and also because of the sharp change in congressional policy in 1871, cases construing grants made prior to 1871 as vesting a fee in the railroads are without force These important differences between the 1875 Act and the earlier land grant acts were not called to this Court's attention in *Rio Grande Ry. v. Stringham,* 239 U. S. 44 (1915), a case in which the Government and private owners were not represented Hence, the statement there made, by way of dictum, that the railroads have a "limited fee" in rights of way acquired under the 1875 Act should be reexammed A repudiation of that dictum by a decision holding that the 1875 Act grants the railroads an casement rather than a fee will nor

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

disturb land titles; it will merely restore a rule of property which existed between 1875 and 1915, the period during which most of these rights of way were acquired.

II

But even if it be determined that the Railroad has a "limited fee" in its right of way, it does not necessarily follow that such a "fee" includes the right to extract oil and other minerals. The purposes of Congress are accomplished if the grant is held to be a "fee" in the surface and so much of the subsurface as is necessary for support--a "fee" for a railroad thoroughfare exclusively. Cf. *Western Union Tel. Co. v. Pennsylvania R. R.,* 195 U. S. 540, 570. Since such an interest would accomplish the purposes of Congress, this is the largest interest which the applicable rules of construction will permit to pass under the Act. *Caldwell v. United States,* 250 U. S. 14, 20-21. Under such a construction the railroad is restricted in the use of the land except as a railroad thoroughfare. The right to use and extract minerals is a use of the land not permitted to the railroad. Cf. *Union Missionary Baptist Church v. Fyke,* 179 Okla. 102; *Jordan v. Goldman,* 1 Okla. 406, 453.

ARGUMENT

I

THE RIGHT OF WAY GRANTED BY

THE ACT OF MARCH 3, 1875, IS IN THE NATURE OF AN EASEMENT

*Introduction.*--The present suit was instituted by the Government in order to obtain a determination**\*9** of the nature and scope of the grant made by the Act of March 3, 1875. Until recently, the question whether the 1875 Act conveyed an absolute fee, a limited fee, or simply a surface easement was not of great practical consequence, since under any of the theories the Railroad's control of the surface was complete, and only the surface rights were of importance. But with the recent discovery of oil in Glacier County, Montana, close to the Railroad's right of way, the more precise nature and scope of the 1875 grant has become a matter of considerable importance not only to the Great Northern and other railroads with similar grants, but also to the Government and other owners of land adjacent to the railroad rights of way.

To resolve the question, the Railroad, in 1937, requested the Department of the Interior for an opinion respecting its rights to the minerals underlying its right of way. The Department concluded that the Act of March 3, 1875, conveyed no right to use the right of way in order to drill and remove subsurface oil and title or interest in such oil. 56 I. D. 206, 214 (1937). The Railroad, however, declared its intention to commence drilling operations notwithstanding the decision (R. 5), and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

reasserted its claim and intention in its answer to the Government's complaint (R. 9). With the Government's allegations of fact admitted by the Railroad (R. 7-10), the motion for judgment on the pleadings (R. 10) **\*10** thus presented the single question of law whether the Right of Way Act of March 3, 1875, granted to the Railroad the subsurface minerals.[FN4]

> FN4. Many legal subdivisions crossed by railroad rights of way have since been patented to homesteaders, stock-raisers, and miners. This fact suggests an additional question whether these subsequent patentees have not thereby succeeded to the mineral rights of the Government in the lands thus patented But inasmuch as the United States still owns thousands of acres of unpatented land along the Great Northern and other railroad rights of way, it is in a position to litigate the scope of the 1875 Act without raising at this time the legal effect of particular patents in specific cases (R. 134-136) It may be said in passing that the solution to the question whether the Government's mineral rights in particular parcels have passed to individual patentees will depend on the language of the statute under which the patent was issued, on the classification of the land at the time the patent was issued, and on the nature of the interest which this Court ultimately decides was granted to the railroads under the 1875 Act.

A. *The language of the 1875 Act shows that only an easement was granted.*-- Section 1 of the Act does not grant "a" right of way. It grants "the" right of way through the public lands of the United States. This language, while not conclusive, would seem to indicate that Congress intended to grant the incorporeal "right" to lay tracks across the public domain and not a corporeal "strip of land." That Congress was granting the railroads the right to use and occupy the public lands, and not the lands themselves, is further evidenced by the language of Section 2, which declares that any railroad whose right of **\*11** way passes through a canyon, pass, or defile, "shall not prevent any other railroad company from the *use and occupancy* of the said canyon, pass, or defile, for the purposes of its road, *in common* with the road first located" In other words, the Act confers a right of "use and occupancy" which in some instances must be shared "in common" with other railroads.

Finally, and significantly. Section 4 requires the location of each right of way to be noted on the plats in the local land office, and "thereafter all such lands *over* which such right of way shall pass shall be disposed of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*subject to* such right of way." To construe the right of way grant as a fee in the land would be to rob this provision of all meaning. It surely would have been novel, as well as wholly unnecessary, for Congress, after it granted a fee, to declare that the adjacent lands are to be conveyed "subject to" the prior grant in fee As the court below pointed out, apter words to indicate an intent to convey an easement would be difficult to find (R. 129).

