## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **WARREN BERES and VICKI BERES, <u>et al.</u>,** ) | |
| ) | |
| ) | |
| **Plaintiffs,** ) | Nos. 03-785L, 04-1456L, 04-1457L, 04- |
| ) | 1458L, 04-1459L, 04-1463L, 04-1465L, |
| **v.** ) | 04-1466L, 04-1467L, 04-1468L, 04-1469L, |
| ) | 04-1471L, 04-1472L, 04-1473L, 04-1474L |
| **UNITED STATES,** ) | |
| ) | Hon. Marian Blank Horn |
| **Defendant.** ) | |
| ) | |
| ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT <u>ON THE SCOPE OF THE EASEMENTS</u>

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division


BRUCE K. TRAUBEN
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044
Tel: (202) 305-0238
Fax: (202) 305-0506
bruce.trauben@usdoj.gov

*Attorneys for Defendant*

Filed: June 8, 2011

## TABLE OF CONTENTS

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ......................... 1

MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ...................................................................... 2

    I.     INTRODUCTION ............................................... 2

         A.     FACTUAL BACKGROUND .................................. 2

         B.     PROCEDURAL BACKGROUND ............................. 4

    II.    SUMMARY JUDGMENT STANDARD .............................. 7

    III.   ARGUMENT ..................................................... 8

         A.     The Operative Question Is Not the Scope of the Easement,
but Rather Whether the Issuance of the NITU Blocked Abandonment
under State Law ............................................... 8

         B.     Trail Use Falls Within the Scope of the Deeded Easements
Granted to the Railroad for a "Road" .......................... 13

         C.     Easements Acquired Under the 1875 Act Include Railbanking
and Interim Trail Use ......................................... 19

         D.     The Prescriptive Easements Were Acquired for Use as a Transportation
Corridor - a Road - and Encompass Trail Use ..................... 23

    IV.   CONCLUSION ................................................. 26

## TABLE OF AUTHORITIES

### CASES

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Barclay v. United States,
    443 F.3d 1368 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Becker v. STB,
    132 F.3d 60 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Beres v. United States,
    2011 WL 1467922 (Fed. Cl. April 7, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6,15

Beres v. United States,
    64 Fed. Cl. 403 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6, 19

Birt v. STB,
    90 F.3d 580 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Brown v. Washington,
    924 P.2d 908 (Wash. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Caldwell v. United States,
    391 F.3d 1226 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Chevy Chase Land Co. v. United States,
    230 F.3d 1375 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Chevy Chase Land Co. v. United States,
    733 A.2d 1055 (Md. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

City of Seattle v. Nazarenus,
    60 Wash. 2d 657 (Wash. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Great Northern Ry. Co. v. United States,
    315 U.S. 262 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Idaho v. Or. Short Line R.R. Co.,
   617 F. Supp. 207 (D. Idaho 1985)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Kesler v. United States,
   25 Cl. Ct. 189 (1992)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Ladd v. United States,
   630 F.3d 1015 (Fed. Cir. 2010)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Lawson v. State,
   107 Wash.2d 444 (Wash. 1986)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Lee v. Lozier,
   88 Wash.App. 176 (Wash. Ct. App. 1997)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 26

Leo Sheep Co. v. United States,
   440 U.S. 668 (1979)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Marlow v. Malone,
   734 N.E.2d 195 (Ill. App. Ct. 2000)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
   475 U.S. 574 (1986)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Nat'l Wildlife Fed'n v. ICC,
   850 F.2d 694 (D.C. Cir. 1988)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Preseault v. I.C.C.,
   494 U.S. 1 (1990)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 22

Preseault v. U.S.,
   100 F.3d 1525 (Fed. Cir. 1996)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Puget Sound Elec. Ry. v. Railroad Comm'n,
   65 Wash. 75 (Wash. 1911)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 25

Ray v. King County,
   120 Wash.App. 564, 86 P.3d 183 (2004)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

RLTD Ry. Corp. v. Surface Transp. Bd.,
   166 F.3d 814 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Roediger v. Cullen,
    26 Wash.2d 690 (Wash. 1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Sunnyside Valley Irr. Dist. v. Dickie,
    73 P.3d 369 (Wash. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Tiger v. W. Inv. Co.,
    221 U.S. 286 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Troha v. United States,
    692 F. Supp. 2d 550 (W.D. Pa. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v. Denver & Rio Grande Ry. Co.,
    150 U.S. 1 (1893) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

United States v. Oregon,
    295 U.S. 1 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Veach v. Culp,
    92 Wash. 2d 570 (Wash. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Whipps Land & Cattle Co. v. Level 3 Commc'ns,
    658 N.W.2d 258 (Neb. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Yakima Valley Canal Co. v. Walker,
    76 Wash. 2d 556 (Wash. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Zobrist v. Culp,
    95 Wash. 2d 556 (Wash. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,15

**STATUTES**

16 U.S.C. § 1247(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12, 21, 22

43 U.S.C. § 912 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

43 U.S.C. § 913 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

43 U.S.C. § 934 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19

43 U.S.C. § 935 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

43 U.S.C. § 939 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

42 Stat. 212 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

49 C.F.R. § 1152.29(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**RULES**

RCFC 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7

**MISCELLANEOUS**

25 Am. Jur. 339 §2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Common Carrier Status of States, State Agencies & Instrumentalities, & Political Subdivision,
    363 I.C.C. 132, 135 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Great Nw. R.R., Inc., Abandonment Exemption in Clearwater County, ID,
    2004 WL 2017513 (Surface Transp. Bd. Sept. 10, 2004) . . . . . . . . . . . . . . . . . . . . . . . 11

Policy Statement on Rails to Trails Conversions,
    1990 WL 287255 (I.C.C. Jan. 29, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Union Pac. R.R. co. Abandonment Exemption in Cerro Gordo County, IA,
    2005 WL 835611 (Surface Transp. Bd. Apr. 12, 2005) . . . . . . . . . . . . . . . . . . . . . . . . 11

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, the United States of America, respectfully moves for summary judgment pursuant to Rule 56 of the Court of Federal Claims on Plaintiffs' Fifth Amendment takings claims.[1]

Plaintiffs allegedly own land in King County, Washington that abuts or is traversed by a railroad corridor formerly owned by the Burlington Northern and Santa Fe Railroad ("BNSF"). Plaintiffs contend that they have a "reversionary" interest in the subject corridor, and that this interest has been taken as a result of the Surface Transportation Board's ("STB") issuance of a Notice of Interim Trail Use ("NITU") under section 8(d) of the National Trails System Act, 16 U.S.C. § 1247(d), authorizing the railroad to negotiate an agreement to preserve the railroad corridor for possible future active rail use (i.e., "railbanking"), while allowing interim use of the corridor as a public trail.

