# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕱𝖊𝖉𝖊𝖗𝖆𝖑 𝕮𝖑𝖆𝖎𝖒𝖘

### Nos.  03-785L, 04-1456L, 04-1457L, 04-1458L, 04-1459L,  04-1463L, 04-1465L, 04-1466L, 04-1467L, 04-1468L, 04-1469L, 04-1471L, 04-1472L, 04-1473L, 04-1474L

### Filed: April 5, 2012

| | |
|---|---|
| * * * * * * * * * * * * * | |
| **WARREN BERES and VICKI BERES, et al.,** * | |
| * | |
| **Plaintiffs,** * | **Fifth Amendment Taking; Rails** |
| **v.** * | **to Trails; Scope of Easement;** |
| * | **Railbanking; Deed Interpretation.** |
| **UNITED STATES,** * | |
| * | |
| **Defendant.** * | |
| * | |
| * | |
| * * * * * * * * * * * * * | |

**John M. Groen**, Groen Stephens & Klinge LLP, Bellevue, Wash. and **Cecilia C. Fex**, Ackerson Kauffman Fex, P.C., Washington, D.C., for the plaintiffs.

**Bruce K. Trauben**, Trial Attorney, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for the defendant.  With him was **Ignacia S. Moreno**, Assistant Attorney General, Environment and Natural Resources Division.

## O P I N I O N

<u>**HORN, J.**</u>

At issue is the scope of the rights of way in these multifaceted takings cases, involving numerous plaintiffs, multiple statutory land grants, different deed types, a prescriptive easement and subsequent conveyances over a more than one hundred year time period for property located along the eastern shore of Lake Sammamish in King County, Washington.  The plaintiffs in these consolidated[1] lawsuits allege that

---

[1] For case management purposes all of the above captioned cases were consolidated under the lead case, <u>Beres v. United States</u>, No. 03-785L.  Originally seventeen separate cases were consolidated, and as of the date of this opinion, fifteen cases are now consolidated.

when the United States Department of Transportation, Surface Transportation Board (STB) issued a Notice of Interim Trail Use (NITU), the federal government denied plaintiffs a reversionary interest in the rights of way located on their properties, formerly occupied by a railroad, which plaintiffs claim constituted takings under the Fifth Amendment to the United States Constitution.

This court previously has issued multiple opinions in these consolidated cases. One opinion denied defendant's motion for summary judgment regarding the interpretation of the General Railroad Right of Way Act of 1875, 18 Stat. 482, 43 U.S.C. §§ 934 et seq. (repealed in 1976),[2] (the 1875 Act), and its effect on plaintiffs Warren and Vicki Beres.  See Beres v. United States, 64 Fed. Cl. 403 (2005).  This court also issued an Order forwarding the plaintiffs' request for certification on relevant questions of state law to the State of Washington Supreme Court, which the State of Washington Supreme Court summarily denied.  See Schroeder v. United States, 66 Fed. Cl. 508 (2005).  Subsequently, this court issued an opinion, addressing issues of collateral estoppel regarding former plaintiffs Gerald L. and Kathryn B. Ray and a number of other plaintiffs in the above captioned consolidated cases.  See Beres, et al. v. United States, 92 Fed. Cl. 737 (2010).  Finally, this court issued an opinion addressing the question of fee versus easement for a number of the deeds which conveyed rights of way to the railroads.  See Beres, et al. v. United States, 97 Fed. Cl. 757 (2011).  The facts established in those decisions are incorporated into this opinion.  Certain of the relevant facts are briefly repeated below, together with additional facts pertinent to this opinion.

## FINDINGS OF FACT

The railroad line in question was originally constructed by the Seattle, Lake Shore & Eastern Railway Company (SLS&E) from May 1887 through March 1888.  The SLS&E acquired rights of way across public lands under the 1875 Act.  The 1875 Act granted railroad companies rights of way over public land to construct tracks and operate railways.  Requirements for obtaining a right of way were set forth in the 1875 Act, and included filing a map of the intended railroad with the local district land office and receiving approval from the Secretary of the Interior.  See 1875 Act, § 4 (codified at 43 U.S.C. § 937 (repealed by the Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, § 706(a), 90 Stat. 2743)).  Pursuant to the 1875 Act, between 1887 and 1891, the SLS&E took the necessary steps to establish a railroad right of way across public land along the eastern shore of Lake Sammamish in King County, Washington.  On July 5, 1887, the SLS&E secured approval from the Department of the Interior of their map identifying the location for proposed construction of a railroad running generally along the eastern shoreline of Lake Sammamish, Washington.  Construction of the railroad was completed in 1888.  On April 15, 1891, the SLS&E filed, with the United States Land Office in Seattle, Washington, a Map of Location showing

---

[2] The General Railroad Right of Way Act of 1875 was repealed by the Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, § 706(a), 90 Stat. 2743, 2793 (1976).

the final location of the constructed railroad.  A segment of the completed railroad traversed through a parcel of land identified as Government Lot 4, Section 6, Township 24 North, Range 6 East, Willamette Meridian, in King County, Washington.

On January 11, 1892, after the SLS&E had secured its right of way under the 1875 Act, the United States issued a land patent to William H. Cowie.  The parcel of land patented to William H. Cowie was described as Government Lot 4, in Section 6, Township 24 North, Range 6 East, Willamette Meridian, in what is now King County, Washington.  Therefore, the parcel of land patented to William H. Cowie included a portion of the rights of way previously secured by the SLS&E.

In Beres v. United States, 64 Fed. Cl. 403, this court determined that:

Under the facts at issue in the case currently before this court, when the United States granted a right-of-way to the [SLS&E], pursuant to the 1875 Act, it granted an easement to the railroad for railroad purposes, in keeping with the purpose of the 1875 Act.  The 1875 Act indicated that future dispositions of such lands shall be disposed of "subject to" the right-of-way granted to a railroad.  Act of 1875, at § 4.  The language of the 1875 Act makes no statement reserving any property interest in the United States.  Thus, when the United States granted a land patent to William H. Cowie in 1892, the land transfer was subject only to the existing railroad right-of-way by operation of the specific words of the 1875 Act.

Beres v. United States, 64 Fed. Cl. at 427.

The parties have stipulated for the purposes of their cross-motions for partial summary judgment, subject to verification by professional mapping or like services, that at least some of the Beres plaintiffs,[3] Case No. 03-785L; Ritzen plaintiffs,[4] Case No. 04-1469L; Estate of Pearl Welch plaintiffs,[5] Case No. 04-1471L; and/or the Waverly Hills Club, Inc. plaintiffs,[6] Case No. 04-1474L, are successors-in-interest to Mr. Cowie.[7]

---

[3] The plaintiffs in Beres are Warren and Vicki Beres.

[4] The Ritzen plaintiffs are Alex A. and Jean M. Ritzen, James Lee Sutter, Fred Robert W. Sutter, Richard H. Sutter, Pamela Joy Sutter Spencer, and Robert B. Sutter.

[5] The Estate of Pearl Welch plaintiffs are the estate of Pearl Welch, represented by Jeffrey A. Welch, executor for the estate of Pearl Welch, Paul and JoAnn Spears, Charles and Anita Karr, Shirley Seil, Winlock Pickering, and Robert C. Folkman.

[6] The plaintiffs in Waverly Hills Club, Inc. are Waverly Hills Club, Inc., Bill and Lois Wilson, Brian and Mary Conway, Scott and Sandra deMers, Bud and Connie Olson, Barbara Petzold, Carol Fedigan, Gene and Betty Liekhus, Foster and Lemoine Radford, EVI & HLP, LP, HSK & LMK, LP, Kosenkranius Trust, Leo Kosenkranius, and Sandra Kosenkranius.

In addition to acquiring rights of way by way of the 1875 Act, during May and June of 1887, the SLS&E acquired land needed to construct the railroad along the eastern shore of Lake Sammamish by right of way deeds from plaintiffs' predecessors in title: grantors Louis and Mary Tahalthkut for the Schroeder plaintiffs,[8] Case No. 04-1456L; grantors Bill and Mary Hilchkanum for the Chamberlin plaintiffs,[9] Case No. 04-1457L; grantors George and Elizabeth Davis for the Klein plaintiffs,[10] Case No. 04-1458L; grantors Bill and Lucinda Sbedzuse for the Peterson plaintiffs,[11] Case No. 04-1459L, and the Lane plaintiff,[12] Case No. 04-1468L (on the Sbedzuse deed); grantors Jim and Alice Yonderpump for the Spencer plaintiffs,[13] Case No. 04-1463L, and grantor

---

[7] At this time, based on the record filed by the parties to date, the court cannot and does not make a legal judgment as to the validity of the chains of title regarding any of the plaintiffs' properties.

[8] The plaintiffs in Schroeder are Clifford F. and Kathryn L. Schroeder.

[9] The plaintiffs in Chamberlin are Martin and Carol Chamberlin, Craig and Tammy Owens, Jeffrey and Sandra Sheehan, Steven and Susan Roberts, Frederic and Linda Vicik, Steven and Karin Farrar, Hank and Eden Waggoner, Patrick and Chenoa Haluptzok, Lester and Barbara Peterson, Lauren Jenkins, J. Terry Pietromonaco, Gary Nelson, Hans Apel, and Pamela Burton.  J. Terry Pietromonaco is listed as both "J. Terry Pietromonaco" and "Terry Pietromonaco" in the complaint.  The Chamberlin case formerly was captioned Gerald and Kathryn Ray v. United States.  In the court's opinion issued April 12, 2010, the claims brought by Gerald L. and Kathryn B. Ray were dismissed, with prejudice.  See generally Beres, et al. v. United States, 92 Fed. Cl. 737. The claims of the remaining plaintiffs in Case No. 04-1457L are still pending.

[10] The plaintiffs in Klein are Henry D. and Judy D. Klein.

[11] The plaintiffs in Peterson are Clarence A. Peterson, George W. Raab, Donna Marie Raab Martinez, and J. Herb and Judith T. Gilbo.  Judith Gilbo is listed as both "Judith D. Gilbo" and "Judith T. Gilbo" in the complaint.

[12] The plaintiff in Lane is Phyllis Lane.

[13] The plaintiffs in Spencer are Raymond and Lael Spencer, James and Billie Cairns, Thomas and Angela Napier, William and Lynda Ott, William and Carolyn Daly, Douglas and Joyce McCallum, Evan and Beverly Helling, Reid and Susan Brockway, Phillip and Arlene Pielemeier, Jorge and Kristine Calderon, Robert Lester, John and Carolyn Rossi, Debra Grove, Douglas and Jill Hendel, the Welch Family LLC, the Estate of Mavis N. Welcome, Karen Gregory, and Diane Gregory.

Alfred Palmberg for the <u>Nelson</u> plaintiffs,[14] Case No. 04-1465L; and the <u>Collins</u> plaintiffs,[15] Case No. 04-1472L (collectively, the SLS&E Deeds).  The deed at issue in <u>Manning</u>,[16] Case No. 04-1466L, was acquired by the Northern Pacific Railway Company (Northern Pacific), successor of the SLS&E, on June 3, 1904, by Quit Claim Deed (the 1904 Reeves Quit Claim Deed) from the <u>Manning</u> plaintiffs' predecessor in title, J.D. and Elizabeth Reeves.[17]

In pertinent part, the SLS&E Deeds were in the following format:

> In Consideration of the benefits and advantages to accrue to us from the location, construction and operation of the Seattle, Lake Shore and Eastern Railway in the County of King in Washington Territory we do hereby donate, grant and convey unto said Seattle, Lake Shore and Eastern Railway Company a right of way one hundred (100) feet in width through our lands in said County, described as follows, to wit:

> [specific description of lot and section]

> Such right of way strip to be fifty (50) feet in width on each side of the center line of the railway track as located across our said lands by the Engineer of said Railway Company, which location is described as follows, to wit:

> [description of the metes and bounds]

> And the said Seattle, Lake Shore and Eastern Railway Company shall have the right to go upon the land adjacent to said line for a distance

---

[14] The plaintiffs in <u>Nelson</u> are Robert G. and Beth Nelson, the Estate of William F. Hughes, Jill Barney, Beth Nelson [sic], William Hughes, and Charles Hughes.  Robert Nelson is listed as both "Robert G. Nelson" and "Robert Nelson" in the complaint.

[15] The plaintiffs in <u>Collins</u> are D. Mike and Vanessa Collins, George and Judith Sutherland, Howard and Pam Freedman, and Donald and Jean Barrett.

[16] The plaintiffs in <u>Manning</u> are Paul and Joy Manning and the DeMeester Family Limited Partnership.

[17] Originally the consolidated cases also included claims by the plaintiffs in <u>Edlund</u>, Case No. 04-1464L and <u>Rundle</u>, Case No. 04-1476L. The plaintiff in <u>Edlund</u> was Douglas Edlund, and the plaintiffs in <u>Rundle</u>, were Robert M. and Denise C. Rundle, and Frederick and Karen Horvath.   Those claims were dismissed pursuant to the parties' joint stipulation of dismissal.  As noted above, claims by Gerald L. and Kathryn B. Ray were dismissed in the court's April 13, 2010 opinion.  <u>See</u> generally <u>Beres, et al. v. United States</u>, 92 Fed. Cl. 737.

of two hundred (200) feet on each side thereof and cut down all trees dangerous to the operation of said road.

To Have and to Hold said premises with the appurtenances unto the said party of the second part, and to its successors and assigns forever.

In Witness Whereof the parties of the first part have hereunto set their hands and seals this [__] day of [Month], A.D. 1887.

The source deeds in <u>Schroeder</u>, <u>Chamberlin</u>, <u>Klein</u>, <u>Peterson</u>, <u>Lane</u>, and <u>Spencer</u> follow this form.  The source deed at issue in <u>Nelson</u> and <u>Collins</u>, also follows the same form, but contains the following additional sentence in the habendum clause: "All riparian and water front rights on Lake Samamish [sic] are hereby expressly reserved."  In an earlier opinion, the court concluded that after analysis of the seven plus two <u>Brown</u> factors in <u>Brown v. State</u>, 924 P.2d 908, 911 (Wash.), <u>recons.</u> <u>denied</u> (Wash. 1996), the language of the source deeds was intended to convey easements to the SLS&E. <u>See</u> <u>Beres et al.</u> <u>v. United States</u>, 97 Fed. Cl. at 803.

Additionally, the June 3, 1904 Reeves Quit Claim Deed to the Northern Pacific, at issue in <u>Manning</u>, states, in pertinent part:

This Indenture made this third day of June in the year of our Lord one Thousand nine hundred and four, Between J.D. Reeves and Elizabeth Jane Reeves, his wife, the parties of the first part and the Northern Pacific Railway Company, a corporation, the party of the second part, Witnesseth: That the said parties of the first part for and in consideration of the sum of One hundred and Fifty dollars of the United States to them in hand paid by the said party of the second part, the receipt whereof is hereby acknowledged do by these presents, remise, release, and forever quit claim unto the said party of the second part and to its assigns all right, title and interest and estate of said first parties in and to all that certain lot, piece or parcel of land, situate lying and being in the County of King, State of Washington, and particularly bounded and described as follows, to wit:

The interest of said grantors in and to a tract of Land lying within lines drawn parallel with with [sic][18] the center of the main Line track and fifty feet from said center of the Seattle, Lake Shore & Eastern Railway, now the Northern Pacific Railway, through the Townsite of Inglewood, King County, State of Washington, and running from Ash Street to Willow Streets and through the following Blocks in said Townsite; [list of blocks] according to the plat of said Town of Inglewood as recorded in Volume

---

[18] This first "[sic]" is included in the copy of the deed provided to the court in the Joint Stipulation of Issues and Facts.

three, of Plat Books, page 169 records of King County, Washington; the intention being to convey herein a right of way fifty feet on each side of said track through any lots or blocks conveyed to the Grantor J.D. Reeves by grant of date, November 13, 1903, from King County, Washington, said lots being as follows, [list of lots and blocks]

Together will [sic] all and singular the tenements, hereditaments and appurtenances thereunto, belonging, or in anywise appertaining, and the reversions, remainder and remainers [sic], rents, issues and profits thereof.

To have and to hold all and singular the said premises together with the appurtenances, unto said party of the second part and to its heirs and assigns forever.  In witness whereof, The said parties of the first part have hereunto set hands and seals the day and year first above written.

In its April 7, 2011 opinion, this court concluded "that the grantors of the 1904 Reeves Quit Claim Deed intended to convey only an easement to the railroad." Beres et al. v. United States, 97 Fed. Cl. at 809.  In addition to acquiring rights of way by the 1875 Act, the SLS&E Deeds, and the 1904 Reeves Quit Claim Deed, the SLS&E also acquired land to construct the railroad along the eastern shore of Lake Sammamish by prescriptive easement in 1887 or 1888.   According to the parties' Joint Stipulations, "the SLS&E acquired an easement by adverse possession/prescriptive easement in Government Lot 2, Section 7, Township 24 North, Range 6 East, W.M."  The parties also stipulated that after the SLS&E acquired its interest by adverse possession/prescriptive easement, "certain successors-in-interest to the patentee conveyed by deed an interest in sections of the right-of-way in Government Lot 2, Section 7, Township 24 North, Range 6 East, W.M."  The Morel plaintiffs,[19] Case No. 04-1467L, and the Brown plaintiffs,[20] Case No. 04-1473L, are "successors-in-interest to landowners who retained a fee interest in the right-of-way subject to, or burdened by, the railroad's easement acquired by adverse possession/prescriptive easement."[21]

---

[19] The plaintiffs in Morel are Eugene and Elizabeth Morel, Stephen and Jean Guthrie, Ivan Stewart, Roy M. Crispin, Ashok and Shawna Kuruganti, Bernita McNabb, Mary K. Heston, Royce Berg and Charlene A. Tagas, Eva Barnes, Gordon G. Conger, Elizabeth Mueller, Lois K. Jarman, and Douglas W. Conger.

[20] The plaintiffs in Brown are Reid and Teresa Brown.

[21] According to the Brown plaintiffs, the Browns owned property located in "Section 7, Township 24 North, Range 6 East, in King County."  The parties have indicated, "that the parcels affected by any subsequent conveyance will be identified through professional mapping, or similar service."

The SLS&E went through receivership in 1889 and was subsequently purchased by the Seattle and International Railroad.  The Seattle and International Railroad was subsequently acquired by the Northern Pacific Railway Company.  The Burlington Northern Railroad was formed in 1970 through the merger of the Northern Pacific Railway, the Great Northern Railway, the Chicago, Burlington and Quincy Railroad, and the Spokane, Portland and Seattle Railway, among other wholly-owned subsidiaries, and by virtue of these series of transactions, Burlington Northern Railroad became the successor-in-interest to the SLS&E.  On December 31, 1996, the Atchison, Topeka & Santa Fe Railway Company formally merged into the Burlington Northern Railroad and became Burlington Northern & Santa Fe Railway Company (Burlington Northern).

In 1997, Burlington Northern, a successor-in-interest to the SLS&E's and Northern Pacific's rights of way, concluded that continued operation of the pertinent line was not economically viable.  See Redmond-Issaquah R.R. Pres. Ass'n v. Surface Transp. Bd., 223 F.3d 1057, 1058 (9th Cir. 2000). Therefore, in 1998, Burlington Northern sought an exemption from the STB to abandon a 12.45 mile line of railroad on the eastern shore of Lake Sammamish, a portion of which traverses the plaintiffs' properties.  See Burlington N. & Santa Fe Ry. Co. - Abandonment Exemption - in King Cnty., WA, STB Docket No. AB-6 (Sub. No. 380X), 1998 WL 638432 (S.T.B. Sept. 16, 1998).

On May 13, 1998, the STB granted Burlington Northern an exemption to abandon a 12.45 mile length of railroad between milepost 7.3, near Redmond, and milepost 19.75, at Issaquah, in King County, Washington.  See id.  On September 16, 1998, the STB authorized The Land Conservancy of Seattle and King County (TLC) to assume financial responsibility for the rights of way pursuant to the National Trails System Act Amendments of 1983, Pub. L. No. 98-11, § 208, 97 Stat. 42, codified at 16 U.S.C. § 1247(d) (2006) (the Trails Act).  See Burlington N. & Santa Fe Ry. Co. - Abandonment Exemption - in King Cnty., WA, STB Docket No. AB-6 (Sub. No. 380X), 1998 WL 638432.   The STB also authorized the issuance of a NITU for the Burlington Northern right of way, permitting King County and the TLC to establish a public recreational trail over the railroad right of way.  The STB's ruling authorized conversion of the railroad rights of way into a recreational trail, pursuant to 16 U.S.C. § 1247(d). The NITU was issued on September 18, 1998.  King County, Washington subsequently reached an agreement with Burlington Northern for use of the rights of way for trail purposes.   On September 29, 1998, counsel for the TLC informed the STB that the parties had reached agreements railbanking the railroad corridor pursuant to the NITU. Since the STB approved conversion of the railway to a trail, no railway carriers have used the railroad, and the tracks have been removed from the rights of way.