That this was, in fact, the precise intent of Section 4 is clear. Congressman Slater, in discussing the reason why the Public Lands Committee had inserted a similar clause in a special right of way bill under consideration in 1872, said:
Mr. SLATER The point [of this clause] is simply this, the land over which this right of way passes is to be sold subject to the right of way It simply provides that **\*12** this right of way *shall be an incumbrance upon the land for one hundred feet* upon each side of the line of the road; that those who may afterward make locations for settlement shall not interfere with this right of way.
Mr. SPEER of Pennsylvania. It grants no land to any railroad company?
Mr. SLATER. No, sir.[FN5]

FN5. Cong. Globe, 42d Cong., 2d Sess., 2137 (1872).

The 1875 Act becomes a harmonious whole if Section 1 be construed as conferring on the railroads an easement; to construe it as granting a fee would be to deprive this provision of Section 4 of all meaningful content.

Even were the words of the Act of 1875 less clear, it is well settled that any ambiguity in a grant is to be resolved in favor of the sovereign grantor.[FN6] This rule is applicable to the 1875 Act. *Caldwell v. United States, 250 U. S. 14, 20-21; United States v. Minidoka & S. W. R. Co., 190 Fed. 491, 494 (C. C. A. 9, 1911).* In the *Caldwell* case, the appellants contended that the 1875 grant of timber for railroad construction included the refuse or tie slash from felled trees. In rejecting that interpretation, this Court said (pp. 20-21):

FN6. *Barden v. Northern Pacific Railroad, 154 U. S. 288, 326; Sioux City &c. Railroad v. United States, 159 U. S. 349, 360; Wisconsin Central R'd v. United States, 164 U. S. 190, 202; Charles River Bridge v. Warren Bridge, 11 Pet. 420, 545-546.*

**\*13** The contention of appellants encounters the rule that statutes granting privileges or relinquishing rights are to be strictly construed: or to express the rule more directly, that such grants must be construed favorably to the Government and that *nothing passes but what is conveyed in clear and explicit language-inferences being resolved not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

against but for the Government. *Wisconsin Central R. R. Co. v. United States*, 164 U. S. 190. *United States v. Oregon & California R. R. Co*, 164 U. S. 526 * * *
The rule, it seems to us. is particularly applicable There was a grant of timber by the Act of March 3, 1875, not of trees, but of timber for purposes of railroad construction, *not as a means of business or of profit;* nor could it be made an element, as contended, of compensation to the agents employed to cut it.

If the timber grant in the 1875 Act does not include tie slash, there seems to be no reason why the right of way grant should be construed to include subsurface minerals The rule of "liberal construction" for which petitioner contends (Pet 23-25) is applicable only when necessary to carry out the *purposes* of the Act Cf. *United States v. Denver &c. Railway*, 150 U. S. 1, 14. *Nadeau v. Union Pacific R. R. Co.,* 253 U. S. 442, 444 Plainly, in an act designed to permit railroads to lay their tracks across the public lands of the United States, it is not necessary to construe a right of way grant as **\*14** including fuel oil for railroad locomotives (cf. Pet. 43-44).[FN7]

>   FN7. Cf. Circular Instructions of August 29, 1885, 4 L. D. 150, 151, stating that "no public timber is permitted to be taken or used [under the 1875 Act] for *fuel* by any railroad company." And, of course, Congress could hardly have intended in 1875 to give oil to the railroads since oil as locomotive fuel was then unknown.

Nor can it be argued that railroads, in order to operate efficiently, must have a fee in their rights of way. Petitioner conceded in its brief in the court below (p. 61) that railroads, when they condemn land for rights of way, "do not acquire mineral rights or full fee ownership." If the railroads do not need a fee in those portions of their rights of way acquired by eminent domain proceedings, and the courts have so held,[FN8] the need for a fee in those portions of their right of way acquired under the 1875 Act is no more compelling. Hence, it scarcely can be said that the *purpose* of the 1875 grant will be frustrated if it be construed as conveying an easement rather than a fee. This will merely give to the grant the same meaning which is commonly given to deeds conveying a right of way for railroad purposes.[FN8a]

>   FN8. E. g. *Quick v. Taylor,* 113 Ind. 540, 542 (1887); *Railroad Co. v. Schmuck,* 69 Kan. 272, 276-277 (1904); *Keown v. Brandon,* 206 Ky. 93 (1924); *Hall v. Boston & Maine Railroad,* 211 Mass. 174, 176 (1912); *Roberts v. Sioux City & P. R. Co.,* 73 Nebr. 8, 14 (1905); *Washington Cemetery v. P. P. & C. I. R. R. Co.,* 68 N.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Y. 591 (1877).

FN8a. The weight of authority supports the view that railroads acquire only an easement and not a fee where the granting clause of the deed declares the purpose of the grant to be a right of way for a railroad. See *Magnolia Petroleum Co v. Thompson,* 106 F. (2d) 217, 227 (C. C. A. 8), and cases there cited reversed on other grounds 809 U. S. 478.

**\*15** B. *The legislative background and history of the 1875 Act show that the grant was of an easement rather than a fee.--*

1. The year 1871 marks the end of one era and the beginning of a new in American land-grant history In that year the policy of lavish grants of land to encourage railroad construction was replaced by a new policy of severe restriction of federal munificence in respect of railroads. It is in the light of this shift that the Act of 1875 must be read, for it is well recognized that railroad grants "are to receive such a construction as will carry out the intent of Congress." and to ascertain that intent courts "must look to the condition of the country when the acts were passed." *Winona & St. Peter R. R. Co. v. Barney,* 113 U. S. 618, 625; *United States v. Denver &c Railway,* 150 U. S. 1, 14. *Minidoka & S. W. R. Co. v. Weymouth,* 19 Idaho 234 (1911). "Courts, in construing a statute, may with propriety recur to the his-

tory of the times when it was passed" *United States v. Union Pacific R. R. Co,* 91 U. S. 72, 79: *Smith v. Townsend,* 148 U. S. 490, 494