A memorandum in support of the United States' motion follows.  As explained in that memorandum, the United States is entitled to summary judgment, because  railbanking and interim trail use fall within the scope of the easements at issue under long-standing Washington law and the facts of this case.  As a result, Plaintiffs cannot show that the United States has taken any property interest belonging to them, warranting summary judgment in favor of the United States.

---

[1] The United States' motion is limited to the scope of the easements pursuant to the Court's April 26, 2011 Order at 1 (Dkt. No. 106) ("The parties shall only brief the limited issue of the scope of the easement for all of the deeds at issue in the consolidated cases, separately, for the 1875 Act case, the Deed cases, and the Prescriptive Easement cases.").  Nevertheless, the United States believes that the Court must address the issue of abandonment during some phase of this action.

For these reasons, as discussed in greater detail in the memorandum that follows, the

United States respectfully requests that this Court grant Defendant's motion, and deny any cross-

motion Plaintiffs may file on this issue.

### MEMORANDUM IN SUPPORT OF
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This Court previously held that the predecessor railroad acquired only an easement in

those segments of the right-of-way acquired by deed or under the General Railroad Right of Way

Act of 1875.[2/]   The Parties have agreed that the railroad acquired an easement by adverse use, or

prescriptive easement, in other segments of the right-of-way.   Regardless of the method by which

the railroad acquired its easement in the right-of-way, those easements in the right-of-way are for

transportation purposes, such as a road or highway, and, therefore, encompass trail use, which

serves a transportation purpose.   The United States, therefore, is entitled to summary judgment on

liability because trail use is within the scope of the easements.

## I.      INTRODUCTION

### A.      FACTUAL BACKGROUND

The Seattle, Lake Shore & Eastern Railway Company ("SLS&E") acquired the right-of-

way at issue and constructed the line in 1887 and 1888.   *See* Statement of the Issue and

Stipulation of Facts, ¶ 1 (filed May 17, 2011) (Dkt. No. 109) (hereinafter, "Stipulation"); *see also*

Statement of Harry R. Talcott, Chief Engineer, SLS&E, April 9, 1891 (Joint Appendix Vol. V

("J.A."), Ex. 205).   The SLS&E acquired the right-of-way at issue from individuals who

conveyed by deed (J.A. Exs. 206-212), across public lands pursuant to the General Railroad Right

---

[2/] The United States expressly reserves its right to appeal from these decisions.

of Way Act of 1875, 18 Stat. 482, 43 U.S.C. §§ 934 *et seq. (*repealed 1976) (the "1875 Act"), and

by adverse use.  *See* Stipulation, ¶¶ 3-5.  This Court held that the railroad acquired easements in

the right-of-way under the 1875 Act (*see Beres v. United States*, 64 Fed. Cl. 403, 427 (2005)), and

by deed (*see Beres v. United States*, 2011 WL 1467922, at *59 (Fed. Cl. April 7, 2011)).  *See*

Stipulation, ¶¶ 3, 5.  The Parties have agreed that the railroad acquired an easement by adverse

use.  Stipulation, ¶ 4.

The SLS&E's activities prior to and during the construction of its road were closely

followed by the local press.  *See*, *e.g.*, *Railroad Avenue*, Seattle Daily Post-Intelligencer, Jan. 22,

1887 (J.A. Ex. 213 at 000042) (report on the establishment of Railroad Avenue and difficulties

encountered by the SLS&E "in securing its right of way along the city front . . . call[ing] attention

anew to the necessity for a common highway by means of which any railroad can enter the

city . . . ."); *see also Report to the President of the Chamber of Commerce, Seattle*, Seattle Daily

Post-Intelligencer, Feb. 8, 1887 (J.A. Ex. 214 at 000047) (article stating that the SLS&E advises

"that work on this road will commence quite soon . . . that the company has already expended

large sums of money here[,] [and] [t]he work will be pushed vigorously"); *Forging Ahead*, Seattle

Daily Post-Intelligencer, May 13, 1887 (J.A. Ex. 216 at 000052) (report that the SLS&E is

forging ahead and "[f]orty-three miles of this road is now under contract . . . ."); *Various Business*

*Undertakings, Railroad Operations*, Seattle Daily Post-Intelligencer, July 3, 1887 (JA. Ex. 220 at

000059) (reporting that the SLS&E "has been particularly energetic . . . [and] operations of the

company in town have been progressing steadily during the past three months, and are rapidly

assuming great magnitude").

Through a series of transactions and mergers, the BNSF (formerly known as the

Burlington Northern Railroad Company) became the successor-in-interest to the SLS&E.  *See*

Stipulation, ¶ 2; *see also* Surface Transp. Bd., NITU, service date Sept. 18, 1998,  (J.A. Ex. 223).

On September 18, 1998, the STB issued a NITU for the right-of-way at issue, setting a 180-day

period for BNSF to negotiate a railbanking/interim trail use agreement, "subject to the future

restoration of rail service . . . ."  Sept. 18, 1998, NITU, at 000111.  Under the terms of the NITU,

BNSF could negotiate a railbanking/trail use agreement with King County and/or The Land

Conservancy of Seattle and King County ("TLC") or, if no agreement was reached within 180

days after service of the NITU, BNSF was authorized to abandon the line.  *See id.* at 000110.

Rather than abandon the line, BNSF entered into a railbanking/trail use agreement with "King

County, WA [as] the interim trail manager for MP 7.30 (near Redmond) to approximately MP

18.2 (near Issaquah) . . . ."  Letter from Charles H. Montange, Esq. to Hon. Vernon Williams,

Secretary, STB, Sept. 29, 1998 (J.A. Ex. 224).

###    B.    PROCEDURAL BACKGROUND

Plaintiffs in *Beres*, No. 03-785L, brought suit against the United States on April 15, 2003,

and the remaining cases were filed on September 15, 2004 (*i.e.*, *Schroeder*, No. 04-1456 L;

*Chamberlin*, No. 04-1457 L (filed *sub nom Ray*); *Klein*, No. 04-1458 L; and *Peterson*, No. 04-

1459L;), and September 16, 2004 (*i.e.*, *Spencer*, No. 04-1463 L; *Nelson*, No. 04-1465 L;

*Manning*, No. 04-1466 L; *Morel*, No. 04-1467 L; *Lane*, No. 04-1468 L; *Ritzen*, No. 04-1469 L;

*Estate of Pearl Welch*, No. 04-1471 L; *Collins*, No. 04-1472 L; *Brown*, No. 04-1473 L; and

*Waverly Hills Club, Inc.*, No. 04-1474 L).[3] "For case management purposes only," all of the cases

were consolidated under the lead case, *Beres.  See Beres v. United States*, No. 03-785 L, Order

(Fed. Cl. July 25, 2006) (Dkt. No. 68).