## DISCUSSION

The plaintiffs in the above captioned consolidated cases allege that the federal government's actions resulted in takings of their property without compensation, in violation of the Fifth Amendment to the United States Constitution.  This court previously determined that the 1875 Act conveyed only easements, the SLS&E Deeds conveyed

only easements, the 1904 Reeves Quit Claim Deed conveyed only an easement to the Northern Pacific, and the parties have stipulated that the SLS&E acquired certain of their interests by adverse possession/prescriptive easement.  The parties have filed partial cross-motions for summary judgment on the limited issue of the scope of those easements.

RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed. R. Civ. P.) and is similar, both in language and effect.  Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a) (2011); Fed. R. Civ. P. 56(a) (2012); see also Alabama v. North Carolina, 130 S. Ct. 2295, 2308 (2010); Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Nebraska v. Wyoming, 507 U.S. 584, 590 (1993); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Fujitsu Ltd. v. Netgear Inc., 620 F.3d 1321, 1325 (Fed. Cir.), reh'g denied (Fed. Cir. 2010); Consol. Coal Co. v. United States, 615 F.3d 1378, 1380 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 131 S. Ct. 2990 (2011); 1st Home Liquidating Trust v. United States, 581 F.3d 1350, 1355 (Fed. Cir. 2009); Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1378 (Fed. Cir. 2009); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008), reh'g and reh'g en banc denied, 556 F.3d 1329 (Fed. Cir. 2009); Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2005); Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1370-71 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Cohen v. United States, 100 Fed. Cl. 461, 469 (2011); Boensel v. United States, 99 Fed. Cl. 607, 610 (2011).  A fact is material if it will make a difference in the result of a case under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Thompson v. United States, 101 Fed. Cl. 416, 426 (2011); Cohen v. United States, 100 Fed. Cl. at 469.  Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Walker v. United States, 79 Fed. Cl. 685, 692 (2008); Curtis v. United States, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; see, e.g., Schlup v. Delo, 513 U.S. 298, 332 (1995); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Cohen v. United States, 100 Fed. Cl. at 469-70; Boensel v. United States, 99 Fed. Cl. at 611; Macy Elevator, Inc. v. United States, 97 Fed. Cl. 708, 717 (2011); Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States, 87 Fed. Cl. 113, 126 (2009); Johnson v. United States, 49 Fed. Cl. 648, 651 (2001), aff'd, 52 F. App'x 507 (Fed. Cir. 2002), published at 317 F.3d 1331 (Fed. Cir. 2003).  The judge must determine whether the evidence presents a

disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-52; Jay v. Sec'y of Dep't of Health and Human Servs., 998 F.2d 979, 982 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1993).  When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted.  See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Rothe Dev. Corp. v. U.S. Dep't of Def., 262 F.3d 1306, 1316 (Fed. Cir. 2001); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996).  In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

> In appropriate cases, summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless.  "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

Dehne v. United States, 23 Cl. Ct. 606, 614-15 (1991) (quoting Pure Gold, Inc. v. Syntex, (U.S.A.) Inc., 739 F.2d 624, 626 (Fed. Cir. 1984)), vacated on other grounds, 970 F.2d 890 (Fed. Cir. 1992) (citation omitted); see also Metric Constr. Co., Inc. v. United States, 73 Fed. Cl. 611, 612 (2006).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Takeda Pharm. Co. v. Doll, 561 F.3d 1372, 1375 (Fed. Cir. 2009); Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 555 U.S. 812 (2008); Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1109 (2002); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999); Gonzales-McCaulley Inv. Group, Inc. v. United States, 101 Fed. Cl. 623, 629 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied.  Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs.  See Ricci v. DeStefano, 557 U.S. 557, 129 S. Ct. 2658, 2677 (2009); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Yant v. United States, 588 F.3d 1369, 1371 (Fed. Cir. 2009), cert. denied, 131 S. Ct. 69 (2010); Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 293 F.3d 1364 (Fed. Cir. 2002), cert. denied, 539 U.S. 957 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998); see also Am. Pelagic Co. v. United States, 379

F.3d at 1371 (citing <u>Helifix Ltd. v. Blok-Lok, Ltd.</u>, 208 F.3d 1339, 1345-46 (Fed. Cir. 2000)); <u>Boensel v. United States</u>, 99 Fed. Cl. at 611 ("'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 255) (citing <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. at 587-88; <u>Casitas Mun. Water Dist. v. United States</u>, 543 F.3d at 1283, <u>Lathan Co. Inc. v. United States</u>, 20 Cl. Ct. 122, 125 (1990))). "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." <u>Republic Sav. Bank, F.S.B. v. United States</u>, 584 F.3d 1369, 1374 (Fed. Cir. 2009); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 247-48.

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986); <u>see also</u> <u>Riley & Ephriam Constr. Co. v. United States</u>, 408 F.3d 1369, 1371 (Fed. Cir. 2005); <u>Crown Operations Int'l Ltd. v. Solutia Inc.</u>, 289 F.3d 1367, 1377 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 2002); <u>Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc.</u>, 109 F.3d 739, 741 (Fed. Cir.) (quoting <u>Conroy v. Reebok Int'l, Ltd.</u>, 14 F.3d 1570, 1575 (Fed. Cir. 1994), <u>reh'g denied</u> <u>and</u> <u>en</u> <u>banc</u> <u>suggestion</u> <u>declined</u> (Fed. Cir. 1995)), <u>reh'g denied</u> <u>and</u> <u>en</u> <u>banc</u> <u>suggestion</u> <u>declined</u> (Fed. Cir. 1997); <u>Lockwood v. Am. Airlines, Inc.</u>, 107 F.3d 1565, 1569 (Fed. Cir. 1997); <u>Dana R. Hodges Trust v. United States</u>, 101 Fed. Cl. 549, 553 (2011). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 322; <u>see also</u> <u>Wavetronix LLC v. EIS Elec. Integrated Sys.</u>, 573 F.3d 1343, 1354 (Fed. Cir. 2009); <u>Long Island Sav. Bank, FSB v. United States</u>, 503 F.3d at 1244; <u>Florida Power & Light Co. v. United States</u>, 375 F.3d 1119, 1124 (Fed. Cir. 2004); <u>Schoell v. Regal Marine Indus., Inc.</u>, 247 F.3d 1202, 1207 (Fed. Cir. 2001); <u>Am. Airlines, Inc. v. United States</u>, 204 F.3d 1103, 1108 (Fed. Cir. 2000). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." <u>Saab Cars USA, Inc. v. United States</u>, 434 F.3d 1359, 1369 (Fed. Cir. 2006).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other. <u>See</u> <u>Prineville Sawmill Co. v. United States</u>, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing <u>Mingus Constructors, Inc. v. United States</u>, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); <u>see also</u> <u>Marriott Int'l Resorts, L.P. v. United States</u>, 586 F.3d 962, 968-69 (Fed. Cir. 2009); <u>B.F. Goodrich Co. v. U.S. Filter Corp.</u>, 245 F.3d 587, 593 (6th Cir. 2001); <u>Atl. Richfield Co. v. Farm Credit Bank of Wichita</u>, 226 F.3d 1138, 1148 (10th Cir. 2000); <u>Chevron USA, Inc. v. Cayetano</u>, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), <u>cert. denied</u>, 532 U.S. 942 (2001); <u>Bubble Room, Inc. v. United States</u>, 159 F.3d 553, 561 (Fed. Cir. 1998)

("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."), reh'g denied and en banc suggestion declined (Fed. Cir. 1999); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998); Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997); LewRon Television, Inc. v. D.H. Overmyer Leasing Co., 401 F.2d 689, 692 (4th Cir. 1968), cert. denied, 393 U.S. 1083 (1969); Rogers v. United States, 90 Fed. Cl. 418, 427 (2009), subsequent determination, 93 Fed. Cl. 607 (2010); Consol. Coal Co. v. United States, 86 Fed. Cl. 384, 387 (2009), aff'd, 615 F.3d 1378 (Fed. Cir. 2010), cert. denied, 131 S. Ct. 2990 (2011); St. Christopher Assocs., L.P. v. United States, 75 Fed. Cl. 1, 8 (2006), aff'd, 511 F.3d 1376 (Fed. Cir. 2008); Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or otherwise stated, in favor of the non-moving party. See First Commerce Corp. v. United States, 335 F.3d 1373, 1379; reh'g and reh'g en banc denied (Fed. Cir. 2003); see also DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1322 (Fed. Cir. 2001); Gart v. Logitech, Inc., 254 F.3d 1334, 1338-39 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1114 (2002); Oswalt v. United States, 85 Fed. Cl. 153, 158 (2008); Telenor Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 119 (2006).

Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. B.F. Goodrich Co. v. United States Filter Corp., 245 F.3d at 593; Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998); Rogers v. United States, 90 Fed. Cl. at 427; Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 748 (1998).

"Questions of law are particularly appropriate for summary judgment." Oenga v. United States, 91 Fed. Cl. 629, 634 (2010) (citing Dana Corp. v. United States, 174 F.3d 1344, 1347 (Fed. Cir. 1999) ("Summary judgment was appropriate here [in Dana Corp.] because no material facts were disputed, many being stipulated, and the only disputed issues were issues of law. Moreover, on each issue one party or the other is entitled to judgment as a matter of law.")). For the purposes of resolving the cross-motions for partial summary judgment currently before the court, the material facts are not in dispute. Therefore, the issues presented may be resolved by summary judgment.

Under the Tucker Act, the United States Court of Federal Claims has exclusive jurisdiction to render judgment upon any claim against the United States for money damages exceeding $10,000.00 that is "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2006). Therefore, "a claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." E. Enters. v. Apfel, 524 U.S. 498, 520 (1998) (citing

Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016-19 (1984)); see also Acceptance Ins. Cos. v. United States, 503 F.3d 1328, 1336 (Fed. Cir. 2007); Morris v. United States, 392 F.3d 1372, 1375 (Fed. Cir. 2004) ("Absent an express statutory grant of jurisdiction to the contrary, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000."). The United States Supreme Court has declared: "If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [United States Court of Federal Claims] to hear and determine." Preseault v. Interstate Commerce Comm'n,[22] 494 U.S. 1, 12 (1990) (quoting United States v. Causby, 328 U.S. 256, 267 (1946)); see also Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1368 (Fed. Cir. 2005); Narramore v. United States, 960 F.2d 1048, 1052 (Fed. Cir. 1992); Perry v. United States, 28 Fed. Cl. 82, 84 (1993).

The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V.  The purpose of this Fifth Amendment provision is to prevent the government from "'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001) (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)); see also Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 123-24, reh'g denied, 439 U.S. 883 (1978); Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 536 (2005); E. Enters. v. Apfel, 524 U.S. at 522; Rose Acre Farm, Inc. v. United States, 559 F.3d 1260, 1266 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2009), cert. denied, 130 S. Ct. 1501 (2010); Janowsky v. United States, 133 F.3d 888, 892 (Fed. Cir. 1998); Resource Invs., Inc. v. United States, 85 Fed. Cl. 447, 469-70 (2009); Pumpelly v. Green Bay & Miss. Canal Co., 80 U.S. (13 Wall.) 166, 179 (1871) (citing to principles which establish that "private property may be taken for public uses when

---

[22] Preseault v. Interstate Commerce Commission, 494 U.S. 1, is a 1990 United States Supreme Court decision and is sometimes referred to as Preseault I.  In Preseault I, the Supreme Court concluded that although the Trails Act represented a valid exercise of Congressional power under the commerce clause of the United States Constitution, when railroad rights of way are converted to interim public trail use under the Trails Act, the Trails Act could not effect takings of private property without just compensation. See generally id.  Subsequently, in 1996, the United States Court of Appeals for the Federal Circuit issued a decision also involving the Preseaults, Preseault v. United States, 100 F.3d 1525 (Fed. Cir. 1996), sometimes referred to as Preseault II.  As explained by the Federal Circuit, "[t]he Preseaults own a fee simple interest in a tract of land near the shore of Lake Champlain in Burlington, Vermont, on which they have a home. This tract of land is made up of several previously separate properties, the identities of which date back to before the turn of the century. The dispute centers on three parcels within this tract, areas over which the original railroad right-of-way ran." Id. at 1531.  In Preseault II, the Federal Circuit concluded that "[w]hen state-defined property rights are destroyed by the Federal Government's preemptive power in circumstances such as those here before us, the owner of those rights is due just compensation." Id. at 1552.

public necessity or utility requires" and that there is a "clear principle of natural equity that the individual whose property is thus sacrificed must be indemnified.").

To succeed under the Fifth Amendment Takings Clause, a plaintiff must show that the government took a private property interest for public use without just compensation. See Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004), cert. denied, 546 U.S. 811 (2005); Arbelaez v. United States, 94 Fed. Cl. 753, 762 (2010); Gahagan v. United States, 72 Fed. Cl. 157, 162 (2006). The issue of whether a taking has occurred is a question of law based on factual underpinnings." Huntleigh USA Corp v. United States, 525 F.3d 1370, 1377-78 (Fed. Cir.), cert. denied, 555 U.S. 1045 (2008).

The Federal Circuit has established a two-part test to determine whether governmental actions amount to takings of private property under the Fifth Amendment. See Klamath Irr. Dist. v. United States, 635 F.3d 505, 511 (Fed. Cir. 2011); Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir. 1995)). A court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged takings. Then, the court must determine whether the government action is a "'compensable taking of that property interest.'" Huntleigh USA Corp v. United States, 525 F.3d at 1377 (quoting Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d at 1372)

A takings plaintiff must have a legally cognizable property interest, such as the right of possession, use or disposal of the property. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (citing United States v. Gen. Motors Corp., 323 U.S. 373 (1945)); CRV Enters., Inc. v. United States, 626 F.3d 1241, 1249 (Fed. Cir. 2010), cert. denied, 131 S. Ct. 2459 (2011); Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374-75 (Fed. Cir.), reh'g denied and en banc suggestion denied (Fed. Cir. 2000), cert. denied, 532 U.S. 941 (2001). "It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (quoting Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001), cert. denied 353 U.S. 1077 (2002) and citing Cavin v. United States, 956 F.2d 1131, 1134 (Fed. Cir. 1992)). Therefore, "[i]f the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end." Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (citing Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003) and M & J Coal, 47 F.3d at 1154). The court does not address the second step "without first identifying a cognizable property interest." Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir.) (citing Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1381 and Conti v. United States, 291 F.3d 1334, 1340 (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003)), reh'g denied and reh'g en banc denied (Fed. Cir. 2005). Only if there is to be a next step, "after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest." Huntleigh USA Corp. v. United States, 525 F.3d at 1378 (quoting Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372).

If a plaintiff has a valid property interest, the government takes that interest by destroying, physically occupying, or excessively regulating it for a public purpose.  See Stop the Beach Renourishment, Inc. v. Fla. Dept. of Envtl. Prot., 130 S. Ct. 2592, 2601 (2010); Boyle v. United States, 200 F.3d 1369, 1374 (Fed. Cir. 2000). "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." Brown v. Legal Found. of Wash., 538 U.S. 216, 233 (2003) (quoting Tahoe Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 321-23 (2002)) (citations omitted); see also John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1357 (Fed. Cir.) ("[A] permanent physical occupation by the government is a per se physical taking requiring compensation under the Fifth Amendment because it destroys, among other rights, a property owner's right to exclude."), reh'g en banc denied (Fed. Cir. 2006), aff'd, 552 U.S. 130 (2008).  The United States Supreme Court has indicated that when "deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole…."  Penn Central Transp. Co. v. City of New York, 438 U.S. at 130-31.  If a plaintiff does possess a property interest, the court decides if the "property has been deprived or abridged sufficiently to qualify as 'taken.'"  See Northwest La. Fish & Game Pres. Comm'n v. United States, 574 F.3d 1386, 1390 (Fed. Cir. 2009) (quoting Members of Peanut Quota Holders Ass'n v. United States, 421 F.3d 1323, 1330 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2005), cert. denied, 548 U.S. 904 (2006)), cert. denied, 130 S. Ct. 1072 (2010); see also Acceptance Ins. Cos. v. United States, 583 F.3d 849, 854 (Fed. Cir. 2009), cert. denied, 130 S. Ct. 2402 (2010); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003); Wyatt v. United States, 271 F.3d at 1099-1100; Karuk Tribe of Cal. v. Ammon, 209 F.3d at 1374.

The STB has authority to regulate most railroad lines in the United States.  See 49 U.S.C. § 702 (2006).  A railroad seeking to abandon any part of its railroad lines must either (1) file an application to abandon or (2) file a notice of exemption to abandon the line.  49 U.S.C. § 10903 (2006); 49 C.F.R. § 1152.50 (2012).  "If the STB approves a standard abandonment application or grants an exemption and the railroad ceases operation, the STB relinquishes jurisdiction over the abandoned railroad right-of-way and state law reversionary property interests, if any, take effect."  Caldwell v. United States, 391 F.3d 1226, 1228-29 (Fed. Cir.) (citing Preseault I, 494 U.S. at 6-8), reh'g en banc denied (Fed. Cir.), cert. denied, 546 U.S. 826 (2005).

Alternatively, by operation of the Trails Act, the STB may issue a NITU, "suspending exemption proceedings for 180 days to allow a third party to enter into an agreement with the railroad to use the right-of-way as a recreational trail."  Barclay v. United States, 443 F.3d 1368, 1371 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2006), cert. denied, 846 U.S. 1209 (2007).  Section 8(d) of the Trails Act, "allows a railroad to negotiate with a state, municipal, or private group ('the trail operator') to assume financial responsibility for operating the railroad right of way as a recreational trail."  See Bright v. United States, 603 F.3d 1273, 1275 (Fed. Cir.), reh'g and reh'g en banc denied

(Fed. Cir. 2010) (citing <u>Caldwell v. United States</u>, 391 F.3d at 1229).  If the railroad and an authorized trail provider[23] reach an agreement, the NITU extends indefinitely, and the corridor is railbanked, with interim trail use permitted.   <u>See</u> 49 C.F.R. § 1152.29(d)(1)-(2) (current through Mar. 29, 2012) ("The NITU will indicate that interim trail use is subject to future restoration of rail service…[t]he NITU will also provide that, if the user intends to terminate trail use, it must send the [STB] a copy of the NITU and request that it be vacated on a specific date."); <u>see also</u> <u>Caldwell v. United States</u>, 57 Fed. Cl. 193, 194 (2003) (quoting <u>Neb. Trails Council v. Surface Transp. Bd.</u>, 120 F.3d 901, 903 n.1 (8th Cir. 1997)) ("The term railbanking refers to the 'preservation of railroad corridor for future rail use,' while making the corridor available for other activities."), <u>aff'd</u>, 391 F.3d 1226 (Fed. Cir. 2004), <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir.), <u>cert.</u> <u>denied</u>, 546 U.S. 826 (2005).  When the NITU extends indefinitely and the corridor is railbanked, the STB retains jurisdiction and abandonment of the rail corridor is blocked.  <u>See</u> 16 U.S.C. § 1247(d) ("[I]n the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.").

As described by the United States Court of Appeals for the Federal Circuit:

> Thus, section 8(g) of the Trails Act prevents the operation of state laws that would otherwise come into effect upon abandonment-property laws that would "result in extinguishment of easements for railroad purposes and reversion of rights of way to abutting landowners."   Rail Abandonments-Use of Rights-of-Way as Trails, Ex Parte No. 274 (Sub-No. 13), 2 I.C.C. 2d 591, 1986 WL 68617 (1986).  A Fifth Amendment taking occurs if the original easement granted to the railroad under state property law is not broad enough to encompass a recreational trail.  <u>See</u> <u>Preseault II</u>, 100 F.3d at 1552; <u>see also</u> <u>Toews [v. United States]</u>, 376 F.3d at 1376.