That there was a marked change in land-grant policy in 1871 is not open to dispute. The first important grant of public lands for railroad purposes was made to the Illinois Central in 1850.[FN9] During the next two decades "there passed into the hands **\*16** of western railroad promoters and builders a total of 158,293,000 acres, an area equaling that of the New England states, New York, and Pennsylvania combined."[FN10] The largest of these grants (40,000,000 acres) was made to the Northern Pacific Railroad Company by the Act of July 2, 1864, c. 217, 13 Stat. 365. That Act, in addition to providing a 400-foot right of way from Lake Superior to Puget Sound, also granted the alternate odd-numbered sections of public lands for 40 miles on each side of the railroad, with indemnity provisions for lands already sold, homesteaded, pre-empted, or otherwise disposed of. It is thus apparent that Congress in 1864 was willing to grant lands in "almost any amount"[FN11] to encourage the construction of transcontinental railroads. Faced with such an openhanded congressional policy, the courts have construed such early grants as conveying to the railroads a fee in their rights of way.[FN12]

FN9. Act of September 20,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1850, c 61, 9 Stat 466.

FN10. "Land Grants," 9 Encyclopaedia of the Social Sciences (1933), p 35.

FN11. Statement by Representative Thaddeus Stevens during the debates on the Northern Pacific Bill, Cong. Globe, 38th Cong, 1st sess, 1698 (1864).

FN12. *Northern Pacific Ry. v. Townsend, 190 U. S. 267, 271*. See *infra,* pp. 30-31.

But there was soon a public reaction against such legislative beneficence. In the late '60's land reformers began to condemn land grants "as inconsistent with the free homestead idea."[FN13] The abuses accompanying the lavish land grant policy **17** of the two previous decades finally became "so numerous and so apparent that land grants as a form of subsidizing internal improvements ceased with 1871."[FN14] The public sentiment promptly found congressional expression in the following Resolution adopted by the House of Representatives on March 11, 1872:

FN13. "Land Grants to Railways," 3 Dictionary of American. History (1940), p. 237.

FN14. "Land Grants," 9 Encyclopaedia of the Social Sciences (1933), p 35; see also Bogart. *Economic History of*

*the United States* (3d ed. 1918), p 351.

*Resolved,* That in the judgment of this House the policy of granting subsidies in public lands to railroads and other corporations ought to be discontinued, and that every consideration of public policy and equal justice to the whole people requires that the public lauds should be held for the purpose of securing homesteads to actual settlers, and for educational purposes, as may be provided by law.[FN15]

FN15. Cong Globe, 42d Cong. 2d Sess. 1585 (1872) Cf H. Rep. No 10, 43d Cong. 2d Sess (1874), p 1 (Ser No 1656) "The Committee on the Public Lands, having considered the bill (H R 2732) to grant lands to and in the construction of a railroad in the State of Alabama, are of opinion that *new grants of land for building railroads ought not to be made,* and therefore beg leave to report back the bill with the recommendation that it do not pass" (the bill reported on did not pass). That a similar policy prevailed in the Senate during this period is evident from the following statement by Senator Stewart during the debate on the Great Salt Lake and Colorado Railroad right-of-way bill (Cong. Globe, 42d Cong, 2d Sess., 4162 (1872)): "We were formerly in the habit

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

of granting lands to aid in the building of railroads in the States and Territories. We have abandoned that policy." See also Cong. Globe, 42d Cong., 2d Sess., 2543 (1872); 3 Cong. Rec., pt. 1, 404 (1875).

Although unwilling after 1871 to make outright grants of land to private railroad compames, Congress did not wish to paralyze the development of an integrated system of railroads. And since the Government had not yet disposed of vast areas of land in the West, paralysis of development would have resulted had Congress refused to permit the railroads to lay their tracks across **\*18** the public lands of the United States.[FN16] To meet this situation the Forty-second and Forty-third Congresses (1871-1875) passed a number of special acts granting to designated railroads simply "the right of way" through the public lands of the United States.[FN17] And finally in 1875, in order to avoid the need for special legislation for each new railroad, Congress enacted the General Right of Way Statute involved in the instant case. The one purpose of that Act was to grant to the railroads a right of passage across the public domain, a right which could be acquired in no other way while large blocks of land were held by a sovereign immune from suit.

FN16. Cf. Cong. Globe, 42d

Cong., 2d sess., 1591 (1872).

FN17. Act of April 12, 1872, c. 96, 17 Stat 52; Act of May 23, 1872, c. 205, 17 Stat. 159; Act of May 27, 1872, c 220, 17 Stat. 162, 163; Act of June 1, 1872, c. 258, 17 Stat. 202; Act of June 1, 1872, c. 261, 17 Stat. 212; Act of June 4, 1872, c. 293, 17 Stat. 224; Act of June 7, 1872, c. 323, 17 Stat. 280, Act of June 8, 1872, c 354, 17 Stat 339, Act of June 8, 1872, c. 359, 17 Stat 340: Act of June 8, 1872, c 364, 17 Stat 343. Act of June 10, 1872, c 437, 17 Stat 393 Act of March 3, 1873, c 291; 17 Stat 612; Act of June 20 1874, c 348, 18 Stat 130, Act of June 23, 1874, c 473, 18 Stat 274; Act of February 5, 1875, c 35, 18 Stat 306.