Except in four actions (*Estate of Pearl Welch*, No. 04-1471 L; *Collins*, No. 04-1472 L;

*Brown*, No. 04-1473 L; and *Waverly Hills Club, Inc.*, No. 04-1474 L), all of the Plaintiffs allege

in their Claim for Relief, with minor modifications, that:

> BN has abandoned the subject railroad right of way.  Plaintiffs have
> a property right in the reversionary interest to the right of way that has
> been taken by the Federal government through the issuance of the
> NITU and conversion of the right of way into use as an interim trail.

*Beres v. United States*, No. 03-785 L, Complaint, ¶ 8 (filed April 15, 2003).  In *Estate of Pearl*

*Welch*, *Collins*, *Brown*, and *Waverly Hills Club*, the Plaintiffs allege that:

> The STB's NITU . . . has resulted in the imposition of a recreational
> trail on the Plaintiffs' properties.
>
> This conversion of the former railroad right of way into recreational
> trail use has deprived the Plaintiffs of their right to the use, possession,
> control, and enjoyment of their land that they otherwise would have
> had but for the NITU.
>
> As such, this federal action has resulted in a taking of the Plaintiffs'
> properties for which they are entitled to just compensation under the
> Fifth Amendment to the United States Constitution.

*Estate of Pearl Welch*, No. 04-1471 L, Complaint, ¶¶ 23-25 (filed Sept. 16, 2004).

On March 9, 2004, the United States moved for summary judgment in *Beres*, arguing that

it retained the reversionary interest in the right-of-way granted to the railroad under the General

---

[3] Two related actions, *Edlund*, No. 04-1464 L, and *Rundle*, No. 04-1476 L, were voluntarily
dismissed.  *See Edlund v. United States*, No. 04-1464 L, Order (Fed. Cl. May 15, 2007) (Dkt.
No. 10) (dismissing plaintiff's claims with prejudice); *see also Rundle v. United States*, No. 04-
1476 L, Order (Fed. Cl. May 15, 2007) (Dkt. No. 11) (same).

Railroad Right of Way Act of 1875.  On March 16, 2005, the Court denied the government's

motion, holding "that the United States did not retain a reversionary interest when it granted a

right-of-way to the [SLS&E] under the 1875 Act and subsequently issued a land patent to

William H. Cowie in 1892."  *Beres*, 64 Fed. Cl. at 428.

The Parties subsequently filed cross-motions for partial summary judgment addressing

whether the deeds conveying the right-of-way to the SLS&E, or its successor-in-interest,

conveyed the fee interest or an easement in the right-of-way.  The government also argued that

plaintiffs Gerald and Kathryn Ray, and other Plaintiffs who are successors-in-interest to

Hilchkanum, were estopped from re-litigating the interest conveyed by a deed from Hilchkanum

to the SLS&E, in light of *Ray v. King County*, 120 Wash.App. 564, 86 P.3d 183, *rev. denied*, 152

Wash. 2d 1027 (2004) (table).  The Court agreed that the Rays were collaterally estopped from

relitigating the interest conveyed by the Hilchkanum deed, and dismissed them with prejudice

from this action.  *See Beres*, No. 03-785 L, slip op. at 14-20, 29 (Fed. Cl. April 12, 2010) (Dkt.

No. 101); *see also Ray*, No. 04-14571 L, Order (Fed. Cl. April 13, 2010) (severing the claims of

Gerald and Kathryn Ray from No. 04-1457 L, and dismissing the Rays' case with prejudice).  The

Court, however, did not agree that any of the Rays' co-plaintiffs who are successors-in-interest to

Hilchkanum also are collaterally estopped from litigating the interest Hilchkanum conveyed by

deed to the SLS&E.  *Id.* at 29.

On April 7, 2011, the Court held that the deeds at issue conveyed an easement to the

railroad.  *Beres*, 2011 WL 1467922, at *59.  On April 26, 2011, the Court directed the Parties to

"brief the limited issue of the scope of the easement for all of the deeds at issue in the

consolidated cases, separately, for the 1875 Act case, the Deed cases, and the Prescriptive

Easement cases." *Beres*, No. 03-785 L, Order (Fed. Cl. April 26, 2011) (Dkt. No. 106).

## II.      SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c)(1). The rule continues, "[i]n considering such a motion, the court will, absent persuasive reason to the contrary, deem the material facts claimed and adequately supported by the moving party to be established, . . ." *Id.* A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Alternatively, summary judgment is appropriate "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322; accord *Kesler v. United States*, 25 Cl. Ct. 189, 195 (1992) ("the party bearing the burden of proof at trial must produce the evidence from which a finder of fact could reasonably find in its favor on the merits of the case" (citing *Anderson*, 477 U.S. at 254-55)). As the Supreme Court has explained, "[i]n such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322-23.

Once the moving party meets its initial burden, the non-moving party "may not rely merely on allegations or denials in its own pleading." RCFC 56(e)(2). Instead, where the moving party's initial burden is met, the non-moving party, through affidavits or as otherwise provided in RCFC 56, must set forth specific facts showing a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324 (applying Fed. R. Civ. P. 56). In evaluating motions for summary judgment, courts must view any inferences drawn from the underlying facts in the light most favorable to the non-moving party and may not engage in credibility determinations or weigh the evidence. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.   ARGUMENT

### A.   The Operative Question Is Not the Scope of the Easement, but Rather Whether the Issuance of the NITU Blocked Abandonment under State Law

In its April 26, 2011, Order, the Court directed the parties to "brief the limited issue of the scope of the easement for all of the deeds at issue in the consolidated cases, separately, for the 1875 Act case, the Deed cases, and the Prescriptive Easement cases." April 26, 2011, Order at 1 (Dkt. No. 106). In compliance with this Order, in the parties' Statement of the Issue and Stipulation of Facts filed May 17, 2011, the United States stated the issue now before the Court as follows: "Whether the scope of the original easements granted to, or acquired by, the railroad are sufficiently broad to encompass railbanking and interim trail use?" Stipulation at 1. Nevertheless, the United States respectfully disagrees that the scope of the easements is relevant to the question of whether the government should be held liable for a taking when the STB issued a NITU on September 18, 1998, relating to the right-of-way at issue. *See* Stipulation at 6, ¶ 16.