<u>Caldwell v. United States</u>, 391 F.3d at 1229.

The Federal Circuit has established a three-part inquiry to determine takings liability in cases involving the conversion of railroad rights of way to a recreational trail via 16 U.S.C. § 1247(d) of the Trails Act:

> (1) who owned the strips of land involved, specifically did the Railroad…acquire only easements, or did it obtain fee simple estates; (2)

---

[23] The Trails Act indicates that a trail provider may be "a State, political subdivision, or qualified private organization [that] is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way."  16 U.S.C. § 1247(d).

> if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

Preseault II, 100 F.3d at 1533.  Phrased differently, the Federal Circuit more recently indicated:

> the determinative issues for takings liability are (1) who owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate; (2) if the railroad acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and (3) even if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).

Ellamae Phillips Co. v. United States, 564 F.3d 1367, 1373 (Fed. Cir. 2009) (citing Presault II, 100 F.3d at 1533).

As noted above, this court previously issued opinions determining that the conveyances pursuant to the 1875 Act, the SLS&E Deeds, and the 1904 Reeves Quit Claim Deed conveyed only easements and not fee interests; and the parties have stipulated that the interests the SLS&E acquired by adverse possession/prescriptive easement also were easements and not fee interests, thereby addressing the first part of the Federal Circuit's Rails to Trails takings inquiry.  The court, therefore, ordered the parties to brief the second part of the Rails to Trails takings inquiry, the scope of the easements.

**Scope of the Easements**

The United States Court of Appeals for the Federal Circuit has indicated that "[a] Fifth Amendment taking occurs if the original easement granted to the railroad under state property law is not broad enough to encompass a recreational trail."  Caldwell v. United States, 391 F.3d at 1229 (citing Presault II, 100 F.3d at 1533).  The Federal Circuit also has stated, "[i]t is settled law that a Fifth Amendment taking occurs in Rails–to–Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." Ladd v. United States, 630 F.3d 1015, 1019 (Fed. Cir. 2010), reh'g and reh'g en banc denied, 646 F.3d 910 (Fed. Cir. 2011) (citing Ellamae Phillips Co. v. United States, 564 F.3d at 1373; see also Jenkins v. United States, 102 Fed. Cl. 598, 605 (2011); Dana R. Hodges Trust v. United States, 101 Fed. Cl. at 551.

In Toews v. United States, 376 F.3d 1371 (Fed. Cir.), reh'g denied (Fed. Cir. 2004), the Federal Circuit noted that "[i]t is elementary law that if the Government uses…an existing railroad easement for purposes and in a manner not allowed by the terms of the grant of the easement, the Government has taken the landowner's property for the new use. The consent of the railroad to the new use does not change the equation-the railroad cannot give what it does not have." Id. at 1376.

Despite the court's clear instructions to the parties to "brief the limited issue of the scope of the easement for all of the deeds at issue in the consolidated cases," the defendant's first argument in its cross-motion for partial summary judgment states that "the operative question is not the scope of the easement, but rather whether the issuance of the NITU blocked abandonment under state law," and defendant's abandonment argument covers almost one-third of the total arguments in the defendant's opening brief.[24]  As previously indicated to the parties, however, the court will direct its attention to the third and final part of the rails to trails takings inquiry, abandonment, only if indicated by the results of the current scope of the easements inquiry.  See Whispell Foreign Cars, Inc. v. United States, 100 Fed. Cl. 529, 541 (2011) (footnote omitted) ("Because the court has determined that recreational trail use is not within the scope of the easement, the court need not determine at this time whether the easement was abandoned under Florida law."); see also Ybanez v. United States, 102 Fed. Cl. 82, 87 (2011) ("Where the scope of a new easement exceeds the original grant, a determination of whether abandonment occurs is unnecessary.") (citing Preseault II, 100 F.3d at 1533 and Toews v. United States, 376 F.3d at 1381).  Similarly, when interpreting the 1875 Act, a Judge of the Court of Federal Claims noted: "Defendant raises several arguments concerning abandonment. Since we have determined that trail use exceeds the scope of the easement, we have no need to address the contingent issue of abandonment."  Ellamae Phillips Co. v. United States, 99 Fed. Cl. 483, 487 (2011).

Turning to the merits of the scope of the easements inquiry, the plaintiffs broadly argue that for the plaintiffs involved, "[i]t is beyond cavil that these easements were never intended to be used as linear parks," and "[f]or this reason, when the Government authorized recreational trail use on these easements, it effected a per se taking, giving rise to its liability."  Therefore, plaintiffs allege they are entitled to partial summary judgment on the issue of the scope of the easements, and further that, "[u]nder settled

---

[24] Moreover, although not addressed in this opinion, it is not certain that the defendant will succeed in its abandonment arguments, especially regarding railbanking.  The defendant asserts that "[t]he Trails Act merely preserves the corridor intact and (potentially) preempts any law that might otherwise result in abandonment of the easement." As a Judge of the United States Court of Federal Claims recently noted, however, "the government's narrow interpretation of the Trails Act divorces the language of the Act from its history, purpose, and regulatory scheme. The Trails Act scheme does not, as the government contends, authorize only that the railway right-of-way will not be deemed abandoned for railroad purposes if the corridor is railbanked." Jenkins v. United States, 102 Fed. Cl. at 614-15.

Federal Circuit law, just compensation is due Plaintiffs here."   By contrast, the defendant argues that the United States is entitled to partial summary judgment, "because railbanking and interim trail use fall within the scope of the easements at issue under long-standing Washington law and the facts of this case.   As a result, Plaintiffs cannot show that the United States has taken any property interest belonging to them, warranting summary judgment in favor of the United States."

**Scope of the Easements for the SLS&E Deeds**

As indicated above, the SLS&E Deeds are in the following format:

In Consideration of the benefits and advantages to accrue to us from the location, construction and operation of the Seattle, Lake Shore and Eastern Railway in the County of King in Washington Territory we do hereby donate, grant and convey unto said Seattle, Lake Shore and Eastern Railway Company a right of way one hundred (100) feet in width through our lands in said County, described as follows, to wit:

[specific description of lot and section]

Such right of way strip to be fifty (50) feet in width on each side of the center line of the railway track as located across our said lands by the Engineer of said Railway Company, which location is described as follows, to wit:

[description of the metes and bounds]

And the said Seattle, Lake Shore and Eastern Railway Company shall have the right to go upon the land adjacent to said line for a distance of two hundred (200) feet on each side thereof and cut down all trees dangerous to the operation of said road.

To Have and to Hold said premises with the appurtenances unto the said party of the second part, and to its successors and assigns forever.

In Witness Whereof the parties of the first part have hereunto set their hands and seals this [__] day of [Month], A.D. 1887.[25]

---

[25] The source deed at issue in <u>Nelson</u> and <u>Collins</u> also follows the same form, but contains the following additional sentence in the habendum clause: "All riparian and water front rights on Lake Samamish [sic] are hereby expressly reserved," a distinction which does not impact the court's current inquiry regarding the scope of the easements for the SLS&E Deeds at issue.

As the SLS&E Deeds are essentially the same, except for the grantors' names, the date the deeds were executed, the property descriptions, minor grammatical differences, and the use of the singular versus plural in the case of the source deed at issue in <u>Nelson</u> and <u>Collins</u>, the court will analyze the scope of the easements for all the SLS&E Deeds together.

There is no dispute that State of Washington law controls to determine the scope of the easements for the SLS&E Deeds. The United States Court of Appeals for the Federal Circuit, interpreting a takings claim for a railroad right of way, was clear that "state law generally creates the property interest in a railroad right-of-way," <u>Barclay v. United States</u>, 443 F.3d at (citing <u>Preseault I</u>, 494 U.S. at 8, 16) and in a footnote on the same page repeated, "[i]n <u>Toews v. United States</u>, 376 F.3d 1371 (Fed. Cir. 2004), we reiterated that state law controls the basic issue of whether trail use is beyond the scope of the right-of-way." <u>Barclay v. United States</u>, 443 F.3d at 1374 n.4. "The nature of the interest conveyed is determined according to the law of the state where the conveyance occurred.  'State law creates and defines the scope of the reversionary or other real property interests affected by the ICC's [Interstate Commerce Commission] action pursuant to Section 208 of the National Trails System Act Amendments of 1983, 16 U.S.C. §1247(d).'" <u>Chevy Chase Land Co. of Montgomery Cnty. v. United States</u>, 37 Fed. Cl. 545, 565 (1997) (quoting <u>Preseault I</u>, 494 U.S. at 20 (O'Connor, J., concurring) (citing <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. at 1001)), <u>aff'd</u>, 230 F.3d 1375 (Fed. Cir. 1999), <u>reh'g and reh'g en banc denied</u> (Fed. Cir.), <u>cert. denied</u>, 531 U.S. 957 (2000); <u>see also</u> <u>Whispell Foreign Cars, Inc. v. United States</u>, 97 Fed. Cl. 324, 331 ("Whether an individual has a compensable private property interest is determined by state law."), <u>amended after recons. in part</u>, 100 Fed. Cl. 529 (2011).

While <u>Chevy Chase Land Co. of Montgomery County v. United States</u> and <u>Preseault I</u> specifically addressed the application of state law to be applied in Rails to Trails cases, the United States Supreme Court has made similar pronouncements about state law governing how determinations are made regarding property conveyances.  For example, in <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. at 1001, the Supreme Court stated, "we are mindful of the basic axiom that '"[p]roperty interests...are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."'" (quoting <u>Webb's Fabulous Pharmacies, Inc. v. Beckwith</u>, 449 U.S. 155, 161 (1980) (quoting <u>Board of Regents v. Roth</u>, 408 U.S. 564, 577 (1972))) (omission in original).  In <u>Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.</u>, 429 U.S. 363 (1977), the United States Supreme Court stated that, "[u]nder our federal system, property ownership is not governed by a general federal law, but rather by the laws of the several States." <u>Id.</u> at 378; <u>see also</u> <u>Davies Warehouse Co. v. Bowles</u>, 321 U.S. 144, 155 (1944) ("The great body of law in this country which controls acquisition, transmission, and transfer of property, and defines the rights of its owners in relation to the state or to private parties, is found in the statutes and decisions of the state.").  The Federal Circuit also has directed that state law determines whether trail use exceeds the scope of the easement.  <u>See generally</u> <u>Toews v. United States</u>, 376 F.3d 1371; <u>Presault II</u>, 100 F.3d at 1541-42.

According to the State of Washington Supreme Court, under Washington law, "when construing a deed, the intent of the parties is of paramount importance and the court's duty to ascertain and enforce." Brown v. State, 924 P.2d at 911 (footnote omitted); see also Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Lines Ass'n, 126 P.3d 16, 25-26 (Wash. 2006); Wash. State Grange v. Brandt, 148 P.3d 1069, 1073 (Wash. Ct. App. 2006) ("Generally, when construing a deed, the intent of the parties is of paramount importance and courts must ascertain and enforce such intent."), review denied, 171 P.3d 1054 (Wash. 2007). The State of Washington Supreme Court also has concluded that, "[t]he interpretation of an easement is a mixed question of law and fact. What the original parties intended is a question of fact and the legal consequence of that intent is a question of law." Sunnyside Valley Irr. Dist. v. Dickie, 73 P.3d 369, 372 (Wash. 2003) (citing Veach v. Culp, 599 P.2d 526, 527 (Wash. 1979)). The Sunnyside Valley court also offered the standard contract interpretation guidance, as applied to railroad deeds, stating:

> The intent of the original parties to an easement is determined from the deed as a whole. Zobrist v. Culp, 627 P.2d 1308[, 1310] ([Wash.] 1981). If the plain language is unambiguous, extrinsic evidence will not be considered. City of Seattle v. Nazarenus, 374 P.2d 1014[, 1019-20] ([Wash.] 1962). If ambiguity exists, extrinsic evidence is allowed to show the intentions of the original parties, the circumstances of the property when the easement was conveyed, and the practical interpretation given the parties' prior conduct or admissions.

Sunnyside Valley Irr. Dist. v. Dickie, 73 P.3d at 372 (other citations omitted); see also City of Seattle v. Nazarenus, 374 P.2d 1014, 1019-20 (Wash. 1962) ("'Where the language is unambiguous, other matters may not be considered; but where the language is ambiguous the court may consider the situation of the property and of the parties, and the surrounding circumstances at the time the instrument was executed, and the practical construction of the instrument given by the parties by their conduct or admissions.'") (quoting 28 C.J.S. Easements § 26, p. 680).[26]

The State of Washington Supreme Court, however, has applied the "context rule" to interpretation of railroad deeds. As indicated in Harris v. Ski Park Farms, Inc., "[t]his court has adopted the 'context rule' which succinctly stated is that 'extrinsic evidence is admissible as to the entire circumstances under which [a] contract [is] made, as an aid

---

[26]   The current version of the Corpus Juris Secundum on Easements quoted by the State of Washington Supreme Court is at section 64 of the Corpus Juris Secundum on Easements. See 28A C.J.S. § 64 (2012) ("Where the language is unambiguous, other matters may not be considered, as an easement specific in its terms is decisive of its limit. However, where the language is ambiguous the court may consider the situation of the property and of the parties, and the surrounding circumstances at the time the instrument was executed, and the practical construction of the instrument given by the parties by their conduct or admissions.") (footnotes omitted).

in ascertaining the parties' intent,' specifically adopting the Restatement (Second) of Contracts §§ 212, 214(c) (1981)." Harris v. Ski Park Farms, Inc., 844 P.2d 1006, 1014 (Wash.), recons. denied (Wash. 1993), cert. denied, 510 U.S. 1047 (1994) (footnote omitted) (omissions in original); see also Brown v. State, 924 P.2d at 912 ("In addition to the language of the deed, we will also look at the circumstances surrounding the deed's execution and the subsequent conduct of the parties."). Citing to Brown v. State, the State of Washington Court of Appeals in Roeder Co. v. K & E Moving & Storage Co., Inc., noted that "the Supreme Court has recently ruled that, in light of Washington's adoption of the 'context rule' for contracts, courts may look to extrinsic evidence *along with* the deed itself to determine the parties' intent." Roeder Co. v. K & E Moving & Storage Co., Inc., 4 P.3d 839, 841 n.6 (Wash. Ct. App.), recons. denied, (Wash. Ct. App. 2000), review denied, 16 P.3d 1264 (Wash. 2001) (emphasis in original). To look first to the language of the statutes and the source deeds, but also to refer to the context of the deeds at their time of execution is reasonable, given their age and the sometimes stilted language used. The meaning of these deeds is not always clear to a reader well more than 100 years later, creating possible ambiguities.

In addition to acknowledging and citing the court's prior decisions, the plaintiffs argue that the express language in the SLS&E Deeds, regarding the location, construction and operation of the SLS&E, describes one purpose of the easement; to build and operate a railroad. There was no other purpose. According to plaintiffs, "[t]his language clearly and objectively manifests a single purpose of using the easement to operate a railroad. The only reasonable interpretation is that the grant of the right of way was for the purpose stated, *and only that purpose.*" (emphasis in original).

Defendant argues, however, that "other than conveying land for a right-of-way, none of the deeds at issue expressly limit the use of the right-of-way to any specific purpose." According to the defendant, "[t]he rights-of-passage granted thus encompass the right to pass through in vehicles of all types, including trains and bicycles, and to pass on foot. Trail use therefore falls within the scope of the easements granted." Although defendant chose essentially to reargue, with only slight variation, the arguments it had made earlier regarding whether the SLS&E Deeds conveyed a fee interest or an easement, the court already rejected defendant's line of argument in its earlier opinions. This court previously observed:

> The defendant argues that the use of the term "strip" indicates conveyance of a fee interest, citing to the Washington State Court of Appeals decision in Ray v. King County, which determined, "where there is no language relating to the purpose of the grant or limiting the estate conveyed, and the deed conveys a strip of land, courts will construe the deed to convey fee simple title." Ray v. King Cnty., 86 P.3d at 189 (citing Brown v. State, 924 P.2d at 913) (footnote omitted). In the SLS&E Deeds, however, the language of the granting clause establishes the purpose of the grant, to receive the benefits from the construction, operation, and maintenance of a railroad, for which purpose the right of way use was conveyed to the SLS&E.

Beres et al. v. United States, 97 Fed. Cl. at 784, and, this court previously determined that:

> The SLS&E Deeds also use the phrase "right of way" as a limitation of the grant to the SLS&E. The deed in Kershaw conveyed "a strip of land seventy five feet wide…to be used by [the Railway] as a right of way for a railway forever, together with the perpetual right to construct, maintain and operate a railway or railways over and across the same." [Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Association, 126 P.3d] at 18 (brackets in original). The SLS&E Deeds state the purpose of the conveyance as: "In Consideration of the benefits and advantages to accrue to us from the location, construction and operation of the Seattle, Lake Shore and Eastern Railway in the County of King in Washington Territory we do hereby donate, grant and convey unto said Seattle, Lake Shore and Eastern Railway Company a right of way one hundred (100) feet in width through our lands…."
>
> The defendant argues, however, that the SLS&E Deeds contain "no language limiting the grant to the privilege of constructing, operating, or maintaining a railroad over the land." As quoted immediately above, however, the granting clauses of the SLS&E Deeds specifically refer to the railroad purpose for granting the right of way, "[i]n Consideration of the benefits and advantages to accrue to us from the location, construction and operation" of the railroad to the benefit of the source deed grantors.

Beres et al. v. United States, 97 Fed. Cl. at 787-88. In addition, this court previously found: "In fact, in the language of the SLS&E Deeds, the consideration for the right of way was specifically related to benefits the grantors of the source deeds expected to have 'accrue' to them from the railroad, the construction and operation of the railroad. Moreover, as discussed below, no monetary consideration is listed in the SLS&E Deeds, therefore, the construction and operation of the railroad was the consideration offered to the source deed grantors." Id. at 788. Therefore, despite the defendant's repeated assertions to the contrary, and refusal to accept of the court's previous decisions in this case, the court already has decided that the SLS&E Deeds did have a specific and limited purpose – the railroad purpose of limiting the easements to location, construction and operation of the SLS&E. Review of the SLS&E Deeds and the arguments raised during the scope of the easements litigation, including defendant's failure to offer much new information, only serves to confirm the court's finding that the SLS&E Deeds were limited to the railroad purpose of "the location, construction and operation of the Seattle, Lake Shore and Eastern Railway in the County of King in Washington Territory…."

Further supporting the conclusion that the plain language of the SLS&E Deeds was to grant easements for the purpose of the location, construction and operation of the SLS&E railroad, is the fact that the grantors apparently received no financial

compensation for the easements, but only received the benefits which would result from the location, construction and operation of the railway.   The plain language of the SLS&E Deeds state: "In Consideration of the benefits and advantages to accrue to us from the location, construction and operation of the Seattle, Lake Shore and Eastern Railway," without any mention of financial compensation.   This stands in contrast to the railroad deeds in cases the court previously analyzed in its earlier opinion, which repeatedly identify the compensation to the grantor.   For example, in <u>Morsbach v. Thurston County</u>, 278 P. 686 (Wash. 1929), the 1872 railroad deed stated, in part: "Know all men by these presents that Edward Kratz, of Thurston county, Washington Territory, in consideration of two hundred dollars ($200.00) paid by the Northern Pacific Railroad Company and other good and valuable considerations, the receipt whereof is hereby acknowledged, do by these presents give, grant, bargain, sell and convey unto said Northern Pacific Company…."   <u>Id.</u> at 687.   Later decisions by the State of Washington Supreme Court interpreting railroad deeds also included the amount of compensation to the grantor.   For example, in <u>Swan v. O'Leary</u>, 225 P.2d 199 (Wash. 1950), the 1909 quit claim deed stated, in part: "This indenture witnesseth, That Minnie L. Swan, unmarried, party of the first part, for and in consideration of the sum of Six Hundred & Twenty-five Dollars in lawful money of the United States of America to her." Similarly in <u>Veach v. Culp</u>, 599 P.2d 526, the 1901 quit claim deed stated, in part: "(T)he [sic] said party of the first part, for and in consideration of the sum of Two Hundred and Twenty-five Dollars…."   <u>Id.</u> at 527 (omissions in original).