2. The debates preceding the enactment of the 1875 Act establish that the congressional intention, previously formulated, was to confer upon the railroads**\*19** a mere right of passage rather than a strip of land. The statement by Mr. Hawley of Illinois is typical:

It *simply and only* gives the right of way. It merely grants to such railroad compames as may be chartered the *right* to lay their tracks and run their trams *over* the public lands; it does nothing more.[FN18]

FN18. 3 Cong. Rec. pt 1, p 407 (1875) See also the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

statements of Mr Hoar (pp 404, 406).

The Railroad contends (Pet. 27-28) that the force of these statements is weakened since, it is said, the character of the estate granted was not under discussion, and the statements were directed simply to assurances that the Act did not also grant a federal franchise or charter[FN19] But it is significant that the same observations were repeatedly made during the debates on the special right-of-way statutes enacted between 1872 and 1875, in which the question of federal charters was wholly absent. For example, in reporting a bill granting a right-of-way to the Dakota Grand **20** Trunk Railway Company,[FN20] the committee chairman said: "This is merely a grant of the right of way."[FN21] Likewise, in reporting a right-of-way bill for the New Mexico and Gulf Railway Company,[FN22] Mr. Townsend of Pennsylvania (the same Congressman who sponsored the Right of Way Act of March 3, 1875) observed: "It is nothing but a grant of the right of way."[FN23] Such statements, coupled with Mr. Slater's declaration (*supra,* pp. 11-12) of the purpose of the "subject to" clause, warrant the conclusion that Congress intended to grant the railroads an easement rather than a fee.

FN19. But cf 2 Cong Rec., pt. 3, p 2898 (1874), where Senator Stewart, in commenting on the Senate version which included a franchise provision, stated that the "bill grants the right of way *simply*" And compare the statement of Mr Hoar opposing the proposal to give the states power to regulate railroad rates. Mr. Hoar insisted that the proposal was invalid since "if the right of way were granted over the public land the title to which belongs to the United States and is vested in the United States, *so that the title consists in the ownership by the United States of the soil, and the use of it by the corporation,* it is very doubtful whether the State has authority, if disposed, to require changes in the rates" (3 Cong. Rec., pt. 1, p. 404 (1875)).

FN20. Act of June 1, 1872, c. 258, 17 Stat 202.

FN21. Cong. Globe, 42d Cong., 2d Sess. 3913 (1872).

FN22. Act of June 8, 1872, c. 364, 17 Stat. 343.

FN23. Cong Globe, 42d Cong., 2d Sess. 4134 (1872) For other similar statements, see Cong. Globe, 42d Cong., 2d Sess. 2138, 2543 (1872).

C. *Subsequent administrative and congressional construction confirm that only an easement was granted.-*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1. It is an established rule that "the contemporaneous construction of a statute by those charged with its execution, especially when it has long prevailed, is entitled to great weight, and should not **\*21** be disregarded or overturned except for cogent reasons, and unless it be clear that such construction is erroneous." *United States v. Johnston* 124 U. S. 236, 253; *United States v. Moore*, 95 U. S. 760, 763: *Brewster v Gage*, 280 U. S 327, 336. Departmental circulars and regulations are especially persuasive. *Fawcus Machine Co. v. United States*, 282 U S. 375, 378; *Norwegian Nitrogen Co v United States*, 288 U S. 294, 315; *Swendig v. Washington Co*, 265 U. S. 322, 331; *McFadden v. Mountain View Min. & Mill Co*, 97 Fed. 670, 677 (C. C A. 9); *Taggart v. Great Northern Ry Co.*, 208 Fed. 455, 460 (E. D Wash. 1912), affirmed 211 Fed. 288 (C. C. A. 9).[FN24]

> FN24. Petitioner suggests (Pet 41) that the administrative interpretations are irrelevant since they follow the Act of 1875 by at least 13 years But the rule relating to the weight to be given to administrative construction is not dependent on strict contemporaneity Cf *Swendig v Washington Co. supra.* where the statute preceded the administrative construction by 11 years

The earliest and most nearly contemporaneous administrative construction of the 1875 Act confirms that the Railroad was granted an easement rather than a fee. The first general right of way circular of January 13, 1888, stated (12 L. D 423, 428):

The act of March 3, 1875, is not in the nature of a grant of lands; *it does not convey an estate in fee,* either in the "right of way" or the grounds selected for depot purposes.**\*22** It is a *right of use* only, the *title* still remaining in the United States. \* \* \*

All persons settling on public lands to which a railroad right of way has attached, take the same *subject to* such right of way and must pay for the full area of the subdivision entered, there being no authority to make deductions in such cases.[FN25]

> FN25. Cf Circular of June 27, 1900, 30 L. D. 325, 327, which uses similar language in describing the canal and reservoir rights of way granted by the Act of March 3, 1891, c. 561, sec. 18, 26 Stat. 1101.

These same provisions are repeated in the right of way regulations of March 21, 1892, 14 L. D. 338, 342. The next revisions of November 4, 1898 (27 L. D. 663, 664), and of February 11, 1904 (32 L. D. 481, 82) disclose slight changes in phraseology but the basic thought is the same.[FN26] In the departmental regulations of May 21, 1909, appeared perhaps the clearest of statements relating to the interests

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1942 WL 54245 (U.S.)                                                                          Page 19

acquired under the 1875 Act (37 L. D. 787, 788):

> FN26. The changes in phraseology, especially those in the 1904 regulations, seem directly traceable to language used by this Court in describing a *land grant* right-of-way. *Northern Pacific Ry. v. Townsend,* 190 U. S. 267 (1903). Cf. *Melder v. White,* 28 L. D. 412 (1899), which also defined the Northern Pacific right-of-way as a base or qualified fee.