The U.S. Supreme Court and the Federal Circuit have made clear that the issue is whether the issuance of the NITU foreclosed or forestalled an abandonment of the right-of-way that

otherwise would have occurred under applicable state law.  *See Preseault v. I.C.C.*, 494 U.S. 1, 21 (1990) (O'Connor, J., concurring) ("Determining what interest petitioners would have enjoyed under [applicable state] law, in the absence of the ICC's recent actions, will establish whether petitioners possess the predicate property interest that must underlie any takings claim.") ("*Preseault I*"); *see also Barclay v. United States*, 443 F.3d 1368, 1371 (Fed. Cir. 2006) (holding that a takings claim accrues "when railroad abandonment proceedings are suspended by the STB's issuance of a NITU," not when a railroad reaches a trail agreement or a trail group constructs a trail); *Caldwell v. United States*, 391 F.3d 1226, 1233-34 (Fed. Cir. 2004) (same). The Federal Circuit's plurality opinion in *Preseault v. United States*, does not avert the focus of the inquiry from abandonment to the scope of the easement in all cases.  100 F.3d 1525, 1544 (Fed. Cir. 1996) (finding that the original railroad's easements "are limited by their terms and as a matter of law to railroad purposes.") ("*Preseault II*").  In *Preseault II*, the plurality agreed with the trial court that the railroad's "easements were extinguished as a matter of law in 1975," more than ten years before the ICC issued the NITU.  *Id.* at 1545; *see also id.* at 1546 ("[T]he purpose of the Railroad's actions leading up to the track removal in 1975 was to abandon this stretch of rail line.")[4]  Given the unique facts in *Preseault*, the plurality identified "two bases on which the Preseaults are entitled to recover" – first, because the recreational trail "could not be justified

---

[4]   The facts of *Preseault* are very unusual and, in the history of rails-to-trails litigation, unique. Indeed, in *RLTD Ry. Corp.*, decided several years after the Federal Circuit's *Preseault* decision, the Court of Appeals for the Sixth Circuit held that "once a line of track has been properly abandoned, the STB loses jurisdiction and cannot issue a trail condition."  166 F.3d at 814; *Becker v. STB*, 132 F.3d 60, 63 (D.C. Cir. 1997) (same); *see also Common Carrier Status of States, State Agencies & Instrumentalities, & Political Subdivision*, 363 I.C.C. 132, 135 (1980) ("When a rail line has been fully abandoned, it is no longer [a] rail line and the transfer of the line is not subject to our jurisdiction").

under the terms and within the scope of the existing easements for railroad purposes"; and second, because the railroad had abandoned its easement more than ten years before the ICC issued the NITU.  *Id.* at 1550.

A majority of the judges in *Preseault II*, however, found abandonment to be the primary issue determining liability.  Two judges in a separate concurrence noted that "the court now correctly sets its sights on the question of abandonment."  *Preseault II* at 1553.  The three dissenting judges also identified abandonment as the primary liability question:

> Whether the Preseaults presently have a justiciable Fifth Amendment claim, however, depends upon whether the right-of-way has been abandoned.  This is so, because if the right-of-way still exists, and if the current use of the original right-of-way is permissible under Vermont law, then the Preseaults would have no present right to claim ownership of the underlying land, free of the burden on their property created by the trail.

*Id.* at 1555.  The dissenting judges would have found the government not liable for a taking on the ground that the railroad had not abandoned its easement either before the ICC issued the NITU or afterwards.  Significantly, a majority of the judges on the Federal Circuit (5-4) believed liability turned, primarily, on the issue of abandonment.

Subsequent decisions by the Federal Circuit recognize this fact:  "In *Preseault II*, we established that the elimination of adjacent landowners' state law reversionary interests when abandonment is suspended under the Trails Act constitutes a Fifth Amendment taking."  *Barclay*, 443 F.3d at 1371; *Caldwell*, 391 F.3d at 1233-34 (same).  For that reason, the Federal Circuit has consistently held that a takings claim accrues when the STB issues a NITU, and not when a railroad reaches a trail agreement or a trail group constructs a trail.  *Barclay*, 443 F.3d at 1371; *see also Caldwell*, 391 F.3d at 1235; *Ladd v. United States*, 630 F.3d 1015, 1025 (Fed. Cir. 2010)

(holding that, in a rails-to-trails action, a temporary takings claim accrues when the NITU issues, because the NITU may forestall or foreclose the landowner's right to unencumbered possession of the property).

Moreover, whether the trail sponsor's use of the right-of-way exceeds the scope of the easement is irrelevant, because the STB does not require or authorize use of the right-of-way in a manner that exceeds the scope of any easement. First, there is no evidence in this case that the STB approved the agreement between the railroad and the trail group, as the plurality found the ICC did in *Preseault II*. *See Preseault II* at 1550. The STB certainly issued the NITU in the instant case, but did not approve, and had no authority to approve, any agreement that might permit uses outside the scope of the original railroad grant.

This argument is fully consistent with the STB's Policy Statement on Rails to Trails Conversions, which states:

> The Commission views the issuance of a NITU or CITU as a ministerial act. We do not analyze, approve, or set the terms for the interim trails use arrangement. Nor do we rule on the 'qualifications' of a particular trail proponent, other than its willingness to assume full financial responsibility and liability for the line and to agree to the railbanking condition for potential future reactivation of rail service.

Policy Statement on Rails to Trails Conversions, 1990 WL 287255, at *3 (I.C.C. Jan. 29, 1990). The STB has repeated this position on numerous occasions, noting that it "has no role to play in determining the suitability of the line for interim trail use/railbanking. . . . The Board has no involvement in the negotiations and does not analyze, approve, or set the terms of trail use agreements. The Board is not authorized to regulate activities over the actual trail." *Union Pac. R.R. Co. Abandonment Exemption in Cerro Gordo County, IA*, 2005 WL 835611, at *2-3 (Surface Transp. Bd. Apr. 12, 2005); *Great Nw. R.R., Inc. – Abandonment Exemption – in Clearwater*

*County, ID*, 2004 WL 2017513, at *4 (Surface Transp. Bd. Sept. 10, 2004) (same).