In <u>Roeder Co. v. Burlington Northern, Inc.</u>, 716 P.2d 855 (Wash.), <u>recons. denied</u> (Wash. 1986), the State of Washington Supreme Court noted that "[t]he granting clause of the deed states that the Improvement Company, in consideration of ten dollars, 'conveys and warrants unto Bellingham and Northern Railway Company...for all railroad and other right of way purposes, certain tracts and parcels of land situate in the City of Bellingham....'"   <u>Id.</u> at 857 (omissions in original).   Similarly, the exemplary, statutory warranty form deed in <u>Brown v. State</u>, 924 P.2d 908, stated, in part "KNOW ALL MEN BY THESE PRESENTS, That Geo. D. Brown and Annie L. Brown his Wife of Spokane County, State of Washington, for and in consideration of Ten & 00/100 Dollars, to them in hand paid, the receipt whereof is hereby acknowledged."   <u>Id.</u> at 910 (capitalization in original).   More recently, in 2006, the State of Washington Supreme Court in <u>Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Association</u>, 126 P.3d 16, identified the compensation from the railroad in the 1905 deed at issue as "we, the said E.A. Kershaw and Ora A. Kershaw...for and in consideration of the sum of [$1,000.00]…and other good and valuable considerations including the covenants of the [Railway]…do hereby give, grant, sell, confirm and convey to the said...NORTH YAKIMA & VALLEY RAILWAY COMPANY…."   <u>Id.</u> at 18 (omissions, brackets, and capitalization in original).

Unlike the exemplary deeds quoted immediately above, the SLS&E Deeds currently at issue before this court do not indicate receipt of any financial compensation by the grantors.   Given the lack of monetary compensation, the only benefit the grantors apparently received was the location, construction and operation of the railroad.   The limited purpose for which the grantors gave easements was for the railroad development and use.   Any use of the easements broadening the concept of the

"location, construction and operation" of a railroad, therefore, exceeds the scope of the easements.

Defendant also repeats its reliance on the decisions of the State of Washington Court of Appeals in Ray v. King County, 86 P.3d 183 (Wash. Ct. App.), review denied, 101 P.3d 421 (Wash. 2004) and the United States Court of Appeals for the Ninth Circuit in King County v. Rasmussen, 299 F.3d 1077 (9th Cir. 2002), cert. denied, 538 U.S. 1057 (2003), for the proposition that the Hilchkanum deed,[27] and the SLS&E Deeds generally, do not restrict how the rights of way granted to SLS&E could be used. The defendant points to the State of Washington Court of Appeals decision in Ray, which stated, "[t]he language of the deed grants a right of way to the Railway without expressly *restricting* how that right of way was to be used," Ray v. King Cnty., 86 P.3d at 190 (emphasis in original), and to the decision of the Ninth Circuit in Rasmussen, which stated that "neither the granting nor the habendum clauses contains language clearly limiting the use of the land to a specific purpose." King Cnty. v. Rasmussen, 299 F.3d at 1086. Defendant argues that the Ray and Rasmussen decisions refute the plaintiffs' contention that the defendant ignores the "express and clear statement of how the easement would be used," instead, arguing that "the United States is properly reading the granting clause as the courts did in both Ray and Rasmussen." The defendant, citing to Rasmussen, argues that if the grantors of the SLS&E Deeds "intended to limit the use of the right-of-way to any specific purposes, they would have inserted that language as a limitation in the granting clause, but they did not do so." According to the defendant, to reach the conclusion that the purpose of the easements was to build and operate a railroad requires "rewriting the deeds by importing into the granting clause the consideration as a limitation on the grant. This is contrary to Washington law."[28]   As this court previously determined: "In the SLS&E Deeds, however, the language of the granting clause establishes the purpose of the grant, to receive the benefits from the construction, operation, and maintenance of a railroad, for which purpose the right of way use was conveyed to the SLS&E." Beres et al. v. United States, 97 Fed. Cl. at 784.

Neither Ray nor Rasmussen is determinative in this case. The court's earlier April 7, 2011 opinion took great pains to distinguish the Ray and Rasmussen cases from the above captioned consolidated cases. This court wrote:

> The defendant relies heavily on decisions issued by the United States
> District Court for the Western District of Washington and the United States

---

[27] As described in the court's earlier opinion, the Hilchkanum deed is the source deed for the Chamberlin plaintiffs and is one of the one of the SLS&E Deeds.

[28] Defendant repeatedly uses the phrases "rewriting the deeds" and "contrary to Washington law" in its filings with the court. Defendant also states trail use "falls within the scope of the easements granted. To hold otherwise, the Court must insert into the deeds words of limitation that are not present. Rewriting the deeds to thus limit the use of the rights-of-way to any specific purpose would be contrary to Washington law."

Court of Appeals for the Ninth Circuit in <u>King County v. Rasmussen</u>, 143 F. Supp. 2d 1225, <u>King County v. Rasmussen</u>, 299 F.3d 1077, as well as the State of Washington Court of Appeals, Division 1 in <u>Ray v. King County</u>, 86 P.3d 183, which found that the Hilchkanum deed, one of the SLS&E Deeds also at issue before this court, conveyed a fee interest and not an easement to the SLS&E. Although these decisions are of analytical interest, none of these decisions are precedential for this court. The decision in <u>Ray v. King County</u> is a State of Washington lower court decision. Similarly, decisions issued by the United States District Court for the Western District of Washington and the United States Court of Appeals for the Ninth Circuit, although potentially persuasive, are not binding on the State of Washington Supreme Court or this court. This court is bound by the decisions of the United States Supreme Court and the United States Court of Appeals for the Federal Circuit.

<u>Beres et al. v. United States</u>, 97 Fed. Cl. at 798 (citations omitted). This court continued, stating:

Analysis of the <u>Ray v. King County</u> and the <u>King County v. Rasmussen</u> cases, and their analytical impact on this consolidated action, must be undertaken in the context of the State of Washington Supreme Court decisions in <u>Brown v. State</u> and <u>Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Lines Association</u>. Certain important differences between <u>Ray v. King County</u> and <u>King County v. Rasmussen</u> and the SLS&E Deeds currently before this court are apparent. The <u>Ray v. King County</u> and <u>King County v. Rasmussen</u> cases were brought as quiet title actions, not as taking claims, as are the consolidated cases before this court. <u>See</u> <u>generally</u> <u>Ray v. King Cnty.</u>, 86 P.3d 183; <u>King Cnty. v. Rasmussen</u>, 299 F.3d 1077; <u>King Cnty. v. Rasmussen</u>, 143 F. Supp. 2d 1225. None of the plaintiffs before this court, as successors in interest, were before the court in <u>Ray v. King County</u> or <u>King County v. Rasmussen</u>. More significantly, all the decisions in <u>Ray v. King County</u> and <u>King County v. Rasmussen</u> were decided prior to the State of Washington Supreme Court's decision in <u>Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Association</u>. Indeed, the Ninth Circuit specifically noted that "[t]he Washington Supreme Court provided its most recent guidance on this issue [easement versus fee interest] in <u>Brown</u>." <u>King Cnty. v. Rasmussen</u>, 299 F.3d at 1084. The decision in <u>Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Association</u>, while not rejecting the holding or the evaluation factor guidance offered in <u>Brown</u>, added a new, significant analytical approach to the precedent in the State of Washington, that a presumption of an easement exists when the phrase "right of way" is used to define the purpose of the grant.

<u>Beres et al. v. United States</u>, 97 Fed. Cl. at 800 (footnote omitted). Finally, this court noted:

26

Moreover, the record in this case contains exhibits which were not before the courts in <u>Ray v. King County</u> and <u>King County v. Rasmussen</u>.  The record in this court contains six virtually indistinguishable, SLS&E Deeds and additional relevant exhibits.  The records in <u>Ray v. King County</u> and <u>King County v. Rasmussen</u> included only the Hilchkanum deed and limited additional information.  Moreover, the railroad's decision to follow what appears to be a pre-printed form, which was not in the form of statutory warranty deed, for all the SLS&E Deeds, and the apparent illiterate state of the majority of the source deed grantors, supports plaintiffs' argument that the form deeds were drafted by the railroad.  Therefore, any ambiguity in the language of the deeds should be construed against the railroad.  <u>See</u> <u>Hanson Indus., Inc. v. Cnty. of Spokane</u>, 58 P.3d [910,] 916 [(Wash. Ct. App. 2002)].

In contrast, in <u>Ray v. King County</u>, the State of Washington Court of Appeals indicated that the Hilchkanums, not the railroad, drafted the deed, which appears from the record before this court to be both implausible and incorrect.

<u>Beres et al. v. United States</u>, 97 Fed. Cl. at 801 (footnote omitted).

In both <u>Ray</u> and <u>Rasmussen</u>, the State of Washington Court of Appeals and the Ninth Circuit, respectively, were interpreting the Hilchkanum deed to determine if the right of way conveyed an easement or a fee interest to the SLS&E.  <u>See</u> <u>generally</u> <u>Ray v. King Cnty.</u>, 86 P.3d 183; <u>King Cnty. v. Rasmussen</u>, 299 F.3d 1077.  As repeatedly noted in the court's April 7, 2011 opinion, although both courts determined that the right of way in the Hilchkanum deed conveyed a fee interest and not an easement to the SLS&E, neither court reached the issue of the scope of the easements, because neither court determined easements were intended by the grantors.  The relative value of either case, already called into question by the court's earlier opinion, therefore, is diminished further for the purpose of an inquiry of the scope of easements of the SLS&E Deeds. For the reasons described above, the defendant's repeated efforts to try to reargue the merits of the decisions in <u>Ray</u> and <u>Rasmussen</u>, as applied to the SLS&E Deeds, proves ineffective.

The defendant additionally argues that the language of the SLS&E Deeds stands in contrast to two State of Washington Supreme Court cases in which a railroad right of way easement was specifically limited for railroad purposes.  In <u>Zobrist v. Culp</u>, 627 P.2d 1308 (Wash. 1981), the grantors gave an easement to a railroad which was limited by

[s]aid right of way is hereby granted for the purpose of running and operating a Railroad thereover….  Provided always however that if second party shall at any time cease or fail to use the right of way herein mentioned and described for the purpose of running and operating a

railroad over the same for the continuous period of 12 consecutive months then and from thenceforth this instrument and the estate hereby granted shall cease and revert to first party.

Id. at 1308-09.

In the first place, the Zobrist case was brought as a quiet title action. See generally Zobrist v. Culp, 627 P.2d 1308. In Zobrist, the State of Washington Supreme Court concluded "that for a period of more than 1 year the tracks across the petitioner's property were not used for the purpose of 'running and operating a railroad over the same,'" id. at 1311, and the appellate court reinstated the trial court's finding that the easement had been extinguished. Id. at 1309. Nonetheless, defendant argues that the language of the SLS&E Deeds "contrasts starkly with the language in a deed previously analyzed under Washington law in Zobrist…." Both the Zobrist deed and the SLS&E Deeds limited the scope of the easements. In the case of the Zobrist deed, the limitations were "for the purpose of running and operating a Railroad," and "for the purpose of running and operating a railroad over the same for the continuous period of 12 consecutive months." In the case of the SLS&E Deeds, the scope of the easements was limited by the language for the "location, construction and operation of the Seattle, Lake Shore and Eastern Railway." The differences between the Zobrist deed and the SLS&E Deeds are hardly material distinctions for the purpose of the scope of the easements inquiry.

In support of its cross-motion for partial summary judgment on the scope of the easements inquiry, the defendant initially cites to Lawson v. State, 730 P.2d 1308 (Wash. 1986). After receiving plaintiffs' response, also relying on Lawson, the defendant became less enthusiastic about the utility of the Lawson case. Plaintiffs had had pointed out that the Lawson case "deals with the same regional trail system, and even the same East Lake Sammamish segment of that trail system, that is now at issue in the case at bar." (emphasis in original). As attested to in an affidavit included in the Joint Exhibits to the case currently before this court, two of the plaintiffs in Lawson also derived their property from the Hilchkanum source deed, one of the SLS&E Deeds.[29] In response to plaintiffs, the defendant retreats and now argues that plaintiffs' reliance is misplaced, and that Lawson has no application to the facts in the above captioned case because Lawson was decided on a motion to dismiss, and, therefore, in Lawson, "'plaintiffs' factual allegations are presumed to be true.'" (quoting Lawson v. State, 730 P.2d at 1310-11). Defendant is correct that although plaintiffs claim that the deed language "is exactly the same deed language as the present case," (emphasis in original), the Lawson court did not consider the terms of the Hilchkanum deed, because it dismissed as unripe the claim of the Hilchkanums' successors-in-interest. Despite the rhetoric exchanged between the parties, the Lawson court did state that "[d]efendants argue that under Washington law a railroad is a perpetual public easement. They

_____

[29] The affidavit stated in part, that "the source deed for the railroad right of way that ran through their property was the 1887 right of way grant from Bill Hilchkanum to the Seattle, Lake Shore & Eastern Railway."

contend that a railroad right of way easement does not terminate upon a change from one transportation use to another transportation or recreation use, or any other consistent public use. We disagree." Id. at 1311.

In addition to Lawson, plaintiffs cite to King County v. Squire Investment Co., 801 P.2d 1022 (Wash. Ct. App. 1990), review denied, 811 P.2d 219 (Wash. 1991) for support that a public recreational trail use is beyond the scope of the easement granted to the SLS&E. The discussion regarding the scope of the easement in Squire Investment, however, is dicta, as the State of Washington Court of Appeals determined that the deed at issue in Squire Investment conveyed an easement to the railroad which terminated when the railroad abandoned the line with Interstate Commerce Commission approval.  This precluded any need by the State of Washington Court of Appeals to address the scope of the easement.  See id. at 1025 ("King County contends, however, that its use of the right-of-way as a recreational trail is within the scope of the interest conveyed to the railroad and, hence, it was not abandoned.  The County's argument is without merit.  Burlington Northern formally abandoned the right-of-way on July 29, 1985 [the date the ICC issued a Certificate of Abandonment].  The easement was extinguished at that moment and its interest reverted to the Squires' heirs.  Burlington Northern had no interest to convey to King County for use as a railroad much less as a trail.") (footnotes omitted).

If the court were limited by the language of Sunnyside Valley Irrigation District v. Dickie, which stated, "[i]f the plain language is unambiguous, extrinsic evidence will not be considered," Sunnyside Valley Irr. Dist. v. Dickie, 73 P.3d at 372 (citing City of Seattle v. Nazarenus, 374 P.2d at 1019-20), the court's inquiry would be over as the plain language of the SLS&E Deeds indicates that the grant to the SLS&E of easements was for the purpose of "the location, construction and operation" of the SLS&E. The State of Washington Supreme Court, however, as indicated above, also has instructed the court to look at the circumstances surrounding the deed's execution and the subsequent conduct of the parties.  In Harris v. Ski Park Farms, Inc., 844 P.2d at 1014, the State of Washington Supreme Court rejected the requirement that ambiguity in the contract language must exist before allowing evidence of the "surrounding circumstance," in the case of railroad deeds.  The Harris court instead "adopted the 'context rule' which succinctly stated is that 'extrinsic evidence is admissible as to the entire circumstances under which [a] contract [is] made, as an aid in ascertaining the parties' intent,' specifically adopting the Restatement (Second) of Contracts §§ 212, 214(c) (1981)." Id.; see also Brown v. State, 924 P.2d at 912 ("In addition to the language of the deed, we will also look at the circumstances surrounding the deed's execution and the subsequent conduct of the parties."); Roeder Co. v. K & E Moving & Storage Co., Inc., 4 P.3d at 841 n.6 (noting that Washington State courts should "consider both the deed and the extrinsic evidence.").

The defendant argues that "in the context of the times in which the deeds were granted during the late 1800s and early 1900s, railroads were considered to be public highways or roads."  Therefore, defendant contends that "[e]ven if any limitation arguably has been placed upon the use of the right-of-way, it must be understood to

encompass use of the right-of-way as a highway or road."  For support, the defendant cites to Black's Law Dictionary, and alleges "road" is defined as "'[a] highway; an open way or public passage; a line of travel or communication extending from one town or place to another; a strip of land appropriated and used for purposes of travel and communication between different places.'" (quoting Black's Law Dictionary).  Defendant, however, does not include a pinpoint citation reference, or even identify which edition or year of publication of Black's Law Dictionary defendant is citing to for the definition of road.  It is not surprising then that the first edition of Black's Law Dictionary, dated 1891, which would best reflect the contemporary understanding of the term "railroad" in the late 1800s and early 1900s, has a different definition than the one offered by the defendant, and defines "road" as "a way or a passage; a line of travel or communication extending from one town or place to another."  Black's Law Dictionary 1049 (1st ed. 1891).  The first edition of Black's Law Dictionary's definition of road, unlike the defendant's definition, does not mention "highway," or "public passage."  The first edition of Black's Law Dictionary defines a "highway" as "[a] free and public road, way, or street; one which every person has the right to use."  Id. at 572.  Notably, this definition of highway was not cited by the defendant.[30]  Moreover, while also not cited by the defendant, the first edition of Black's Law Dictionary defines a "railroad" as: "A road or way on which iron or steel rails are laid for wheels to run on, for the conveyance of heavy loads in cars or carriages propelled by steam or other motive power."  Id. at 992.  This definition of railroad is not synonymous with the definition of a road.

In response, the plaintiffs do not disagree that the term "road" sometimes was used as a shorthand reference for a railroad, however, they note "[a]lthough a railroad may at times be referred to as a 'road,' this does not bring the East Lake Sammamish Trail within the scope of the railroad easement."  Merely stating that a railroad is a public highway is insufficient to demonstrate that a public recreational trail is within the scope of the railroad easements.  Since the deeds at issue conveyed the easements to locate, construct and operate the SLS&E, the railroad purpose of the easements was clear in the conveyances and is not contradicted by the contemporaneous dictionary definitions.

Defendant also cites to a 1911 State of Washington Supreme Court decision, Puget Sound Electric Railway v. Railroad Commission, 117 P. 739 (Wash. 1911), which stated in passing that "[a] railroad is a public highway, created for public purpose."  Id. at 743.  Notably, Puget Sound addressed the rates a railroad could charge, and made the

---

[30] By way of further explanation, the first edition of Black's Law Dictionary stated:

> Roads are of two kinds, - *public* and *private*.  Public roads are those which are made use of as highways, which are generally furnished and kept up by the owners of the estates adjacent to them.  Private roads are those which are only open for the benefit of certain individuals, to go from and to their homes, for the service of their lands, and for the use of some estates exclusively.

Black's Law Dictionary 1049 (emphasis in original).

comment about railroads as public ways in the context of a railroad's obligation to the public.    As the <u>Puget Sound</u> court noted: "Railways and other public service corporations are created upon the hypothesis that they will be a public benefit. The state confers upon them special and extraordinary privileges. It exacts from them in return the performance of public duties, and that they hold their property in trust, not only for the pecuniary benefit of their stockholders, but for the public use as well." <u>Id.</u>   Citing to the same language, the State of Washington Supreme Court in <u>Lawson</u> stated:

> It is true railroad companies were created on the theory that they will provide a public benefit.  Pursuant to statute, the State has conferred upon them special and extraordinary privileges. In return, the railroads must hold their property in trust for the public use.  <u>Puget Sound Elec. Ry. v. Railroad Comm'n</u>, 65 Wash. 75, 83–84, 117 P. 739 (1911).  A railroad is a public highway, created for public purposes.  <u>Puget Sound Elec. Ry.</u>, at 84, 117 P. 739.

<u>Lawson v. State</u>, 730 P.2d at 1311.  Taking the analysis from <u>Puget Sound</u> one step further, the <u>Lawson</u> court continued:

> But these considerations do not necessarily lead to the conclusion that a railroad right of way is a perpetual public easement. To the contrary, this court has frequently recognized that railroad rights of way revert to reversionary interest holders when a railroad company abandons a line. <u>See</u>, <u>e.g.</u>, <u>Roeder Co. v. Burlington Northern, Inc.</u>, 105 Wash.2d 567, 716 P.2d 855 (1986); <u>Zobrist v. Culp</u>, 95 Wash.2d 556, 627 P.2d 1308 (1981); <u>Morsbach v. Thurston Cy.</u>, 152 Wash. 562, 278 P. 686 (1929). These cases demonstrate that, under Washington law, when an easement is granted to a railroad through a private conveyance, the easement is not a "perpetual public easement."

<u>Lawson v. State</u>, 730 P.2d at 1311.