1. *Nature of grant.*--A railroad company to which a right of way is granted *does not secure a full and complete* title to the land on which the right of way is located. It obtains only the *right to use* the land for the purposes for which it is granted and for no **23** other purpose, and may hold such possession, if it is necessary to that use, as long and only as long as that use continues. The Government conveys the *fee simple title* in the land over which the right of way is granted to the person to whom patent issues for the legal subdivision on which the right of way is located, and *such patentee takes the fee,* subject only to the railroad company's right of use and possession All persons settling on a tract of public land, to part of which right of way, has attached, take the same subject to such right of way, and at the total area of the subdivision entered, there being no authority to make deduction in such cases

* * *

And the departmental regulations thus construing the Act of 1875 are further confirmed by decisions of the Land Department in which the 1875 grant has been construed as a "mere casement," as "an incorporeal heriditament, an easement and not the land," as "in the nature of a mere easement." as "merely an easement." and similar phrases[FN27]

> FN27. 19 L D 588, 590 (1894). 20 L D 131, 132 (1895). 32 L. D 33, 34 (1903); 35 L D 495 (1907); 44 L D 5??2, 556 (1916) Patents issued to settlers on lands crossed by railroad rights-of-way have consistently included the entire legal subdivision, generally with a notation that it was issued "subject to" the right-of-way See 4 L D 523, 524 (1884); 8 L. D. 115, 120 (1889); 19 L D 386, 388 (1894). 20 L D 131 (1895); 23 L D 67 (1896). 26 L D 77 (1898). 27 L D 430 (1898); 29 L D 478 (1900). 32 L D 33 (1903); 46 L D 429 (1918) Similarly it has been held that the railroads do not acquire a fee in, but only the use of, 20 acres for their station grounds. 4 L D 523 (1884); 4 L. D 525 (1886); 32 L. D. 311 (1903); 35 L. D. 495 (1907); cf. Circular Instructions of March 9, 1878, 5 Copp's LandOwner 35, 36 (1878), requir-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing proper affidavits to be filed before a company "may obtain the use" of grounds for station purposes; see also Circular Instructions of November 7, 1879, 6 Copp's Land-Owner 141, 144-148, 155 (1879). Petitioner's suggestion (Pet. 41) that the administrative construction loses force because of a supposed failure to discriminate between the grant of the Act of 1875 and similar granting acts, on the one hand, and the pre-1871 acts on the other, is not justified. Thus, for example, in 28 L. D. 412 (1899), Assistant Attorney General Van Devanter described the Northern Pacific (1864) right-of-way as "a base or qualified fee," but at the same time recognized that the special Act of July 4, 1884, c 179 (23 Stat. 73), granted "only an easement." And in 32 L. D. 33, 34 (1902), he likewise observed that it was "well established that the right of way through the public lands granted to railroads" under the 1875 and similar acts was "in the nature of a mere easement."

*24 It is plain, then, that the 1875 Act was contemporaneously construed by the Department of the Interior in its right of way circulars and its decisions as merely granting to the railroads a right to "use and occupy" the land for railroad pur-

poses, with the fee remaining in the United States or its subsequent grantees. These are the regulations and the decisions which were in force when the Great Northern Railway Company and other non-land-grant railroads in the West acquired their rights of way across the public lands of the United States.

It is true that this uniformity of interpretation was broken in 1915 on the heels of the decision in *25 Rto Grande Ry v Stringham, 239 U. S. 44[FN28] But this administrative construction after 1915 cannot be deemed binding upon the Department of Interior since it was impelled by the apparent (although, we urge, erroneous) compulsions of the Stringham case. Hartley v Commissioner, 295 U S. 216, 220; Helvering v Halloch, 309 U S. 106, 121 And in any event, earlier decisions, being more nearly contemporaneous with the 1875 statute and evidencing a long-continued and uniform construction until 1915, are a more reliable index of the legislative intent and are accordingly more persuasive.[FN29] Fawcus Machine Co v United States, 282 U. S 375, 378. Norwegian Nitrogen Co v United States, 288 U S 294, 315.

FN28. Compare 14 L D 105 (1892). 35 L D 495 (1907), and 45 L D 473 (1916) with 51 L D 27, 305 (1925) 51 L D 131 (1925). 51 L D 604 (1926) 5?? L D 270 (1931), and 53 I D 339, 340 (1931)

FN29. It should also be noted that at least indirectly, the earlier administrative construction received congressional approval and adoption. By the Act of March 3, 1891, c 561 (26 Stat. 1101). Congress granted canal and reservoir compames rights of way across the public domain, and in doing so repeated the language of the 1875 Act And by the Act of March 6, 1896, c 42 (29 Stat 44). Congress made the 1875 Act partially applicable to the Colville Indian Reservation

These statutes are, in effect, legislative reenactments of the 1875 Act, and as such may be said to constitute adoption of the intervening administrative construction. See *National Lead Co. v. United States,* 252 U. S 140, 146; *McCaughn v. Hershey Chocolate Co.,* 283 U. S. 488, 492-493; *Massachusetts Mutual Life Ins. Co. v United States,* 288 U S 209, 273. The situation is not substantially different from that presented in the *National Lead* case, *supra,* in which this Court held that congressional extension of the usual tariff drawback provision to another commodity constituted implied legislative approval of the administrative interpretation of the drawback provisions then in force in respect

of other articles.