It bears noting that the Trails Act provides:

> If a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way *and for any legal liability arising out of such transfer or use* . . . then the [STB] shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use.

16 U.S.C. § 1247(d) (emphasis added).  Consequently, even if the current uses fall outside the scope of the easements, any "legal liability arising out of such transfer or use" does not render the United States liable for an unconstitutional taking.

Rather than authorizing uses inconsistent with the original railroad grant, the Trails Act states that when a railroad agrees to preserve a rail line for future reactivation of active rail service, interim use of the corridor "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way. . . ."  16 U.S.C. § 1247(d).  The Trails Act merely preserves the corridor intact and (potentially) preempts any law that might otherwise result in abandonment of the easement.  *See also* 49 C.F.R. § 1152.29(d)(1) (stating that the NITU will permit the railroad to discontinue service and salvage tracks without effecting abandonment, but offering no indications that a NITU would allow a third party to exceed the scope of the line).

The government's liability therefore does not turn on whether the scope of the easements at issue were exceeded, but rather turns upon whether the issuance of the NITU blocked the vesting of any rights the Plaintiffs may have in the right-of-way by foreclosing abandonment

under state law.[5/]  At some phase of this action, therefore, the Court still must address the

abandonment issue.

Regardless, an analysis of the easements at issue in this case shows that railbanking and

interim tail use are well within their scope.

> **B.     Trail Use Falls Within the Scope of the Deeded Easements Granted to the Railroad for a "Road"**

The question currently presented by the Court is whether the deeds conveyed to the

predecessor railroad are broad enough to encompass railbanking and interim trail use.  The deeds

grant a right-of-way and do not limit the use of the right-of-way to any specific purpose.  Even if

any limitation arguably has been placed upon the use of the right-of-way, it must be understood to

encompass use of the right-of-way as a highway or road.  This conclusion is consistent with the

terms of the deeds, and the context of the times during which the deeds were executed in May,

1887 (J.A. Exs. 206-211), before the railroad was constructed (*see* J.A. Ex. 205), and in June,

1904 (J.A. Ex. 212) after it was built.  Because the trail at issue is a road, it falls within the scope

of the grant to the railroad.

This analysis necessarily begins with the language in the deeds.  *Sunnyside Valley Irr.*

*Dist. v. Dickie*, 73 P.3d 369, 372 (Wash. 2003).  Under Washington law, the "interpretation of an

easement is a mixed question of law and fact."  *Id.* at 372 (citing, *Veach v. Culp*, 92 Wash. 2d

570, 573 (Wash. 1979)).  "What the original parties intended is a question of fact and the legal

consequence of that intent is a question of law."  *Id.*  "The intent of the original parties to an

---

[5/] In fact, the majority of the Plaintiffs explicitly base their claim upon abandonment and none explicitly assert that the scope of any easement was exceeded by railbanking or interim trail use. *See* Section I.B., *supra.*

easement is determined from the deed as a whole." *Id.* (citing *Zobrist v. Culp*, 95 Wash. 2d 556, 560 (Wash. 1981)).  If the language of the deed is ambiguous "extrinsic evidence is allowed to show the intentions of the original parties, the circumstances of the property when the easement was conveyed, and practical interpretation given the parties' prior conduct or admissions." *Id.* (citing *City of Seattle v. Nazarenus*, 60 Wash. 2d 657, 665 (Wash. 1962)).

The majority of the deeds at issue, with minor exceptions, state the following**:**

> In consideration of the benefits and advantages to accrue to us from the location, construction and operation of the Seattle, Lake Shore and Eastern Railway in the County of King, in Washington Territory we do hereby donate, grant and convey unto said Seattle, Lake Shore and Eastern Railway Company *a right of way* one hundred (100) feet in width through our lands in said County, described as follows, to wit: [specified lots or section and township].
>
> Such *right of way* strip to be fifty (50) feet in width on each side of the center line of the railway track as located across our said lands by the Engineer of said Railway Company, which location is described as follows, to wit: [metes and bounds].
>
> And the said Seattle, Lake Shore and Eastern Railway Company shall have the right to go upon the land adjacent to the said line for a distance of two hundred (200) feet on each side thereof and cut down all trees dangerous to the operation of *said road*.  To Have and to Hold the said premises, with the appurtenances, unto the said party of the second part, and to its successors and assigns forever.
>
> \* \* \*

J.A. Ex. 206 at 000002 (May 9, 1887, Right of Way Deed from Tahalthkut et ux. to S.L.S. & E. Ry. Co.) (emphasis added); *see also* J.A. Exs. 207-211.  The 1904 Quit Claim Deed from J.D. Reeves and his wife to the Northern Pacific Railway Co. is worded slightly differently, and states in pertinent part:

> This indenture made this [June 3, 1904], Between J.D. Reeves and Elizabeth Jane Reeves, his wife, the parties of the first part and the

- 14 -

Northern Pacific Railway Company, a corporation, the party of the second part, Witnesseth: That the said parties of the first part for and in consideration of the sum of [$150] . . . do by these presents, remise, release, and forever quit claim unto the said party of the second part and to its assigns all right, title and interest and estate of said first parties in and to all that certain lot, piece or parcel of land, situate lying and being in the County of King, State of Washington, and particularly bounded and described as follows, to wit:

The interest of said grantors in and to a tract of Land lying within lines drawn parallel with . . . the center of the main Line track and fifty feet from said center of the Seattle, Lake Shore & Eastern Railway, now the Northern Pacific Railway, through the Townsite of Ingelwood, King County, State of Washington, and running from [between specified streets through certain platted Blocks]; *the intention being to convey herein a right of way* fifty feet on each side of said track through any lots or blocks conveyed to the Grantor J.D. Reeves by grant of date, November 13, 1903, from King County, Washington, said lots being as follows [list of lots in the specified blocks].

Together [with] all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the reversions, remainder and [remainders], rents, issues and profits thereof.

To have and to hold all and singular the said premises together with the appurtenances, unto said party of the second part and to its heirs and assigns forever. *   *   *

J.A. Ex. 212 at 000035-36 (emphasis added); *see also id.* at 000038-39.

According to the Court in its April 7, 2011 decision, the deeds with the language quoted above conveyed only an easement to the predecessor railroad. *See Beres*, 2011 WL 1467922, at *59. None of these deeds, however, limit the easement granted in the right-of-way to any specific purpose.