To bolster its claim that the public recreational trail is within the scope of the rights of way at issue, the government also cites to the 1971 Urban Trails Plan for King County, Washington, which states that one of the goals of the Urban Trails Plan, conceived before the railway was abandoned and converted in to a trail, was to "complement the County-wide transportation system by providing facilities for hikers and riders."  Plaintiffs respond that "the Government ignores the first three goals which were to 'provide a healthful leisure time activity,' and to provide 'non-motorized access to and among recreation resources' and to provide 'the opportunity for the enjoyment of scenic amenities.'"  Defendant also overlooks the following statement in the introduction and background section of the Plan, "[m]otorized vehicles, including trail bikes and four-wheel-drive vehicles will not be permitted on the proposed urban routes.  These trail uses would not be compatible with residential neighborhoods in an urban area."  If smaller motorized vehicles would be incompatible for use on the trail, a motorized train on a railroad track is just as incompatible, if not more so.  A railroad is larger, louder,

and has more impact on a trail than other motorized vehicles, such as trail bikes or four-wheel-drive vehicles.

In addition, defendant quotes from the 2004 King County Department of Natural Resources and Parks' Regional Trail Inventory and Implementation Guidelines to argue that King County's regional trails, such as the East Lake Sammamish Trail, "'serve a significant number of transportation oriented trips, *i.e.*, commuting, shopping, etc. [and]…function as conduits between major destinations, and as recreation destinations in and of themselves,'" and that the "regional trails should be considered as a transportation facility[, which] is not a lesser facility to any street." Defendant, however, selectively quotes from the Regional Trail Inventory and Implementation Guidelines, as the quotation defendant uses refers to Street and Driveway Crossings, and the entire quotation demonstrates that it is only in the limited instances of when a trail crosses a street or a driveway that it should it be considered "a transportation facility." The entire section states:

> Street and Driveway Crossings: Street and driveway crossings are covered in both the *AASHTO* [American Association of State Highway and Transportation Officials] *guide to the development of bicycle facilities* and in the *Manual on Uniform Traffic Control Devices*. The one item that should be stressed here is that in planning for such crossings under the guidance of those manuals, is that the regional trails should be considered as a transportation facility. It is not a lesser facility to any street, and should be considered a street, or any other transportation corridor, in determining right of way at such crossings.

(emphasis added).

Further undercutting defendant's argument that the public recreational trail is a transportation corridor is plaintiffs' correct observation that it is not the Transportation Department that administers the trail, but the King County's Department of Natural Resources and Parks. Plaintiffs' also cite to Title 7 of the King County Code, Parks and Recreation, and the definition of parks and recreation facility, which states: "R. 'Facility,' 'facilities,' 'parks and recreation facility,' 'parks and recreation facilities' or 'park area' means any building, structure, park, open space, trail or other property owned or otherwise under the jurisdiction of the parks and recreation division of the department of natural resources and parks," to emphasize that a public recreational trail in King County is a park and recreation facility, not a transportation facility. As plaintiffs note, "emphasizing the 'public transportation' purposes of the trail does not bring the rails to trails conversion within the scope of the easement."

Like the defendant, plaintiffs also cite to a number of historical sources to provide context and demonstrate that a recreational trail is outside the scope of the grantors' easements. For example, in explaining the benefits that would accrue to the grantors by virtue of the location, construction and operation of a railroad, plaintiffs cite to the book, Our Town Redmond, by Nancy Way (1989). Plaintiffs note that in the 1880s and 1890s

"'most people traveled on horse or foot, and this often meant harrowing and backbreaking experiences. There are many stories of settlers carrying furniture and household belongings on their backs....still others regularly carried 50-pound sacks of flour on their back.'" (quoting Nancy Way, Our Town Redmond 31).   Therefore, according to plaintiffs, the operation of a railroad as a means of travel would be of real benefit to the original grantors.

Plaintiffs also argue that "the greatest benefit and advantage to accrue from rail service was to vastly improve the accessibility to the Seattle markets and seaport with freight."  Citing again to Our Town Redmond, plaintiffs note that among other industries, logging became viable because of rail service:

> "Rail service was crucial to the logging of the Squak Valley and hillsides after the turn of the century. Spurs to pick up logs went everywhere, even on pilings out into Lake Sammamish....  Logging brought the first real growth and commerce to Redmond. The town's population in 1885 was 100. It grew to 271 by 1900... The Redmond area had around eight sawmills operating at various times between 1890 and 1930. One employed as many as 200 men. The *Seattle Lake Shore and Eastern [Railway] opened the area up to lumbering, since it made transportation of both logs and lumber much easier.*"

(quoting Nancy Way, Our Town Redmond 39, 49) (emphasis in original).   Similarly, plaintiffs argue that coal mining was made economically feasible by the construction and operation of a railroad in the area.   Quoting from A Hidden Past: An Exploration of Eastside History, published by the Seattle Times, plaintiffs state that: "'Issaquah, briefly called Gilman, grew up around its [the SLS&E] depot as coal mining and logging in the area brought in settlers,'" (quoting A Hidden Past: An Exploration of Eastside History, 28 (2000)) and quoting from a History of Seattle From the Earliest Settlement to the Present Time, by Clarence B. Bagley (1916), plaintiffs note:

> "That transportation was the main problem confronting the coal mine operators in King County is shown by the history of the Issaquah field. It was from this mine that L.B. Andrews dug the first flour sack of really good coal ever brought into Seattle. This was in 1863, but it was not until the building of the Seattle, Lake Shore & Eastern, now the North Pacific's North Bend branch, in 1888, that this immense body of coal was made available to market."

(quoting Clarence B. Bagley History of Seattle From the Earliest Settlement to the Present Time 130-31).  Plaintiffs summarize, "[i]n short, operation of the railroad meant vastly improved transportation of freight, significant economic activity, and an increasing

population," and "[t]o have railroad service was an economic advantage over those that did not."[31]

Defendant argues that "all of the documents reciting the history of the Redmond and Seattle area during the late 1800s, relied upon by the Plaintiffs, are irrelevant because none contain any information relating to the grantors." According to the defendant, each of the documents "only goes to the subjective, unilateral intent of the grantors and may not be considered under Washington law." Although not dispositive, plaintiffs' citations demonstrate the general intent of individuals in Washington in the late 1800s, such as the grantors. Railroad service brought unique benefits to the grantors which were not achievable by a pedestrian, bike, and horse trail, emphasizing the benefits to be achieved as a result of the "location, construction and operation" of the SLS&E the grantors sought in return for the easements granted. Regardless of the information offered by both parties, the record includes no information, historical or otherwise, to suggest that the original grantors intended the easements conveyed to the SLS&E to be for anything other than railroad purposes.   In fact, the language of the conveyances themselves clearly indicates that the conveyances to the railroad were for "the location, construction and operation of the Seattle, Lake Shore & Eastern Railway." As the United States Court of Appeals for the Federal Circuit in Toews declared:

> [I]t appears beyond cavil that use of these [railroad] easements for a recreational trail-for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway-is not the same use made by a railroad, involving tracks, depots, and the running of trains. The different uses create different burdens. In the one case there was an occasional train passing through…. In the other, individuals or groups use the property, some passing along the trail, others pausing to engage in activities for short or long periods of time.

Toews v. United States, 376 at 1376.   And, additionally stated by the Federal Circuit, "[s]ome might think it better to have people strolling on one's property than to have a freight train rumbling through. But that is not the point.   The landowner's grant authorized one set of uses, not the other."   Id. at 1376-77; see also Thompson v. United

---

[31]   The court notes that, according to plaintiffs, and not contradicted in the record, the subsequent conduct of the parties is consistent with the express language of the SLS&E Deeds.  After acquiring the rights of way in the SLS&E Deed, the SLS&E constructed the railway, and subsequently operated the railroad.  As the parties have stipulated: "SLS&E went through receivership in 1889, and subsequently was purchased by the Seattle and International Railroad, which later was acquired by the Northern Pacific Railway Company.  The Burlington Northern Railroad was formed in 1970 through the merger of the Northern Pacific Railway, the Great Northern Railway, the Chicago, Burlington and Quincy Railroad, and the Spokane, Portland and Seattle Railway, among other relatively small wholly-owned subsidiaries."

States, 101 Fed. Cl. at 433.  More recently another Judge of the United States Court of Federal Claims wrote:

> A railroad, or a highway for public travel, has the primary purpose of transporting goods and people. The purpose of a recreational trail is fundamentally different. A bicycle trail does not exist to transport people but rather to allow the public to engage in recreation and enjoy the outdoors. The two uses are distinct and an easement for a recreational trail is not like in kind to an easement for railroads.

Capreal, Inc. v. United States, 99 Fed. Cl. 133, 145 (2011).  In conclusion, the scope of easements of the SLS&E Deeds was exceeded by the conversion of the railroad easement to trail use.

**Scope of the Easement for the 1904 Reeves Quit Claim Deed**

The 1904 Reeves Quit Claim Deed states, in pertinent part:

> This Indenture made this third day of June in the year of our Lord one Thousand nine hundred and four, Between J.D. Reeves and Elizabeth Jane Reeves, his wife, the parties of the first part and the Northern Pacific Railway Company, a corporation, the party of the second part, Witnesseth: That the said parties of the first part for and in consideration of the sum of One hundred and Fifty dollars of the United States to them in hand paid by the said party of the second part, the receipt whereof is hereby acknowledged do by these presents, remise, release, and forever quit claim unto the said party of the second part and to its assigns all right, title and interest and estate of said first parties in and to all that certain lot, piece or parcel of land, situate lying and being in the County of King, State of Washington, and particularly bounded and described as follows, to wit:

> The interest of said grantors in and to a tract of Land lying within lines drawn parallel with with [sic][32] the center of the main Line track and fifty feet from said center of the Seattle, Lake Shore & Eastern Railway, now the Northern Pacific Railway, through the Townsite of Inglewood, King County, State of Washington, and running from Ash Street to Willow Streets and through the following Blocks in said Townsite; [list of blocks] according to the plat of said Town of Inglewood as recorded in Volume three, of Plat Books, page 169 records of King County, Washington; the intention being to convey herein a right of way fifty feet on each side of said track through any lots or blocks conveyed to the Grantor J.D. Reeves

---

[32] The first "[sic]" is included in the copy of the deed provided to the court in the Joint Stipulation of Issues and Facts.

by grant of date, November 13, 1903, from King County, Washington, said lots being as follows, [list of lots and blocks]

Together will [sic] all and singular the tenements, hereditaments and appurtenances thereunto, belonging, or in anywise appertaining, and the reversions, remainder and remainers [sic], rents, issues and profits thereof.

To have and to hold all and singular the said premises together with the appurtenances, unto said party of the second part and to its heirs and assigns forever.  In witness whereof, The said parties of the first part have hereunto set hands and seals the day and year first above written.

Washington law also controls to determine the scope of the easement for the 1904 Reeves Quit Claim Deed.   In their cross-motion for partial summary judgment, the plaintiffs note that "[t]he Government makes no additional argument that is specific to the 1904 Reeves deed."   Indeed, in its opening brief the defendant referred to the "deeded easements" generally and argued that "none of the deeds at issue expressly limit the use of the right-of-way to any specific purpose," and defendant did not make any unique arguments regarding the 1904 Reeves Quit Claim Deed.  To the extent that the defendant implicitly argues that the 1904 Reeves Quit Claim Deed, like the SLS&E Deeds, must be understood to encompass use of the right of way as a highway or road, and the trail was a transportation corridor, the court's rejection of those arguments applies equally to the discussion of the 1904 Reeves Quit Claim Deed.

In its reply brief, the defendant raises one additional argument:

[E]ven if the Plaintiffs' consideration argument had merit with respect to the Hilchkanum-type deed, it falls flat when applied to the Reeves deed, where the consideration was not "the benefits and advantages to accrue" but, rather, "the sum of One hundred and Fifty dollars."   Thus, Plaintiffs cannot import this consideration into the granting clause as a limitation on the scope of the grant.  The Reeves deed conveyed a right-of-way without any restrictions or limitations on its use.  Trail use, therefore, is within the scope of the Reeves deed.

This court's analysis regarding the 1904 Reeves Quit Claim Deed in Beres et al. v. United States, 97 Fed. Cl. 757, stated:

The language in the 1904 Reeves Quit Claim Deed also is similar to the language of the deed in Swan v. O'Leary, 225 P.2d 199, in which the quit claim deed stated, "for the purpose of a *Railroad right-of-way to-wit:-a strip of land 50 feet in width*...." Id. at 199 (emphasis in original). Both the quit claim deed in Swan v. O'Leary and the 1904 Reeves Quit Claim Deed signaled the grantor's clear objective to convey a right of way.

Beres et al. v. United States, 97 Fed. Cl. at 806.  This court's analysis continued:

>   Notably, the 1904 Reeves Quit Claim Deed does not use the phrase "strip of land," but specifically uses the phrase a "right of way." The 1904 Reeves Quit Claim Deed states, "the intention being to convey herein a right of way fifty feet on each side of said track through any lots or blocks conveyed to the grantor...."

Id. at 807.[33]  This court previously concluded "that the grantors of the 1904 Reeves Quit Claim Deed intended to convey only an easement to the railroad."  Beres et al. v. United States, 97 Fed. Cl. at at 809.  The right of way conveyed to Northern Pacific was limited to the right of way fifty feet on each side of the "Seattle, Lake Shore & Eastern Railway, now the Northern Pacific Railway railroad track."

The record before this court indicates that the construction of the SLS&E railroad was initiated in the 1880s, prior to the execution of the 1904 Reeves Quit Claim Deed. For example, on May 13, 1887, the Seattle Daily Post-Intelligencer reported that SLS&E was "forging ahead" with construction, and that "[t]he work on all sections under contract is progressing rapidly...." Seattle Daily Post-Intelligencer, May 13, 1887.  Again on July 3, 1887, the Seattle Daily Post-Intelligencer reported that "[n]othing has been more active than the extension of railroad operations.  The Seattle Lake Shore and Eastern Company has been particularly energetic….  The operations of the company in town have been progressing steadily during the past three months, and are rapidly assuming great magnitude."  Seattle Daily Post-Intelligencer, July 3, 1887.  After acquiring the rights of way in the SLS&E Deeds, the SLS&E constructed the railway, and subsequently operated a railroad.  Moreover, the parties have stipulated that the railway was "constructed by the Seattle, Lake Shore & Eastern Railway Co. (the 'SLS&E') from May 1887 through March 1888."

As pointed out by plaintiffs, "[a]s indicated within the [1904 Reeves Quit Claim] deed itself, the context in 1904 was that the railroad tracks were *already* constructed and in operation. Under that factual circumstance, the intent of providing a right of way was clearly for the purpose of allowing continued operation of the existing railroad.

---

[33] In Swan v. O'Leary, 225 P.2d 199, the quit claim deed stated, "*for the purpose of a Railroad right-of-way to-wit:-a strip of land 50 feet in width*...." Id. at 199 (emphasis in original).  The 1904 Reeves Quit Claim Deed states "the intention being to convey herein a right of way fifty feet on each side of said track...."  Except for the use of the singular in the quit claim deed in Swan v. O'Leary and the use of the plural in the 1904 Reeves Quit Claim Deed, the second to last paragraph of the deed in Swan is also identical to the language in the 1904 Reeves Quit Claim Deed.  In Swan, the quit claim deed states, in part, "'To Have and to Hold All and singular the said premises together with the appurtenances, unto said party of the second part, and to *his* heirs and assigns forever." See  Swan v. O'Leary, 225 P.2d at 199.  The 1904 Reeves Quit Claim Deed states, in part, "To have and to hold all and singular the said premises together with the appurtenances, unto said party of the second part and to its heirs and assigns forever."

Under the language of the deed, no other purpose is stated or implied." (emphasis in original).   Indeed, the 1904 Reeves Quit Claim Deed itself specifically refers to "the Seattle, Lake Shore & Eastern Railway, now the Northern Pacific Railway" railroad track, and states "the intention being to convey herein a right of way fifty feet on each side of said track."   Moreover, as stipulated by the parties, by 1904 the SLS&E had already been through receivership.   As argued by plaintiffs, "where an easement is conveyed to a railroad, the railroad use is itself the limited and specific purpose." Furthermore, no other purpose is even hinted at in the 1904 Reeves Quit Claim Deed. In Roeder Co. v. Burlington Northern, Inc., 716 P.2d 855, the State of Washington Supreme Court stated:

> The conveyance of a right of way to a railroad may be in fee simple or only an easement. Where only an easement for a right of way is concerned, and its use for such purpose ceases, the land is discharged of the burden of the easement and the right to possession reverts to the original landowner or to that landowner's successors in interest; the right to possession does not go to grantees and successors in interest of the railroad company.

Id. at 859 (footnotes omitted).

Although plaintiffs acknowledge that the Swan case does not directly address the scope of a railroad right of way easement, they direct the court's attention to the language in Swan which states: "It is very clear from what subsequently happened that it was the intention of the grantee to acquire the two strips of land in order that a logging railroad might be constructed thereon over which to haul timber logged from his lands, and for no other purpose."   Id. at 201.   The plaintiffs suggest that both the SLS&E Deeds and "also the 1904 Reeves deed, were followed by the subsequent conduct that the right of way was in fact used for operating the railroad.   No other use was ever made.   Accordingly, the subsequent conduct, as in Swan v. O'Leary, makes it 'very clear' that the intention was for operating a railroad, 'and for no other purpose.'"   In the case under consideration by this court, the purpose of the easement in the 1904 Reeves Quit Claim Deed was stated as "the intention being to convey herein a right of way fifty feet on each side of said track," which was limited by the grantors to railroad use only.   Any use other than railroad use would exceed the scope of the easement. Therefore, in the above captioned consolidated case, by converting the railway to a public recreational trail, the scope of the easement for the 1904 Reeves Quit Claim Deed was exceeded.

**Scope of the Prescriptive Easement**

As with the interpretation of the SLS&E Deeds and the 1904 Reeves Quit Claim Deed, Washington law controls to determine the scope of the easement for SLS&E's prescriptive easement.   Under Washington law, "[a] prescriptive easement presents a mixed question of law and fact."   Imrie v. Kelley, 250 P.3d 1045, 1048 (Wash. Ct. App. 2010), amended on recons. (Wash. Ct. App.), review denied, 257 P.3d 662 (Wash.

2011); see also Petersen v. Port of Seattle, 618 P.2d 67, 71 (Wash. 1980); Lee v. Lozier, 945 P.2d 214, 217 (Wash. Ct. App. 1997) ("Whether the elements of a prescriptive easement are met is a mixed question of fact and law."). The State of Washington Court of Appeals has stated:

> The requirements to establish a prescriptive easement are the same as those to establish adverse possession. The claimant must prove use of the servient land that is: (1) open and notorious; (2) over a uniform route; (3) continuous and uninterrupted for 10 years; (4) adverse to the owner of the land sought to be subjected; and (5) with the knowledge of such owner at a time when he was able in law to assert and enforce his rights. Washington employs an objective test for adversity. When the claimant uses the property as the true owner would, under a claim of right, disregarding the claims of others, and asking no permission for such use, the use is adverse. Adversity may be inferred from the actions of the claimant and the owner. Under the doctrines of both prescriptive easement and adverse possession, a use is not adverse if it is permissive. Permission can be express or implied.

Kunkel v. Fisher, 23 P.3d 1128, 1130 (Wash. App. Ct.), review denied, 37 P.3d 390 (Wash. 2001) (footnotes omitted); see also Mountaineers v. Wymer, 355 P.2d 341, 342 (Wash. 1960) (quoting Northwest Cities Gas Co. v. Western Fuel Co., 123 P.2d 771, 776 (Wash. 1942)) ("'To establish a prescriptive right of way over the land of another person, the claimant of such right must prove that his use of the other's land has been open, notorious, continuous, uninterrupted, over a uniform route, adverse to the owner of the land sought to be subjected, and with the knowledge of such owner at a time when he was able in law to assert and enforce his rights.'"); Imrie v. Kelley, 250 P.3d at 1048; Drake v. Smersh, 89 P.3d 726, 729 (Wash. Ct. App.), as amended (Wash. Ct. App. 2004).