2 This Court has frequently recognized that "subsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject" **\*26***Tiger v. Western Investment Co.* 221 U. S. 286, 309; *Cope v. Cope,* 137 U. S. 682, 687. "\* \* \* if it can be gathered from a subsequent statute *in pari materia,* what meaning the legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute." *United States v. Freeman,* 3 How. 556, 564-565. Or, as the Ninth Circuit has tersely put it, "the legislative construction of its own act is always potent." *McFadden v. Mountain View Min. & Mill. Co.,* 97 Fed. 670, 677.

An examination of subsequent legislation plainly reveals that Congress has construed the 1875 Act as granting an easement rather than a fee. For example, the Act of June 26, 1906, c. 3550, 34 Stat. 482, declaring a forfeiture of unused rights of way, provides:

*Be it enacted* \* \* \* That each and every grant of right of way and station grounds heretofore made to any railroad corporation under the [1875] Act \* \* \* where such railroad has not been constructed **\*27** and the period of five years next following the location of said road, or any section thereof, has now expired, shall be and hereby is, declared for-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

feited to the United States, to the extent of any portion of such located line now remaining unconstructed, and the United States hereby resumes the full title to the lands covered thereby *freed and discharged from such easement,* and the forfeiture hereby declared shall, without need of further assurance or conveyance, inure to the benefit of any owner or owners of land heretofore conveyed by the United States subject to any such grant of right of way or station grounds * * *[FN30]

> FN30. The same language is repeated in the forfeiture Act of February 25, 1909, c 191, 35 Stat 647

On this same day Congress enacted another statute confirming the rights of way which certain railroads had acquired under the 1875 Act in the Territories of Oklahoma and Arizona Act of June 26, 1906, c 3548, 34 Stat. 481 The committee reports, explaining the purpose of this legislation, contain the following pertinent description of the 1875 Act:

The right as originally conferred and as proposed to be protected by this bill simply grants an *easement or use* for railroad purposes. Under the present law wherever the railroad passes through a tract of public land the entire tract is patented to the settler or entryman, *subject* only to this easement **\*28** The present bill does not in any way enlarge the nature of the right conferred.[FN31]

> FN31. H. Rept. No. 4777, 59th Cong., 1st Sess., p. 2 (Ser. No. 4908); cf. Sen. Rept. No. 1417, 59th Cong., 1st Sess, p. 2 (Ser. No. 4904).

And finally the Act of May 21, 1930, c. 307, 46 Stat. 373, 30 U. S. C. sec. 301, states that:

Whenever the Secretary of the Interior shall deem it to be consistent with the public interest he is authorized to lease deposits of oil and gas in or under lands embraced in railroad or other rights of way acquired under any law of the United States, whether the same be a base fee [e. g. Northern Pacific right-of-way?] or a mere easement [e. g. Great Northern right-of-way?] * * *

While this 1930 statute loses some of its probative value by reason of the fact that it was enacted 55 years after the 1875 Act was passed and also because it may have been influenced by the dictum in the *Stringham* case, we submit that the 1906 statutes are subject to no such infirmities. Especially are these earlier statutes pertinent since they are approximately contemporaneous with the acquisition by the Great Northern and its predecessor of large segments of its present right of way. See Record pp. 4, 7; see also, *Taggart v. Great Northern Ry. Co.,* 208 Fed. 455, 457 (E. D. Wash.), affirmed 211 Fed. 288 (C. C. A. 9). Statutes enacted between the time a grant is made and the time it takes effect may be considered in **\*29** de-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

termining the scope of the original grant. *Northern Pacific Railway v Soderberg.* 188 U. S. 526, 533-534 And this is true even though the subsequent statutes modify the original grant, which is not the fact in the instant case. Hence, if the phrase "right of way" was theretofore ambiguous, the 1906 statutes remove the ambiguity and make it clear that the 1875 Act granted an easement and nothing more.[FN32]

> FN32. In addition, as we have noted above (*supra.* p 26, n 29) there has been an implied legislative endorsement of the administrative construction by virtue of partial reenactment.

D. *Summary*--In short, the language of the 1875 Act with its "subject to" proviso, when read in connection with the legislative purpose of the statute and the then prevailing congressional land-grant policy, and when viewed in the light of its subsequent administrative and legislative construction establishes that the Act should also be construed by the courts as granting the railroads an easement rather than a fee in their rights of way. If the foregoing analysis of the 1875 statute be correct, it will follow as of course that the subsurface minerals were not conveyed to the railroads.

Petitioner in advancing the contrary contention relies for the most part upon a series of decisions of this Court (Pet. 29-33) arising under the railroad right of way and land grants of 1850-1871 Petitioner urges that, since the 1875 Act is substantially**30** identical to the pre-1871 grants, it should be identically construed (Pet. 34-36).

None of these cases involved the issue whether the railroads' rights, whatever their precise nature, include title to subsurface minerals.[FN33] And in any event, we submit that petitioner's argument based on these cases fails because it disregards the essential differences between the 1875 Act and its predecessors. These differences rest, as we have noted, in the distinctive language of the 1875 grant (*supra,* pp. 10-12) and in the sharp change in congressional land-grant policy in 1871 (*supra,* pp. 15-19). No provision comparable to the "subject to" clause of Section 4 of the 1875 Act is to be found in the land-grant acts of 1850-1871; its appearance coincides with the establishment of the new legislative policy.[FN34]

> FN33. Petitioner states (Pet. 4, 29) that *Rio Grande Ry. v. Stringham,* 239 U. S. 44, "involved a question whether the railway company could enjoin the removal of minerals underlying its [granted] right of way strip" The railroad had, however, instituted a suit to quiet title to its right of way; the defendant's claim to the land derived solely from his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

purchase of *surface* rights from a placer mine patentee. See *infra,* pp. 32-33.