This deed language contrasts starkly with the language in a deed previously analyzed under Washington law in *Zobrist*, where "[s]aid right of way [was] . . . granted for the purpose of running and operating a Railroad . . . ." *Zobrist*, 95 Wash.2d at 557 (holding that the railroad

- 15 -

easement at issue was extinguished by its own terms when no trains ran for 12 consecutive

months, and quieting title in the plaintiff) (internal quotation marks omitted).  Nor is the easement

granted by the deeds at issue here limited to "railroad purposes only," as was the situation alleged

by the plaintiffs in *Lawson v. State*, 107 Wash.2d 444, 451 (Wash. 1986) ("Plaintiffs have alleged

that the grantors conveyed easements for railroad purposes only.").  Here, other than conveying

land for a right-of-way, none of the deeds at issue expressly limit the use of the right-of-way to

any specific purpose.

Moreover, in the context of the times in which the deeds were granted during the late

1800s and early 1900s, railroads were considered to be public highways or roads.[9]  As the

Washington Supreme Court observed at a time not long after the grants at issue in this case, "[a]

railroad is a public highway, created for public purposes."  *Puget Sound Elec. Ry. v. Railroad

Comm'n*, 65 Wash. 75, 84 (Wash. 1911).  This is consistent with other evidence of the

contemporaneous view of railroads at the time of the grants at issue here.  For example, on

February 8, 1887, the Seattle Daily Post-Intelligencer published an article on a report to the

President of the Seattle Chamber of Commerce by the Committee on Railroads and

Transportation regarding the SLS&E's progress, stating:

> We are advised that work on *this road* will commence quite soon, and
> that the company has already expended large sums of money here.
> The work will be pushed vigorously.  Funds sufficient to build *the
> road* across the Cascades have already been secured.  The people of
> our city feel a great interest in *this road* and are doing all they can to
> aid it.  The building of *this road* will for all time make our city the

---

[9] According to Black's Law Dictionary, a "road" is "[a] highway; an open way or public
passage; a line of travel or communication extending from one town or place to another; a strip
of land appropriated and used for purposes of travel and communication between different
places."

great railroad center and metropolis of Puget Sound.

J.A. Ex. 214 at 000047 (col. 2) (emphasis added).  On May 13, 1887, the Seattle Daily Post-Intelligencer reported again on the construction progress made by the SLS&E, announcing that "[f]orty-three miles of *this road* is now under contract . . .[and] [t]he Puget Sound Construction Company confidently expect to have *the road* completed to the Snoqualmie Pass before the snow flies." J.A. Ex. 216 at 000052 (col. 2) (emphasis added).  On July 3, 1887, the Seattle Daily Post-Intelligencer reported that the SLS&E purchased a tract of land for a passenger and freight depot "between Mill street and Columbia, and on which *the road* will terminate." J.A. Ex. 220 at 000059 (col. 3) (emphasis added).

Consistent with this view, the majority of the deeds at issue also refer to the right of way as a "road" when granting the SLS&E "the right to go upon the land adjacent to said line for a distance of two hundred (200) feet on each side thereof and cut down all trees dangerous to the operation of *said road*." J.A. Exs. 206-211.

The right-of-way at issue, the East Lake Sammamish Trail, is a road within the scope of the easement.  The trail is part of a network of an alternative transportation system that was first planned in 1971 as part of the Lake Sammamish Loop.  *See* 1971 Urban Trails Plan, King County, Washington, at 000104, 000107-109 (J.A. Ex. 222).  A basic goal of the Urban Trails Plan was to "complement the County-wide transportation system by providing facilities for hikers and riders," among others.  *Id.* at 000095.  Another basic goal of the Plan was "[t]o provide for a mode of transportation that will not create environmental pollution." *Id.* at 000096.  The trails proposed in 1971, including the East Lake Sammamish Trail at issue, were to

> perform both a transportation function and a recreation function.  As
> transportation routes, trails serve urban activities such as schools,

- 17 -

shopping areas and churches.  Commuters can also use trails to get to
work.

*Id.* at 000096.  Thus "[t]rails perform a transportation function and should connect and serve

schools, shopping areas, entertainment facilities, and churches as well as provide access to places

of work."  *Id.* at 000098.

Consistent with the 1971 Urban Trails Plan, the East Lake Sammamish Trail was

developed as a component of a multi-purpose transportation system, and therefore functions as a

transportation corridor or road.  In 2004, King County's Department of Natural Resources and

Parks published its "Regional Trail Inventory and Implementation Guidelines," including a report

on the status of the East Lake Sammamish Trail, which is one of the Regional Trails in King

County.  *See* Stipulation, ¶ 18; *see also* J.A. Ex. 225 at 000145-46.  These regional trails "serve a

significant number of transportation oriented trips, *i.e.*, commuting, shopping, etc. [and] . . .

function as conduits between major destinations, and as recreation destinations in and of

themselves."  J.A. Ex. 225 at 000121.  King County's "regional trails should be considered as a

transportation facility[, which] is not a lesser facility to any street . . . ."  *Id.* at 000138.  In fact,

during the week, use of county trails is split "almost 50-50, between recreational/exercise and a

commuting purpose, *i.e.*, going to school, work or shopping. . . ."  *Id.* at 000151.  It cannot be

genuinely disputed that the right-of-way at issue is being used as a road within the county's

transportation system.  *See Roediger v. Cullen*, 26 Wash.2d 690, 692 (Wash. 1946) ("There can

be no question but that a public path is of the same nature as a public highway, and, as is said in

25 Am. Jur. 339, §2: 'It is the right of travel by all the world, * * * which constitutes a way a

public highway, * * *.'").  Plaintiffs' narrow characterization of the trail at issue as a

"recreational trail" simply is inaccurate.  *See* Statement of the Issue, ¶ A.

Continuing use of the right-of-way as a segment of the county's transportation system therefore falls squarely within the scope of the easement granted to the predecessor railroad.

### C.   Easements Acquired Under the 1875 Act Include Railbanking and Interim Trail Use

"The construction of grants by the United States is a federal not a state question."  *United States v. Oregon*, 295 U.S. 1, 28 (1935); *see also Beres*, 64 Fed. Cl. at 410 (concluding that federal law governs the scope of an easement created under the 1875 Act (citing *Leo Sheep Co. v. United States*, 440 U.S. 668, 682 (1979))); *Whipps Land & Cattle Co. v. Level 3 Commc'ns*, 658 N.W.2d 258, 264 (Neb. 2003) ("The scope of [a] right-of-way [under the 1875 Act] is a matter of federal law); *Marlow v. Malone*, 734 N.E.2d 195, 205 (Ill. App. Ct. 2000) (same); *Idaho v. Or. Short Line R.R. Co.*, 617 F. Supp. 207, 212 (D. Idaho 1985).