Under Washington law, prescriptive rights "are not favored in the law, since they necessarily work corresponding losses or forfeitures of the rights of other persons." Northwest Cities Gas Co. v. Western Fuel Co., 123 P.2d at 776; see also Imrie v. Kelley, 250 P.3d at 1048 ("Prescriptive rights are not favored by the law."); 810 Props. v. Jump, 170 P.3d 1209, 1216 (Wash. Ct. App. 2007). Moreover, "[t]he burden of proving a prescriptive right rests upon the one who is to be benefited by the establishment of such right." Northwest Cities Gas Co. v. Western Fuel Co., 123 P.2d at 776; see also Anderson v. Secret Harbor Farms, 288 P.2d 252, 254-55 (Wash. 1955); Imrie v. Kelley, 250 P.3d at 1048; 810 Props. v. Jump, 170 P.3d at 1216.

The parties have stipulated that "the SLS&E acquired an easement by adverse possession/prescriptive easement in Government Lot 2, Section 7, Township 24 North, Range 6 East, W.M.," and that "after the SLS&E acquired an easement in the right-of-way by adverse possession/prescriptive easement, certain successors-in-interest to the patentee conveyed by deed an interest in sections of the right-of-way in Government Lot 2, Section 7, Township 24 North, Range 6 East, W.M." The parties further

stipulated that "based upon information currently available, it appears that at least some Plaintiffs in <u>Morel</u> and <u>Brown</u> are successors-in-interest to landowners who retained a fee interest in the right-of-way subject to, or burdened by, the railroad's easement acquired by adverse possession/prescriptive easement."

The State of Washington Supreme Court, quoting from the Corpus Juris Secundum on Easements, has indicated that "'[w]here an easement is acquired by prescription, the extent of the right is fixed and determined by the user in which it originated, or, as it is sometimes expressed, by the claim of the party using the easement and the acquiescence of the owner of the servient tenement.'" <u>Northwest Cities Gas Co. v. Western Fuel Co.</u>, 135 P.2d 867, 868-69 (Wash. 1943) (quoting 28 C.J.S., Easements § 74, p. 751);[34] <u>see</u> <u>also</u> <u>Lee v. Lozier</u>, 945 P.2d at 220 (citing <u>Northwest Cities Gas Co. v. Western Fuel Co.</u>, 135 P.2d at 868-69 and Restatement of Property § 477, at 2992 (1944)) ("The extent of the rights acquired through prescriptive use is determined by the uses [sic][35] through which the right originated."); <u>Mahon v. Haas</u>, 468 P.2d 713, 716 (Wash. Ct. App. 1970) ("The extent of any prescriptive rights based upon such adverse possession is fixed and determined by the user in which it originated, and prescriptive rights once acquired cannot be terminated or abridged at the will of the owner of the servient estate.").

The State of Washington Supreme Court also has written that "[t]here is a marked distinction between the extent of an easement acquired under a claim of right and the scope of one acquired under color of title. When one seeks to acquire an easement by prescription under a claim of right, user and possession govern the extent of the easement acquired. It is established only to the extent necessary to accomplish the purpose for which the easement is claimed." <u>Yakima Valley Canal Co. v. Walker</u>, 455 P.2d 372, 374 (Wash. 1969); <u>see</u> <u>also</u> <u>Lee v. Lozier</u>, 945 P.2d at 220 ("The easement acquired extends only to the uses necessary to accomplish the purpose for which the easement was claimed.").   The State of Washington Supreme Court continued, "[o]n the other hand, however, where one's occupancy or adverse user is under color of title that is a matter of public record, possession or user of a portion is regarded as coextensive with the entire tract described in the instrument under which possession is claimed." <u>Yakima Valley Canal Co. v. Walker</u>, 455 P.2d at 374 (citing <u>Omaha & Republican Valley Ry. Co. v. Rickards</u>, 38 Neb. 847, 57 N.W. 739 (1894)). Under Washington law, "[c]olor of title 'means that the adverse claimant holds or traces

---

[34] The current version of the Corpus Juris Secundum on Easements quoted by the State of Washington Supreme Court is at section 193 of the Corpus Juris Secundum on Easements and differs slightly from the version quoted in <u>Northwest Cities Gas Co. v. Western Fuel Co.</u>  <u>See</u> 28A C.J.S. § 193 (2012) ("Where an easement is acquired by prescription, the extent of the right is determined by the user in which it originated.").

[35] Although purporting to be citing to the State of Washington Supreme Court in <u>Northwest Cities Gas Co. v. Western Fuel Co.</u>, 135 P.2d at 868-69, and the Corpus Juris Secundum on Easements, the court in <u>Lee v. Lozier</u> altered the word "uses" to "user."  <u>See</u> <u>Lee v. Lozier</u>, 945 P.2d at 220.

back to a title document, usually a deed, that appears on its face to convey good title, but that, for some reason that does not appear on its face, did not convey title.'" Campbell v. Reed, 139 P.3d 419, 423 (Wash. App. 2006) (quoting William B. Stoebuck & John W. Weaver, 17 Washington Practice, Real Estate: Property Law § 8.20, at 542 (2004)), review denied, 163 P.3d 794 (Wash. 2007).

The parties have stipulated that "[n]o deed conveying legal title in the right-of-way to the SLS&E being found," the SLS&E's prescriptive easement is based on a claim of right. Therefore, SLS&E's prescriptive easement extends only to the uses necessary to accomplish the purpose for which the easement was claimed. See Yakima Valley Canal Co. v. Walker, 455 P.2d at 375; see also Lee v. Lozier, 945 P.2d at 220. The defendant notes in its cross-motion for partial summary judgment, that "[n]o agreement was reached, however, regarding the scope of that easement." Defendant argues that "[b]ecause, under Washington law, the easement acquired by the railroad was for a right-of-way for a public highway, trail use falls well within the scope of that easement." By contrast, plaintiffs argue that "[t]he scope of the prescriptive right of way easement does not encompass trail use."

Both parties rely heavily on Lee v. Lozier, 945 P.2d 214, to support their respective positions that the scope of the prescriptive easement either did, or did not, encompass trail use. At issue in Lee v. Lozier was access to a community dock in a sub-division on Lake Washington, for which a group of neighbors had agreed to share the building cost. The owner into whose property a portion of docket extended had agreed to let the other neighbors access the dock, and claimed in a letter that he would never deny the other neighbors access to the dock that crossed his property line. He promised to file the letter against his title, although he never recorded the easement. Id. at 216. As noted by the Lozier court, "[i]n the years following the completion of the dock, the neighbors used it for various activities including fishing, sailing, waterskiing, strolling, picnicking, temporarily tying up boats to unload goods and passengers, and mooring boats. During the warm summer months, the neighbors also used the dock for sunbathing and swimming." Id. Subsequently, the owner conveyed his interest in the lot to Lozier, who denied the neighbors use of the dock. In response, the neighbors sued, requesting an order establishing that they had acquired a prescriptive easement to use the portions of the dock that extended onto the property. Id. at 216-17. The trial court entered an order which provided that, "[t]he recreational uses permitted under this easement shall include, without limitation, waterskiing, swimming, fishing, strolling, sunbathing, picnicking, and the temporary moorage of boats as permitted by the covenants and bylaws of the Homeowners' Association on the outer (western) portion of the 'T-shaped' end of the dock." Id. at 220.

On appeal, the State of Washington Court of Appeals reviewed the trial court's grant of a prescriptive easement and upheld the trial court's finding that the use of the property was adverse and that the use was continuous and uninterrupted. Id. at 219-20. After concluding that the neighbors had acquired a prescriptive easement, the State of Washington Court of Appeals addressed the scope of the prescriptive easement. The Lozier court indicated that "[i]n ascertaining whether a particular use is

permissible under a prescriptive easement the court should compare that use with the uses leading to the prescriptive easement in regard to: (a) their physical character, (b) their purpose, and (c) the relative burden caused by them upon the servient tenement." Id. (citing Restatement (First) of Property § 478 at 2994 (1944)). Quoting the Restatement (First) of Property, the Lozier court noted that:

> "No use can be justified under a prescriptive easement unless it can fairly be regarded as within the range of the privileges asserted by the adverse user and acquiesced in by the owner of the servient tenement. Yet, no use can ever be exactly duplicated. If any practically useful easement is ever to arise by prescription, the use permitted under it must vary in some degree from the use by which it was created. *Hence, the use under which a prescriptive interest arises determines the general outlines rather than the minute details of the interest.*"

Lee v. Lozier, 945 P.2d at 220 (quoting Restatement (First) of Property § 477 comment b (1944)) (emphasis added by Lozier court). The Lozier court continued, "[h]ere, the physical character of the uses that led to the creation of the prescriptive easement in this case is very similar to the character of the uses permitted by the trial court's order: all are activities that take place on a dock. The purpose of the uses is the same: recreation." Id. The court disagreed with the argument that the prescriptive easement would lead to an increased or overburdening use of the dock, concluding that the prescriptive easement granted no additional rights than the subdivision neighbors believed they already enjoyed. See id. Therefore, the State of Washington Court of Appeals held "that the specific recreational activities set out in the trial court's order are consistent with the 'general outlines' of the activity that led to the prescriptive easement, and do not exceed its scope." Id. at 220-21.

Citing to Lee v. Lozier, defendant in the cases currently before this court argues that there "is no allegation that any of the activities at issue here extend beyond the confines of the existing right-of-way," and that just as all the activities in Lee v. Lozier took place on a dock, "[h]ere, all of the activities take place on a transportation corridor." Plaintiffs, however, correctly note that "in comparing trail use to railroad use, it is clear that the physical character of the uses is remarkably different. Other than being linear, a railroad track is physically constructed far differently than a walking and bike path. Likewise, properly construed, the actual purposes for running a train (shipment of heavy freight) are far different from a recreational walking and biking trail." Although the Loizer court was careful to note that a court should look to the "general outlines" of the interest conveyed, and not to the minute details of the interest, here, even the general outlines of the interest, railroad use, encompass far different uses than use as a public recreational trail for walking, biking, and hiking. Even if all the activities were to take place within the same space of the rail corridor, it would not mean that all the activities are covered by the original prescriptive easement. As plaintiffs noted at oral argument, "here the right originated, the prescriptive right, originated through railroad use, and so that means that the extent of the rights are to railroad use, and that should be the end of

the story."  Uses of a public recreational trail, for walking, hiking, and biking, constitute very different uses than use as a railroad.

The defendant also raises the argument that "there is no allegation in any of the Complaints that interim trail use will overburden the right-of-way or the 'servient tenement.' Interim trail use therefore falls squarely within the prescriptive easement acquired by the railroad." (internal citation omitted).  Defendant argues that the test articulated in Lee v. Loizer is, "the relative burdens imposed on the servient estate, and Plaintiffs neither allege in their pleadings, nor attempt to show in their brief, the differences in the relative burden imposed on the servient estate by rail versus trail use." Defendant ignores plaintiffs' argument that the burden on the servient estate is also very different in nature because a train is a commercial enterprise, one which is predictable, and consistent, whereas a public recreational trail "allows access to anyone who desires to stroll or bike in, the entry is personal in nature, unpredictable and the behavior inconsistent." Just as the type of uses are completely different between rail use and trail use, the burden on the servient estate is likewise completely different.  The burdens of a trail, with public access for walking, hiking, or biking is inconsistent with the burdens expected for rail use.

In addition, the defendant repeats its arguments made regarding the scope of easements for the SLS&E Deeds and the 1904 Reeves Quit Claim Deed, that a railroad is a public highway and interim trail use serves a similar function as a public highway, and that the purposes of both are transportation. This argument has been addressed above and provides no more compelling grounds in the defendant's favor in the context of a prescriptive easement.  As observed above, the United States Court of Appeals for the Federal Circuit stated that:

> [I]t appears beyond cavil that use of these [railroad] easements for a recreational trail-for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway-is not the same use made by a railroad, involving tracks, depots, and the running of trains. The different uses create different burdens. In the one case there was an occasional train passing through…. In the other, individuals or groups use the property, some passing along the trail, others pausing to engage in activities for short or long periods of time.

Toews v. United States, 376 at 1376.  The same is true here, the prescriptive easement acquired by the SLS&E did not encompass trail use, and the conversion of a railroad easement into a public recreational trail exceeded the scope of the prescriptive easement.

## Scope of the 1875 Act Easements

Previously, this court determined that "[u]nder the facts at issue in the case currently before this court, when the United States granted a right-of-way to the

[SLS&E], pursuant to the 1875 Act, it granted an easement to the railroad for railroad purposes, in keeping with the purpose of the 1875 Act." Beres v. United States, 64 Fed. Cl. at 427.  This court must now determine if the scope of the original grant of easements pursuant to the 1875 Act was exceeded by the conversion to a public recreational trail.

As discussed and determined in the court's earlier decision in Beres v. United States, 64 Fed. Cl. 403, federal law, not state law, controls the determination of Congressional intent as to the property interests impacted by a federal statute, such as the 1875 Act. Id. at 410. The United States Supreme Court has stated that "[t]he construction of grants by the United States is a federal not a state question," and "involves the consideration of state questions only in so far as it may be determined as a matter of federal law that the United States has impliedly adopted and assented to a state rule of construction as applicable to its conveyances." United States v. Oregon, 295 U.S. 1, 27-28 (1935) (citations omitted).[36] The United States Court of Appeals for the Tenth Circuit similarly has noted that, "[i]n the specific context of federal land grant statutes, the [Supreme] Court has explained that courts may incorporate state law 'only in so far as it may be determined as a matter of federal law that the United States has impliedly adopted and assented to a state rule of construction.'" Southern Utah Wilderness Alliance v. Bureau of Land Mgmt., 425 F.3d 735, 762-63 (10th Cir. 2005) (quoting United States v. Oregon, 295 U.S. at 28 and citing United States v. Gates of the Mountains Lakeshore Homes, Inc., 732 F.2d 1411, 1413 (9th Cir. 1984)), amended on reh'g denied (10th Cir. 2006); see also Ellamae Phillips Co. v. United States, 564 F.3d 1367. Therefore, to determine the scope of the easements for the 1875 Act cases, the court applies federal law.

This court has the authority to determine the scope of the easements granted pursuant to the 1875 Act.  See Ellamae Phillips Co. v. United States, 564 F.3d at 1373. As the Federal Circuit in Ellamae Phillips held: "We conclude that Hash II [Hash v. United States, 403 F.3d 1308 (Fed. Cir. 2005)] does not preclude the trial court from deciding either the scope of the easement granted under the 1875 Act…." Ellamae Phillips Co. v. United States, 564 F.3d at 1373.[37]

---

[36] The Supreme Court in Oregon also indicated that "[i]n construing a conveyance by the United States of land within a state, the settled and reasonable rule of construction of the state affords an obvious guide in determining what impliedly passes to the grantee as an incident to land expressly granted. But no such question is presented here, for there is no basis for implying any intention to convey title to the state." United States v. Oregon, 295 U.S. at 28.  The same applies in the above captioned consolidated cases regarding the 1875 Act easements.

[37] In Ellamae Phillips Co. v. United States, the Federal Circuit asked if its precedent "requires us to hold that conversion of a railroad to a public trail under the 1875 Act is a taking per se," id. at 1372, noting that the Supreme Court in Presault I stated "if a conversion to a trail gives rise to a taking, compensation is available, satisfying the requirements of the Fifth Amendment." Id. (citing Presault I, 494 U.S. at 4-5).  The

The 1875 Act stated:

*Be it enacted by the Senate and the House of Representatives of the United States of America in Congress assembled*, [Section 1] That the right of way through the public lands of the United States is hereby granted to any railroad company duly organized under the laws of any State or Territory, except the District of Columbia, or by the Congress of the United States, which shall have filed with the Secretary of the Interior a copy of its articles of incorporation, and due proofs of its organization under the same, to the extent of one hundred feet on each side of the central line of said road; also the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad; also ground adjacent to such right of way for station buildings, depots, machine shops, side-tracks, turn-outs, and water-stations, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road.

Sec. 2   That any railroad company whose right of way, or whose track or roadbed upon such right of way, passes through any canyon, pass, or defile, shall not prevent any other railroad company from the use and occupancy of the said canyon, pass, or defile, for the purposes of its road, in common with the road first located, or the crossing of other railroads at grade. And the location of such right of way through any canyon, pass, or defile shall not cause the disuse of any wagon or other public highway now located therein, nor prevent the location through the same of any such wagon road or highway where such road or highway may be necessary for the public accommodation; and where any change in the location of such wagon road is necessary to permit the passage of such railroad through any canyon, pass, or defile, said railroad company shall before entering upon the ground occupied by such wagon road, cause the same to be reconstructed at its own expense in the most favorable location, and in as perfect a manner as the original road: *Provided,* That such expenses shall be equitably divided between any number of railroad companies occupying and using the same canyon, pass, or defile.

---

Federal Circuit concluded that the conversion of a railroad to a public trail was not a *per se* taking as "the Supreme Court added that 'under any view of takings law, only some rail-to-trail conversions will amount to takings.... Others are held as easements that do not even as a matter of state law revert upon interim use as nature trails.'" Ellamae Phillips Co. v. United States, 564 F.3d 1367 (quoting Presault I, 494 U.S. at 16) (omissions in original).  Despite the foregoing, plaintiffs continue to allege that "[i]n the late 1800's the Railroad acquired easements for railroad purposes. It is beyond cavil that these easements were never intended to be used as linear parks. For this reason, when the Government authorized recreational trail use on these easements, it effected a *per se* taking giving rise to liability."

Sec. 3.  That the legislature of the proper Territory may provide for the manner in which private lands and possessory claims on the public lands of the United States may be condemned; and where such provision shall not have been made, such condemnation may be made in accordance with section three of the act entitled "An act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the Government the use of the same for postal, military, and other purposes, approved July first, eighteen hundred and sixty-two," approved July second, eighteen hundred and sixty-four.

Sec. 4.  That any railroad company desiring to secure the benefits of this act, shall, within twelve months after the location of any section of twenty miles of its road, if the same be upon surveyed lands, and, if upon unsurveyed lands, within twelve months after the survey thereof by the United States, file with the register of the land office for the district where such land is located a profile of its road; and upon approval thereof by the Secretary of the Interior the same shall be noted upon the plats in said office; and thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way: *Provided,* That if any section of said road shall not be completed within five years after the location of said section, the rights herein granted shall be forfeited as to any such uncompleted section of said road.

Sec. 5.  That this act shall not apply to any lands within the limits of any military, park, or Indian reservation, or other lands especially reserved from sale, unless such right of way shall be provided for by treaty-stipulation or by Act of Congress passed heretofore.

Sec. 6  That Congress reserves the right at any time to alter, amend, or repeal this act, or any part thereof.

Approved, March 3, 1875.

18 Stat. 482 §§ 1-6; see also 43 U.S.C. §§ 934-39 (emphasis in original).[38]

In Great Northern Railway Co., 315 U.S. 262 (1942), the Supreme Court, when examining the purpose of the 1875 Act, noted that "[t]he Act was the product of a period, and, 'courts, in construing a statute, may with propriety recur [sic] to the history of the times when it was passed.'" Great Northern Ry. Co. v. United States, 315 U.S. at 273; see also Leo Sheep Co. v. United States, 440 U.S. 668, 682 (1979) (quoting Winona & St. Peter R.R. Co. v. Barney, 113 U.S. 618, 625 (1885) ("'To ascertain that

---

[38] The codified version of the 1875 Act at 43 U.S.C. §§ 934-39 made mostly minor conforming changes to the text of the 1875 Act, none of which are informative to the scope of the easements inquiry before the court.

intent we must look to the condition of the country when the acts were passed, as well as to the purpose [of the statutes] declared on their face, and read all parts of them together.'"").   The <u>Great Northern</u> court observed that:

> Beginning in 1850 Congress embarked on a policy of subsidizing railroad construction by lavish grants from the public domain.  This policy incurred great public disfavor which was crystallized in the following resolution adopted by the House of Representatives on March 11, 1872:
>
> "Resolved, that in the judgment of this House the policy of granting subsidies in public lands to railroads and other corporations ought to be discontinued, and that every consideration of public policy and equal justice to the whole people requires that the public lands should be held for the purpose of securing homesteads to actual settlers, and for educational purposes, as may be provided by law."