FN34. The "subject to" provision first appeared in the Portland, Dallas and Salt Lake right of way Act of April 12, 1872, 17 Stat. 52.

But even if the language of the 1875 Act were identical with that of the 1850-1871 grants, which it is not, the legislative background warrants a construction**31** of the 1875 Act different from the earlier grants. For it is plain, and this Court has so held.[FN35] that the meaning of words in a grant varies according to the time and circumstances of their utterance And, as we have pointed out (*supra,* pp. 15-19), the time and circumstances of the 1875 grant were in sharp contrast to those of the grants between 1850 and 1871

FN35. An unreserved grant of swamp land has been held to include a grant of mineral lands (*Work v Louisiana* 269 U S  250) while an unreserved grant of school lands was held not to pass title to mineral lands lying in the section described in the grant (*United States v. Sweet* 245 U S 563) The Court in Work v Louisiana expressly distinguished the Strict case on the ground that at the time of the grant there in controversy there was a settled congressional policy

of reserving mineral lands while there was no such settled policy at the time of the grant considered in *Work v Louisiana* (pp 258-259) The Court also distinguished the *strict* case on the ground that there was, in respect of the grant involved in *Work v Louisiana.* no settled departmental construction of the swamp land Acts and no subsequent congressional interpretation (p 259) Both these factors are present in the instant case (*supra.* pp 21-29) And compare the *Sweet* case with *Cooper v Roberts.* 18 How 173, where the grant of school lands was held to pass title to mineral lands Here again, the Court distinguished identical grants in part on the ground of a shift in legislative policy See the *Sweet* case at p 574 Cf *Northern Pacific Railway v Soderberg.* 188 U S 526, 533-534

It is true that this Court in *Rio Grande Ry. v Stringham,* 239 U S 44, 47, stated that the interest granted by the Act of 1875 was "neither a mere easement, nor a fee simple absolute, but a limited fee." But that statement was not necessary to the decision and is not decisive of the instant **32** case. In the *Stringham* case, the plaintiff railroad brought suit to quiet title to a strip of land acquired by it under the 1875 Act. Defendants asserted title

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

to the same strip of land by virtue of a purported purchase of surface rights from a placer mine claimant. *Rio Grande Ry. v. Stringham, 38 Utah 113, 116, 110 Pac. 868, 869-870 (1910).* The Supreme Court of Utah reversed the judgment of the trial court, and remanded the case with a direction "to enter a judgment awarding to the plaintiff title to a right of way over the lands in question." The trial court accordingly entered judgment declaring plaintiff to be the owner of the right of way. The plaintiff again appealed, asserting that it should have been adjudged "owner in fee simple of the right of way over the premises." *Rio Grande Ry. v. Stringham, 39 Utah 236, 115 Pac. 967 (1911).* The Supreme Court of Utah affirmed the judgment of the trial court on the ground that the plaintiff should have sought its remedy by petitioning for a rehearing of the earlier case. The plaintiff thereupon brought up both judgments to this Court by writ of error. This Court held that the writ of error addressed to the second judgment presented nothing reviewable (p. 47). It affirmed the first judgment since it "describes the right in the exact terms of the Right-of-Way Act and evidently uses those terms with the same meaning they have in the act" (p. 48).

**\*33** It is, therefore, clear that the issue now before this Court was not squarely presented in the *Stringham case.* since the defendant claimed only a surface right which conflicted with the plaintiff's surface right, and since, further, the only issue before this Court was the accuracy of the language utilized in the first judgment And, in any event, this Court's conclusion that the plaintiff was owner of a "limited fee" was based (p 47) entirely on cases arising under the land-grant acts passed prior to 1871 and containing no requirement that the lands "over which" the right of way passed should thereafter be disposed of "subject to such right of way." These important differences in the land grant acts and the Right of Way Act were not called to the Court's attention[FN36] No brief was filed by the defendant in that case by the United States or by the other owners of land crossed by these rights of way (p 45)

> FN36. In this connection it is worth noting that in two early cases decided at a time when the 1871 change in legislative policy was a matter of common knowledge, this Court described two similar Acts as merely granting an easement For example, in *Railway Co v Alling. 99 U S 463 475 (1878)* it was held that the Act of June 8 1872 ?? 3?? 17 Stat. 339, granted to the Denver and Rio Grande Railway Company "a present beneficial easement Chief Justice Waite, in a dissenting opinion (p 182) described it as no more than a license to enter upon and use the unappropriated public

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

lands In *Smith v Townsend. 148 U S 490, 498-499,* the Court declared that the Southern Kansas Railway Company and its successors, under the Act of July 4, 1884, e 179, 23 Stat 73. "had simply an easement, not a fee in the land", that "the fee continued in the Indians," "all that the company received was a mere right-of-way", and that "doubtless whoever obtained title from the government to any quarter section of land through which ran this right of way would acquire a fee to the whole tract *subject to the easement of the company; and* If ever the *use* of that right of way was abandoned by the railroad company the *easement* would cease, and the *full title* to that right-of-way would vest in the patentee of the land." Such statements, made by this Court as early as 1878, refute petitioner's contention "that prior to and during the period of the Congressional grants, the idea that a railroad might be built upon an easement had hardly been thought of" (Pet. 13) Sec also *East Alabama Railway Company v. Doe,* 114 U S. 340, 350 (1885); *Hazen, v Boston and Maine Railroad,* 2 Gray 574, 580 (1854); *Blake v. Rich,* 34 N. H. 282, 283-284, 288-289 (1856)

**\*34** In these circumstances we submit that the statement in the *Stringham* case is not controlling.[FN37] And the question is one of sufficient importance to the railroads, to the Government, and to the other owners of lands crossed by these rights of way to warrant an examination *de novo.*

> FN37. In two subsequent cases where the 1875 grant is described as a limited fee, the statements are merely dicta based on the *Stringham* case. *Choctaw, O. & G. R. R. Co v. Mackey,* 256 U. S 531, 538; *Noble v. Oklahoma City,* 297 U. S. 481, 494.