An 1875 Act grant is not limited to active rail service only.  Section 1 of the 1875 Act granted a "right-of-way" through the public lands of the United States to any railroad company that met the requirements of the Act.  43 U.S.C. § 934.  Although Congress contemplated that the grants would go to railroad companies for construction of their roads, Congress did not so limit 1875 Act grants.  Omission of such express language of limitation is critical because it reflects Congress' intent – even in 1875 – to not restrict these grants to active rail service.  *See United States v. Denver & Rio Grande Ry. Co.*, 150 U.S. 1, 11 (1893) (declining to read a restriction into the provisions of the 1875 Act allowing railroads to take timber or other materials from public lands adjacent to an 1875 Act grant because "[i]f congress had intended to impose [such a] restriction . . . it should have been so expressed").

Section 2 of the 1875 Act reflects Congress' recognition that 1875 Act grants might include uses other than active rail service.  That section provides that where railroad and "other

public highway[s]" conflict, in areas such as canyons, the 1875 Act grant would not "prevent the location . . . of any such wagon road or highway where such road or highway may be necessary for the public accommodation."  43 U.S.C. § 935.  Even in 1875, then, Congress contemplated other non-railroad uses of these right-of-way grants.[7]

Subsequent statutes confirm that 1875 Act grants are not restricted to active rail service. As a federal instrument, an 1875 Act grant is subject to the intentions and specifications of Congress; it is not a common law easement.  *See Brown v. Washington*, 924 P.2d 908, 917 (Wash. 1996) ("'[E]asements' on public lands are granted by Congress and subject to the intentions and specifications of Congress rather than common law.").  Because the "more strict rule of construction adopted in the case of purely private grants" does not apply with respect to 1875 Act grants, *Denver & Rio Grande*, 150 U.S. at 15, the Court is "not limited to the lifeless words of the statute and formalistic canons of construction in [its] search for the intent of Congress."  *Great Northern Ry. Co. v. United States*, 315 U.S. 262, 273 (1942).  "It is settled that 'subsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject."  *Id.* at 277 (citing *Tiger v. W. Inv. Co.*, 221 U.S. 286, 309 (1911)) (considering legislation enacted in 1906 and 1909 to assist in the interpretation of the 1875 Act).

Section 6 of the 1875 Act provides that "Congress reserves the right at any time to alter, amend, or repeal" any of the provisions of the 1875 Act, or any part thereof.  43 U.S.C. § 939.  In

_____

[7] The scope of an 1875 Act grant mirrors the easement at issue in *Chevy Chase Land Co. v. United States*, 733 A.2d 1055 (Md. 1999).  In that case, the railroad had acquired a "free and perpetual right of way" with no explicit restrictions.  *Id.* at 1065.  The court rejected plaintiff's argument that the railroad's interest only included active railroad operations, finding instead that the unrestricted terms of the easement did not preclude interim trail use.  The Federal Circuit affirmed the state court's interpretation, thereby rejecting plaintiff's claim for an unconstitutional taking.  *See Chevy Chase Land Co. v. United States*, 230 F.3d 1375 (Fed. Cir. 1999) (table).

- 20 -

subsequent years, Congress enacted several statutes, which demonstrate that 1875 Act grants are not limited to active railroad uses only.  In 1920, Congress authorized all railroad companies to allow state or local governments to use "any portion of such right of way . . . as a public highway or street."  43 U.S.C. § 913.  The 1920 Act provided that "no such conveyance shall have the effect to diminish the right of way of such railroad company."  *Id.*  As discussed above, here, King County is using the right-of-way as part of its transportation system - a public highway.

In 1921, Congress authorized railroads to "convey to the highway department of any State any part of its right of way or other property in that State acquired by grant from the United States."  Federal Highway Act, § 16, Pub. L. No. 67-87, 42 Stat. 212, 216 (1921).  In 1922, Congress enacted 43 U.S.C. § 912, which precluded the transfer of rights-of-way on which public highways had previously been established or were established within a year after the railroad's lawful abandonment.  *See* 43 U.S.C. § 912.

In 1983, Congress enacted the Trails Act itself, which provided railroads an opportunity to railbank a rail line for future rail service.  As discussed above, the Trails Act provides that, if a railroad railbanks the rail line for future rail service, interim trail use "shall not be treated, for the purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."  16 U.S.C. § 1247(d).  At a minimum, these statutes, individually and in sum, demonstrate Congress' clear understanding that 1875 Act grants could include other forms of public transportation, in addition to active rail service.

Railbanking is a present railroad-related use, and plainly falls within the scope of an 1875 Act grant.  Railbanking furthers "the national policy to preserve established railroad rights-of-way for future reactivation of rail service."  *Id.*  "Congress specifically identified rail banking as a goal

in the text of § 8(d)" of the Trails Act. *Nat'l Wildlife Fed'n v. ICC*, 850 F.2d 694, 707 (D.C. Cir.

1988).  Railbanking serves a present railroad purpose by maintaining and preserving an intact rail

corridor as part of the national transportation system until the corridor is needed for the

reactivation or restoration of active rail service.  *See Preseault I*, 494 U.S. at 10, 18-19; *Birt v.*

*STB*, 90 F.3d 580, 582-83 (D.C. Cir. 1996).

Railbanking falls within the scope of permitted uses under the 1875 Act even if an 1875

Act grant is limited to present rail purposes.  Under even such an inappropriately cramped reading

of an 1875 Act grant, railbanking did not "take" anything from Plaintiff: before the STB issued

the NITU, a rail easement traversed Plaintiff's property; after the STB issued the NITU, the same

easement traversed the property.  The Court should conclude, therefore, that railbanking lies

within the scope of the 1875 Act grant.

The Court must conclude that an 1875 Act grant encompasses interim trail use.  As

Congress itself determined in enacting the Trails Act, interim trail use serves an important

transportation purpose by providing another, energy efficient, means of public transportation.

*See* 16 U.S.C. § 1247(d) (". . . in furtherance of the national policy to preserve established

railroad rights-of-way for future reactivation of rail service, to protect rail transportation

corridors, and to encourage energy efficient transportation use, in the case of interim use of any

established railroad rights-of-way . . .").  In addition, interim trails serve a railroad purpose by

preserving the corridor intact and ensuring that the corridor remains available for future rail

service.  *Id.*; *see also Troha v. United States*, 692 F. Supp. 2d 550, 560-61 (W.D. Pa. 2010)

(railbanking and interim trail use "is a method of rail maintenance and preservation," and is "at all

times consistent with an intent to preserve the right-of-way for future rail use rather than to

abandon it").