<u>Id.</u> at 273-74 (quoting Cong. Globe, 42d Cong. 2d Sess. 1585 (1872)) (footnote omitted).  The United States Supreme Court noted that "[a]fter 1871 outright grants of public lands to private railroad companies seem to have been discontinued," and that "[f]or a time special acts were passed granting to designated railroads simply 'the right of way' through the public lands of the United States."  <u>Great Northern Ry. Co. v. United States</u>, 315 U.S. at 274.  According to remarks in Congress by those sponsoring the measures, the special acts were "'merely a grant of the right of way,'" through the public lands.  <u>Id.</u> (quoting Cong. Globe, 42d Cong. 2d Sess. 3913 and 4134 (1872)).  Due to the number of special grants and the burdens they placed on Congress, Congress passed the 1875 Act, permitting any railroad company to construct a railway line over public lands.  The Supreme Court observed that the 1875 Act represented a "sharp change in Congressional policy...."  <u>Great Northern Ry. Co. v. United States</u>, 315 U.S. at 275.   The United States Supreme Court, shortly after the 1875 Act was enacted, noted that: "At the time of the passage of the act of March 3, 1875, [the 1875 Act] Congress had become convinced of the importance to the country, and particularly to the Western States, of preserving cañons, passes, and defiles in the public domain for the equal and common use of all railroad companies organized under competent State or territorial authority, and to which might be granted by national authority the right of way."  <u>Denver & Rio Grande Railway, Co. v. Alling</u>, 99 U.S. 463, 480 (1878).

Plaintiffs assert that "[t]he scope of the easements, granted solely to railroads under the 1875 Act, were limited to railroad purposes and did not include the use of linear parks or other recreational pursuits."  Defendant, however, argues that "[a]n 1875 Act grant is not limited to active rail service only."  According to the defendant, there is "no binding precedent regarding the scope of an 1875 Act easement."  Plaintiffs cite to the Federal Circuit's decision in <u>Ellamae Phillips Co. v. United States</u>, 564 F.3d 1367, which concluded that after review of prior Federal Circuit decisions, "[t]he question of the scope of the easement provided by the 1875 Act therefore has not been addressed in this court and needs to be first decided by the Court of Federal Claims."  <u>Id.</u> at 1374.  On remand in <u>Ellamae Phillips</u>, the Court of Federal Claims concluded that "trail use is

outside the scope of the easement granted by the 1875 Act, irrespective of the existence of railbanking." Ellamae Phillips Co. v. United States, 99 Fed. Cl. at 486.

Defendant argues that "[a]s a federal instrument, an 1875 Act grant is subject to the intentions and specifications of Congress; it is not a common law easement." Defendant cites to the language of Brown v. State, 924 P.2d 908,[39] in which the State of Washington Supreme Court concluded, "'easements' on public lands are granted by Congress and subject to the intentions and specifications of Congress rather than common law." Id. at 917.  As indicated, however, by the United States Supreme Court:

> We begin, of course, with "the assumption that the ordinary meaning of the language" chosen by Congress "accurately expresses the legislative purpose." Engine Mfrs. Assn. v. South Coast Air Quality Management Dist., 541 U.S. 246, 252, 124 S. Ct. 1756, 158 L. Ed. 2d 529 (2004) (internal quotation marks omitted).  But where Congress uses a common-law term in a statute, we assume the "term...comes with a common law meaning, absent anything pointing another way."

Microsoft Corp. v. i4i Ltd. P'ship, 131 S. Ct. 2238, 2246 (2011) (quoting Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 58 (2007) (citing Beck v. Prupis, 529 U.S. 494, 500–501 (2000))); see also Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1168 n.4 (Fed. Cir. 2011) (quoting Neder v. United States, 527 U.S. 1, 21 (1999) (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322 (1992))) ("'"Where Congress uses terms that have accumulated settled meaning under...the common law, [we] must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of those terms."'") (omissions in original).  Moreover, over 100 years ago, the Supreme Court indicated that "[n]o statute is to be construed as altering the common law, farther than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express." Shaw v. Merchants' Nat'l Bank, 101 U.S. 557, 565 (1879).

Examining the specific language of the 1875 Act, the 1875 Act provided, in pertinent part, that "the right of way through the public lands of the United States is granted to any railroad company duly organized under the laws of any State or Territory, except the District of Columbia, or by the Congress of the United States." 1875 Act, at § 1, 43 U.S.C. § 934.  The term "right of way" is used five more times, and used together with a reference to the word railroad, when the 1875 Act stated, "that any railroad company whose right of way." Moreover, the term railroad or railroad company appears

---

[39] Unlike the analysis of the SLS&E Deeds, the 1904 Reeves Quit Claim Deed, or the prescriptive easement, federal law, and not State of Washington law controls, and thus the Brown decision is only persuasive authority.  This court is bound by the decisions of the United States Supreme Court and the United States Court of Appeals for the Federal Circuit.  See Strickland v. United States, 423 F.3d 1335, 1338 n.3 (Fed. Cir.) (noting this court is bound by Federal Circuit precedent), reh'g en banc denied (Fed. Cir. 2005).

in the relevant portion of the 1875 Act five additional times, one of those referencing Section 3 of the 1875 Act titled: "An act to aid in the construction of a railroad."  There are no references whatsoever in the relevant portions of the Act to any other form of transportation, organization, endeavor or use.  Plaintiffs are correct when they state: "Nothing in the [1875] Act purports to create a unique estate in the railroad. Nothing in the Act purports to characterize the easement, which was the interest the railroad received, as anything other than an easement for the purpose specified, to inure to the benefit of the subsequent private owner of the subdivision burdened by the easement. Nothing in the Act purports to transmogrify these railroad easements into a broad, unspecified purpose."

Defendant, nonetheless, alleges that an 1875 Act grant of an easement was not limited to railroad purposes, arguing that Section 1 of the 1875 Act generally granted a right of way "through the public lands of the United States to any railroad company that met the requirements of the Act."   Defendant also states, "[a]lthough Congress contemplated that the grants would go to railroad companies for construction of their roads, Congress did not so limit 1875 Act grants."   Therefore, defendant claims, "[o]mission of such express language of limitation is critical because it reflects Congress' intent – even in 1875 – to not restrict these grants to active rail service." Citing to <u>United States v. Denver & Rio Grande Railway, Co.</u>, 150 U.S. 1, 11 (1893), defendant argues that the United States Supreme Court declined "to read a restriction into the provisions of the 1875 Act allowing railroads to take timber or other materials from public lands adjacent to an 1875 Act grant because, '[i]f congress had intended to impose [such a] restriction…it should have been so expressed.'"

Plaintiffs assert in response that defendant is selectively quoting from <u>Denver & Rio Grande Railway</u>.  Plaintiffs are correct.  In <u>Denver & Rio Grande Railway</u>, the Supreme Court noted the "well-settled rule of this court that public grants are construed strictly against the grantees; but that they are not to be so construed as to defeat the intent of the legislature, or to withhold what is given, either expressly or by necessary or fair implication."  <u>Id.</u> at 11.  The Supreme Court continued:

When an act, operating as a general law, and manifesting clearly the intention of congress to secure public advantages, or to subserve the public interests and welfare by means of benefits more or less valuable, offers to individuals or to corporations, as an inducement to undertake and accomplish great and expensive enterprises or works of a quasi public character in or through an immense and undeveloped public domain, such legislation stands upon a somewhat different footing from merly [sic] a private grant, and should receive at the hands of the court a more liberal construction in favor of the purposes for which it was enacted. <u>Bradley v. Railroad Co.</u>, 21 Conn. 294; Pierce, R. R. 491.

This is the rule, we think, properly applicable to the construction of the act of 1875, rather than the more strict rule of construction adopted in the case of purely private grants; and in view of this character of the act we

are of opinion that the benefits intended for the construction of the railroad in permitting the use of timber or other material should be extended to and include the structures mentioned in the act as a part of such railroad.

United States v. Denver & Rio Grande Ry., Co., 150 U.S. at 14-15.  In United States v. Denver & Rio Grande Railway, Co, the Supreme Court was focused on the permissibility of the railroad's use of timber.  The issue in Denver & Rio Grande Railway was, construing the 1875 Act, whether the railway company was permitted to take timber or other materials from public lands adjacent to the line of the railroad or was the railroad restricted to "timber or other material found in the vicinity of the place where the work of construction is going on?"  Id. at 2.  Section 1 of the 1875 Act allowed for "the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad."  1875 Act, at § 1, 43 U.S.C. § 934.  As plaintiffs correctly note, "[t]here was nothing 'mentioned in the 1875 act'…concerning transforming railways into linear parks, nor was there in the patent that issued full fee title, thereafter burdened only with the railway easements."  There is no argument from the defendant that converting a railroad corridor into a recreational trail was included in "the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad."  Even strictly construed against the original grantee, an expansive reading to include public recreational trails in the scope of the 1875 Act grant would appear to defeat the Congressional intent to make public lands available to railroad companies for the purpose of constructing railway lines.  See Denver & Rio Grande Ry., Co. v. Alling, 99 U.S. at 480; see also Great Northern Ry. Co. v. United States, 316 U.S. at 273-74.

Turning to Section 2 of the 1875 Act, defendant alleges that: "Section 2 of the 1875 Act reflects Congress' recognition that the 1875 Act grants might include uses other than active rail service," noting that Section 2 addressed when railroads or public highways conflicted "in areas such as canyons, the 1875 Act grant would not 'prevent the location…of any such wagon road or highway where such road or highway may be necessary for the public accommodation.' 43 U.S.C. § 935. Even in 1875, then, Congress contemplated other non-railroad uses of these right-of-way grants."  In response, plaintiffs assert that, as with defendant's argument respecting Section 1, defendant takes too expansive a view of Section 2.  According to the plaintiffs, Section 2 "merely targeted the occasional impassable topography where, in a canyon, pass, or narrow passage in a gorge, cooperation with other railroad companies' 'roads' would be necessary." Section 2 stated, in relevant part,

And the location of such right of way through any canyon, pass, or defile shall not cause the disuse of any wagon or other public highway located therein, nor prevent the location through the same of any such wagon road or highway where such road or highway may be necessary for the public accommodation; and where any change in the location of such wagon road is necessary to permit the passage of such railroad through any canyon, pass, or defile, said railroad company shall before entering upon the ground occupied by such wagon road, cause the same to be

reconstructed at its own expense in the most favorable location, and in as perfect a manner as the original road….

1875 Act, at § 2, 43 U.S.C. § 935.  Nothing in the words of Section 2 allowed for the expansion of the railroad easement granted in the 1875 Act to uses like public recreational trails.  Nor can Congress' intention in drafting Section 2 be seen as incorporating public recreational trails into the scope of the 1875 Act grants. Section 2 addressed a railroad company's inevitable need to make the newly created railroad easement co-exist with existing wagon roads or public highways when both intersected in a narrow pass or canyon.  Other than the uses specifically enumerated by Congress for the newly created railroad easements, the 1875 Act did not suggest any additional purposes beyond railroad purposes.

The mechanics of obtaining a grant pursuant to the 1875 Act also demonstrate that the purpose of such a grant was for railroad purposes.  The requirements for obtaining a grant pursuant to the 1875 Act were set out in Section 4 of 1875 Act, and included filing a map of the intended railroad with the local district land office and receiving approval from the Secretary of the Interior.  See 1875 Act, § 4; 43 U.S.C. § 937.  As it applies to the above captioned consolidated cases, and pursuant to the 1875 Act, between 1887 and 1891, the SLS&E took the necessary steps to establish a railroad right of way across public land along the eastern shore of Lake Sammamish in King County, Washington, by first securing approval from the Department of the Interior of their map identifying the location for proposed construction of a railroad running generally along the eastern shoreline of Lake Sammamish, Washington on July 5, 1887. Subsequently, after construction of the railroad was completed in 1888, the SLS&E filed, on April 15, 1891, with the United States Land Office in Seattle, Washington, a Map of Location showing the final location of the constructed railroad.  The SLS&E and the SLS&E's successor-in-interest, used the easement for railroad purposes for over 100 years until 1997 when the successor-in-interest concluded that continued operation of the railroad line was not economically viable.

Plaintiffs cite to regulations interpreting the 1875 Act and numerous statements from the Congressional Record prior to the enactment of the 1875 Act expressing a desire to limit the scope of the grants to railroad purposes.  The cumulative effect, plaintiffs argue is that "these sources expressed the 1875 Act grants to be easements for railroad purposes only is unremarkable given the context in which they were granted."  Although defendant's urge an appropriate note of caution regarding the use of legislative history, defendant wishes to ignore the legislative history cited by the plaintiffs related to the 1875 Act, which can inform and clarify the Congressional intent of the statute, although it cannot "trump clear text."  See Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States, 617 F.3d 1357, 1361 (Fed. Cir.) (quoting Bull v. United States, 479 F.3d 1365, 1376 (2007)), reh'g en banc denied (Fed. Cir. 2010) ("'Beyond the statute's text, the traditional tools of statutory construction include the statute's structure, canons of statutory construction, and legislative history.'").

Regarding the 1875 Act, plaintiffs note that Senator Bayard of Delaware stated that: "If it shall be found to be the pleasure of the Senate to pass any general law authorizing the incorporation of railway companies through this vast extent of land, let them at least confine it to railway purposes, and not under the guise of creating railway corporations or facilitating the creation of those corporations, set up great landed associations." 2 Cong. Rec. 2950 (Apr. 9, 1874). Similarly, Senator Stewart of Nevada stated that: "In virtue of the condemnation for the purposes of this act; that is, for the purposes of the railroad. If they do not build a railroad and do not use it for that purpose, they do not have it at all. The title is for this purpose." 2 Cong. Rec. 2900 (Apr. 8, 1874) (discussing and amending the Senate version of the 1875 Act).

Plaintiffs also cite to caselaw to assist in understanding the 1875 Act, including Hash v. United States, in which the Federal Circuit, quoting from 43 C.F.R. § 243.2(a) (1909),[40] stated: "'A railroad company to which a right-of-way is granted does not secure a full and complete title to the land on which the right-of-way is located. It obtains only the right to use the land for the purposes of which it is granted and for no other purpose....'" Hash v. United States, 403 F.3d 1308, 1314 (Fed. Cir), reh'g denied (Fed. Cir. 2005). Plaintiffs further cite to United States v. Union Pacific Railroad Co., to point out that the Supreme Court recognized: "a great shift in congressional policy occurred in 1871: that after that period only an easement for railroad purposes was granted, while prior thereto a right of way with alternate sections of public land along the right of way had been granted." United States v. Union Pac. R.R. Co., 353 U.S. 112, 119 (1957) (citing Great Northern Ry. Co. v. United States, 315 U.S. at 278). Regarding the 1875 Act, the Supreme Court in Great Northern Railway noted that:

> The Act was designed to permit the construction of railroads through the public lands and thus enhance their value and hasten their settlement. The achievement of that purpose does not compel a construction of the right of way grant as conveying a fee title to the land and the underlying minerals; a railroad may be operated though its right of way be but an easement.

Great Northern Ry. Co. v. United States, 315 U.S. at 272 (footnote omitted).

In response, defendant argues "[c]ertainly, the Supreme Court did not hold in Great Northern that the Act granted an easement for railroad purposes; rather it found 'it is improbable that Congress intended by it to grant more than a right of passage....' Id. at 275. Clearly, the Supreme Court did not find in Great Northern, that Congress intended to grant anything less than a right of passage in the 1875 Act. Trail use is within the scope of such a right of passage." More recently, however, in interpreting the 1875 Act, in Ellamae Phillips Co. v. United States, the trial court cited Great Northern, and stated:

---

[40] 43 C.F.R. § 243.2(a) (1909) was repealed by the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701 et seq., the same act that repealed the 1875 Act.

the context in which the Act was passed indicates that the grant was intended for only railroad purposes. In <u>Great Northern Railway Co. v. United States</u>, 315 U.S. 262, the Court recounts the history of Western settlement and the role of railroad development in facilitating settlement. The Court points out that outright grants of public land stopped in 1871, but because Congress still wanted to encourage Western development, it instead granted rights of way to the railroads.  <u>Id.</u> at 274.

<u>Ellamae Phillips Co. v. United States</u>, 99 Fed. Cl. at 486.  The Judge concluded that:

Taken together, the language of the 1875 Act, the implementing regulations, and context in which the 1875 Act was passed indicate that the easements were granted to a "railroad company" for a "railroad purpose" and for "no other purpose" because Congress' ultimate goal was to promote railroad construction that would in turn promote Western expansion. Trail use is not a railroad purpose….

<u>Id.</u>

Regardless of the available sources allowing some limited review of contemporaneous context and Congressional statements expressed regarding the intent and meaning of the 1875 Act, defendant looks to the words in the 1875 Act, which provided that "Congress reserves the right at any time to alter, amend, or repeal" any of the provisions of the 1875 Act, or any part thereof.  <u>See</u> 1875 Act, at § 6, 43 U.S.C. § 939.  Defendant next cites to the words of <u>Great Northern Railway Co. v. United States</u>, 315 U.S. 262, for the proposition that the Supreme Court is "'not limited to the lifeless words of the statute and formalistic canons of construction in [its] search for the intent of Congress," even though the next sentence indicates: "The Act was the product of a period, and, 'courts, in construing a statute, may with propriety recur [sic] to the history of the times when it was passed.'"  <u>Id.</u> at 273 (quoting <u>United States v. Union Pacific R.R. Co.</u>, 91 U.S. 72, 79 (1875)).  Defendant also quotes from <u>Great Northern</u>: "'[i]t is settled that 'subsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject.'" <u>Great Northern Ry. Co. v. United States</u>, 315 U.S. at 277 (quoting <u>Tiger v. Western Inv. Co.</u>, 221 U.S. 286, 309 (1911)).  Relying on Section 6 of the 1875 Act and looking forty-five years after the enactment of the 1875 Act, defendant argues that "'[i]n 1920, Congress authorized all railroad companies to allow state or local governments to use "any portion of such right of way…as a public highway or street.' 43 U.S.C. § 913.  The 1920 Act provided that 'no such conveyance shall have the effect to diminish the right of way of such railroad company.' <u>Id.</u>"  Furthermore, defendant alleges that, regarding the 1920 Act "King County is using the right-of-way as part of its transportation system - a public highway."  As noted above, however, the court already has concluded that the public recreational trail at issue before this court should not be considered part of a transportation system or a public highway, but as a part of the King County's Department of Natural Resources and Parks.

In <u>Hash v. United States</u>, the Federal Circuit, in addressing the lower court's conclusion that the government retained the fee to the land underlying the easement after granting the land patent without reservation of the fee, examined the same statute. The court observed that the:

> 1920 statute, 43 U.S.C. § 913, provided: "All railroad companies to which grants for rights of way through the public lands have been made by Congress, or their successors in interest or assigns, are authorized to convey to any State, county, or municipality any portion of such right of way to be used as a public highway or street: *Provided*, That no such conveyance shall have the effect to diminish the right of way of such railroad company to a less width than 50 feet on each side of the center of the main track of the railroad as now established and maintained."

<u>Hash v. United States</u>, 403 F.3d at 1317 (quoting 43 U.S.C. § 913) (emphasis in original).  The Federal Circuit concluded that although the government argued that the statute demonstrates Congress viewed the railway right of way as under its continuing governmental control and not under private control, "an authorization to railroads to share their 200-foot wide right-of-way with local highway needs does not mandate the conclusion that the United States retained the fee to the land underlying the right-of-way after land patents including that land were granted to private persons."  <u>Id.</u>

Looking again to the 1920s, defendant argues that "Congress authorized railroads to 'convey to the highway department of any State any part of its right of way or other property in that State acquired by grant from the United States.' Federal Highway Act, § 16, Pub. L. No. 67-87, 42 Stat. 212, 216 (1921). In 1922, Congress enacted 43 U.S.C. § 912, which precluded the transfer of rights-of-way on which public highways had previously been established or were established within a year after the railroad's lawful abandonment. <u>See</u> 43 U.S.C. § 912."   In an earlier opinion, this court examined Section 912 observing that "[t]he 1922 Act was restating the obvious conclusion regarding the language of the 1875 Act and other right-of-way statutes that, in the absence of additional language, a right-of-way through public lands allowed for a limited use and did not reserve any fee type interests or reversionary rights as part of that right-of-way." <u>Beres v. United States</u>, 64 Fed. Cl. at 419.  The Federal Circuit in <u>Hash</u> also examined Section 912, indicating:

> To similar effect is the Railroad Rights-of-Way Abandonment Act of 1922, codified at 43 U.S.C. § 912.  Section 912 was of the nature of a "quiet title" enactment, for it provided that when a railroad ceased use and occupancy of a right-of-way that was originally granted from the public lands, the disposition of that relinquished right-of-way depended on whether title had previously been granted to a private owner.  Section 912 provided that the interests of the United States would be disposed of in accordance with that premise, in that

all right, title, interest, and estate of the United States in said lands shall, except such part thereof as may be embraced in a public highway legally established within one year after the date of said decree or forfeiture or abandonment, be transferred to and vested in any person ... to whom or to which title of the United States may have been or may be granted, conveying or purporting to convey the whole of the legal subdivision or subdivisions traversed or occupied by such railroad or railroad structures of any kind as aforesaid....