No settled rule of property will be disturbed by a repudiation of the dictum in the *Stringham* case. In fact, as we have shown (*supra,* pp. 21-25), a decision construing the 1875 Act as granting an easement rather than a fee will merely restore a rule of property which existed between 1875 and 1915. And since it was during that period that the Great Northern Railway Company acquired its present **\*35** right of way, no hardship is wrought upon the Railroad if the construction that the grant conveyed an easement rather than a fee be reaffirmed.

II

EVEN IF THE RIGHT OF WAY IS A LIMITED FEE IT DOES NOT FOLLOW THAT THE RAILROAD

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

### OWNS THE MINERALS

We have urged (*supra,* pp. 32-35) that this Court's statement in the *Stringham* case that the right of way granted in the 1875 Act is a "limited fee" on an implied condition of reverter be not regarded as decisive of the instant case But even adherence to that definition of the right of way does not impel the conclusion that such a "fee" includes the right to extract oil and minerals The expression "limited fee" may be used to describe the *duration* of a particular estate or interest (e g the duration of an easement), or it may be employed to describe the *use* to which an estate may be put (e. g. "for church purposes only").

In none of its decisions has this Court defined the term "limited fee."[FN35] But the Circuit Court of Appeals for the Eighth Circuit, in *United States v. Big Horn Land & Cattle Co, 17 F (2d) 357,* has construed these words as defining the *duration* of the *easement.* That court, after adverting to a similar statement by Justice Van Devanter in *Kern River Co. v United States, 257 U. S 147, 152*. **\*36** that the "right of way intended by the [Canal and Reservoir Right of Way] act was neither a mere easement nor a fee simple absolute, but a *limited fee* on an implied condition of reverter," said (p. 365):

> FN38. Nor has the Court, as we have pointed out (*supra.* p

30), determined the issue whether whatever the nature of the railroad's interest, the grant includes title to subsurface minerals.

Of course it is clear that Mr. Justice Van Devanter used the expression "mere casement" in its restricted sense, implying little more, if any, than a license, for it is well settled that an easement may include a fee * * *.

A *fee* may exist in an incorporeal hereditament, and may, of course, under this principle, exist in an *easement.* * * * *Branson v. Studabaker, 133 Ind. 147, 165, 33 N. E. 98.*

We think it, therefore, not important whether the interest or estate passed be considered an easement or a limited fee. In any event it is a limited fee in the nature of an easement.

It is well settled that an easement may be held in fee determinable. 2 Tiffany, *Real Property* (2d ed. 1920), p. 1228; 1 Washburn, *Real Property* (6th ed. 1902), sec. 146, p. 74; Jones, *Easements* (1898) sec. 16, p. 14; *Hall v. Turner,* 110 N. C. 292, 304, 14 S. E. 791 (1892); *Oswald v. Wolf,* 126 Ill. 542, 548, 19 N. E. 28 (1888); *Branson v. Studabaker,* 133 Ind. 147, 164, 33 N. E. 98 (1892); *Nellis v. Munson,* 108 N. Y. 453, 461, 15 N. E. 739 (1888).

The mere fact that the right of way has some of the attributes of a fee--"perpetuity and exclusive**\*37** use

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

and possession; also the remedies of the fee, and, like it, corporeal, not incorporeal, property"--does not require the conclusion that the right of way is not an easement. *New Mexico v. United States Trust Co, 172 U S. 171, 183: Western Union Tel. Co. v Pennsylvania R. R, 195 U. S. 540, 570* The purposes of Congress are accomplished if the grant is held to be a "fee" in the surface and so much of the subsurface as is necessary for support--a "fee" for a railroad thoroughfare exclusively Since such an interest would accomplish the purposes of Congress, this is the largest interest which the applicable rules of construction will permit to pass under the Act (*supra.* pp 12-15) Under such a construction the Railroad is restricted in the use of the land except as a railroad thoroughfare The right to use and extract minerals is a use of the land not permitted to the railroad. *Union Missionary Baptist Church v. Fyke, 179 Okla. 102 (1937). Jordan v Goldman, 1 Okla. 406, 453 (1891).*

Hence, even though the Act be construed as granting the railroads a "limited fee" in their rights of way, it does not follow that the railroads acquired any rights in the subsurface minerals

### CONCLUSION

If the Right of Way Act of March 3, 1875, be construed as granting the railroads an easement rather than a fee in their rights of way which we

believe to be the correct construction, it necessarily **38** follows that these railroads have no right, title, or interest in the minerals underlying their rights of way. Even if the Act be construed as granting the railroads a limited fee in their rights of way, this "fee" does not include subsurface minerals. It therefore follows that the judgment of the court below should be affirmed.

Appendix not available.

Great Northern Ry. Co. v. U.S.
1942 WL 54245 (U.S. ) (Appellate Brief )

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.