As the King County transportation plans show, the right-of-way at issue comprises a segment of a public transportation system (J.A. 222 at 000095-96, 000104, 000107-109; J.A. 225 at 000121, 000145-46), while simultaneously preserving the right-of-way for future rail use.  *See* Sept. 29, 1998 Letter from Charles Montange, Esq. to Hon. Vernon Williams, Secretary, STB (J.A. 224 at 000115) (notifying the STB that "the parties have reached agreements railbanking the railroad corridor . . .").  Railbanking and interim trail use, therefore, serve a railroad purpose, and the Court should conclude that those uses lie within the scope of the 1875 Act grant.

**D.     The Prescriptive Easements Were Acquired for Use as a Transportation Corridor - a Road - and Encompass Trail Use**

In a Stipulation filed December 13, 2006, the Parties agreed that the original railroad acquired an easement in specified segments of the right-of-way at issue by adverse possession.  *See* Stipulation, ¶¶ 1 & 2 (filed Dec. 13, 2006) (Dkt. No. 87).[8/]  No agreement was reached, however, regarding the scope of that easement.  Because, under Washington law, the easement acquired by the railroad was for a right-of-way for a public highway, trail use falls well within the scope of that easement.

Under Washington law, a prescriptive "easement . . . extends only to the uses necessary to

---

[8/] The Parties also agreed that "[a]fter the Railroad acquired an easement in the right-of-way . . . certain successors in title to the patentee conveyed by deed an interest in sections of the right-of-way . . . to the Railroad.  It remains to be determined which Plaintiffs are affected by such conveyances and, if so, how their interests are affected."  Dec. 13, 2006, Stipulation, ¶ 3.  The Parties also noted that the Stipulation was based upon the facts and information currently available and that it may be modified "by agreement among the Parties should additional factual information come to light that affects the accuracy of these stipulations."  *Id.* at 2.  Finally, the Parties agreed that it remains to be determined whether any Plaintiffs own the fee simple interest in the right-of-way.  *Id.*

accomplish the purpose for which the easement was claimed." *Lee v. Lozier*, 88 Wash.App. 176,

187 (Wash. Ct. App. 1997) (citing *Yakima Valley Canal Co. v. Walker*, 76 Wash.2d 90, 94 (Wash.

1969)).  There is no authority, however, limiting the use of a prescriptive easement "to the

individual activities . . . engaged in the past." *Id.*  To the contrary, "as stated in the *Yakima*

*Valley* case, the easement extends to uses necessary to achieve the *purpose* of the easement." *Id.*

(emphasis as in original).  This conclusion, the *Lozier* court recognized, is supported by the

Restatement:

> No use can be justified under a prescriptive easement unless it can
> fairly be regarded as within the range of the privileges asserted by the
> adverse user and acquiesced in by the owner of the servient tenement.
> Yet, no use can ever be exactly duplicated.  If any practically useful
> easement is ever to arise by prescription, the use permitted under it
> must vary in some degree from the use by which it was created.
> *Hence, the use under which a prescriptive interest arises determines*
> *the general outlines rather than the minute details of the interest.*

*Id.* (quoting Restatement of Property § 477 comment b, at 2992) (emphasis added by court).

When "ascertaining whether a particular use is permissible under a prescriptive easement the

court should compare that use with the uses leading to the prescriptive easement in regard to: (a)

their physical character, (b) their purpose, and (c) the relative burden caused by them upon the

servient tenement." *Id.* at 187-88 (citing Restatement of Property § 478 at 2994).

In *Lozier*, neighbors constructed a community dock on a community-owned beach lot.

Part of the dock, however, extended onto a private lot owned by Lozier's predecessor in title,

Fogleman, who allegedly agreed to allow the neighbors to use that part of the dock extending

onto his private property.  No easement actually was recorded.  About three years after Lozier

acquired Fogleman's lot, he erected a "private property" sign on the dock, separating that part of

the dock extending onto his property from the community property.  The neighbors filed suit

- 24 -

alleging that they had a prescriptive easement to use the entire dock, and Lozier counterclaimed seeking an injunction to prevent the neighbors from entering his portions of the dock. At trial, Fogleman denied that he agreed to give the neighbors a right to use the dock extending onto his former lot. Nevertheless, the trial court found that the neighbors had openly used the entire dock for at least 10 years and otherwise met the requirements to establish a prescriptive easement.

Lozier appealed, arguing, among other things, that the prescriptive easement granted by the trial court was overly broad because it allowed all of the neighbors to engage in recreational uses of the dock, although "not all of the neighbors testified that they had engaged in all types of recreational uses in the past." *Lozier*, 88 Wash.App. at 186.

The Washington Court of Appeals affirmed, finding that:

> the physical character of the uses that led to the creation of the prescriptive easement . . . is very similar to the character of the uses permitted by the trial court's order: all are activities that take place on a dock. The purpose of the uses is the same: recreation.

*Lozier*, 88 Wash.App. at 188. Lozier did not contend that the prescriptive easement granted by the court would lead to excessive use of the dock. *See id.* Affirming, the court of appeals held that the neighbors' use of the dock "are consistent with the 'general outlines' of the activity that led to the prescriptive easement, and do not exceed its scope." *Id.* at 188.

There is no allegation that any of the activities at issue here extend beyond the confines of the existing right-of-way. As noted above in Section III.B., "[a] railroad is a public highway, created for public purposes." *Puget Sound Elec. Ry.*, 65 Wash. at 84. Also shown above, interim trail use serves a similar function as a public highway. *See* Section III. B, *supra*. Accordingly, the purpose of the uses of the right-of-way are the same: transportation. Moreover, there is no allegation in any of the Complaints that interim trail use will overburden the right-of-way or the

"servient tenement."  *See Lozier*, 88 Wash.App. at 187-88.  Interim trail use therefore falls

squarely within the prescriptive easement acquired by the railroad.

**IV.     CONCLUSION**

Because railbanking and trail use are within the scope of the easements, the United States

is entitled to summary judgment on this issue.

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division


/s/ Bruce K. Trauben
Bruce K. Trauben
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
601 D Street, NW, Rm. 3126
Washington, D.C. 20004
Tel.: (202) 305-0238
Fax:  (202) 305-0506
e-mail: bruce.trauben@usdoj.gov


Dated: June 8, 2011