Hash v. United States, 403 F.3d at 1317-18 (quoting 43 U.S.C. § 912).  The Federal Circuit concluded that:

The government argues that this [section 912] supports the position that the government tacitly intended to retain ownership of the servient estate whenever land patents were granted to lands traversed by a previously granted railway right-of-way. The statute does not support this position. The statute requires the United States to convey any rights it may have, to the patentee of the land traversed by the abandoned right-of-way; it does not say what rights the United States had after the land patent was granted. Indeed, if the United States did have residual rights despite the patented land grant, then the statute required that the rights be conveyed to the private owner. Such an interpretation does not weaken the position of the landowners herein. Neither section 912 nor 913 purported to establish governmental ownership of land that had been granted to homesteaders subject to a right-of-way easement.

Hash v. United States, 403 F.3d at 1318.  Defendant argues that prior Federal Circuit precedent articulated in Hash is irrelevant because the Federal Circuit later stated in Ellamae Phillips, "our holding in Hash II that the conversion to a trail was a taking rested on the prior conclusion that the railway abandoned the right-of-way." Ellamae Phillips, Co. v. United States, 564 F.3d at 1373. The Federal Circuit in Ellamae Phillips did not, however, challenge the prior decision's analysis of 43 U.S.C. § 912 or 43 U.S.C. § 913. Moreover, the Federal Circuit remanded the case to the trial court to review issues related to the scope of the easement under the 1875 Act stating those issues must "be first decided by the Court of Federal Claims."  Ellamae Phillips, Co. v. United States, 564 F.3d at 1374.  As noted above, the trial court subsequently concluded that "[w]e find that trail use is outside the scope of the easement granted by the 1875 Act...."  Ellamae Phillips Co. v. United States, 99 Fed. Cl. at 486.

Plaintiffs recognize the cautionary words of this court regarding the use of subsequent legislative history to infer the intent of an earlier Congress, citing Beres v. United States, 64 Fed. Cl. at 415, but plaintiffs also indicate that 1920s legislation did not retroactively change the nature of the easements granted under the 1875 Act or the interests that vested in settlers subject to the easements.  Instead, plaintiffs argue the

1920s legislation was a result of a "momentary period of confusion during the early 1900's concerning the nature of interests actually granted and vested under the 1875 Act," resulting from the Supreme Court decision in Rio Grande Western Railway Co. v. Stringham, 239 U.S. 44 (1915).   Additionally, the plaintiffs argue "any understanding Congress may have had concerning the nature of the 1875 Act interests was propelled by decisional law which was later directly overruled, see Great Northern, 315 U.S. at 276, and should therefore have no bearing whatsoever on how the 1875 Act is construed."  Moreover, plaintiffs assert, "under any analysis, Congress's understanding in the 1920's of an Act passed over forty-five years earlier should carry little to no weight in determinations of intent."

In Stringham, the Supreme Court held that the "strip of land claimed and used by the plaintiff as a railroad right of way," under the 1875 Act was a defeasible, "limited fee" with an implied reversionary interest in the United States.  Rio Grande Western Railway Co. v. Stringham, 239 U.S. at 45, 47.  But this court previously concluded: "It is also clear in the Supreme Court's later decision in Great Northern that the United States Supreme Court specifically overturned the Stringham line of cases, which had previously described the railroads' interest as a 'limited fee.'"  Beres v. United States, 64 Fed. Cl. at 422; see also Great Northern Ry. Co. v. United States, 315 U.S. at 279 ("The conclusion that the railroad was the owner of a 'limited fee' was based on cases arising under the land-grant acts passed prior to 1871 and it does not appear that Congress' change of policy after 1871 was brought to the Court's attention. That conclusion is inconsistent with the language of the Act, its legislative history, its early administrative interpretation and the construction placed on it by Congress in subsequent legislation. We therefore do not regard it as controlling.") (footnote omitted).

As noted by plaintiffs, quoting from Great Northern, "while the 1875 Act shall be liberally construed to carry out its purpose, still, '"nothing passes but what is conveyed in clear and explicit language."'"  (quoting Great Northern Ry. Co. v. United States, 315 U.S. at 272 (quoting Caldwell v. United States, 250 U.S. at 14, 20-21)).   As further stated by the Federal Circuit in Hash v. United States:

> Although the government stresses that national policy today favors government ownership of land for environmental and conservation purposes, the property rights of these early landowners are governed by the law in effect at the time they acquired their land. See Leo Sheep Co. v. United States, 440 U.S. 668, 687-88 (1979) ("This Court has traditionally recognized the special need for certainty and predictability where land titles are concerned, and we are unwilling to upset settled expectations to accommodate some ill-defined power to construct public thoroughfares without compensation.") (footnote omitted).

Hash v. United States, 403 F.3d at 1315.  These principles mandate that the 1875 Act be construed in a manner that recognizes what was passed to the railroads by the United States as a matter of law should not exceed the Congressional intent to grant easements for the limited purpose of promoting railroad development and operation.

The 1875 Act easements by the 1875 Act's very terms, as validated by contextual history, were limited to railroad purposes.

Notably, the defendant makes little mention of this court's earlier decision on the rights of the plaintiffs whose interests derive from the 1875 Act.  Previously, this court determined that:

> Under the facts at issue in the case currently before this court, when the United States granted a right-of-way to the [SLS&E], pursuant to the 1875 Act, it granted an easement to the railroad for railroad purposes, in keeping with the purpose of the 1875 Act.  The 1875 Act indicated that future dispositions of such lands shall be disposed of "subject to" the right-of-way granted to a railroad.  Act of 1875, at § 4.  The language of the 1875 Act makes no statement reserving any property interest in the United States.  Thus, when the United States granted a land patent to William H. Cowie in 1892, the land transfer was subject only to the existing railroad right-of-way by operation of the specific words of the 1875 Act.

Beres v. United States, 64 Fed. Cl. at 427.

In its filings with the court, defendant does not address the land patent from settler William H. Cowie,[41] whose land patent was perfected in 1892, and whose "land transfer was subject only to the existing railroad right-of-way by operation of the specific words of the 1875 Act."  Id.  As plaintiffs note, Mr. Cowie was "vested with all right and title to the public lands at issue, subject only to the railway easement," and once so vested, "then no subsequent laws could alter or amend a perfected claim."  Therefore, the railroad passed to Mr. Cowie its interest as it existed in the 1890s.  Defendant does not reconcile this with its arguments about the 1902s legislation, which purported to change the interest a railroad could convey or address how the rights of the plaintiffs in Beres, Ritzen, Estate of Welch, and/or Waverly Hills Club, the successors in interest to Mr. Cowie, could be altered by Congressional action 30 years after the rights vested.

Defendant also claims that "[t]he scope of an 1875 Act grant mirrors the easement at issue in Chevy Chase Land Co. v. United States, 733 A.2d 1055 (Md. 1999)."  Defendant argues that the State of Maryland Court of Appeals "rejected plaintiff's argument that the railroad's interest only included active railroad operations, finding instead that the unrestricted terms of the easement did not preclude interim trail use.  Responding to a certification request from the United States Court of Appeals for the Federal Circuit, Chevy Chase Land Co. of Montgomery Cnty. v. United States, 158

---

[41] As noted above, the parties stipulated "that the United States did not retain any reversionary interest in the right-of-way when it patented adjacent land to William H. Cowie in 1892," and "at least some of the Plaintiffs in Beres, Ritzen, Estate of Welch, and/or Waverly Hills Club, are successors-in-interest to Mr. Cowie." (internal citations omitted).

F.3d 574 (Fed. Cir. 1998), the Maryland Court of Appeals, interpreting a 1911 Maryland railroad deed, concluded: "We believe it indisputable that use of the right-of-way as a trail is consistent with its essential nature relating to the 'pass[ing] over land of another' and is a reasonable use of a general right of way.  Accordingly, the scope of the right-of-way in the instant case encompasses use as a hiker/biker trail."  Chevy Chase Land Co. of Montgomery Cnty. v. United States, 733 A.2d at 1076.  After the Maryland Court of Appeals responded to the certification request, the Federal Circuit, in a brief, unpublished, decision adopted the state court's interpretation, and rejected plaintiff's claim for an unconstitutional taking."  Chevy Chase Land Co. of Montgomery Cnty. v. United States, 230 F.3d 1375, 1999 WL 1289099, at *2 (Fed. Cir. Dec. 17, 1999).[42]

The Federal Circuit stated:

The Court of Appeals' answers to the certified questions, which we accept, state that the current recreational trail use of the easement is a permissible use, no acts of abandonment of that use being shown. Consequently, as we stated in Preseault, the servient estate holder, here the Land Company, cannot show a property interest that has been impermissibly taken.  We do not consider the Country Club's new state law argument, see Jay v. Secretary of Health & Human Servs., 998 F.2d 979, 983, n.4 (Fed. Cir. 1993), and thus the Country Club lacks grounds to support its takings claim.

Chevy Chase Land Co. of Montgomery Cnty. v. United States, 230 F.3d 1375, 1999 WL 1289099, at *3.  As it applies to the 1875 Act easements and to the above captioned consolidated cases, defendant concedes that the "Chevy Chase decision did not involve 1875 Act grants, and the court's evaluation of Maryland state law is certainly not controlling here."  Defendant argues, however, that "the decision does reflect the principle that absent explicit restrictions, a railroad easement may allow more uses other than active rail service." As determined above, however, the federally granted 1875 Act easements were for railroad purposes only.  In sum, the scope of the 1875 Act easements was exceeded by the conversion to a public recreational trail.

Finally, defendant argues that "[r]ailbanking falls within the scope of permitted uses under the 1875 Act even if an 1875 Act grant is limited to present rail purposes." According to the defendant, the "Court must conclude that an 1875 Act grant encompasses interim trail use." Defendant continues, "[u]nder even such an inappropriately cramped reading of an 1875 Act grant, railbanking did not 'take' anything from Plaintiff: before the STB issued the NITU, a rail easement traversed Plaintiff's property; after the STB issued the NITU, the same easement traversed the property.

---

[42] After the adoption of Federal Circuit Rule 32.1, parties may cite nonprecedential dispositions issued after January 1, 2007.  Fed. Cir. R. 32.1 (2011).  The rule makes no provision regarding the citation of nonprecedential dispositions issued before that time. Chevy Chase Land Co. v. United States was issued as an unpublished table decision in 1999.

The Court should conclude, therefore, that railbanking lies within the scope of the 1875 Act grant."

Defendant first cites to the Trails Act, noting that the statute states: "in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way…." 16 U.S.C. § 1247(d).   Defendant asserts that "the right-of-way at issue comprises a segment of a public transportation system while simultaneously preserving the right-of-way for future rail use," citing to the same documents defendant cited to above to argue that the trail is a transportation corridor.   As noted by plaintiffs, the trail is "a non-motorized recreational trail open for the public to stroll, walk their pets, roller-skate, and stop to admire the view of Lake Sammamish and other local features."   Citing to the King County website for capital improvement projects, plaintiffs observe that King County believes a trail "is needed that will accommodate a full range of trail users of all ages and skill levels, such as walkers, runners, wheelchair users, bicyclists, in-line skaters, and equestrians," because "[t]he continuing increase in population has put pressure on existing recreational facilities in the area."   As demonstrated in the discussion above, when the original interests vested, they did not included activities other than for railroad purposes, and the government has not demonstrated otherwise.

Defendant additionally alleges that "interim trails serve a railroad purpose by preserving the corridor intact and ensuring that the corridor remains available for future rail service."   Defendant cites to Troha v. United States, 692 F. Supp. 2d 550 (W.D. Pa. 2010), to argue that "railbanking and interim trail use 'is a method of rail maintenance and preservation,' and is 'at all times consistent with an intent to preserve the right-of-way for future rail use rather than to abandon it.'" (quoting Troha v. United States, 692 F. Supp. 2d at 560-61). Quoting Troha, defendant states, "'[r]ailbanking provides conservation of this right-of-way in a rail-ready state during a period when rail service is not feasible, and this is not a departure from the intended "use and purposes" of the easement.'" (quoting Troha v. United States, 692 F. Supp. 2d at 563 (quoting Moody v. Allegheny Valley Land Trust, 976 A.2d 484, 491-92 (Pa. 2009), cert. denied 130 S. Ct. 1507 (2010)).   Troha, however, is the only case that defendant cites to for the proposition that railbanking with interim trail use is within the scope of railroad purpose easements.

In Troha v. United States, which is not a precedential, federal case, or relevant state court case, and is not binding on this court, the United States District Court for the Western District of Pennsylvania found that easement deeds "for the purposes of said Railroad" and limited to "railroad purposes" encompassed use as a public recreational trail under Pennsylvania law because railbanking with interim trail use preserves future rail service by conserving the right of way in a "rail-ready state" and allowing "investment in the upkeep of rail networks."   Troha v. United States, 692 F. Supp. 2d at 563 (quoting Moody v. Allegheny Land Trust, 976 A.2d at 491-92).   The court in Troha relied on another Pennsylvania decision, Moody v. Allegheny Valley Land Trust, and borrowed language from Moody regarding the railroad purposes served by railbanking.

See Moody v. Allegheny Land Trust, 976 A.2d at 491-92 (terming railbanking "a method of rail maintenance and preservation" which "provides conservation of this right-of-way in a rail-ready state during a period when rail service is not feasible…[and] preserves rail networks for the purposes of rail service in the future"). The court in Moody, in turn, relied on another Pennsylvania court case, Buffalo Township v. Jones, 778 A.2d 1269 (Pa. Commw. Ct. 2001), aff'd, 813 A.2d 659 (Pa. 2002), cert. denied, 540 U.S. 841 (2003), for the proposition that, under Pennsylvania law, a railroad does not abandon a right of way by transferring it to a trail operator for railbanking with interim trail use because railbanking preserves a railroad corridor.  See Moody v. Allegheny Land Trust, 976 A.2d at 489 ("In Buffalo Township, this Court established that private railbanking is valid as long as the terms of the railbanking are in compliance with Section 1247(d) of the National Act….Railbanking consistent with the requirements of Section 1247(d) means that the right-of-way is preserved for future use by another rail operator....").

Notably, as conceded at oral argument by the defendant, Troha is a Pennsylvania case, "[a]nd it's a deed case.  It's not an 1875 Act [case]." Moreover, regardless of the basis of the conveyance in Troha, no federal court has relied on the holding in Troha that railbanking with interim trail use preserves future rail service.  In fact, only two federal cases, both Court of Federal Claims cases, even mention the Troha decision.  In Raulerson v. United States, 99 Fed. Cl. 9, 12 n.2 (2011), in a footnote, the court cited to Troha and stated: "But see Troha v. United States, 692 F. Supp. 2d 550, 559-60 (holding that railbanking agreement precluded finding of abandonment)."  Raulerson v. United States, 99 Fed. Cl. 9, 12 n.2.  In Biery v. United States, 99 Fed. Cl. 565, 568 n.2 (2011), the court only noted that included in the defendant's submissions to the court was a letter supplementing earlier pleadings regarding the Moody and Troha cases.

Furthermore, the Western District of Pennsylvania's characterization of railbanking as a railroad purpose in Troha cannot be reconciled easily with the Federal Circuit's finding that the scope of the easement did not encompass the "new use as a recreational trail" and characterization of railbanking as "speculation" in Toews v. United States.  Compare Troha v. United States, 692 F. Supp. 2d at 563 (quoting Moody v. Allegheny Land Trust, 976 A.2d at 491-92), with Toews v. United States, 376 F.3d at 1381.  Moreover, as was the case in Toews, in the cases before this court, it is speculation if rail service will ever be reactivated along the former SLS&E railway line. Since the STB approved conversion of the railway to a trail, no railway carriers have used the railroad, and the tracks have been removed from the right of way.  In Toews, the Federal Circuit indicated that: "Whether there ever will be a light rail system or other railroad service over these paved routes in Clovis is a matter of speculation about the distant future, based on uncertain economic and social change, and a change in government policy by managers not yet known or perhaps even born. Such speculation does not provide a basis for denying protection to existing property rights under the Constitution."  Toews v. United States, 376 F.3d at 1381.  The same is true in the above captioned consolidated cases.

The characterization of railbanking as a railroad purpose within the scope of the easement in Troha also conflicts with the Federal Circuit's standard requiring courts to evaluate whether trail use is within the scope of the easement.  See Ladd v. United States, 630 F.3d at 1019 ("It is settled law that a Fifth Amendment taking occurs in Rails-to-Trail cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement."); see also Ellamae Phillips Co. v. United States, 564 F.3d at 1372-73 (citing the Preseault II factors as the "determinative issues for takings liability" in cases arising under the Trails Act); Caldwell v. United States, 391 F.3d at 1229 ("A Fifth Amendment taking occurs if the original easement granted to the railroad under state property law is not broad enough to encompass a recreational trail." (citing Preseault II, 100 F.3d at 1552; Toews v. United States, 376 F.3d at 1376)).

Troha also remains an outlier as compared to other cases in the Federal Circuit interpreting railroad easements in a rails to trails context.  See, e.g., Preseault II, 100 F.3d at 1554 (Rader, J., concurring) (rejecting the railbanking argument as a "vague notion" incapable of overriding the present use of the property as a recreational trail); Capreal, Inc. v. United States, 99 Fed. Cl. at 146 ("The Court finds, however, that railbanking is too hypothetical and unlikely to serve as a railroad purpose."); Nordhus Family Trust v. United States, 98 Fed. Cl. 331, 339 (2011) ("In the present case, there is no evidence of any plan to reactivate the rail service - simply a speculative assertion by Defendant that some resumed rail service could occur in the future.  The transfer of the easement to entities completely unconnected with rail service, and the removal of all rail tracks on the corridor, lead the Court to conclude that any future rail use simply is unrealistic."); Macy Elevator, Inc. v. United States, 97 Fed. Cl. at 730 (relying on Preseault II to deem railbanking "irrelevant to the question of whether a taking has occurred"); Rogers v. United States, 90 Fed. Cl. at 432 ("Here, as in Preseault II, the use of the right-of-way as a public trail while preserving the right-of-way for future railroad activity was not something contemplated by the original parties to the Honore conveyance back in 1910."); Glosemeyer v. United States, 45 Fed. Cl. 771 (2000) ("In sum, neither component of railbanking-the preservation of the rail line for future use nor the 'interim' use of the easement as a recreation trail-constitutes a railroad purpose under Missouri law").   These same cases have declined to find railbanking a railroad purpose or even a relevant consideration for analysis of a claim for Trails Act takings.  See, e.g., Preseault II, 100 F.3d at 1554 (Rader, J., concurring); Capreal, Inc. v. United States, 99 Fed. Cl. at 146; Macy Elevator, Inc. v. United States, 97 Fed. Cl. at 730; Rogers v. United States, 90 Fed. Cl. at 432; Glosemeyer v. United States, 45 Fed. Cl. at 771.  A Judge of the United States Court of Federal Claims in Ellamae Phillips, finding trail use was outside the scope of the easement granted by the 1875 Act, summed up by stating, "[r]ailbanking does not convert trail use into a railroad use," and "[t]here is clear consensus that recreational trail use is fundamentally different in nature than railroad use."  Ellamae Phillips Co. v. United States, 99 Fed. Cl. at 487.  Defendant's railbanking arguments are without merit.

**CONCLUSION**

For the reasons discussed above, the court finds that the scope of the easements in the SLS&E Deeds, the 1904 Reeves Quit Claim Deed, the prescriptive easement, and the 1875 Act easements, were exceeded by the establishment of the public recreational trail. Therefore, the court **DENIES** the defendant's cross-motion for partial summary judgment, and **GRANTS** the plaintiffs' cross-motion for partial summary judgment. The plaintiffs in the above captioned consolidated cases may proceed with their causes of action for Fifth Amendment takings. The parties shall consult and propose procedures for the further proceedings to resolve all of the above captioned consolidated cases.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**