# In the United States Court of Federal Claims

## Nos. 03-785L, 04-1456L, 04-1459L, 04-1463L, 04-1465L, 04-1467L, 04-1469L, 04-1471L, 04-1472L, 04-1473L

### Filed: April 16, 2019

\* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| **WARREN S. BERES, et al.,** | \* |
| **Plaintiffs,** | \* |
| **v.** | \* |
| **UNITED STATES,** | \* |
| **Defendant.** | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**Motion to Dismiss; Motion to Strike; Cross-Motions for Partial Summary Judgment; Rails to Trails; Fifth Amendment Taking; Subject Matter Jurisdiction; Deed Interpretation; Plat Interpretation; Adverse Possession; Preemption; RCFC 56(d).**

**Cecilia Fex**, Ackerson Kauffman Fex, P.C., Washington, D.C., for plaintiffs in D. Mike Collins, et al. v. United States, Case No. 04-1472L; and Reid Brown, et al. v. United States, Case No. 04-1473L.

**Richard M. Stephens**, Stephens & Klinge LLP, Bellevue, WA, for plaintiffs in Warren S. Beres v. United States, Case No. 03-785L; Clifford F. Schroeder, et al. v. United States, Case No. 04-1456L; Clarence A. Peterson, et al. v. United States, Case No. 04-1459L; Raymond Spencer, et al. v. United States, Case No. 04-1463L; Robert C. Nelson, et al. v. United States, Case No. 04-1465L; and Eugene Morel, et al. v. United States, Case No. 04-1467L.

**Tanya C. Nesbitt**, Trial Attorney, Natural Resources Section, Environmental and Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With her was **Jeffrey H. Wood**, Acting Assistant Attorney General, Environment and Natural Resources Division.

## O P I N I O N

### HORN, J.

At issue in the court's Opinion is whether ten plaintiffs have an interest in the land underlying the railroad corridor at issue in D. Mike Collins, et al. v. United States, No. 04-1472L (Collins), Robert G. Nelson, et al. v. United States, No. 04-1465L (Nelson), Clarence A. Peterson, et al. v. United States, No. 04-1459L (Peterson), Raymond Spencer, et al. v. United States, No. 04-1463L (Spencer), and Clifford F. Schroeder, et al. v. United States, No. 04-1456L (Schroeder). The plaintiffs in the specifically-named, consolidated cases allege that the United States effected a taking without just compensation along a 12.45-mile railroad line (the railroad corridor) near the eastern

shore of Lake Sammamish in King County, Washington, when the Surface Transportation Board issued a Notice of Interim Trail Use (NITU) on September 18, 1998.

The ten specifically-named plaintiffs[1] whose interests are addressed in this Opinion are <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder, <u>Peterson</u> plaintiff Donna Marie Raab Matrinez,[2] <u>Collins</u> plaintiffs D. Michael and Vanessa Collins, Donald Barrett, Howard and Pam Freedman, and <u>Nelson</u> plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes.[3]

The cases were consolidated for case-management purposes under the lead case, <u>Warren S. Beres v. United States</u>, Case No. 03-785L (<u>Beres</u>). The court previously has issued multiple Opinions in the specifically-named cases. <u>See</u> <u>Beres v. United States</u>, 104 Fed. Cl. 408, 412 (2012) (discussing Opinions issued in the above-captioned cases) (<u>Beres V</u>). In <u>Beres V</u>, an Opinion in which the court addressed "the scope of the rights of way in these multifaceted takings cases, involving numerous plaintiffs, multiple

---

[1] The parties' filings with the court have referred to sets of married plaintiffs as one plaintiff, and, in this Opinion, the court likewise refers to sets of married plaintiffs as one plaintiff.

[2] Documents submitted to the court throughout the course of this litigation have referred to Donna Marie Raab Matrinez as both "Donna Marie Raab Matrinez" and "Donna Marie Raab Martinez." Plaintiffs submitted to the court an affidavit signed by Donna Marie Raab Matrinez, in which Ms. Raab Matrinez signs her last name as "Raab Matrinez," and both parties' cross-motions for partial summary judgment use the last name "Raab Matrinez." The court, therefore, will refer to that plaintiff as Donna Marie Raab Matrinez.

[3] In defendant's motion for partial summary judgment, defendant originally moved for partial summary judgment against Paul and Joanne Spears, plaintiffs in <u>Estate of Pearl Welch</u>, No. 04-1471L (<u>Welch</u>), as well as against Brian and Mary Conway, Scott and Sandra DeMers, and Foster and Lemoine Radford, who are plaintiffs in <u>Waverly Hills Club v. United States</u>, No. 04-1473L (<u>Waverly Hills Club</u>). In defendant's reply, defendant states:

> The parties have reached a settlement in principal of the remaining claims in <u>Estate of Welch</u>, No. 04-1471L and <u>Waverly Hills Club</u>, No. 04-1474L, and dispositive title issues are not present in the remaining three actions: <u>Beres v. United States</u>, No. 03-785L (Fed. Cl.); <u>Brown v. United States</u>, No. 04-1473L (Fed. Cl.) [(<u>Brown</u>)]; and <u>Morel v. United States</u>, No. 04-1467 (Fed. Cl.) [(<u>Morel</u>)].

On June 12, 2018, pursuant to the parties' June 8, 2018 joint stipulations of dismissal, the court dismissed, with prejudice, the claims of <u>Welch</u> plaintiff Paul and Joanne Spears and <u>Waverly Hills Club</u> plaintiffs Brian and Mary Conway, Scott and Sandra DeMers, and Foster and Lemoine Radford, whose claims initially were addressed in defendant's motion for partial summary judgment.

statutory land grants, different deed types, a prescriptive easement and subsequent conveyances over a more than one hundred year time period," the court explained:

> One opinion denied defendant's motion for summary judgment regarding the interpretation of the General Railroad Right of Way Act of 1875, 18 Stat. 482, 43 U.S.C. § 934 et seq. (repealed in 1976), (the 1875 Act), and its effect on plaintiffs Warren and Vicki Beres. See Beres v. United States, 64 Fed. Cl. 403 (2005) [(Beres I)]. This court also issued an Order forwarding the plaintiffs' request for certification on relevant questions of state law to the State of Washington Supreme Court, which the State of Washington Supreme Court summarily denied. See Schroeder v. United States, 66 Fed. Cl. 508 (2005) [(Beres II)]. Subsequently, this court issued an opinion, addressing issues of collateral estoppel regarding former plaintiffs Gerald L. and Kathryn B. Ray and a number of other plaintiffs in the above captioned consolidated cases. See Beres, et al. v. United States, 92 Fed. Cl. 737 (2010) [(Beres III)]. Finally, this court issued an opinion addressing the question of fee versus easement for a number of the deeds which conveyed rights of way to the railroads. See Beres, et al. v. United States, 97 Fed. Cl. 757 (2011) [(Beres IV)].

Beres V, 104 Fed. Cl. at 412 (footnote omitted). The facts in the Opinions discussed above are incorporated into this Opinion, and certain facts relevant to the court's analysis are repeated below. Following the numerous previous Opinions issued by this court on a variety of issues and numerous attempts by the parties at settlement negotiations, the parties have filed cross-motions for partial summary judgment, as well as a motion to dismiss and a motion to strike, addressed below in this Opinion.

## FINDINGS OF FACT

The following specific facts which bear on the issues currently before the court are summarized below. In 1998, the Burlington Northern and Santa Fe Railway (Burlington Northern), a successor-in-interest to the Seattle, Lake Shore and Eastern Railway Company, sought an exemption to abandon the railroad corridor from the Surface Transportation Board (STB). Beres V, 104 Fed. Cl. at 417 (citation omitted). On May 13, 1998, the STB granted Burlington Northern an exemption to abandon the railroad corridor. Id. (citation omitted). On September 16, 1998, the STB authorized The Land Conservancy of Seattle and King County (TLC) to assume financial responsibility for Burlington Northern's right-of-way pursuant to the National Trails System Act, 16 U.S.C. § 1241 et seq. (1994) (the Trails Act). Beres V, 104 Fed. Cl. at 417 (citation omitted). On September 18, 1998, the STB authorized the issuance of a NITU permitting King County and TLC to establish a public recreational trail over the railroad right-of-way, pursuant to 16 U.S.C. § 1247(d) (1994), and, subsequently, King County reached an agreement with Burlington Northern for use of the railroad right-of-way for trail purposes. Beres V, 104 Fed. Cl. at 417. On September 29, 1998, counsel for the TLC indicated to the STB that the parties had reached a railbanking agreement related to Burlington Northern's railroad corridor pursuant to the NITU. Id.

Lake Sammamish is located to the west of the parcels owned by the ten plaintiffs whose interest in the land underlying the railroad corridor currently is at issue in this Opinion. The railroad corridor is to the east of all ten of the plaintiffs' parcels, and the East Lake Sammamish Parkway is to the east of the railroad corridor. The ten plaintiffs' parcels, therefore, lie between Lake Sammamish and the railroad corridor.

**Spencer, Schroeder, and Peterson Plaintiffs**

The parties dispute whether the metes and bounds in the deeds conveying land to Spencer plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, Schroeder plaintiffs Clifford and Kathy Schroeder, and Peterson plaintiff Donna Marie Raab Matrinez rebut the centerline presumption under Washington State law. The parties also dispute whether Spencer plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, Schroeder plaintiffs Clifford and Kathy Schroeder, and Peterson plaintiff Donna Marie Raab Matrinez have an interest in the land underlying the railroad corridor.

The deeds conveying parcels of land to Spencer plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway all contain references to tracts of land on an unrecorded plat map of a subdivision of land created by Willis J. Connell, as indicated in the text of those plaintiffs' deeds quoted below.[4] The pertinent portion of the deed conveying parcel number 173870-0035 to Spencer plaintiffs Raymond and Lael Spencer states:

> That portion of Government Lot 2[[5]] in Section 32, Township 25 North, Range 6 East, in King County, Washington, described as follows:
>
> Beginning at the intersection of a line of said Government Lot 2 with the southwesterly line of the Northern Pacific Railway right-of-way; thence north 38 degrees 00 minutes 00 seconds east along said right-of-way line 313.29 feet to the true point of beginning; thence continuing north 38 degrees 00 minutes 00 seconds east along said right-of-way line 75.00 feet; thence north 52 degrees 00 minutes 00 seconds west 230 feet more or less to the westerly line of said Government Lot 2; thence southwesterly along said westerly line to a point which bears north 52 degrees 00 minutes 00

---

[4] Unlike the deeds conveying land to Spencer plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, the deeds conveying land to Schroeder plaintiffs Clifford and Kathy Schroeder and Peterson plaintiff Donna Marie Raab Matrinez do not contain references to the unrecorded plat map of a subdivision created by Willis J. Connell.

[5] When a section of land "contains or borders upon a body of water, which interrupts the normal quarter-section measurements [of land], all or part of the section may be divided into irregular portions called 'government lots.'" See 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE SERIES: REAL ESTATE § 13.2 (2d ed. 2004 & Supp. 2018).

seconds west from the true point of beginning; thence south 52 degrees 00 minutes 00 seconds east 230 feet more or less to the point of beginning;

(ALSO KNOWN AS Tract 8 and the northeasterly 25 feet of Tract 7, Connell's Subdivision of Government Lot 2, according to the unrecorded plat thereof.)

(capitalization in original). The pertinent portion of the deed conveying parcel number 173870-0130 to <u>Spencer</u> plaintiffs John and Carolyn Rossi states:

That portion of Government Lot 2, Section 32, Township 25 North, Range 6 East, W.M., in King County, Washington, described as follows:

Beginning at the intersection of the southerly line of said Government Lot with the westerly line of the right-of-way of the Northern Pacific Railway Company and running thence northerly along said westerly line 1238.29 feet to the true point of beginning; thence northerly along said westerly line 62 feet; thence North 52° 00' 00" West 43 feet; thence northeasterly at right angles 13 feet; thence North 52° 00' 00" West to the westerly line of said Government Lot; thence southerly along said westerly line to a point from which the true point of beginning bears South 52° 00' 00" east; thence South 52° 00' 00" East 210 feet, more or less, to the true point of beginning.

Together with second class shorelands adjoining.

(Also known as Tract 26 and a portion of Tract 27, Willis J. Connell's Subdivision, according to the unrecorded plat thereof; together with second class shorelands adjoining.)

(capitalization in original). Similarly, the pertinent portion of the deed conveying parcel number 173870-0080 to <u>Spencer</u> plaintiffs Reid and Susan Brockway states:

BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF GOVERNMENT LOT 2, SECTION 32, TOWNSHIP 25 NORTH, RANGE 6 EAST, W.M., IN KING COUNTY, WASHINGTON, WITH THE WESTERLY LINE OF THE NORTHERN PACIFIC RAILWAY RIGHT OF WAY; THENCE ALONG SAID RIGHT OF WAY LINE NORTH 38°00' EAST 738.29 FEET TO THE TRUE PLACE OF BEGINNING; THENCE NORTH 38°00' EAST 75 FEET; THENCE NORTH 52°00' WEST 225 FEET, MORE OR LESS, TO THE WESTERLY LINE OF SAID GOVERNMENT LOT 2; THENCE SOUTHWESTERLY ALONG SAID LOT LINE TO A POINT WHICH BEARS NORTH 52°00' WEST FROM THE TRUE PLACE OF BEGINNING; THENCE SOUTH 52°00' EAST 220 FEET, MORE OR LESS, TO THE PLACE OF BEGINNING.

(BEING KNOWN AS TRACT 16 AND THE SOUTH HALF OF TRACT 17, WILLIS J. CONNELL'S SUB-DIVISION, ACCORDING TO THE UNRECORDED PLAT THEREOF; SUBJECT TO A ROADWAY OVER THE SOUTHEASTERLY 15 FEET THEREOF; TOGETHER WITH SECOND CLASS SHORE LANDS RUNNING THEREON.)

(capitalization in original).

The Spencer plaintiffs state, and the plat maps submitted to the court indicate, that Willis J. Connell created the subdivision in March 1927.[6] The 1927 plat map created by Willis J. Connell is titled "Connell's Sub. Of Gov Lot 2" and indicates that the subdivision is located in Section 32, Township 25 North, Range 6 East, and contains thirty-one tracts of land. The thirty-one tracts are numbered sequentially and are all bordered by Sammamish Lake to the west. The plat map indicates that thirty-one parcels are not all the same size, and that the western border runs along the sinuosities of Lake Sammamish. For example, on the plat map of Willis J. Connell's subdivision, the distance between Lake Sammamish and the eastern border of Tract 26, a tract identified in the deed conveying land to Spencer plaintiffs John and Carolyn Rossi, is listed as 175 feet wide, while the distance between Lake Sammamish and the eastern border of Tract 16, a tract identified in the deed conveying land to Spencer plaintiffs Reid and Susan Brockway, is listed as 225 feet wide. The distance between Lake Sammamish and the eastern border of Tract 8, a tract identified in the deed conveying land to Spencer plaintiffs Raymond and Cael Spencer, is listed as 250 feet wide.

To the east of the eastern border of all of the thirty-one parcels is a dotted line, above which is written "NOR. PAC. RY." (capitalization in original). To the east of that dotted line is another line, above which is written "R. of Way Limit," and to the east of line

---

[6] Plaintiffs submitted to the court two plat maps of the subdivision created by Willis J. Connell in 1927, the first of which plaintiffs labeled "Connell's Plat Map ver. 1" and the second of which plaintiffs labeled "Connell's Plat Map ver. 2." The plat map labeled "Connell's Plat Map ver. 1" is a large copy of a plat map of the subdivision created by Willis J. Connell in 1927. The plat map labeled "Connell's Plat Map ver. 2" appears to be a smaller, photo-copied, black-and-white copy, sometimes very difficult to read, of the subdivision created by Willis J. Connell in 1927. Plaintiffs' cross-motion for partial summary judgment indicates that the plat map labeled "Connell's Plat Map ver. 1" and the plat map labeled "Connell's Plat Map ver. 2" both were created in March 1927. The two plat maps are substantially the same, with the same number of tracts, which appear to have the same dimensions. There do not appear to be any significant differences between the plat map labeled "Connell's Plat Map ver. 1" and the plat map labeled "Connell's Plat Map ver. 2." The two versions of the plat map, however, do contain some minor differences, although the minor differences do not impact the court's analysis in this Opinion. The court's analysis in this Opinion discusses the plat map labeled "Connell's Plat Map ver. 1," and the court's analysis will note any differences between the plat map labeled "Connell's Plat Map ver. 1" and the plat map labeled "Connell's Plat Map ver. 2" when relevant.

labeled "R. of Way Limit" is yet another line, above which is written "County Road Margin."[7] (capitalization in original). The number "50.'" is written between the eastern edge of the parcels and the dotted line labeled "NOR. PAC. RY.," as well as between the dotted line labeled "NOR. PAC. RY." and the line labeled "R. of Way Limit." (capitalization in original).

Based on the record before the court, it appears that Willis J. Connell died shortly after creating the 1927 unrecorded plat map. A probate document concerning the estate of Willis J. Connell, which is dated January 30, 1928, lists as inventory: "That portion of Government Lot 2, Section 32, Township 25, North, Range 6 E. W. M., lying West of the Northern Pacific Railroad right of way, together with the shore lands of the second class fronting thereon, less the north ten feet previously conveyed." The probate document concerning the estate of Willis J. Connell does not explicitly mention the land underlying the railroad corridor.

Unlike the deeds conveying parcels of land to Spencer plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, the deeds conveying parcels to Schroeder plaintiffs Clifford and Kathy Schroeder and to Peterson plaintiff Donna Marie Raab Matrinez do not contain references to the unrecorded plat map of the subdivision created by Willis J. Connell. The pertinent portion of the deed conveying parcel number 322506-9144 to Schroeder plaintiffs Clifford and Kathy Schroeder states:

> Beginning at a point which is 229.36 feet east and 834.91 feet north of the southwest corner of said Government Lot 4 and running southwesterly 66 feet along the northwesterly margin of the Northern Pacific Railroad right of way to the point of beginning; thence north 70° 28' 04" west to the shore of Lake Sammamish; thence southwesterly along said shoreline to a line which is parallel to an 250 feet southwesterly of said initial course of north 70° 28' 04" west; thence south 70° 28' 04" east along said parallel line to the northwesterly margin of the Northern Pacific Railroad right of way; thence northerly along said margin to the point of beginning. EXCEPT the northeasterly 100 feet thereof.

(capitalization in original). The pertinent portion of the deed conveying parcel number 322506-9241 to Peterson plaintiff Donna Marie Raab Matrinez states:

> That portion of government lot 3 and the northeast quarter of the southwest quarter of section 32, township 25 north, range 6 east, W.M., in king [sic] County, Washington, described as follows:
>
> Beginning at the intersection of the westerly line of the Northern Pacific Railway Company's right-of-way with the east-west center line of said section; thence south 38°05'37" west 282.99 feet; thence north 51°54'23"

---

[7] The plat map labeled "Connell's Plat Map ver. 2" contains the words "Redmond Issaquah Road" above the line marked as "County Road Margin" in the plat map labeled "Connell's Plat Map ver. 1." (capitalization in original).

west 190 feet, more or less, to the westerly line of said government lot; thence northeasterly along said lot line to the northwest corner thereof; thence easterly along said lot line to the point of beginning . . . .

## The "Shorelands" Conveyances and Collins plaintiffs D. Michael and Vanessa Collins, Donald Barrett, and Howard and Pam Freedman and Nelson plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes

The parties have referred to five plaintiffs as the plaintiffs with the "shorelands" issue. The five plaintiffs whose deeds reference second-class shorelands are Collins plaintiffs D. Michael and Vanessa Collins, Donald Barrett, and Howard and Pam Freedman and Nelson plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes. Nelson plaintiff the Estate of William F. Hughes claims to own two parcels, the first of which is parcel number 202506-9071 and is located in Government Lot 1. Nelson plaintiff the Estate of William F. Hughes' second parcel is parcel number 202506-9085 and is located in Government Lot 2. The parcels alleged to be owned by Collins plaintiffs D. Michael and Vanessa Collins, Donald Barrett, and Howard and Pam Freedman and Nelson plaintiffs Robert and Beth Nelson all are located in Government Lot 2.

According to defendant, "[u]nder Washington law, second-class shorelands are 'shores of a navigable lake or river belonging to the state, not subject to tidal flow, *lying between the line of ordinary high water and the line of navigability*, and more than two miles from the corporate limits of any city.'" (emphasis in original) (quoting WASH. REV. CODE § 79.105.060 (2017)).[8] Defendant also states that, "[i]n sum, under [Washington] state law, 'second-class shorelands' are defined as lands underwater." Plaintiffs state that second-class shorelands "would ordinarily mean they are underwater and adjacent to so-called 'uplands,'[9] i.e., dry ground. See, e.g., Albee v. Town of Yarrow Point, 445 P.2d 340, 343 (Wash. 1968). But that is not the case here." (footnote omitted). The land underneath a body of water is considered to be the "'bed,'" which is defined as "the land under the water beyond the 'shorelands,' on tidal water also called the 'tidelands' or the

---

[8] The current version of the Revised Code of Washington defines first-class shorelands as:

> [S]hores of a navigable lake or river belonging to the state, not subject to tidal flow, lying between the line of ordinary high water and the line of navigability, or inner harbor line where established and within or in front of the corporate limits of any city or within two miles of either side.

See WASH. REV. CODE § 79.105.060 (2019).

[9] The State of Washington Supreme Court has indicated that uplands are dry land abutting navigable water. See Davidson v. State, 802 P.2d 1374, 1376 (Wash. 1991) (en banc) ("When plaintiffs purchased their property in 1961, they believed they were purchasing all of the uplands (dry land bordering the lake) and abutting shorelands (submerged land out to the State-owned harbor area) encompassing the marina improvements.").

'beach.' In general, then, shorelands lie between uplands and beds." See 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE SERIES: REAL ESTATE § 13.5 (2d ed. 2004 & Supp. 2018).

According to plaintiffs, the "story of these properties begins in the late 19th century." On June 13, 1887, Alfred Palmberg executed a deed conveying a 100-foot wide strip of land to the Seattle, Lake Shore and Eastern Railway Company, on which the railroad corridor was subsequently constructed.[10] The June 13, 1887 deed provided that "[a]ll riparian and water front rights on Lake Samamish [sic] are hereby expressly reserved." In Beres IV, the undersigned determined that the June 13, 1887 deed only conveyed an easement to the Seattle, Lake Shore and Eastern Railway Company. See Beres IV, 97 Fed. Cl. at 781-92. According to plaintiffs and defendant, as of June 13, 1887, Alfred Palmberg had not yet acquired second-class shorelands from Washington State.

On March 30, 1893, Alfred Palmberg executed a deed conveying a parcel of land in Government Lot 2 and Government Lot 3 to Alonzo C. Stares in exchange for $60.00. The pertinent portion of the March 30, 1893 deed stated:

Beginning at a point on the line between lots 2 and 3 in section 20 Tp. 25 N R. 6 E. W.M. 569 64/100 feet south of the NW corner of said lot 3 thence west in said lot 2 two hundred and twenty one and 58/100 (221 58/100) feet thence southwesterly along a line drawn at right angels [sic] to the center line of the Seattle Lake Shore and Eastern Railway Company fifteen and 3/10 feet to the easterly margin of the right of way of said Railway Company thence southeasterly along said right of way two hundred forty and 4/10 (240 4/10) feet thence east eighty seven (87) feet to the line between said lots 2 and 3 thence east in said lot 3 fifty five (55 25/100) feet thence north two hundred (200) feet thence west fifty five and 25/100 (55 25/100) feet to the place of beginning containing 1 one acre Together with all riparian rights as reserved from Seattle Lake Shore and Eastern Railway Company fronting upon and appurtenant to the land hereinbefore described.

(the A. Stares tract). According to plaintiffs and defendant, in 1908, Alfred Palmberg died, and his wife, Bertha Palmberg, inherited Alfred Palmberg's property. On September 29, 1914, Bertha Palmberg and King County executed a quitclaim deed conveying to King County a sixty-foot-wide strip of land in Governments Lots 1 and 2 "lying easterly of and adjacent to the right of the Northern Pacific Ry." in exchange for $200.00. Following the

---

[10] The Seattle, Lake Shore and Eastern Railway Company subsequently was acquired by the Seattle and International Railroad, which subsequently was acquired by the Northern Pacific Railway Company. See Beres V, 104 Fed. Cl. at 416. In 1970, the following railway companies merged to form the Burlington Northern Railroad: Northern Pacific Railway Company; the Great Northern Railway; the Chicago, Burlington and Quincy Railroad; the Spokane, Portland and Seattle Railway; and other wholly-owned subsidiaries. Id.

legal description of the strip of land being conveyed appeared the words "Right-of-way Issaquah Redmond Road."

Bertha Palmberg appears to have died in 1918. Bertha Palmberg's probate document listed the following six individuals as children of Bertha Palmberg: Maude Palmberg, Annie Stangroom, Bessie Zengel, Gertie Gorman, Bert Stares, and Alfred W. Palmberg, who the parties indicate is the son of Alfred Palmberg and Bertha Palmberg. Bertha Palmberg's probate document listed four different parcels, each of which is located in either Government Lot 1, 2, or 3 and is described as extending to the eastern line of the railroad corridor. Bertha Palmberg's probate documents indicated that each of the six children listed above were to receive an undivided one-sixth interest in the properties described in the probate document, as well as an undivided one-sixth interest in any other real or personal property belonging to Bertha Palmberg. According to a title report dated November 15, 1946, which is discussed below, it appears that Maude Palmberg, Annie Stangroom, and Alfred W. Palmberg were the children of both Alfred Palmberg and Bertha Palmberg. Bessie Zengel, Gertie Gorman,[11] and Bert Stares appear to be children of Bertha Palmberg, but appear to have a father other than Alfred Palmberg.

In 1928, after Bertha Palmberg's estate had been probated, Alfred W. Palmberg applied to purchase second-class shorelands adjacent to Government Lot 2 from the State of Washington. Plaintiffs have submitted to the court a report "on title," which was completed by the Lawyers & Realtors Title Insurance Company on July 19, 1928, and was marked as "ENTERED" by the "Commissioner Pub. Lands Office." (capitalization in original). The July 19, 1928 title report states that "we have examined the records" and "find" that Maude Palmberg, Annie Stangroom, Bessie Zengel, Gertie Gorman, Alfred W. Palmberg, and Bert Stares are tenants in common for "[a]ll of Government Lot 2, EXCEPT portion described as Parcel 'A' and except railroad right of way and except County roads." (capitalization in original). Parcel A is defined in the July 19, 1928 title report, and the legal description of Parcel A appears to match the legal description of the A. Stares tract, which, as discussed above, was conveyed by Alfred Palmberg, the father of Alfred W. Palmberg, to Alonzo C. Stares in 1893. The July 19, 1928 title report further states that the "records do not disclose the location of the railroad right of way with reference to the meander line[12] or the high water line, however, the deed to the railroad company of the right of way expressly reserves all riparian and water front rights on Lake Sammamish."

---

[11] The documents submitted to the court refer to what appears to be a single individual as both Gertie Gorman and Gertie Gorman Hughes. The parties have not established when Gertie Gorman became Gertie Gorman Hughes. The court uses Gertie Gorman when the relevant document states Gertie Gorman, and the court uses Gertie Gorman Hughes when the relevant document states Gertie Gorman Hughes.

[12] In 1920, the State of Washington Supreme Court stated:

By the United States government system of surveys, a meander line is run when a water course or other body of water is the external boundary of the adjacent land. The line showing the place of the water course of other body of water and its course, sinuousities [sic], and distance, is called a 'meander

On August 3, 1928, Edward C. Dohm, a "State Field Engineer," submitted a report to the State of Washington Commissioner of Public Lands regarding Alfred W. Palmberg's application to purchase second-class shorelands. Edward Dohm's report states:

> *Sir — I herewith submit the following report on* App. No. 8732 by Alfred Palmberg (A. Palmberg) to purchase shore lands of the second class in front of parts of lot 2, section 20, township 25 north, range 6 east, on the east side of Lake Sammamish, in King County.
>
> The applicant claims to be the owner of the abutting upland and states that there are no improvements on the shore lands.
>
> In proof of ownership has submitted the certificate of title dated July 19, 1928, from Lawyers & Realtors Title Insurance Company, showing that Maude Palmberg, Annie Stangroom, Bessie Zengel, Gertie Gorman, A. Palmberg and Bert Stares are holders as tenants in common and as their separate estates a certain tract of upland located in said lot 2.
>
> This application, together with App. No. 8710 covering the balance of the frontage bordering on said lot 2 have been given considerable study owing to the peculiar descriptions which have been used in describing the upland tracts. We have secured 3 maps from the Northern Pacific Railway Company and a plat from the Engineer of King County. These plats show the railway right of way and the county road right of way mentioned in the descriptions and also show that the line of high water is located outside of the west line of the Northern Pacific right of way, and also outside the government meander line.

---

line.' The general rule adopted by both federal and state courts is that meander lines are not run as boundaries of the fractional tracts thus surveyed, but for the purpose of defining the sinuousities [sic] of the banks of the streams and other bodies of water and as a means of ascertaining the acreage of such body of land subject to sale and which is to be paid for by the purchaser. It has therefore generally been held both by federal and state courts that such meander lines are for the purpose of showing the border lines of the streams, but that the water courses themselves constitute the real boundaries.

Rue v. Oregon & W.R. Co., 186 P. 1074, 1077 (Wash. 1920) (citations omitted); see also WILLIAM B. STOEBUCK & JOHN W. WEAVER, 18 WASHINGTON PRACTICE SERIES: REAL ESTATE § 13.5 (2d ed. 2004 & Supp. 2018) ("'Meander lines' are straight-line segments, run by surveyors, that approximately follow the sinuosities of the edge of a body of water. They are run in straight-line segments because it would be difficult, if not practically impossible, for a surveyor to measure and describe the irregular edge of a body of water. . . . A meander line is not the boundary of uplands that border on a body of water; the actual shore of the body of water is the boundary." (footnote omitted)).

From our study of the records, the following description is submitted:

> All shore lands of the second class owned by the State of Washington, situate in front of, adjacent to or abutting upon the following described uplands:
>
> In front of all of lot 2, section 20, township 25 north, range 6 east W. M., except the following described tract:
>
> [legal description appearing to match the legal description of the A. Stares tract]
>
> The above portion of said lot 2, not thus excepted. [sic] have a frontage of 15.81 lineal chains, more or less, measured along government meander line.

(emphasis in original).

The State of Washington appears to have approved Alfred W. Palmberg's application to purchase the second-class shorelands, and Alfred W. Palmberg appears to then have made installment payments to the State of Washington in exchange for the second-class shorelands. On February 27, 1940, the State of Washington and Alfred W. Palmberg, Maude Palmberg, Annie Stangroom, Bessie Zengel, Gertie Gorman, and Bert Stares, the six heirs of Bertha Palmberg, executed a deed, in which the State of Washington, in exchange for compensation of $395.25, conveyed:

> All shore lands of the second class, owned by the State of Washington, situate in front of, adjacent to or abutting upon the following described uplands:
>
> In front of all of lot 2, section 20, township 25 north, range 6 east, W.M., except the following described tract:
>
> [legal description appearing to match the legal description of the A. Stares tract]
>
> The above portions of said lot 2, not thus excepted, have a frontage of 15.81 lineal chains, more or less, measured along the government meander line.

According to plaintiffs' cross-motion for partial summary judgment in this court, "[i]n 1945—and this is where the 'shorelands' misnomer showed up in Plaintiffs' chain of title—one of the heirs, Bert Stares (Bertha's son from another marriage, hence the different last name), filed a partition action in order to split the remaining Palmberg property between the six heirs." Plaintiffs submitted a complaint to this court dated June 22, 1945, which

was filed in the Superior Court of the State of Washington for King County and listed Bert Stares and Gertie Gorman Hughes as plaintiffs. In subsequent documents filed with the Superior Court of the State of Washington for King County, Gertie Gorman Hughes is listed as a defendant, without explanation as to why Gertie Gorman Hughes originally was listed as a plaintiff on the June 22, 1945 complaint. The June 22, 1945 complaint lists "MAUDE PALMBERG, ANNIE STANGROON [sic], MRS AUTHUR HARRIS, Formerly EILEEN STANGROON, BESSIE ZENGEL, Deceased and her heirs, and ALFRED [W.] PALMBERG, Deceased and his heirs" as defendants. (capitalization in original). The court notes that the complaint appears to incorrectly list Annie Stangroom as Annie Stangroon. The parties have not indicated who "MRS AUTHUR HARRIS, Formerly EILEEN STANGROON," is or her role in the partition action, although, the November 15, 1946 title report, which is discussed below, states that Eileen Stangroon does not have an interest in the land at issue in the partition action. (capitalization in original).

The June 22, 1945 complaint filed in Washington State court stated that "all of the parties herein are joint owners of the following described property in King County, Washington." The June 22, 1945 complaint then provided:

Those portions of Government Lots 1, 2 and 3 of Section 20, Township 25 North, Range 6 E.W.M., Described as follows:

PARCEL "A"
Beginning at a point on the North line of said Government Lot 1, 630 feet East of the Northwest corner thereof; then South 900 feet; thence Southwesterly, at right angles to the right-of-way of the Northern Pacific Railway Company (formerly the Seattle and International Railway) to the Northeasterly line of said right-of-way; thence Southeasterly, along said Northeasterly line to the South line of said Government Lot 1; thence East, along said South line to the Southeast corner thereof; thence North, along the East line thereof, to the Northeast corner thereof; thence West, along the North line, to the point of beginning, EXCEPT County Road.

PARCEL "B"
Beginning at the Northeast corner of said Government Lot 2; thence South, along the East line thereof, 569.04 feet; thence 221.58 feet; thence Southwesterly, at right angles, to the right-of-way of the Northern Pacific Railway Company (formerly the Seattle and International Railway), 15.3 feet, to the Northeasterly line of said right-of-way; thence Northwesterly, along said Northeasterly line, to the North line of said Government Lot 2; thence East, along said North line, to the point of beginning, TOGETHER WITH second class shore lands adjoining, EXCEPT County Road.

PARCEL "C"
Beginning at the Southeast corner of said Government Lot 2; thence North, along the East line thereof, 110 feet; thence West 87 feet to the Northeasterly line of the right-of-way of the Northern Pacific Railway

Company (formerly the Seattle and International Railway); thence Southeasterly, along said Northeasterly line, to the point of beginning, TOGETHER WITH second class shore lands adjoining, EXCEPT County Road.

(capitalization in original). The June 22, 1945 complaint requested that the Superior Court of the State of Washington for King County partition the interests of the parties listed in the complaint.

On April 14, 1948, Gertie Gorman Hughes, who, at that time, was listed as a defendant, filed with the Superior Court of the State of Washington for King County a document titled "BILL OF PARTICULARS," attached to which was a copy of a title report dated November 19, 1946. (capitalization in original). The attached November 19, 1946 title report described three separate parcels in Government Lots 1 and 2. The legal description of the first parcel appears to match the legal description of Parcel A in the June 22, 1945 complaint and states that title was vested in the heirs of Alfred Palmberg and Bertha Palmberg, except for Maude Palmberg. The November 19, 1946 title report indicates that Bert Stares acquired the interest of Maude Palmberg in the parcel with a legal description appearing to match the legal description in Parcel A by quitclaim deed dated June 7, 1945. The legal description of the second parcel in the November 19, 1946 title report appears to match the legal description of Parcel B in the June 22, 1945 complaint, but further states that the second parcel was "EXCEPT portion if any, in said railroad right of way."[13] (capitalization in original). According to the November 19, 1946 title report, title to the second parcel, "EXCEPT the second class shorelands," was vested in S. L. Stangroom and Annie Stangroom.[14] (capitalization in original). The legal description of the third parcel in the title report appears to match the legal description of Parcel C in the June 22, 1945 complaint, but further states that the third parcel was "EXCEPT County Road; TOGETHER with second class shore lands adjoining, EXCEPT portion if any, in said railroad right of way." The November 19, 1946 title report stated that title to the third parcel was vested in an individual, H. N. Coury, "EXCEPT the second class shore lands," and indicated that title to the second-class shorelands was not vested in H. N. Coury. According to the November 19, 1946 title report, the second-class shorelands in the second and third parcels were vested in undivided one-sixth interests in the heirs of Alfred W. Palmberg, the heirs of Bessie Zengel, Maude Palmberg, Annie Stangroom, Gertie Gorman Hughes, and Bert Stares.[15] The November 19, 1946 title report suggested that the Superior Court lacked jurisdiction over the land owned by H. N. Coury.

---

[13] As noted above, in the June 22, 1945 complaint, Parcel B was described as being "TOGETHER WITH second class shore lands adjoining, EXCEPT County Road." (capitalization in original).

[14] S.L. Stangroom and Annie Stangroom appear to have been spouses.

[15] The November 19, 1946 title report indicated that Alfred W. Palmberg and Bessie Zengel were deceased at the time the title report was published.

According to the Superior Court of the State of Washington for King County's January 21, 1949 Findings of Fact and Conclusions of Law, a trial in the partition action was held in September 1948. The Superior Court's Findings of Fact and Conclusions of Law describes three parcels, which are labeled as Parcel A, Parcel B, and Parcel C. The Findings of Fact and Conclusions of Law described the three parcels as:

In the County of King, State of Washington, those portions of Government Lots 1 and 2 of Section 20, Township 25 North, Range 6 E.W.M. described as follows:

PARCEL A:

Beginning at a point on the north line of Government Lot 1, 630 feet east of the northwest corner thereof; thence South 900 feet; thence southwesterly at right angles to the right-of-way of the Northern Pacific Railway Company (formerly the Seattle and International Railway) to the northeasterly line of said right-of-way; thence southeasterly along said northeasterly line to the south line of said Government Lot 1; thence east along said south line to the southeast corner thereof; thence north along the east line thereof to the northeast corner thereof; thence west along the north line to point of beginning; ~~thence west along the north line to point of beginning;~~ EXCEPT County Road;

PARCEL B:

Beginning at the northeast corner of said Government Lot 2; thence south, along the east line thereof 569.64 feet; thence west 221.58 feet; thence southwesterly at right angles to the right-of-way of the Northern Pacific Railway Company (formerly the Seattle and International Railway) 15.3 feet to the northeasterly line of said right-of-way; thence northwesterly along said northeasterly line to the north line of said Government Lot 2; thence east along said North line to the point of beginning; EXCEPT County Road; TOGETHER with second class shore lands adjoining, EXCEPT portion if any, in said railroad right of way.

PARCEL C:

The second class shorelands adjoining that certain parcel of land particularly described as "Beginning at the Southeast corner of said Government Lot 2; thence North, along the East line thereof, 110 feet; thence West 87 feet to the Northeasterly line of the right of way of the Northern Pacific Railway Company (formerly the Seattle and International Railway); thence Southeasterly, along said Northeasterly line, to the point of beginning, EXCEPT County Road." [illegible] any, in said [illegible] right of way.

15

(strike-through and capitalization in original).

The Superior Court of the State of Washington for King County found that "title to Parcel B, exclusive of second class shorelands," was acquired by S. L. Stangroom and Annie Stangroom. According to the Superior Court's Findings of Fact and Conclusions of Law, S.L. Stangroom and Annie Stangroom acquired Parcel B, excluding the second-class shorelands, "beneficially and not as redemption subject to claims of other heirs of the decedent Alfred Palmberg and Bertha Palmberg." The Superior Court's Findings of Fact and Conclusions of Law indicate that S. L. Stangroom and Annie Stangroom acquired Parcel B, excluding the second-class shorelands, after the State of Washington foreclosed on that portion of Parcel B when Bert Stares failed to pay taxes on the property described in Parcel B, excluding the property described as second-class shorelands. Regarding the remaining property that had not been "beneficially" acquired by the Stangrooms, which the Superior Court of the State of Washington for King County described as Parcel A, "PARCEL B SHORELANDS," and Parcel C, the Superior Court determined that "partition in kind cannot be awarded without prejudice to the right of the parties hereto." (capitalization in original). The Superior Court of the State of Washington for King County concluded that "partition in the proceeds of sale can be had without prejudicing the rights of the parties hereto," and the Superior Court appointed Charles W. Bovee as "referee to perform the duties imposed on referees in partition suits, including the matter of sale of the property involved being partitioned."

According to a document titled "REFEREE'S RETURN OF SALE," which was dated May 14, 1949, the referee, Charles W. Bovee, held an auction of "Parcel (a)," "Parcel (b)," and "Parcel (c)" on April 30, 1949.[16] (capitalization in original). The Referee's Return of Sale does not appear to contain legal descriptions of Parcel (a), Parcel (b), or Parcel (c), but it appears that the legal descriptions contained Charles W. Bovee's "Parcel (a)," "Parcel (b)," and "Parcel (c)" corresponded with the legal descriptions of Parcel A, Parcel B, and Parcel C in the Superior Court's Findings of Fact and Conclusions of Law, which the Superior Court of the State of Washington for King County ordered Charles W. Bovee to partition.[17] Mr. Bovee indicated in the Referee's Return of Sale that Parcel (a) was sold to J.J. Simpson for $7,500.00 and "Parcels (b) and (c) in combination" were sold to J.A. Earley for $6,600.00. On May 20, 1949, the Superior Court of the State of Washington for King County issued an order confirming Mr. Bovee's sale and directing that title to Parcel (a) be vested in J.J. Simpson and that title to Parcels (b) and (c) be

---

[16] Although the Superior Court of the State of Washington for King County's January 21, 1949 Findings of Fact and Conclusions of Law refers to the relevant parcels as "PARCEL A," "PARCEL B," and "PARCEL C," Charles Bovee's May 14, 1949 Referee's Return of Sale document refers to the relevant parcels as "Parcel (a)," "Parcel (b)," and "Parcel (c)." (capitalization in original).

[17] As discussed above, the Superior Court of the State of Washington for King County determined that title to the land described in Parcel B lying east of the railroad corridor was vested in S. L. Stangroom and Annie Stangroom and was not subject to partition. Parcel (b) in Mr. Bovee's sale, therefore, only included the second-class shorelands "adjoining" Parcel B.

vested in J.A. Earley. As indicated in the Superior Court of Washington's January 21, 1949 Findings of Fact and Conclusions of Law, Parcel (a) contained land, but not second-class shorelands, in Government Lot 1, while Parcels (b) and (c) contained "second class shore lands" in Government Lot 2.

## Government Lot 1

On June 8, 1949, Charles W. Bovee, as the court-appointed referee of the partition action, executed a deed conveying land in Government Lot 1 to J.J. Simpson for $7,500.00. Specifically, the June 8, 1949 deed stated:

> That portion of Government Lot 1, Section 20, Township 25 North, Range 6, E. W. M., King County, Washington, described as follows: Beginning at a point on the north line of Government Lot 1, 630 feet east of the northwest corner thereof; thence south 900 feet; thence southwesterly at right angles to the right of way of Northern Pacific Railway Company (formerly Seattle and International Railway) to the northeasterly line of the said right of way; thence southeasterly along said northeasterly line to the south line of said Government Lot 1; thence east along said south line to the southeast corner thereof; thence north along the east line thereof to the northeast corner thereof; thence west along the north line to point of beginning; EXCEPT County Road.

(capitalization in original). Subsequently, on July 1, 1949, J.J. Simpson and Gertie Gorman Hughes executed a real estate contract, in which J.J. Simpson exchanged land with a legal description appearing to match the legal description provided in the June 8, 1949 deed quoted above for $7,500.00. A statutory warranty deed conveying the land described in the June 8, 1949 real estate contract to Gertie Gorman Hughes was recorded on November 23, 1962.

According to plaintiffs, after executing the July 1, 1949 real estate contract with J.J. Simpson, Gertie Gorman Hughes then "sought to purchase the adjoining shorelands from the State." A July 28, 1950 document titled "AFFIDAVIT OF ACTUAL OWNERSHIP and WAIVER OF PREFERENCE RIGHT" signed by Gertie Gorman Hughes and J.J. Simpson states that J.J. Simpson is the legal and record owner of the property described in the June 8, 1949 deed quoted above. (capitalization in original). The July 28, 1950 document also states that J.J. Simpson contracted to sell the land described in the June 8, 1949 deed to Gertie Gorman Hughes via the July 1, 1949 real estate contract, and that J.J. Simpson "desires to and does waive his preference right to purchase the shore lands in front of the above-described land, in favor of Gertie Gorman Hughes, who is the applicant to purchase the same."

On July 30, 1951, the Department of Public Lands for the State of Washington issued an order conveying second-class shorelands to Gertie Gorman Hughes for "$50.00 per lineal chain or a total value of $202.00." The July 30, 1951 order described the second-class shorelands as:

The shore lands of the second class, owned by the State of Washington, situate in front of, adjacent to or abutting upon that portion of Lot 1, Section 20, Township 25 North, Range 6 East, W.M., lying southeasterly of a line running S 45° 35' W from a point in said Lot 1 which is East 630 feet and South 900 feet from the northwest corner thereof, with a frontage of 4.04 lineal chains, more or less.

The July 30, 1951 order stated that Gertie Gorman Hughes had "purchased the abutting uplands," and that "by virtue of such upland ownership the said Gertie Gorman Hughes is entitled to the preference right to purchase shore lands abutting upon her upland."

On April 11, 1956, Gertie Gorman Hughes conveyed land in Government Lot 1, which was described as bordering "the northeasterly margin of the Issaquah-Redmond County Road with the south line" of Government Lot 1, to William F. Hughes. On June 14, 1966, Gertie Gorman Hughes executed a deed conveying land in Government Lot 1 to William F. Hughes and Betty Mary Hughes. The legal description of the land in the June 14, 1966 deed had a substantially similar legal description to the legal description of the land contained in the June 8, 1949 real estate contract between Gertie Gorman Hughes and J.J. Simpson. The June 14, 1966 deed further stated that the conveyance was "LESS" an area of land to the east of "the Issaquah-Redmond County Road" and that the conveyance was

TOGETHER WITH the second class shorelands conveyed to the above named grantor from the State of Washington by deed dated September 19, 1951, and recorded in Volume 3098 of Deeds at Page 491 under King County Auditor's Receiving No. 4185298.

(capitalization in original).

On March 8, 1978, Gertie Gorman Hughes executed a deed with William John Hughes and Peggy Anne Hughes. The March 8, 1978 deed conveyed appearing to match the land described in the June 14, 1966 deed following the word "LESS" and described as being east of "the Issaquah-Redmond County Road." (capitalization in original). In 1987, William F. Hughes and Betty Mary Hughes executed a deed conveying a strip of land in Government Lot 1 to William John Hughes and Peggy Anne Hughes. In 1988, the Hughes family appears to have implemented a lot line adjustment in Government Lot 1. On May 26, 1989, William F. Hughes and Betty Mary Hughes executed a deed with the Kao Family Partnership. In the May 26, 1989 deed, William F. Hughes and Betty Mary Hughes appear to only convey lands lying to the east of the County Road, and do not appear to convey the second-class shorelands to the west of the County Road. According to plaintiffs' cross-motion for partial summary judgment, "[t]he Hugheses received and retained all lands in the partition action in Government Lot 1 except for the part later deeded east of the right of way."

**Government Lot 2**

Following the Superior Court of the State of Washington for King County's confirmation of the sale of Parcels (b) and (c) to J.A. Earley on May 20, 1949 by Charles W. Bovee, the court-appointed referee, Mr. Bovee and J.A. Earley executed a deed for $6,600.00 on June 8, 1949. The June 8, 1949 deed described the land being conveyed as follows:

> Those portions of Government Lot 2, Section 20, Township 25 North, Range 6 E. W. M., King County, Washington, described as follows:
>
> The second class shore lands adjoining the following described property: Beginning at the northeast corner of said Government Lot 2; thence south along east line thereof 569.64 feet; thence west 221.58 feet; thence southwesterly at right angles to right of way of the Northern Pacific Railway Company (formerly the Seattle and International Railway) 15.3 feet to the northeasterly line of said right of way; thence northwesterly along said northeasterly line to the north line of said Government Lot 2; thence east along said north line to the point of beginning; EXCEPT County Road; EXCEPT portion if any, in said railroad right of way;
>
> The second class shore lands adjoining that certain parcel of land particularly described as: Beginning at the southeast corner of said Government Lot 2; thence north, along the east line thereof, 110 feet; thence west 87 feet to the northeasterly line of the right of way of the Northern Pacific Railway Company (formerly the Seattle and International Railway); thence southeasterly, along said northeasterly line, to the point of beginning, EXCEPT County Road. EXCEPT portion, if any, in said railroad right of way.

(capitalization in original). On August 11, 1949, Charles W. Bovee filed a petition for a corrected deed for J.A. Earley in the Superior Court of the State of Washington for King County, in which Mr. Bovee stated that the legal description in June 8, 1949 deed was "ambiguous." On August 12, 1949, the Superior Court of the State of Washington for King County issued an Order instructing Charles W. Bovee to issue a corrected deed to J.A. Earley.

Charles W. Bovee executed a corrective deed dated August 11, 1949 to J.A. Earley. The August 11, 1949 contained the following legal description of the land being conveyed to J.A. Earley:

> All shore lands of the second class formerly owned by the State of Washington situated in front of, adjacent to or abutting upon government lot 2, section 20, township 25 north, range 6 east, W. M., except the shore lands in front of the following described tract:

[legal description appearing to match the legal description of the A. Stares tract]

The portions of said government lot 2, not thus excepted, have a frontage of 15.81 lineal chains, more or less, measured along the government meander line.

The shorelands hereby conveyed are all the shore lands of the second class conveyed by that certain deed from the State of Washington to Alfred Palmberg, Maude Palmberg, Annie Stangroom, Bessie Zengel, Gertie Gorman and Bert States by deed dated February 27, 1940 . . . .

Nelson plaintiff the Estate of William F. Hughes, parcel number 202506-9085, Collins plaintiffs D. Michael and Vanessa Collins, Donald Barrett, and Howard and Pam Freedman and Nelson plaintiffs Robert and Beth Nelson assert that they all "trace their ownership of the right of way back to Earley, who purchased the 'second class shorelands' – i.e., the shorelands, uplands, and right of way – in the partition action." In each of the deeds conveying land to Nelson plaintiff the Estate of William F. Hughes, parcel number 202506-9085, Collins plaintiffs D. Michael and Vanessa Collins, Donald Barrett, and Howard and Pam Freedman and Nelson plaintiffs Robert and Beth Nelson, the land being conveyed is described as second-class shorelands "adjacent to," "abutting," or "adjoining" Government Lot 2.

## Adverse Possession

According to all ten plaintiffs, "in the unlikely event their title failed to convey ownership underlying the railroad right of way, then the circumstances show they are entitled to partial summary judgment on the alternative basis that they or their predecessors adversely possessed the right of way." The ten plaintiffs each assert that "evidence shows that under Washington State law they (or their predecessors) satisfied the elements of adverse possession to the subject properties on or before September 18, 1998," prior to the issuance of the NITU, and, therefore, obtained an interest in the land underlying the railroad corridor through adverse possession. Defendant, however, contends that the plaintiffs "cannot adversely possess the reversionary interest in the right-of-way." Defendant has not yet conducted discovery into whether plaintiffs have adversely possessed the land underlying the railroad corridor. Defendant contends that, "[i]f the Court allows Plaintiffs' adverse possession claims to proceed, the United States requests that the Court deny Plaintiffs' cross-motion for partial summary judgment pursuant to RCFC [Rules of the United States Court of Federal Claims] 56(d) in order to allow the United States adequate time to discover facts necessary to its defense" because the "current posture of the litigation is such that the parties have not engaged in intensive factual or expert discovery on the issue of adverse possession."

**Procedural History**

Defendant filed a motion for partial summary judgment, in which defendant argues that <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder, <u>Peterson</u> plaintiff Donna Marie Raab Matrinez, <u>Collins</u> plaintiffs D. Michael and Vanessa Collins, Donald Barrett, Howard and Pam Freedman and <u>Nelson</u> plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes do not own the land underlying the railroad corridor. Regarding plaintiffs' alternative argument that they obtained an interest in the land underlying the railroad corridor through adverse possession, defendant asserts that <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder, <u>Peterson</u> plaintiff Donna Marie Raab Matrinez, <u>Collins</u> plaintiffs D. Michael and Vanessa Collins, Donald Barrett, Howard and Pam Freedman and <u>Nelson</u> plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes cannot adversely possess the land underlying the railroad corridor because plaintiffs' adverse possession claims are preempted by the I.C.C. Termination Act of 1995 (the ICCTA). Defendant also argues that, under Washington State law, plaintiffs cannot adversely possess a reversionary interest.

Plaintiffs filed a single, combined cross-motion for partial summary judgment, in which <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder, <u>Peterson</u> plaintiff Donna Marie Raab Matrinez, <u>Collins</u> plaintiffs D. Michael and Vanessa Collins, Donald Barrett, Howard and Pam Freedman and <u>Nelson</u> plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes each assert that they own the land underlying the railroad corridor in fee through their respective deeds. Alternatively, <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder, <u>Peterson</u> plaintiff Donna Marie Raab Matrinez, <u>Collins</u> plaintiffs D. Michael and Vanessa Collins, Donald Barrett, Howard and Pam Freedman and <u>Nelson</u> plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes argue that, if they do not own the land underlying the railroad corridor based on their deeds, "then plaintiffs or their predecessors adversely possessed the fee title subject to the railroad easements before September 18, 1998." According to plaintiffs' cross-motion, the ICCTA does not preempt their alternative adverse possession claims, nor does Washington State law bar their alternative adverse possession claims. Plaintiffs attached to their cross-motion for partial summary judgment a declaration signed by Jerry Broadus, who states that he is "a retired licensed land surveyor and inactive (retired) attorney in Washington State," a declaration signed by Vicki E. Orrico, who states that she is "a lawyer licensed to practice law in the State of Washington," and a declaration signed by Charles A. Klinge, who states that he has "been an attorney since 1990 and admitted to practice in the State of Washington since 1996."

Subsequently, defendant filed a motion to strike the declarations signed by Mr. Broadus, Ms. Orrico, and Mr. Klinge. In defendant's motion to strike, defendant argues that the court should strike the declarations signed by Mr. Broadus, Ms. Orrico, and Mr. Klinge because ownership of the land underlying the railroad corridor is a legal question

not suitable for expert testimony. Defendant also asserts that plaintiffs violated Rule 26(a)(2) (2018) of the Rules of the United States Court of Federal Claims (RCFC) by failing to disclose Mr. Broadus, Ms. Orrico, and Mr. Klinge as experts, and that Mr. Broadus, Ms. Orrico, and Mr. Klinge are not qualified to provide expert testimony. Plaintiffs filed an opposition to defendant's motion to strike, in which plaintiffs argue that "[d]efendant confuses expert statements that are offered to assist the Court in understanding the evidence with inadmissible legal conclusions." Plaintiffs contend that, "[w]ith no trial scheduled, the declarations do not violate RCFC 26(a)(2)," and that Mr. Broadus, Ms. Orrico, and Mr. Klinge are qualified as expert witnesses. According to plaintiffs, striking the declarations signed by Mr. Broadus, Ms. Orrico, and Mr. Klinge is "not an appropriate remedy if any remedy is needed."

In a footnote in defendant's motion for partial summary judgment, defendant had stated that the "United States renews its objection that this Court does not have jurisdiction to entertain Plaintiffs' adverse possession claims because they must be adjudicated in a Washington state proceeding before they can be asserted against the United States in a takings case." Defendant's cross-motion presumably referred to defendant's opposition to plaintiffs' March 17, 2017 motion requesting that the court issue "an order affirming this Court has jurisdiction to determine whether the land taken by the United States had been adversely possessed by certain plaintiffs prior to the taking," which the court had denied as premature. After receiving the parties' filings discussed above, the court issued an Order directing defendant to update and restate its challenge to this court's jurisdiction over plaintiffs' alternative claims involving adverse possession.

Thereafter, defendant filed a motion to dismiss plaintiffs' claims of acquiring an interest in the land underlying the railroad corridor through adverse possession pursuant to RCFC 12(b)(1) (2018) and 12(b)(6) (2018). Defendant argues that the court lacks jurisdiction over plaintiffs' adverse possession claims because the claims "are between private parties and cannot be definitively resolved by this Court." According to defendant, "[e]ven if the Court were to find that it has subject matter jurisdiction over Plaintiffs' adverse possession claims, these claims should still be dismissed under RCFC 12(b)(6) because the facts Plaintiffs have alleged do not entitle them to a legal remedy." Plaintiffs filed an opposition to defendant's motion to dismiss, in which plaintiffs argued that this court does have jurisdiction over plaintiffs' adverse possession claims, to which defendant filed a reply.

## DISCUSSION

"Subject-matter jurisdiction may be challenged at any time by the parties or by the court sua sponte." Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir. 2004) (citing Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); see also Int'l Elec. Tech. Corp. v. Hughes Aircraft Co., 476 F.3d 1329, 1330 (Fed. Cir. 2007). The Tucker Act, 28 U.S.C. § 1491 (2018), grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 289-90 (2009); see also United States v. Mitchell, 463 U.S. 206, 216 (1983); Alvarado Hosp., LLC v. Price, 868 F.3d 983, 991 (Fed. Cir. 2017); Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999). "Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States . . . ." United States v. Mitchell, 463 U.S. at 216; see also United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003); N.Y. & Presbyterian Hosp. v. United States, 881 F.3d 877, 881 (Fed. Cir. 2018); Smith v. United States, 709 F.3d 1114, 1116 (Fed. Cir.), cert. denied, 571 U.S. 945 (2013); RadioShack Corp. v. United States, 566 F.3d 1358, 1360 (Fed. Cir. 2009); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1343 (Fed. Cir. 2008) ("[P]laintiff must . . . identify a substantive source of law that creates the right to recovery of money damages against the United States."); Golden v. United States, 118 Fed. Cl. 764, 768 (2014). In Ontario Power Generation, Inc. v. United States, the United States Court of Appeals for the Federal Circuit identified three types of monetary claims for which jurisdiction is lodged in the United States Court of Federal Claims. The Ontario Power Generation, Inc. court wrote:

> The underlying monetary claims are of three types. . . . First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver. . . . Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." Eastport S.S. [Corp. v. United States, 178 Ct. Cl. 599, 605-06,] 372 F.2d [1002,] 1007-08 [(1967)] (describing illegal exaction claims as claims "in which 'the Government has the citizen's money in its pocket'" (quoting Clapp v. United States, 127 Ct. Cl. 505, 117 F. Supp. 576, 580 (1954)) . . . . Third, the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." Eastport S.S., 372 F.2d at 1007. Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Id.; see also [United States v. ]Testan, 424 U.S.

[392,] 401-02 [1976] ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim-whether it be the Constitution, a statute, or a regulation-does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting Eastport S.S., 372 F.2d at 1009)). This category is commonly referred to as claims brought under a "money-mandating" statute.

Ont. Power Generation, Inc. v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004); see also Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Twp. of Saddle Brook v. United States, 104 Fed. Cl. 101, 106 (2012).

To prove that a statute or regulation is money-mandating, a plaintiff must demonstrate that an independent source of substantive law relied upon "'can fairly be interpreted as mandating compensation by the Federal Government.'" United States v. Navajo Nation, 556 U.S. at 290 (quoting United States v. Testan, 424 U.S. at 400); see also United States v. White Mountain Apache Tribe, 537 U.S. at 472; United States v. Mitchell, 463 U.S. at 217; Blueport Co., LLC v. United States, 533 F.3d 1374, 1383 (Fed. Cir. 2008), cert. denied, 555 U.S. 1153 (2009). The source of law granting monetary relief must be distinct from the Tucker Act itself. See United States v. Navajo Nation, 556 U.S. at 290 (The Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[] that operate[s] to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts)."). "'If the statute is not money-mandating, the Court of Federal Claims lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction.'" Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1308 (Fed. Cir. 2008) (quoting Greenlee Cnty., Ariz. v. United States, 487 F.3d at 876); see also N.Y. & Presbyterian Hosp. v. United States, 881 F.3d at 881; Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (noting that the absence of a money-mandating source is "fatal to the court's jurisdiction under the Tucker Act"); Price v. United States, 133 Fed. Cl. 128, 130 (2017); Peoples v. United States, 87 Fed. Cl. 553, 565-66 (2009).

When deciding a case based on a lack of subject matter jurisdiction or for failure to state a claim, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. See Erickson v. Pardus, 551 U.S. 87, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007) (citing Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508 n.1 (2002)))); see also Frankel v. United States, 842 F.3d 1246, 1249 (Fed. Cir. 2016) ("In deciding a motion to dismiss, a court is required to accept as true all factual allegations pleaded." (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009))); Fid. & Guar. Ins. Underwriters, Inc. v. United States, 805 F.3d 1082, 1084 (Fed. Cir. 2015); Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011).

"Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1 (1983)), reh'g denied (Fed. Cir. 1997); see also Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. 203, 208 (2011); Gonzalez-McCaulley Inv. Grp., Inc. v. United States, 93 Fed. Cl. 710, 713 (2010). A plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2) (2018); Fed. R. Civ. P. 8(a)(1), (2) (2019); see also Ashcroft v. Iqbal, 556 U.S. at 677-78 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-57, 570). To properly state a claim for relief, "[c]onclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part) (quoting C. WRIGHT AND A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1286 (3d ed. 2004)); Briscoe v. LaHue, 663 F.2d 713, 723 (7th Cir. 1981) ("[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss."), aff'd, 460 U.S. 325 (1983). "A plaintiff's factual allegations must 'raise a right to relief above the speculative level' and cross 'the line from conceivable to plausible.'" Three S Consulting v. United States, 104 Fed. Cl. 510, 523 (2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555), aff'd, 562 F. App'x 964 (Fed. Cir.), reh'g denied (Fed. Cir. 2014). As stated in Ashcroft v. Iqbal, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' 550 U.S. at 555. Nor does a complaint suffice if it tenders 'naked assertion[s] devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555).

In the specifically-named cases, plaintiffs allege that defendant effected a taking under the Fifth Amendment to the United States Constitution through the operation of the Trails Act. The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. The purpose of this Fifth Amendment provision is to prevent the government from "'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001) (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)), abrogated on other grounds by Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005), recognized by Hageland Aviation Servs., Inc. v. Harms, 210 P.3d 444 (Alaska 2009); see also Penn Cent. Transp. Co. v. City of N.Y., 438 U.S. 104, 123-24, reh'g denied, 439 U.S. 883 (1978); Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 536 (2005); E. Enters. v. Apfel, 524 U.S. 498, 522 (1998); Pumpelly v. Green Bay & Miss. Canal Co., 80 U.S. (13 Wall.) 166, 179 (1871) (citing to principles which establish that "private property may be taken for public uses when public necessity or utility requires" and that there is a "clear principle of natural equity that the individual whose property is thus sacrificed must be indemnified"); Rose Acre Farm, Inc. v. United States, 559 F.3d 1260, 1266 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2009), cert. denied, 559 U.S. 935 (2010); Janowsky v. United States, 133 F.3d 888, 892 (Fed. Cir. 1998); Res. Invs., Inc. v. United States, 85 Fed. Cl. 447, 469-70 (2009).

"[A] claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." E. Enters. v. Apfel, 524 U.S. at 520 (citing Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016-19 (1984)); see also Acceptance Ins. Cos. v. United States, 503 F.3d 1328, 1336 (Fed. Cir. 2007); Morris v. United States, 392 F.3d 1372, 1375 (Fed. Cir. 2004) ("Absent an express statutory grant of jurisdiction to the contrary, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000."). The United States Supreme Court has declared: "If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [United States Court of Federal Claims] to hear and determine." Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 12 (1990) (Preseault I) (quoting United States v. Causby, 328 U.S. 256, 267 (1946)); see also Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1368 (Fed. Cir. 2005); Narramore v. United States, 960 F.2d 1048, 1052 (Fed. Cir. 1992); Perry v. United States, 28 Fed. Cl. 82, 84 (1993).

To succeed under the Fifth Amendment Takings Clause, a plaintiff must show that the government took a private property interest for public use without just compensation. See Dimare Fresh, Inc. v. United States, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (stating that the "'classic taking'" is one in which the government directly appropriates private property for its own use (quoting Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 324 (2002)), cert. denied, 136 S. Ct. 2461 (2016); Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004), cert. denied, 546 U.S. 811 (2005); Arbelaez v. United States, 94 Fed. Cl. 753, 762 (2010); Gahagan v. United States, 72 Fed. Cl. 157, 162 (2006). "The issue of whether a taking has occurred is a question of law based on factual underpinnings." Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1377-78 (Fed. Cir.), cert. denied, 555 U.S. 1045 (2008). The government must be operating in its sovereign rather than in its proprietary capacity when it initiates a taking. See St. Christopher Assocs., L.P. v. United States, 511 F.3d 1376, 1385 (Fed. Cir. 2008).

The United States Court of Appeals for the Federal Circuit has established a two-part test to determine whether government actions amount to a taking of private property under the Fifth Amendment. See Casitas Mun. Water Dist. v. United States, 708 F.3d 1340, 1348 (Fed. Cir. 2013); Klamath Irr. Dist. v. United States, 635 F.3d 505, 511 (Fed. Cir. 2011); Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir.), cert. denied, 516 U.S. 808 (1995)). A court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged takings. See Casitas Mun. Water Dist. v. United States, 708 F.3d at 1348; Jackson v. United States, 135 Fed. Cl. 436, 444 (2017) (citation omitted). Then, the court must determine whether the government action is a "'compensable taking of that property interest.'" Huntleigh USA Corp v. United States, 525 F.3d at 1377 (quoting Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d at 1372).

To establish a taking, a plaintiff must have a legally cognizable property interest, such as the right of possession, use, or disposal of the property. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (citing United States v.

Gen. Motors Corp., 323 U.S. 373 (1945)); Piszel v. United States, 833 F.3d 1366, 1374 (Fed. Cir. 2016), cert. denied, 138 S. Ct. 85 (2017); Rogers v. United States, 814 F.3d 1299, 1303 (Fed. Cir. 2015); Casitas Mun. Water Dist. v. United States, 708 F.3d at 1348; CRV Enters., Inc. v. United States, 626 F.3d 1241, 1249 (Fed. Cir. 2010), cert. denied, 563 U.S. 989 (2011); Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374-75 (Fed. Cir.), reh'g denied and en banc suggestion denied (Fed. Cir. 2000), cert. denied, 532 U.S. 941 (2001). "'It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation.'" Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (quoting Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001), cert. denied, 353 U.S. 1077 (2002); and citing Cavin v. United States, 956 F.2d 1131, 1134 (Fed. Cir. 1992)). Therefore, "[i]f the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end." Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (citing Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003); and M & J Coal Co. v. United States, 47 F.3d at 1154). The court does not address the second step "without first identifying a cognizable property interest." Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir.) (citing Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1381; and Conti v. United States, 291 F.3d 1334, 1340 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003)), reh'g denied and reh'g en banc denied (Fed. Cir. 2005); see also Balagna v. United States, 135 Fed. Cl. 16, 22 (2017), recons. denied, No. 14-21L, 2017 WL 5952123 (Fed. Cl. Dec. 1, 2017). Only if there is to be a next step, "'after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest.'" Huntleigh USA Corp. v. United States, 525 F.3d at 1378 (quoting Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372); see also Casitas Mun. Water Dist. v. United States, 708 F.3d at 1348.

        The STB has authority to regulate most railroad lines in the United States. See 49 U.S.C. § 702 (2018). A railroad seeking to abandon any part of its railroad line must either (1) file an application to abandon or (2) file a notice of exemption to abandon the line. See 49 U.S.C. § 10903 (2018); see also 49 C.F.R. § 1152.50 (2018). "If the STB approves a standard abandonment application or grants an exemption and the railroad ceases operation, the STB relinquishes jurisdiction over the abandoned railroad right-of-way and state law reversionary property interests, if any, take effect." Caldwell v. United States, 391 F.3d 1226, 1228-29 (Fed. Cir. 2004) (citing Preseault I, 494 U.S. at 6-8), reh'g en banc denied (Fed. Cir.), cert. denied, 546 U.S. 826 (2005).

        "The Trails Act is designed to preserve railroad rights-of-way by converting them into recreational trails." Bywaters v. United States, 670 F.3d 1221, 1225 (Fed. Cir.), reh'g denied, 684 F.3d 1295 (Fed. Cir. 2012). By operation of the Trails Act, the STB may issue a NITU, "suspending exemption proceedings for 180 days to allow a third party to enter into an agreement with the railroad to use the right-of-way as a recreational trail." Barclay v. United States, 443 F.3d 1368, 1371 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2006), cert. denied, 846 U.S. 1209 (2007). Section 8(d) of the Trails Act, codified at 16 U.S.C. § 1247(d), "allows a railroad to negotiate with a state, municipal, or private group ('the trail operator') to assume financial responsibility for operating the railroad right of way as

a recreational trail." See Bright v. United States, 603 F.3d 1273, 1275 (Fed. Cir.) (citing Caldwell v. United States, 391 F.3d at 1229), reh'g and reh'g en banc denied (Fed. Cir. 2010). If the railroad and an authorized trail provider[18] reach an agreement, the NITU extends indefinitely, and the corridor is railbanked, with interim trail use permitted. See 49 C.F.R. § 1152.29(d)(1)-(2) (2018) ("The NITU will indicate that interim trail use is subject to future restoration of rail service . . . . Additionally, the NITU will provide that if the sponsor intends to terminate interim trail use on all or any portion of the right-of-way covered by the interim trail use agreement, it must send the [STB] a copy of the NITU and request that it be vacated on a specific date."); see also Biery v. United States, 753 F.3d 1279, 1285 (Fed. Cir.) ("If the railroad and the [Surface Transportation] Board reach agreement, the land underlying the railway may be transferred to a trail operator (e.g., state, political subdivision, or qualified private organization) for interim trail use." (citing Citizens Against Rails–to–Trails v. Surface Transp. Bd., 267 F.3d 1144, 1149 (D.C. Cir. 2001))), reh'g and reh'g en banc denied (Fed. Cir. 2014); Caldwell v. United States, 57 Fed. Cl. 193, 194 (2003) ("The term railbanking refers to the 'preservation of railroad corridor for future rail use,' while making the corridor available for other activities." (quoting Neb. Trails Council v. Surface Transp. Bd., 120 F.3d 901, 903 n.1 (8th Cir. 1997))), aff'd, 391 F.3d 1226 (Fed. Cir. 2004), reh'g en banc denied (Fed. Cir.), cert. denied, 546 U.S. 826 (2005).

When the NITU extends indefinitely and the corridor is railbanked, the STB retains jurisdiction and abandonment of the railroad corridor is blocked. See 16 U.S.C. § 1247(d) ("[I]n the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."); see also Rasmuson v. United States, 807 F.3d 1343, 1344 (Fed. Cir. 2015) ("NITUs 'preserve established railroad rights-of-way for future reactivation of rail service' and permit the railroad operator to cease operation without legally abandoning any 'rights-of-way for railroad purposes.'" (quoting 16 U.S.C. § 1247(d))).

As described by the United States Court of Appeals for the Federal Circuit:

> Thus, section 8(d) of the Trails Act prevents the operation of state laws that would otherwise come into effect upon abandonment-property laws that would "result in extinguishment of easements for railroad purposes and reversion of rights of way to abutting landowners." Rail Abandonments-Use of Rights-of-Way as Trails, Ex Parte No. 274 (Sub-No. 13), 2 I.C.C. 2d 591, 1986 WL 68617 (1986). A Fifth Amendment taking occurs if the original easement granted to the railroad under state property law is not broad

---

[18] The Trails Act indicates that a trail provider may be "a State, political subdivision, or qualified private organization [that] is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way." 16 U.S.C. § 1247(d).

enough to encompass a recreational trail. See Preseault II, 100 F.3d at 1552; see also Toews [v. United States], 376 F.3d [1371,] at 1376 [(Fed. Cir.), reh'g denied (Fed. Cir. 2004)].

Caldwell v. United States, 391 F.3d at 1229; see also Rogers v. United States, 814 F.3d at 1303 ("As we have previously explained in other rails-to-trails cases, a taking, if any, occurs when, pursuant to the Trails Act, the STB issues a Notice of Interim Trail Use ('NITU') to suspend the abandonment of the rail line by a railroad and preserve it for future active railroad use." (citing Barclay v. United States, 443 F.3d at 1373)); Burnett v. United States, 139 Fed. Cl. 797, 804 (2018) ("A Fifth Amendment takings occurs in rails-to-trails cases when the government, through the issuance of a CITU [Certificate of Interim Trail Use] or NITU, destroys an individual's state law reversionary interest in property underlying a railroad right-of-way." (citing Ladd v. United States, 630 F.3d at 1023-24)); BHL Props., LLC v. United States, 135 Fed. Cl. 222, 227-28 (2017) (citing Caldwell v. United States, 391 F.3d at 1233).

The Federal Circuit has established a three-part inquiry to determine takings liability in cases involving the conversion of railroad rights of way for recreational trail use by means of 16 U.S.C. § 1247(d) of the Trails Act, as follows:

> (1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates; (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

Preseault v. United States, 100 F.3d 1525, 1533 (Fed. Cir. 1996) (Preseault II). Phrased differently, the Federal Circuit has also indicated:

> the determinative issues for takings liability are (1) who owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate; (2) if the railroad acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and (3) even if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).

Ellamae Phillips Co. v. United States, 564 F.3d 1367, 1373 (Fed. Cir. 2009) (citing Preseault II, 100 F.3d at 1533); see also Chi. Coating Co., LLC v. United States, 892 F.3d 1169, 1170 (Fed. Cir. 2018) (citing Ellamae Phillips Co. v. United States, 564 F.3d at

1373); <u>Butler v. United States</u>, 139 Fed. Cl. 617, 622 (2018) (quoting <u>Ellamae Phillips Co. v. United States</u>, 564 F.3d at 1373).

According to the United States Court of Appeals for the Federal Circuit, "[i]t is settled law that a Fifth Amendment taking occurs in Rails-to-Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." <u>Ladd v. United States</u>, 630 F.3d 1015, 1019 (Fed. Cir. 2010), <u>reh'g and reh'g en banc denied</u>, 646 F.3d 910 (Fed. Cir. 2011); <u>see also Rogers v. United States</u>, 814 F.3d at 1303; <u>Ellamae Phillips Co. v. United States</u>, 564 F.3d at 1373. "It is the law-created right to own private property, recognized and enforced by the Constitution, legislation, and common law, that gives the owner an historically rooted expectation of compensation." <u>Preseault II</u>, 100 F.3d at 1540. The United States Court of Appeals for the Federal Circuit in <u>Preseault II</u> also indicated

> that power includes the power to preempt state-created property rights, including the rights to possession of property when railroad easements terminate. As Justice O'Connor succinctly pointed out in her concurring opinion in <u>Preseault I</u>, however, having and exercising the power of preemption is one thing; being free of the Constitutional obligation to pay just compensation for the state-created rights thus destroyed is another.

<u>Id.</u> at 1537 (citing <u>Preseault I</u>, 494 U.S. at 22).

To determine the nature of the property interest at issue, the court looks to state law. <u>See Rogers v. United States</u>, 814 F.3d at 1305 ("We analyze the property rights of the parties in a rails-to-trails case under the relevant state law."); <u>see also Chi. Coating Co., LLC v. United States</u>, 892 F.3d at 1170 (citing <u>Bd. of Regents v. Roth</u>, 408 U.S. 564, 577 (1972)). The United States Court of Appeals for the Federal Circuit, interpreting a takings claim for a railroad right-of-way, stated that, "state law generally creates the property interest in a railroad right-of-way." <u>Barclay v. United States</u>, 443 F.3d at 1374 (citing <u>Preseault I</u>, 494 U.S. at 8, 16). In a footnote on the same page, the United States Court of Appeals for the Federal Circuit repeated, "[i]n <u>Toews v. United States</u>, 376 F.3d 1371 (Fed. Cir. 2004), we reiterated that state law controls the basic issue of whether trail use is beyond the scope of the right-of-way." <u>Barclay v. United States</u>, 443 F.3d at 1374 n.4.

> The nature of the interest conveyed is determined according to the law of the state where the conveyance occurred. 'State law creates and defines the scope of the reversionary or other real property interests affected by the ICC's [Interstate Commerce Commission] action pursuant to Section 208 of the National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d).'"

<u>Chevy Chase Land Co. of Montgomery Cty. v. United States</u>, 37 Fed. Cl. 545, 565 (1997) (quoting <u>Preseault I</u>, 494 U.S. at 20) (O'Connor, J., concurring) (citing <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. at 1001)), <u>aff'd</u>, 230 F.3d 1375 (Fed. Cir. 1999), <u>reh'g and reh'g</u>

en banc denied (Fed. Cir.), cert. denied, 531 U.S. 957 (2000); see also Whispell Foreign Cars, Inc. v. United States, 97 Fed. Cl. 324, 331 ("Whether an individual has a compensable private property interest is determined by state law."), amended after recons. in part, 100 Fed. Cl. 529 (2011). Moreover, in Ruckelshaus v. Monsanto Co., 467 U.S. at 1001, the Supreme Court stated, "we are mindful of the basic axiom that "'[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'"" (omission in original) (quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980) (quoting Bd. of Regents v. Roth, 408 U.S. at 577)). In Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co., 429 U.S. 363 (1977), the United States Supreme Court stated that, "[u]nder our federal system, property ownership is not governed by a general federal law, but rather by the laws of the several States." Id. at 378; see also Davies Warehouse Co. v. Bowles, 321 U.S. 144, 155 (1944) ("The great body of law in this country which controls acquisition, transmission, and transfer of property, and defines the rights of its owners in relation to the state or to private parties, is found in the statutes and decisions of the state."). The parties do not dispute that Washington State law applies to the specifically-named cases.

In the specifically-named cases, all ten plaintiffs assert that plaintiffs are entitled to compensation because plaintiffs own the land underlying the railroad corridor "by way of their deeds." Alternatively, all ten plaintiffs allege that they acquired title to the land underlying the railroad corridor through adverse possession. Defendant asserts that this court lacks jurisdiction over plaintiffs' claims based on plaintiffs' alternative adverse possession theory because the claims are "inchoate claim[s]" and involve "unresolved claims between private parties," namely the plaintiffs and unidentified third-parties who allegedly own fee interest in the land underlying the railroad corridor. According to defendant, the court lacks jurisdiction to resolve such questions involving third parties because the Tucker Act only provides this court with jurisdiction to resolve claims against the United States. Defendant argues that, in United States v. Sherwood, 312 U.S. 584 (1941), the United States Supreme Court "found that a Tucker Act claim must be dismissed if 'maintenance against private parties is prerequisite to prosecution of the suit against the United States . . . .'" (omission in original) (quoting United States v. Sherwood, 312 U.S. at 588). In its motion to dismiss, defendant notes that "there may be little case law on this specific issue."

Plaintiffs assert that "Plaintiffs could find no case directly on point—likely none exist because the [defendant's jurisdictional] argument seems so far-fetched." All of the plaintiffs, however, argue that it is the court's "task" to determine whether plaintiffs acquired interests in the land underlying the railroad corridor through adverse possession, as plaintiffs, alternatively, have alleged. Plaintiffs assert that, under Washington State law, "once the requisite elements of adverse possession are met title is perfected and the land belongs to the adverse possessor regardless of any judicial proceeding." (emphasis in original). Moreover, plaintiffs contend that the court "routinely adjudicates" whether a plaintiff has a compensable interest in a takings case. Plaintiffs argue:

[W]hen construing a deed or other documents in a Trails Act takings case and consequently deciding whether or not the plaintiff was a bona fide owner on the date of take, the Court will have reviewed evidence and necessarily decided that other successors in interest to the original owner of the right of way—i.e., absent third parties—did or did not own the right of way. And more specifically to this point, a plaintiff in this Court need not first file a quiet title action in a state court to have a state court confirm title as between other, potential third-party owners of the property underlying a railroad easement before the plaintiff can file a takings case in this Court or before this Court can rule on the merits of ownership.

All ten plaintiffs also contend that their "claims *are* against the United States for taking their property interests that were vested in them as of September 1998—they are not making any claim against a purported absent third party because the title vested in them either by deeds or via adverse possession long ago." (emphasis in original). According to plaintiffs, defendant misconstrues United States v. Sherwood, 312 U.S. 584, because, in the specifically-named cases, "there is no requirement that there first be a quiet title suit brought elsewhere in a state court to perfect or vest title in Plaintiffs."

In United States v. Sherwood, Jacob Sherwood had recovered a judgment in a New York State court against Frederick Kaiser in the amount of $5,567.22. United States v. Sherwood, 312 U.S. at 585. The New York State court's order "authorized" Jacob Sherwood "to bring suit against the Government to recover for breach of its contract with Kaiser for the construction of a post office building." See id. Subsequently, Jacob Sherwood filed a lawsuit against the United States and Frederick Kaiser in the United States District Court for the Eastern District of New York. See id. In discussing the Tucker Act jurisdiction of the United States Court of Claims, a predecessor court to this court, the United States Supreme Court stated that the Court of Claims' jurisdiction

is confined to the rendition of money judgments in suits brought for that relief against the United States . . . and if the relief sought is against others than the United States the suit as to them must be ignored as beyond the jurisdiction of the court. . . . [O]r if its maintenance against private parties is prerequisite to prosecution of the suit against the United States the suit must be dismissed.

Id. at 588 (citations omitted). The United States Supreme Court stated that the lawsuit filed by Jacob Sherwood could not have been "maintained in the Court of Claims because that court is without jurisdiction of any suit brought against private parties and because adjudication of the right or capacity of respondent [Jacob Sherwood] to proceed with the suit upon the contract of the judgment debtor [Frederick Kaiser] with the United States is prerequisite to any recovery upon the Government contract." Id.

The cases before this court, however, differ from the circumstances in Sherwood, because, under Washington State law, plaintiffs did not, prior to filing suit in this court, need to bring actions against third-parties in order to have obtained interests in the land

underlying the railroad corridor through adverse possession. The State of Washington Supreme Court has stated:

> The doctrine of adverse possession permits a party to acquire legal title to another's land by possessing the property for at least 10 years in a manner that is "(1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile." ITT Rayonier, Inc. v. Bell, 112 Wash. 2d 754, 757, 774 P.2d 6 (1989) (citing Chaplin v. Sanders, 100 Wash. 2d 853, 857, 676 P.2d 431 (1984)). Title vests automatically in the adverse possessor if all the elements are fulfilled throughout the statutory period. El Cerrito, Inc. v. Ryndak, 60 Wash. 2d 847, 855, 376 P.2d 528 (1962) ("When real property has been held by adverse possession for 10 years, such possession ripens into an original title.").

Gorman v. City of Woodinville, 283 P.3d 1082, 1083 (Wash. 2012) (en banc); see also Ofuasia v. Smurr, 392 P.3d 1148, 1157 (Wash. Ct. App. 2017) ("[T]itle automatically vests in an adverse possession claimant when the requirements of adverse possession have been satisfied for 10 years." (citing Gorman v. City of Woodinville, 283 P.3d at 1083)). Thus, "[w]hen a person adversely possesses real property for 10 years, such possession ripens into an original title." Nickell v. Southview Homeowners Ass'n, 271 P.3d 973, 978 (Wash. Ct. App.) (citing El Cerrito, Inc. v. Ryndak, 376 P.2d at 532), review denied, 282 P.3d 96 (Wash. 2012); see also Smale v. Noretep, 208 P.3d 1180, 1182 (Wash. Ct. App. 2009) ("If the Smales adversely possessed the portion of the disputed property that originally fell within their fence line, their possession ripened into original title after 10 years of possession." (citing El Cerrito, Inc. v. Ryndak, 376 P.2d at 532)). The filing of a quiet title action in a Washington State court is not a "prerequisite" to obtaining title through adverse possession under Washington State law. See Gorman v. City of Woodinville, 283 P.3d at 1085; see also Ofuasia v. Smurr, 392 P.3d at 1157 (stating that a "new title holder need not file suit to perfect" an interest in land obtained through adverse possession (citing Gorman v. City of Woodinville, 283 P.3d at 1085)); Halverson v. City of Bellevue, 704 P.2d 1232, 1234 (Wash. Ct. App. 1985) (stating that Washington State law "is clear that title is acquired by adverse possession upon passage of the 10-year period," not when a quiet title action is filed, and that a "quiet title action merely confirm[s] that title to the land had passed" (citations omitted)).

In the specifically-named cases, the ten plaintiffs did not need to file lawsuits against private parties in order to establish ownership interests in the land underlying the railroad corridor through adverse possession. Under Washington State law, if plaintiffs had satisfied the elements for adverse possession by September 18, 1998, when the NITU was issued in the specifically-named cases, plaintiffs could have had vested interests in the land underlying the railroad corridor when the alleged taking occurred. Washington State law does not require that the plaintiffs in these cases maintain a quiet title action in Washington State court in order to acquire or confirm their interests in the land underlying the railroad corridor, as title in the allegedly adversely possessed land automatically would vest by operation of law when all of the requisite elements for adverse possession were satisfied, which plaintiffs contend occurred prior to the issuance of the

September 18, 1998 NITU. Plaintiffs' claims in the specifically-named cases generally also differ from a quiet title action, which plaintiffs could have filed in Washington State court or federal district court against the alleged third parties. In this court, none of the plaintiffs currently addressed in this Opinion have requested, as they could have done in Washington State court or in federal district court, that, based on plaintiffs' adverse possession claims, the court independently "confirm[]" that title has passed to the plaintiffs. See Gorman v. City of Woodinville, 283 P.3d at 1084 (internal quotation marks and citation omitted). Nor are any of the plaintiffs seeking to "obtain paper title in the form of a court judgment that he has acquired title." See 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE SERIES: REAL ESTATE § 8.6 (2d ed. 2004 & Supp. 2018).[19] Rather, plaintiffs seek to establish as an alternative theory that the actions of the United States resulted in a taking of their property in violation of the Fifth Amendment to the United States Constitution.

Moreover, plaintiffs' claims in the specifically-named cases are against the United States, not "unidentified third parties who are not before the Court," as defendant argues. None of plaintiffs' claims seek remedies from the alleged third parties not before the court. The ten plaintiffs in the specifically-named cases allege that the United States effected a taking without just compensation along the railroad corridor, when the Surface Transportation Board issued a NITU on September 18, 1998, and that plaintiffs had acquired, prior to September 18, 1998, interests in the land underlying the railroad either through their deeds or through adverse possession. In order to assess the validity of the plaintiffs' takings claims, the court must determine whether each of the plaintiffs had an interest in the property allegedly taken by the government. See Casitas Mun. Water Dist. v. United States, 708 F.3d at 1348 (stating that, "[f]irst, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking"). Plaintiffs' alleged takings claims may involve considering whether plaintiffs had satisfied the elements of adverse possession under Washington State law as of September 18, 1998, but consideration of such evidence does not alter the nature of plaintiffs' claims, which seek to acquire compensation for an alleged taking by the government. Indeed, in a situation involving a title dispute in a takings claim between a plaintiff and the United States, the United States Court of Claims stated:

> If plaintiff had brought suit to be restored possession of her land, perhaps the issue would be different and 28 U.S.C. 2409a might require this suit be brought in the district court. But this is not a suit for possession. It is a just compensation action and thereby within the historical jurisdiction of the court. To hold otherwise would allow defendant in its answer to determine the situs of an action by alleging governmental ownership. This we decline to do.

---

[19] The State of Washington Supreme Court has referred to William B. Stoebuck as a "well regarded commentator." See Presbytery of Seattle v. King Cty., 787 P.2d 907, 913 (Wash.) (en banc), cert. denied, 498 U.S. 911 (1990); see also Bain v. Metro. Mortg. Grp., Inc., 285 P.3d 34, 40 (Wash. 2012) (en banc) (discussing the statements of "learned commentators William Stoebuck and John Weaver").

Bourgeois v. United States, 212 Ct. Cl. 32, 35 n.1, 545 F.2d 727, 729 n.1 (Ct. Cl. 1976); see also Katzin v. United States, 908 F.3d 1350, 1366 (Fed. Cir. 2018) (Newman, J., dissenting) ("When title is disputed as to property purportedly taken, and the remedy sought is just compensation, the Court of Federal Claims has authority to decide title."). Thus, because plaintiffs' claims do not require the filing of a quiet title suit under Washington State law in order to establish their interest in the land, and because all of the plaintiffs assert takings claims against the United States for monetary compensation, this court concludes it does have jurisdiction to address plaintiffs' alternative claims of acquiring interests also through adverse possession. The court, therefore, denies defendant's motion to dismiss under RCFC 12(b)(1) based on defendant's position regarding plaintiffs' alternative adverse possession theory.

Although the parties have not cited, and there does not appear to be case law directly addressing the court's jurisdiction over the specific type of adverse possession claims presented in this case and discussed above, the court notes that, in determining whether the ten plaintiffs acquired an interest in the land underlying the railroad corridor through the deeds in their chains of title, the court will be required to analyze deeds between plaintiffs and third-parties not currently before the court, as well as deeds between plaintiffs' predecessors-in-title and judicial proceedings involving the land at issue in the specifically-named cases. The court notes that members of this court routinely have examined chains of title, which involve numerous transactions involving interests in land executed by third parties not before the court, to determine whether plaintiffs possess a valid interest in land allegedly taken by the government. See, e.g., the undersigned's decision in Lucier, et al. v. United States, 138 Fed. Cl. 423, 464-66, recons. denied, 138 Fed. Cl. 793 (2018).

Additionally, in defendant's motion to dismiss, defendant briefly argues, "[i]n each complaint, Plaintiffs alleged that they had obtained their property interest by a deed," and that, "[e]ven if the Court were to find that it has subject matter jurisdiction over Plaintiffs' adverse possession claims, these claims should still be dismissed under RCFC 12(b)(6) because the facts Plaintiffs have alleged do not entitle them to a legal remedy." According to plaintiffs, however, "[e]ach complaint alleges that Plaintiffs possess property interests and are silent as to the method of acquiring the interest," and that plaintiffs are not required to allege in the complaints "the method by which ownership was obtained." In the complaints of Spencer plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, Schroeder plaintiffs Clifford and Kathy Schroeder, Peterson plaintiff Donna Marie Raab Matrinez, Collins plaintiffs D. Michael and Vanessa Collins, Donald Barrett, Howard and Pam Freedman, and Nelson plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes, each plaintiff simply "claims" an "interest" in the "real property" which plaintiffs allege has been taken by the government. None of the plaintiffs' complaints assert acquisition of a property interest in the land underlying the railroad corridor solely through a deed, but, rather, assert that the plaintiffs did have an interest in the land underlying the railroad corridor as of the date of the alleged taking by the government. The complaints plausibly allege that each plaintiff had an

interest in the land allegedly taken by the government, and the court denies defendant's motion to dismiss pursuant to RCFC 12(b)(6).

The parties also have crossed-moved for partial summary judgment. RCFC 56 (2018) is similar to Rule 56 of the Federal Rules of Civil Procedure in language and effect. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); Fed. R. Civ. P. 56(a) (2018); see also Alabama v. North Carolina, 560 U.S. 330, 344 (2010); Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Biery v. United States, 753 F.3d at 1286; Ladd v. United States, 713 F.3d 648, 651 (Fed. Cir. 2013); Minkin v. Gibbons, P.C., 680 F.3d 1341, 1349 (Fed. Cir. 2012); Noah Sys., Inc. v. Intuit Inc., 675 F.3d 1302, 1309-10 (Fed. Cir. 2012); Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc., 674 F.3d 1365, 1372 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2012); Fujitsu Ltd. v. Netgear Inc., 620 F.3d 1321, 1325 (Fed. Cir.), reh'g denied (Fed. Cir. 2010); Consol. Coal Co. v. United States, 615 F.3d 1378, 1380 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 564 U.S. 1004 (2011); 1st Home Liquidating Trust v. United States, 581 F.3d 1350, 1355 (Fed. Cir. 2009); Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1378 (Fed. Cir. 2009); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008), reh'g and reh'g en banc denied, 556 F.3d 1329 (Fed. Cir. 2009); Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2005); Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1370-71 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Mata v. United States, 114 Fed. Cl. 736, 744 (2014); Leggitte v. United States, 104 Fed. Cl. 315, 317 (2012); Arranaga v. United States, 103 Fed. Cl. 465, 467-68 (2012); Cohen v. United States, 100 Fed. Cl. 461, 469 (2011); Boensel v. United States, 99 Fed. Cl. 607, 610 (2011).

A fact is material if it will make a difference in the result of a case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968 (Fed. Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248); Mata v. United States, 114 Fed. Cl. at 744; Arranaga v. United States, 103 Fed. Cl. at 467-68; Thompson v. United States, 101 Fed. Cl. 416, 426 (2011); Cohen v. United States, 100 Fed. Cl. at 469. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Gorski v. United States, 104 Fed. Cl. 605, 609 (2012); Walker v. United States, 79 Fed. Cl. 685, 692 (2008); Curtis v. United States, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; see, e.g., Schlup v. Delo, 513 U.S. 298, 332 (1995); Ford Motor Co. v. United

States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); TigerSwan, Inc. v. United States, 118 Fed. Cl. 447, 451 (2014); Dana R. Hodges Trust v. United States, 111 Fed. Cl. 452, 455 (2013); Cohen v. United States, 100 Fed. Cl. at 469-70; Boensel v. United States, 99 Fed. Cl. at 611; Macy Elevator, Inc. v. United States, 97 Fed. Cl. 708, 717 (2011); Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States, 87 Fed. Cl. 113, 126 (2009); Johnson v. United States, 49 Fed. Cl. 648, 651 (2001), aff'd, 52 F. App'x 507 (Fed. Cir. 2002), published at 317 F.3d 1331 (Fed. Cir. 2003). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-52; Jay v. Sec'y of Dep't of Health and Human Servs., 998 F.2d 979, 982 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1993); Leggitte v. United States, 104 Fed. Cl. at 316. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc., 674 F.3d at 1372; Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968; Am. Seating Co. v. USSC Grp., Inc., 514 F.3d 1262, 1266 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2008); Rothe Dev. Corp. v. U.S. Dep't of Def., 262 F.3d 1306, 1316 (Fed. Cir. 2001); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996). In such cases, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

In appropriate cases, summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

Dehne v. United States, 23 Cl. Ct. 606, 614-15 (1991) (quoting Pure Gold, Inc. v. Syntex, (U.S.A.) Inc., 739 F.2d 624, 626 (Fed. Cir. 1984)) (citation omitted), vacated on other grounds, 970 F.2d 890 (Fed. Cir. 1992); see also Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 806 (Fed. Cir. 1999) ("The purpose of summary judgment is not to deprive a litigant of a trial, but to avoid an unnecessary trial when only one outcome can ensue."); Metric Constr. Co., Inc. v. United States, 73 Fed. Cl. 611, 612 (2006).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Premier Office Complex of Parma, LLC v. United States, 916 F.3d 1006, 1011 (Fed. Cir. 2019); Chi. Coating Co., LLC v. United States, 892 F.3d at 1169; Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 555 U.S. 812 (2008); Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert.

denied, 534 U.S. 1109 (2002); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999); TigerSwan, Inc. v. United States, 118 Fed. Cl. at 451; Stephan v. United States, 117 Fed. Cl. 68, 70 (2014); Gonzales-McCaulley Inv. Grp., Inc. v. United States, 101 Fed. Cl. 623, 629 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. See Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Yant v. United States, 588 F.3d 1369, 1371 (Fed. Cir. 2009), cert. denied, 562 U.S. 827 (2010); Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 293 F.3d 1364 (Fed. Cir. 2002), cert. denied, 539 U.S. 957 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998); see also Am. Pelagic Co. v. United States, 379 F.3d at 1371 (citing Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1345-46 (Fed. Cir. 2000)); Dana R. Hodges Trust v. United States, 111 Fed. Cl. at 455; Boensel v. United States, 99 Fed. Cl. at 611 ("'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Casitas Mun. Water Dist. v. United States, 543 F.3d at 1283; and Lathan Co. Inc. v. United States, 20 Cl. Ct. 122, 125 (1990))); see also Am. Seating Co. v. USSC Grp., Inc., 514 F.3d at 1266-67; Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807. "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." Republic Sav. Bank, F.S.B. v. United States, 584 F.3d 1369, 1374 (Fed. Cir. 2009); see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48.

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); see also FastShip, LLC v. United States, 892 F.3d 1298, 1307 (Fed. Cir. 2018); Riley & Ephriam Constr. Co. v. United States, 408 F.3d 1369, 1371 (Fed. Cir. 2005); Crown Operations Int'l Ltd. v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir.), reh'g denied (Fed. Cir. 2002); Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc., 109 F.3d 739, 741 (Fed. Cir.) (quoting Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994), reh'g denied and en banc suggestion declined (Fed. Cir. 1995)), reh'g denied and en banc suggestion declined (Fed. Cir. 1997); Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1569 (Fed. Cir. 1997); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; RQ Squared, LLC v. United States, 119 Fed. Cl. 751, 757-58 (2015), subsequent determination, 129 Fed. Cl. 742 (2017), aff'd, 708 F. App'x 685 (Fed. Cir. 2018). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. See Celotex Corp. v. Catrett, 477 U.S. at 322; see also Wavetronix LLC v. EIS Elec. Integrated Sys.,

573 F.3d 1343, 1354 (Fed. Cir. 2009); <u>Long Island Sav. Bank, FSB v. United States</u>, 503 F.3d at 1244; <u>Fla. Power & Light Co. v. United States</u>, 375 F.3d 1119, 1124 (Fed. Cir. 2004); <u>Schoell v. Regal Marine Indus., Inc.</u>, 247 F.3d 1202, 1207 (Fed. Cir. 2001); <u>Am. Airlines, Inc. v. United States</u>, 204 F.3d 1103, 1108 (Fed. Cir. 2000); <u>Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.</u>, 200 F.3d at 807; <u>Rasmuson v. United States</u>, 109 Fed. Cl. 267, 271 (2013). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." <u>Saab Cars USA, Inc. v. United States</u>, 434 F.3d 1359, 1369 (Fed. Cir. 2006).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other. <u>See</u> <u>Prineville Sawmill Co. v. United States</u>, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing <u>Mingus Constructors, Inc. v. United States</u>, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); <u>see also</u> <u>Marriott Int'l Resorts, L.P. v. United States</u>, 586 F.3d at 968-69; <u>B.F. Goodrich Co. v. U.S. Filter Corp.</u>, 245 F.3d 587, 593 (6th Cir. 2001); <u>Atl. Richfield Co. v. Farm Credit Bank of Wichita</u>, 226 F.3d 1138, 1148 (10th Cir. 2000); <u>Chevron USA, Inc. v. Cayetano</u>, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), <u>cert. denied</u>, 532 U.S. 942 (2001); <u>Bubble Room, Inc. v. United States</u>, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."), <u>reh'g denied and en banc suggestion declined</u> (Fed. Cir. 1999); <u>Allstate Ins. Co. v. Occidental Int'l, Inc.</u>, 140 F.3d 1, 2 (1st Cir. 1998); <u>Massey v. Del Labs., Inc.</u>, 118 F.3d 1568, 1573 (Fed. Cir. 1997); <u>LewRon Television, Inc. v. D.H. Overmyer Leasing Co.</u>, 401 F.2d 689, 692 (4th Cir. 1968), <u>cert. denied</u>, 393 U.S. 1083 (1969); <u>Rogers v. United States</u>, 90 Fed. Cl. 418, 427 (2009), <u>subsequent determination</u>, 93 Fed. Cl. 607 (2010), <u>aff'd</u>, 814 F.3d 1299 (2015); <u>Consol. Coal Co. v. United States</u>, 86 Fed. Cl. 384, 387 (2009), <u>aff'd</u>, 615 F.3d 1378 (Fed. Cir.), <u>and reh'g and reh'g en banc denied</u> (Fed. Cir. 2010), <u>cert. denied</u>, 564 U.S. 1004 (2011); <u>St. Christopher Assocs., L.P. v. United States</u>, 75 Fed. Cl. 1, 8 (2006), <u>aff'd</u>, 511 F.3d 1376 (Fed. Cir. 2008); <u>Reading & Bates Corp. v. United States</u>, 40 Fed. Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or, otherwise stated, in favor of the non-moving party. <u>See</u> <u>First Commerce Corp. v. United States</u>, 335 F.3d 1373, 1379 (Fed. Cir.), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2003); <u>see also</u> <u>DeMarini Sports, Inc. v. Worth, Inc.</u>, 239 F.3d 1314, 1322 (Fed. Cir. 2001); <u>Gart v. Logitech, Inc.</u>, 254 F.3d 1334, 1338-39 (Fed. Cir.), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2001), <u>cert. denied</u>, 534 U.S. 1114 (2002); <u>Oswalt v. United States</u>, 85 Fed. Cl. 153, 158 (2008); <u>Telenor Satellite Servs., Inc. v. United States</u>, 71 Fed. Cl. 114, 119 (2006).

"Questions of law are particularly appropriate for summary judgment." <u>Oenga v. United States</u>, 91 Fed. Cl. 629, 634 (2010) (citing <u>Dana Corp. v. United States</u>, 174 F.3d 1344, 1347 (Fed. Cir. 1999) ("Summary judgment was appropriate here [in <u>Dana Corp.</u>] because no material facts were disputed, many being stipulated, and the only disputed issues were issues of law. Moreover, on each issue one party or the other is entitled to

judgment as a matter of law.")); see also Santa Fe Pac. R.R. v. United States, 294 F.3d 1336, 1340 (Fed. Cir. 2002) ("Issues of statutory interpretation and other matters of law may be decided on motion for summary judgment.").

## Motion to Strike

In the specifically-named cases, the parties dispute whether the court should strike the declarations signed by Jerry Broadus, Vicki Orrico, and Charles Klinge, which were submitted to the court by plaintiffs. In the declaration signed by Jerry Broadus, Mr. Broadus states that he is a retired land surveyor and attorney who was retained by Richard Stephens, counsel of record for the Nelson, Peterson, Schroeder, and Spencer plaintiffs. Jerry Broadus states that Richard Stephens "has asked me to review the property descriptions on three Statutory Warranty Deeds" relevant to Spencer plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway. In the declaration signed by Vicki Orrico, Ms. Orrico states that she is an attorney who "investigated the chain of title" and "the right of way adjacent" to the parcels owned by Collins plaintiffs D. Michael and Vanessa Collins, Donald Barrett, Howard and Pam Freedman. In the declaration signed by Charles Klinge, Mr. Klinge states that he is an attorney at Stephens & Klinge LLP, the law firm at which counsel of record for the Nelson, Peterson, Schroeder, and Spencer plaintiffs, Richard Stephens, is a partner,[20] making him an odd, and potentially conflicted, choice as the declarant. Mr. Klinge states that his declaration "addresses the chain of title for" Spencer plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, Schroeder plaintiffs Clifford and Kathy Schroeder, Peterson plaintiff Donna Marie Raab Matrinez, and Nelson plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes. Plaintiffs also attached a multitude of documents pertaining to the plaintiffs' chains of title to the declarations signed by Mr. Klinge, Mr. Broadus, and Ms. Orrico.

In defendant's motion to strike, defendant argues that the declaration signed by Charles Klinge offers inadmissible legal opinion because Mr. Klinge "opines on the chain [sic] of titles for the Spencer, Rossi, Brockway, Matrinez, Schroeder, Nelson, and Hughes properties" and "draws conclusions based on what he believes the documents to show." Defendant contends that the court should strike the declaration signed by Jerry Broadus because Mr. Broadus offers inadmissible legal opinion by opining on whether the metes and bounds in certain plaintiffs' deeds "precisely or carefully define the parcels." According to defendant, the declaration signed by Vicki Orrico offers inadmissible legal opinion because Ms. Orrico "forms legal conclusions based on the deeds, legal description and boundary line agreements for the Freedman, Barrett and Collins Plaintiffs." Defendant also contends that the declarations signed by Mr. Klinge, Mr.

---

[20] According to Stephens & Klinge LLP's website, Stephens & Klinge LLP only consists of two attorneys, Mr. Stephens and Mr. Klinge. See Attorneys, STEPHENS & KLINGE LLP (last visited Apr. 16, 2019), https://www.gskonline.com/attorneys.

Broadus, and Ms. Orrico violate RCFC 26(a)(2) (2018)[21] because "none of the attorney-declarants were identified as expert witness under RCFC 26(a)(2)," and "Plaintiffs failed to provide the substantive information required in an expert report." According to defendant, the court should strike the declarations because Mr. Klinge, Mr. Broadus, and Ms. Orrico are not qualified as expert witnesses on deed interpretation, and the three declarations do not meet the requirements of RCFC 56(c)(4) because the declarations are not based on personal knowledge. Alternatively, "the United States requests that the Court require Plaintiffs to file expert reports, grant the United States the opportunity to depose Plaintiffs' experts, and provide time to obtain its own experts."

In its motion to strike and reply in support of that motion, defendant has not moved to strike the exhibits to the declarations signed by Mr. Klinge, Mr. Broadus, and Ms. Orrico. In plaintiffs' opposition to defendant's motion to strike, plaintiffs state that defendant "has agreed informally with Plaintiffs that even if the Court were to strike all the testimony, the exhibits that are attached to the declarations should not be stricken," a statement which defendant has not disputed. Plaintiffs, however, argue:

> [A]s statements offered to assist with determining the intent of the parties, or to explain how boundaries are determined or referred to in Washington by the title and survey professionals, or even to opine on whether parties to historical documents used language which evinced their intent to include or exclude the right of way, the declarants' statements are not impermissible "legal opinions" as Defendant argues.

According to plaintiffs, plaintiffs' alleged failure to disclose Mr. Klinge, Mr. Broadus, and Ms. Orrico as expert witnesses prior to filing plaintiffs' cross-motion for partial summary judgment did not violate RCFC 26(a)(2) by allegedly failing to timely disclose the expert witnesses because RCFC 26(a)(2) is not implicated, as, according to plaintiffs, there is "no trial is scheduled and no deadline has passed to trigger the requirements under RCFC 26(a)(2)." Plaintiffs also argue that Mr. Klinge, Mr. Broadus, and Ms. Orrico are qualified expert witnesses, and that the declarations signed by Mr. Klinge, Mr. Broadus, and Ms. Orrico are based on personal knowledge because Mr. Klinge, Mr. Broadus, and Ms. Orrico reviewed the documents relevant to the transactions discussed in the declarations. Additionally, plaintiffs cite Katzin v. United States, 120 Fed. Cl. 199 (2015), and argue that "Katzin teaches an opinion is not objectionable just because it embraces an ultimate issue."

RCFC 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, present facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." RCFC 56(c)(4). The court will not consider a declaration purporting to support a motion for summary judgment if the declaration contains statements that are legal conclusions, not based on the declarant's personal knowledge,

---

[21] RCFC 26(a)(2)(A) states that "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." See RCFC 26(a)(2)(A).

or would otherwise be inadmissible as evidence. See Found. of Human Understanding v. United States, 88 Fed. Cl. 203, 228 n.19 (2009), aff'd, 614 F.3d 1383 (Fed. Cir. 2010); see also Adarbe v. United States, 58 Fed. Cl. 707, 712 n.1 (2003).

Rule 702 (2019) of the Federal Rules of Evidence (FRE)[22] governs the admissibility of testimony by expert witnesses. FRE 702 states:

A witness who is qualified[[23]] as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

FRE 702. Under FRE 702, the court must, as an initial matter, determine whether the expert testimony being offered will assist the trier of fact to understand evidence or determine facts in issue. See Stobie Creek Invs., LLC v. United States, 81 Fed. Cl. 358, 360 (2008) (citing FRE 702). "Expert testimony that testifies about what the law is or directs the finder of fact how to apply law to facts does not 'assist the trier of fact to understand the evidence or to determine a fact in issue' within the contemplation of Fed. R. Evid. 702." Id. "In general, federal courts have found expert testimony on issues of law, either giving a legal conclusion or discussing the legal implications of evidence, to be

---

[22] The proceedings of the United States Court of Federal Claims "shall be in accordance with such rules of practice and procedure (other than the rules of evidence) as the Court of Federal Claims may prescribe and in accordance with the Federal Rules of Evidence." 28 U.S.C. § 2503 (2018).

[23] "Determinations as to the qualification of experts and the admissibility of their testimony, including an evaluation of whether the opinion is reliable and relevant, are generally within the discretion of a trial judge, and are reviewed for an abuse of discretion, only overturned if manifestly erroneous." Piscopo v. Sec'y of Health & Human Servs., 66 Fed. Cl. 49, 53 (2005) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)); see also Hitkansut LLC v. United States, 127 Fed. Cl. 101, 107 (2016) (stating that a trial judge is responsible for determining "whether an expert witness is qualified or whether his or her opinions constitute admissible evidence" (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993))).

inadmissible." <u>Sparton Corp. v. United States</u>, 77 Fed. Cl. 1, 7 (2007) (citations omitted); <u>see also</u> <u>Katzin v. United States</u>, 120 Fed. Cl. at 211 ("Expert testimony that amounts to an opinion of law is strongly disfavored by federal courts." (citing <u>Sparton Corp. v. United States</u>, 77 Fed. Cl. at 7)); <u>Thomas v. United States</u>, 106 Fed. Cl. 467, 476 n.4 (2012) (disregarding an expert witness' affidavit when the affiant outlined his opinion as to whether a plaintiff owned a reversionary interest under Tennessee law). Although, under FRE 704(a) (2019), opinion testimony is not objectionable merely because the opinion embraces an ultimate issue, expert testimony embracing an ultimate issue that does not assist the court in understanding the evidence before the court or in resolving factual issues is inadmissible. <u>See</u> <u>Katzin v. United States</u>, 120 Fed. Cl. at 212 (citing <u>Stobie Creek Invs., LLC v. United States</u>, 81 Fed. Cl. at 363); <u>see also</u> <u>Sparton Corp. v. United States</u>, 77 Fed. Cl. at 8 ("Although Fed. R. Evid. 704 was amended so as not to preclude expert testimony on the ultimate issue, the amendment was not intended to allow an expert to advise the court on what outcome to reach." (footnote omitted)). "The admission of expert testimony is within the discretion of the trial court." <u>Banks v. United States</u>, 94 Fed. Cl. 68, 73 (2010) (citing <u>Sundance, Inc. v. DeMonte Fabricating Ltd.</u>, 550 F.3d 1356, 1360 (Fed. Cir. 2008), <u>reh'g denied</u> (Fed. Cir. 2009)).

In the forty-seven page declaration signed by Charles Klinge, Mr. Klinge discusses the transactions in the alleged chains of title for <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder, <u>Peterson</u> plaintiff Donna Marie Raab Matrinez, and <u>Nelson</u> plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes. Charles Klinge offers his commentary and thoughts on the transactions in the chains of title and discusses and concludes whether he believes certain transactions included the land underlying the railroad corridor. For example, Mr. Klinge states that "William F. Hughes and Betty Mary Hughes in September 1998 retained ownership of all of the uplands" and that "William F. Hughes and Betty Mary Hughes are the successors to the original private property owner, Alfred Palmberg, who granted the Right of Way Deed to Seattle Lake Shore & Eastern Railway." Charles Klinge also makes conclusory, legal statements such as, "*in the context of this description*, the reference to 'second class shorelands' was a shorthand reference describing the uplands southwesterly of the northeasterly line of the railroad right of way plus the submerged lakebed out to the line of navigability." (emphasis in original). It is within the province of the court to interpret the documents available to determine the intent of the parties' entering into the transactions relevant to the plaintiffs' chains of title. At this stage of the proceedings, without an opportunity for defendant to carefully review and examine the statements made by Mr. Klinge, Ms. Orrico, and Mr. Broadus, each of whom offered declarations with what appears to be an offer of expert conclusions, as discussed further below, the court does not accept the untested declarations submitted by plaintiffs. The court is concerned about relying on the potentially self-serving conclusions of only one party. Therefore, at this stage of the proceedings, the court concludes that the untested declarations do not contain information that will assist the court to fairly understand and reach conclusions about the transactions and conveyances in the chains of title for <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder, <u>Peterson</u> plaintiff Donna Marie Raab Matrinez,

and <u>Nelson</u> plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes. The declaration submitted by Charles Klinge is struck by the court.

In the declaration signed by Vicki Orrico, Ms. Orrico, an attorney, states that she reviewed the chains of title of <u>Collins</u> plaintiffs D. Michael and Vanessa Collins, Donald Barrett, Howard and Pam Freedman. As in the declaration signed by Charles Klinge, Vicki Orrico's declaration discusses the transactions in the chains of title allegedly held by <u>Collins</u> plaintiffs D. Michael and Vanessa Collins, Donald Barrett, Howard and Pam Freedman. Ms. Orrico provides commentary on transactions within the plaintiffs' chains of title and interprets the similarities or differences between the legal descriptions in the plaintiffs' deeds. Deed interpretation ultimately is within the province of the court. As in the case of the declaration submitted by Mr. Klinge, the defendant has not had an opportunity to do its own analysis and allow the court to review submissions from both parties. Moreover, the declaration signed by Vicki Orrico does not contain specialized information that at this stage of the litigation should be used to finally evaluate plaintiffs' interests in the specifically-named cases. Based on the reasoning discussed above, the court also strikes the declaration signed by Vicki Orrico.

In the declaration signed by Jerry Broadus, Mr. Broadus reviewed the legal descriptions in the deeds allegedly conveying title to <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, as well as the 1927 unrecorded plat map of a subdivision created by Willis J. Connell. Mr. Broadus describes what he believes the metes and bounds in the deeds and 1927 unrecorded plat map indicate and concludes that "[t]hose calls do not clearly exclude the abutting fee underlying the railroad easement." Mr. Broadus also asserts, without citation to any authority, that "[i]t is common knowledge among surveyors that metes and bounds descriptions were regularly added to unrecorded plat descriptions at the insistence of the tax assessors, to 'improve' the legal descriptions in case the assessor needed to use them for tax foreclosures." In his declaration, Mr. Broadus discusses what he asserts is the "[m]odern practice" of surveying and states that his understanding is that "[m]odern practice prefers to adopt a mathematically weighted mean bearing between the westerly directions of the north and south lines of the section, but this has hardly been the practice in the past." Mr. Broadus then discusses the partition action in the Superior Court for the State of Washington for King County and states that, "[i]n my opinion," the deed executed by the court-appointed referee, Charles Bovee, and J.A. Earley included the land underlying the railroad corridor. Whether the deeds conveying land to <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway included the land underlying the railroad corridor is a question for the court to decide under Washington State law, including consideration of the decision in <u>Roeder Co. v. Burlington Northern, Inc.</u>, 716 P.2d 855 (Wash.) (en banc), <u>recons. denied</u> (Wash. 1986) (en banc). Mr. Broadus' untested speculative, generalized "common knowledge" and discussion of "[m]odern practice" should not be relied on by the court, and does not assist the court to evaluate the particular deeds and plat maps submitted by the parties. The court, utilizing the guidance of Washington State law, must ascertain the intent of the parties when the transaction was entered into by the parties. Consequently, based on the reasoning discussed above, at this time Jerry Broadus' declaration does not assist the

court in interpreting the evidence submitted to the court, and the court strikes the declaration signed by Jerry Broadus. Although the court is not resistant to understanding how each side to the dispute at issue interprets the underlying documents, without information or testimony or joint stipulations submitted by both sides, the court will not accept the plaintiffs' proffered declarations concerning interpretations of plaintiffs' chains of title.

Plaintiffs' reliance on Katzin v. United States, 120 Fed. Cl. 199, is misplaced. United States Court of Federal Claims judges are not bound by each other. See Park Props. Assocs., L.P. v. United States, 120 Fed. Cl. 787, 790 (2015) (quoting Sotera Def. Solutions, Inc. v. United States, 118 Fed. Cl. 237, 258 (2014)), aff'd, 677 F. App'x 676 (Fed. Cir. 2017). Moreover, the facts and circumstances of each case will direct whether a submitted expert declaration will assist the court. In Katzin v. United States, a judge of the United States Court of Federal Claims was addressing a takings case concerning property located in Puerto Rico. See Katzin v. United States, 120 Fed. Cl. at 217. The Katzin court stated that resolution of the property issues before that judge would "depend upon interpretations of century-old land records and maps, some of which are in Spanish." See id. The Katzin plaintiffs provided an expert declaration discussing the Puerto Rican property records, which were cited by the Katzin plaintiffs and contained certain documents that were in Spanish. See id. at 212. The judge in Katzin declined to strike the expert declaration because the judge in Katzin concluded that the expert's "opinion is derived from a 'review of a century's worth of deed boundary descriptions and transfer information,'" and "assist[ed] the court in understanding the foundational facts at issue in the case." See id. at 212 (quoting the Katzin plaintiffs' brief). The defendant in Katzin also had been able to depose the expert in Katzin. See id. at 212 n.16.

In conclusion, the untested, oversimplified, conclusory declarations signed by Charles Klinge, Vicki Orrico, and Jerry Broadus in the specifically-named cases do not assist the court at this stage of the proceedings to reach a fair and just decision. Defendant in the specifically-named cases has not been provided an expert report or an opportunity to depose Mr. Klinge, Ms. Orrico, or Mr. Broadus. Moreover, unlike the documents in Katzin, the documents in the record before this court are in English and do not require translation by an expert. The court, therefore, strikes the declaration signed by Mr. Klinge, the declaration signed by Ms. Orrico, and the declaration signed by Mr. Broadus. The parties have not moved, however, to strike the exhibits and chains of titles attached to and cited in the declarations signed by Charles Klinge, Vicki Orrico, and Jerry Broadus. The exhibits attached to the declarations signed by Mr. Klinge, Ms. Orrico, and Mr. Broadus, which defendant has not moved to strike, do include information on the plaintiffs' chains of title and additional documents perhaps relevant to the analysis of whether plaintiffs own the lands underlying the railroad corridor in their particular cases. These documents may be relevant at later stages of the proceedings and both parties will have an opportunity to address their significance to finally resolve the cases.

**Contract Interpretation Under Washington State Law**

The parties also dispute whether <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder, <u>Peterson</u> plaintiff Donna Marie Raab Matrinez, <u>Collins</u> plaintiffs D. Michael and Vanessa Collins, Donald Barrett, Howard and Pam Freedman and <u>Nelson</u> plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes had an interest in the land underlying the railroad corridor when the alleged taking occurred. As an initial matter, the parties dispute whether under Washington State law the court may review extrinsic evidence when interpreting the deeds conveying land to plaintiffs in the specifically-named cases. Defendant argues that interpretation of a deed can potentially be a mixed question of fact and law, but, that, "[w]here, as here, there is no dispute as to the language included in a deed or plat, interpretation of either document is a pure question of law that can be resolved on summary judgment." (citing <u>Hanson Indus., Inc. v. Cty. of Spokane</u>, 58 P.3d 910, 913 (Wash. Ct. App. 2002)). Defendant asserts that "surrounding circumstances and other extrinsic evidence are to be used to determine the meaning of *specific words and terms used* and not to show an intention independent of the instrument or to vary, contradict or modify the written word." (internal quotation marks and citations omitted) (emphasis in original). According to plaintiffs, under Washington State law, the court may review extrinsic evidence regardless of whether the deed is ambiguous. Plaintiffs argue that Washington State has adopted the "context rule," which plaintiffs assert "'recognizes that the *intent* of the ... [sic] parties *cannot be interpreted without examining the context* surrounding the making of the contract' or deed, including extrinsic evidence." (emphasis and omission in original) (quoting <u>Pelly v. Panasyuk</u>, 413 P.3d 619, 629 (Wash. Ct. App. 2018)). Plaintiffs contend that this court "must consider the context of the transaction because the parties' intent cannot be determined without it."

According to the State of Washington Supreme Court, under Washington State law, "when construing a deed, the intent of the parties is of paramount importance and the court's duty to ascertain and enforce." <u>Brown v. State</u>, 924 P.2d 908, 911 (Wash.) (en banc), <u>recons. denied</u> (Wash. 1996); <u>see also</u> <u>Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Lines Ass'n</u>, 126 P.3d 16, 25-26 (Wash. 2006) (en banc); <u>Kitsap Cty. v. Kitsap Rifle & Revolver Club</u>, 337 P.3d 328, 345 (Wash. Ct. App. 2014) ("Our goal is to discover and give effect to the parties' intent as expressed in the deed." (citing <u>Harris v. Ski Park Farms, Inc.</u>, 844 P.2d 1006 (Wash.) (en banc), <u>recons. denied</u> (Wash. 1993), <u>cert. denied</u>, 510 U.S. 1047 (1994))), <u>amended</u> <u>on</u> <u>recons.</u> denial (2015), <u>review denied</u>, 352 P.3d 187 (Wash. 2015); <u>Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc.</u>, 277 P.3d 18, 24 (Wash. Ct. App. 2012) (citation omitted); <u>Wash. State Grange v. Brandt</u>, 148 P.3d 1069, 1073 (Wash. Ct. App. 2006) ("Generally, when construing a deed, the intent of the parties is of paramount importance and courts must ascertain and enforce such intent."), <u>review denied</u>, 171 P.3d 1054 (Wash. 2007).

The State of Washington Supreme Court also has applied the "context rule" to the interpretation of "railroad deeds." As indicated by the State of Washington Supreme Court in <u>Harris v. Ski Park Farms, Inc.</u> when analyzing deeds that involved the conveyance of

land underlying a railroad corridor, "[t]his court has adopted the 'context rule' which succinctly stated is that 'extrinsic evidence is admissible as to the entire circumstances under which [a] contract [is] made, as an aid in ascertaining the parties' intent', specifically adopting the Restatement (Second) of Contracts §§ 212, 214(c) (1981)." Harris v. Ski Park Farms, Inc., 844 P.2d at 1014 (footnote omitted) (alterations in original); see also Haggart v. United States, 108 Fed. Cl. 70, 78 (2012) ("When faced with railroad deeds, Washington courts have been more accepting of extrinsic evidence, regularly relying on it to interpret the conveyance language, even when no ambiguity is cited." (citing Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Lines Ass'n, 126 P.3d at 25 n.12; and Harris v. Ski Park Farms, Inc., 844 P.2d at 1014)), recons. denied, 131 Fed. Cl. 628 (2017); Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Lines Ass'n, 126 P.3d at 26 n.15 ("Even absent ambiguity, this court, unlike in statutory or contract construction cases, has consistently examined the circumstances surrounding the transfer and subsequent conduct of the parties, regardless of ambiguity, if helpful in ascertaining the parties' intent, which is of paramount importance." (internal quotation marks and citation omitted)); Brown v. State, 924 P.2d at 912 ("In addition to the language of the deed, we will also look at the circumstances surrounding the deed's execution and the subsequent conduct of the parties."); cf. Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc., 277 P.3d at 27 (noting that the context rule applies to a "discrete subset of cases interpreting railroad right-of-way interests"). Citing to Brown v. State and Harris v. Ski Park Farms, Inc., the State of Washington Court of Appeals in Roeder Co. v. K & E Moving & Storage Co., Inc., noted that "the [State of Washington] Supreme Court has recently ruled that, in light of Washington's adoption of the 'context rule' for contracts, courts may look to extrinsic evidence *along with* the deed itself to determine the parties' intent." Roeder Co. v. K & E Moving & Storage Co., Inc., 4 P.3d 839, 841 n.6 (Wash. Ct. App.) (emphasis in original) (citing Brown v. State, 924 P.2d at 912; and Harris v. Ski Park Farms, Inc., 844 P.2d at 1014), recons. denied, (Wash. Ct. App. 2000), review denied, 16 P.3d 1264 (Wash. 2001)). Analyzing the language of deeds involving a conveyance of land underlying a railroad corridor first, but then referring to the context surrounding the execution of the deeds is reasonable, given the age of deeds and the sometimes stilted language employed therein. See Haggart v. United States, 108 Fed. Cl. at 78-79 (citing the undersigned's decision in Longnecker Prop., et al. v. United States, 105 Fed. Cl. 393, 409 (2012)). Indeed, the undersigned in previous cases applied the context rule when interpreting deeds involving the conveyance of land underlying a railroad corridor in Washington State. See Lucier, et al. v. United States, 138 Fed. Cl. at 449-51; Longnecker Prop., et al. v. United States, 105 Fed. Cl. at 409-10; Beres V, 104 Fed. Cl. at 427-31.

The plaintiffs' deeds in the specifically-named cases, however, are not "railroad deeds" involving a conveyance of land to a railroad company. The plaintiffs' chains of title involve deeds concerning private conveyances of land, which are governed by Washington State's rules of contract interpretation. See Pelly v. Panasyuk, 413 P.3d at 628 (citing Wilkinson v. Chiwawa Cmtys. Ass'n, 327 P.3d 614 (Wash. 2014) (en banc); Hollis v. Garwall, Inc., 974 P.2d 836 (Wash. 1990) (en banc); and Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc., 277 P.3d 18). In Berg v. Hudesman, the State of Washington Supreme Court stated that the "instant case presents a clear

opportunity for this court to resolve the long-standing confusion engendered by inconsistent holdings in this area [of contract interpretation]" and that:

> We now hold that extrinsic evidence is admissible as to the entire circumstances under which the contract was made, as an aid in ascertaining the parties' intent. We adopt the Restatement (Second) of Contracts §§ 212, 214(c) (1981). Section 212 provides:
>
>> (1) The interpretation of an integrated agreement is directed to the meaning of the terms of the writing or writings in the light of the circumstances, in accordance with the rules stated in this Chapter.
>>
>> (2) A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence. Otherwise a question of interpretation of an integrated agreement is to be determined as a question of law.
>
> As explained in comment b to this section [212]:
>
>> It is sometimes said that extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in a context. Accordingly, the rule stated in Subsection (1) is not limited to cases where it is determined that the language used is ambiguous. Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties. . . .
>
> In discerning the parties' intent, subsequent conduct of the contracting parties may be of aid, and the reasonableness of the parties' respective interpretations may also be a factor in interpreting a written contract.

Berg v. Hudesman, 801 P.2d at 228-29. Subsequently, in Hollis v. Garwall, Inc., the State of Washington Supreme Court stated:

> Under Berg and cases interpreting Berg, extrinsic evidence may be relevant in discerning that intent, where the evidence gives meaning to words used in the contract. Nationwide Mut. Fire Ins. Co. v. Watson, 120 Wash.2d 178, 189, 840 P.2d 851 (1992) (extrinsic evidence illuminates what was written, not what was intended to be written). However, admissible extrinsic evidence does *not* include:
>
>> • Evidence of a party's unilateral or subjective intent as to the meaning of a contract word or term;

- Evidence that would show an intention independent of the instrument; or

- Evidence that would vary, contradict or modify the written word.

<u>Hollis v. Garwall, Inc.</u>, 974 P.2d 836, 843 (1999) (en banc) (emphasis in original). In <u>Hearst Communications, Inc. v. Seattle Times Co.</u>, the State of Washington Supreme Court further stated that:

> If relevant for determining mutual intent, extrinsic evidence may include (1) the subject matter and objective of the contract, (2) all the circumstances surrounding the making of the contract, (3) the subsequent acts and conduct of the parties, and (4) the reasonableness of respective interpretations urged by the parties. <u>Id.</u> [<u>Berg v. Hudesman</u>, 801 P.2d at 228] . . .
>
> Our holding in <u>Berg</u> may have been misunderstood as it implicates the admission of parol and extrinsic evidence. We take this opportunity to acknowledge that Washington continues to follow the objective manifestation theory of contracts. Under this approach, we attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties. <u>Max L. Wells Trust v. Grand Cent. Sauna & Hot Tub Co. of Seattle</u>, 62 Wash. App. 593, 602, 815 P.2d 284 (1991). We impute an intention corresponding to the reasonable meaning of the words used. <u>Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.</u>, 123 Wash.2d 678, 684, 871 P.2d 146 (1994). Thus, when interpreting contracts, the subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used. <u>City of Everett v. Estate of Sumstad</u>, 95 Wash.2d 853, 855, 631 P.2d 366 (1981). We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent. <u>Universal/Land Constr. Co. v. City of Spokane</u>, 49 Wash. App. 634, 637, 745 P.2d 53 (1987). We do not interpret what was intended to be written but what was written. <u>J.W. Seavey Hop Corp. of Portland v. Pollock</u>, 20 Wash.2d 337, 348-49, 147 P.2d 310 (1944), <u>cited</u> <u>with</u> <u>approval</u> <u>in</u> <u>Berg</u>, 115 Wash.2d at 669, 801 P.2d 222.

<u>Hearst Commc'ns, Inc. v. Seattle Times Co.</u>, 115 P.3d 262, 266-67 (Wash. 2005) (en banc).

Following the State of Washington Supreme Court's decision in <u>Hearst Communications, Inc.</u>, courts applying Washington State contract interpretation law have stated that "extrinsic evidence relating to the context in which a contract is made may be examined to determine the meaning of specific words and terms," but that extrinsic

evidence may not be used to show an intention independent of a written instrument, to vary or contradict written words, or to show a "party's subjective, unilateral intent as to the contract's meaning." See William G. Hulbert, Jr. & Clare Mumford Hulbert Revocable Living Tr. v. Port of Everett, 245 P.3d 779, 784 (Wash. Ct. App.) (citing Hearst Commc'ns, Inc. v. Seattle Times Co., 115 P.3d at 267-67), review denied, 257 P.3d 662 (Wash. 2011); see also Contractors Equip. Maint. Co. ex rel. U.S. v. Bechtel Hanford, Inc., 514 F.3d 899, 903 (9th Cir. 2008); Wilkinson v. Chiwawa Cmtys. Ass'n, 327 P.3d at 250-51; Pitell v. King Cty. Pub. Hosp. Dist. No. 2, 423 P.3d 900, 905 (Wash. Ct. App. 2018); Pelly v. Panasyuk, 413 P.3d at 629; Kelley v. Tonda, 393 P.3d 824, 830 (Wash. Ct. App. 2017); Dave Johnson Ins., Inc. v. Wright, 275 P.3d 339, 347 (Wash. Ct. App.), review denied, 285 P.3d 1008 (Wash. 2012). As stated by the State of Washington Supreme Court:

> The interpretation of a contract can be a mixed question of law and fact. Mut. of Enumclaw Ins. Co. v. USF Ins. Co., 164 Wash.2d 411, 424 n.9, 191 P.3d 866 (2008). But where the contract presents no ambiguity and no extrinsic evidence is required to make sense of the contract terms, contract interpretation is a question of law. Id.; Tanner Elec. Coop. v. Puget Sound Power & Light, 128 Wash.2d 656, 674, 911 P.2d 1301 (1996); see Badgett[ v. Sec. State Bank], 116 Wash.2d [563,] 568-69[, recons. denied (Wash. 1991)], 807 P.2d 356 (explaining that whether promisor had a duty under the contract is a threshold question of law).

Rekhter v. State, Dep't of Soc. & Health Servs., 323 P.3d 1036, 1051-52 (Wash. 2014) (en banc); see also RSD AAP, LLC v. Alyeska Ocean, Inc., 358 P.3d 483, 488 (Wash. Ct. App. 2015) (quoting Rekhter v. State, Dep't of Soc. & Health Servs., 323 P.3d at 1051), review denied, 369 P.3d 500; Trinity Universal Ins. Co. of Kan. v. Ohio Cas. Ins. Co., 312 P.3d 976, 985 n.8 (Wash. App. 2013) ("The meaning of a contract provision is a mixed question of law and fact, because we ascertain the intent of the contracting parties by viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of the interpretations advocated by the parties. Where the facts are undisputed, such as where the parties agree that the contract language controls and there is no extrinsic evidence to be presented, courts may decide the issue as a matter of law." (citations omitted)).

## The Spencer, Schroeder, and Peterson Plaintiffs and the Centerline Presumption

Defendant argues that Spencer plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, Schroeder plaintiffs Clifford and Kathy Schroeder, and Peterson plaintiff Donna Marie Raab Matrinez do not have an interest in the land underlying the railroad corridor. According to defendant, the deeds conveying land to Spencer plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, Schroeder plaintiffs Clifford and Kathy Schroeder, and Peterson plaintiff Donna Marie Raab Matrinez rebut the centerline presumption for those five plaintiffs because "each of these Plaintiffs' deeds describe the property conveyed to them using an express metes and bounds description that does not include the right-of-way."

Defendant argues that each of the five plaintiffs' deeds "convey property using a metes and bounds description that use one side of the right-of-way- [sic]  the 'northwesterly,' 'southwesterly,' or 'westerly' margin – as a boundary," and that those five plaintiffs have not provided any evidence indicating that the five plaintiffs obtained an interest in the land underlying the right-of-way through "other means." Defendant also asserts that "the phrase 'more or less' [in the plaintiffs' deeds] does not qualify any of the boundary points that are on the ROW [right-of-way]," but only qualifies boundaries on the western edge of plaintiffs' properties. Additionally, defendant argues that <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, the three plaintiffs whose deeds contain a reference to the 1927 unrecorded plat map of a subdivision created by Willis J. Connell, "have provided no indication that either Mr. Connell or his heirs conveyed title to land underlying the ROW to them or their predecessors in interest, which is all that is matters for purposes of this action."

<u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder, and <u>Peterson</u> plaintiff Donna Marie Raab Matrinez each argue that they own the land underlying the railroad corridor. According to <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, whose deeds contain references to tracts of land on the 1927 unrecorded plat map of a subdivision created by Willis J. Connell, "the reason metes and bounds are placed on the *unrecorded* plat [created by Willis J. Connell] and carried into deeds is that the County Treasurer demanded metes and bounds descriptions for unrecorded plats in order to assess property and enforce assessments." (emphasis in original). <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway and <u>Peterson</u> plaintiff Donna Marie Raab Matrinez also argue that the "more or less" language in the deeds of those plaintiffs[24] "is not only different from the metes and bounds addressed in <u>Roeder</u>, but is inconsistent with the rationale of <u>Roeder</u> that a carefully-defined distance evidences an intent to convey only to that specified number of feet and not any part of the right of way." (citing <u>Roeder Co. v. Burlington N., Inc.</u>, 716 P.2d at 862). <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder assert that the metes and bounds in their deed extend beyond the railroad corridor, which the <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder argue indicates that they own at least part of the land underlying the railroad corridor. <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder, and <u>Peterson</u> plaintiff Donna Marie Raab Matrinez also contend that the circumstances under which the deeds were executed indicate that plaintiffs' predecessors-in-title did not retain the right of way, and that those plaintiffs have submitted "evidence establishing they, not others, own the right of way."

Under Washington State law, generally, "the conveyance of land which is bounded by a railroad right of way will give the grantee title to the center line of the right of way if the grantor owns so far, unless the grantor has expressly reserved the fee to the right of way, or the grantor's intention to not convey the fee is clear." <u>Roeder Co. v. Burlington N.,</u>

_____

[24] The deed conveying land to <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder does not contain the phrase "more or less."

Inc., 716 P.2d at 861 (citing Standard Oil Co. v. Milner, 152 So. 2d 431, 438 (Ala. 1962); Vaughn v. Fitzgerald, 511 P.2d 1148, 1151 (Okla. Ct. App.1973); and 11 C.J.S. BOUNDARIES § 45 (1938)), recons. denied (Wash. 1986); see also Hornish v. King Cty., 899 F.3d 680, 697 (9th Cir. 2018) (citing Roeder Co. v. Burlington N., Inc., 716 P.2d at 861), cert. denied, No. 18-838, 2019 WL 1590251 (U.S. Apr. 15, 2019); Haggart v. United States, 180 Fed. Cl. at 83 (citing Roeder Co. v. Burlington N., Inc., 716 P.2d at 861); Northlake Marine Works, Inc. v. City of Seattle, 857 P.2d 283, 289 (Wash. Ct. App. 1993). "This rule," referred to by the parties as the centerline presumption, presumes that the grantor intended to convey fee in a right of way "along with and as a part of the conveyance of the abutting land, generally on the theory that the grantor did not intend to retain a narrow strip of land which could be of use only to the owner of the adjoining land." Roeder Co. v. Burlington N., Inc., 716 P.2d at 861 (citing Standard Oil Co. v. Milner, 152 So. 2d 431; and McConiga v. Riches, 40 Wash. App. 532, 539 (Wash. Ct. App. 1985)). "When metes and bounds provisions in a deed describe property that extends up to, but does not include, a railroad right of way, the presumption that abutting property owners take title to the center of the right of way is rebutted." Roeder Co. v. Burlington N., Inc., 716 P.2d at 861; see also Northlake Marine Works, Inc. v. City of Seattle, 857 P.2d at 289 ("This [centerline] presumption is rebuttable, and if metes and bounds provisions in the deed describe property that extends up to but does not include the right of way, the presumption is rebutted.").

The parties' dispute of whether the property descriptions in the deeds conveying land to Spencer plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, Schroeder plaintiffs Clifford and Kathy Schroeder, and Peterson plaintiff Donna Marie Raab Matrinez rebut the centerline presumption is impacted by the State of Washington Supreme Court's decision in Roeder Co. v. Burlington Northern, Inc., 716 P.2d 855. In Roeder Co. v. Burlington Northern, Inc., the State of Washington Supreme Court stated that it was analyzing three issues,[25] the third of which was "[d]o abutting property owners become owners to the center line of a railroad right of way when the right of way is abandoned?" See id. at 858-59. The State of Washington Supreme Court stated its "CONCLUSION" to the third issue was "[w]hen metes and bounds provisions in a deed describe property that extends up to, but does not include, a railroad right of way, the presumption that abutting property owners take title to the center of the right of way is rebutted." Id. at 861 (capitalization in original). When analyzing whether the plaintiffs in Roeder Co. v. Burlington Northern, Inc. had an interest in the railroad corridor, the State of Washington Supreme Court stated:

When the deed refers to the grantor's right of way as a boundary without clearly indicating that the side of the right of way is the boundary, it is presumed that the grantor intended to convey title to the center of the right of way. When, however, a deed refers to the right of way as a boundary but

---

[25] The State of Washington Supreme Court identified the first two issues as being "ISSUE ONE. Did the Improvement Company convey an easement or fee simple title to Bellingham Northern? ISSUE TWO. Is a 'catchall' description of a grantor's land in a deed legally sufficient to convey title to that land?" Roeder Co. v. Burlington N., Inc., 716 P.2d at 858 (capitalization in original).

also gives a metes and bounds description of the abutting property, the presumption of abutting landowners taking to the center of the right of way is rebutted. A metes and bounds description in a deed to property that abuts a right of way is evidence of the grantor's intent to withhold any interest in the abutting right of way, and such a description rebuts the presumption that the grantee takes title to the center of the right of way.

Id. at 861-62 (footnotes omitted).

The State of Washington Supreme Court in Roeder Co. noted that "[a]ll of the appellants herein, with the exception of the Davises, obtained their abutting property from the" fee owner of the land underlying the railroad corridor, and that, "[w]ith one exception, the deeds with which these grantors conveyed abutting property used metes and bounds to describe that property as extending up to the rights of way." Id. at 862 (footnote omitted). According to the State of Washington Supreme Court, a "typical example" of the deeds at issue in Roeder Co. v. Burlington Northern, Inc. stated:

Beginning at a point on the North line of Oregon Street Two Hundred Seventy (270) Feet East of its point of intersection with the East line of Orleans Street; thence North Three Hundred Fifty-three (353) feet to the South line of the Railroad Right-of-Way of the Chicago, Milwaukee, St. Paul and Pacific Railway; thence Easterly along said Right-of-Way South line One Hundred Sixty and Thirty-Six Hundredths (160.36) Feet; thence South Three Hundred Sixty-three and Seventy-eight [Hundredths] (363.78) Feet to the North line of Oregon Street; thence West along said North line One Hundred Sixty (160) Feet to the point of beginning.

Id. at 862 (alteration in original). The State of Washington Supreme Court in Roeder Co. concluded that a "boundary falling in the center of the rights of way is inconsistent with the careful metes and bounds descriptions in these deeds." Id. Regarding the "one exception" that did not include a metes and bounds description, the State of Washington Supreme Court stated, in a footnote, "[t]hat [the one] exception describes the abutting property as 'lying Northerly of the right-of-way'. While not in metes and bounds terms, under the facts herein such a description appears to exclude any interest in the right of way." Id. at 862 n.27 (citation omitted).[26]

The State of Washington Supreme Court in Roeder Co. also independently analyzed the interest of the Davises, who had not received their interest from the fee owner of the land underlying the railroad corridor, and stated:

Without evidence showing that the owner of abutting property received that property from the fee owner of the right of way property, the railroad presumption is inapplicable. Even in the face of such evidence, other persuasive evidence of the grantor's intent to retain the right of way can

---

[26] The State of Washington Supreme Court did not provide the text of the "one exception" deed in its opinion. See generally Roeder Co. v. Burlington N., Inc., 716 P.2d 855.

rebut the presumption. Specifically, language in a deed that describes the adjoining property as extending up to the edge of the right of way rebuts the presumption that the grantor intended to convey title to the center of the right of way.

Id. at 862-63.

In the cases currently before this court, the pertinent portion of the deed conveying parcel number 322506-9241 to Peterson plaintiff Donna Marie Raab Matrinez states:

That portion of government lot 3 and the northeast quarter of the southwest quarter of section 32, township 25 north, range 6 east, W.M., in king [sic] County, Washington, described as follows:

Beginning at the intersection of the westerly line of the Northern Pacific Railway Company's right-of-way with the east-west center line of said section; thence south 38°05'37" west 282.99 feet; thence north 51°54'23" west 190 feet, more or less, to the westerly line of said government lot; thence northeasterly along said lot line to the northwest corner thereof; thence easterly along said lot line to the point of beginning . . . .

(emphasis added). Peterson plaintiff Donna Marie Raab Matrinez's deed identifies the "westerly line" of the railroad corridor as a boundary for Ms. Raab Matrinez's parcel before providing a metes and bounds description of Ms. Raab Matrinez's parcel, which does not appear to include the land underlying the railroad corridor. The court is not persuaded by the plaintiffs' argument that the "more or less" language in Ms. Raab Matrinez's deed is "inconsistent with the rationale of Roeder that a carefully-defined distance evidences an intent to convey only to that specified number of feet and not any part of the right of way." Peterson plaintiff Donna Marie Raab Matrinez's deed identifies the railroad corridor as a boundary before stating that Ms. Raab Matrinez's parcels runs "west 190 feet, more or less, to the westerly line of said government lot," which is Lake Sammamish. Defendant and plaintiffs do not dispute that, under Washington State law, a body of water may be used as a boundary, which may shift over time. See Smith Tug & Barge Co. v. Columbia-Pac. Towing Corp., 482 P.2d 769, 774 (Wash.), cert. denied, 404 U.S. 829 (1971); see also 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE SERIES: REAL ESTATE § 13.5 (stating, under Washington State law, that "[t]he basic common law principles are that a gradual, imperceptible movement of a water boundary changes the boundary of land that bounds upon it, and a sudden or 'avulsive' change does not change the boundary" (footnote omitted)). Defendant states that "[w]ater bodies are common property boundaries, and frequently used as monuments in property descriptions despite their variable nature." (citing Rue v. Ore. & W.R. Co., 186 P. at 1076-77). Plaintiffs cite to "Hudson House, Inc. v. Rozman, 509 P.2d 992 (Wash. 1973) for the unassailable proposition that the boundary for property that uses a waterbody moves as the waterbody moves."

The plain language in Ms. Raab Matrinez's deed states that Ms. Raab Matrinez runs from the "westerly line" of the railroad corridor, which is a fixed boundary, "west 190 feet, more or less," to Lake Sammamish, a natural water boundary which may be subject to change over time. The "more or less" language appears to address that the western border of Donna Marie Raab Matrinez's parcel may fluctuate as Lake Sammamish changes over time and does not impact that the eastern border of Ms. Raab Matrinez's property is identified as being the "westerly line" of the railroad corridor. Because the deed conveying property to <u>Peterson</u> plaintiff Donna Marie Raab provides a metes and bounds property description that extends up to, but does not appear to include, land underlying the railroad corridor, the centerline presumption is rebutted for <u>Peterson</u> plaintiff Donna Marie Raab Matrinez. <u>See</u> <u>Roeder Co. v. Burlington N., Inc.</u>, 716 P.2d at 861.

The pertinent portion of the deed conveying parcel number 322506-9144 to <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder states:

> Beginning at a point which is 229.36 feet east and 834.91 feet north of the southwest corner of said Government Lot 4 and running southwesterly 66 feet along the northwesterly margin of the Northern Pacific Railroad right of way to the point of beginning; thence north 70° 28' 04" west to the shore of Lake Sammamish; thence southwesterly along said shoreline to a line which is parallel to an 250 feet southwesterly of said initial course of north 70° 28' 04" west; thence south 70° 28' 04" east along said parallel line to the northwesterly margin of the Northern Pacific Railroad right of way; thence northerly along said margin to the point of beginning. EXCEPT the northeasterly 100 feet thereof.

The Schroeders' deed provides a metes and bounds description, identifies the "northwesterly margin" of the railroad corridor as a boundary, and states that the Schroeders' parcel runs along the "northwesterly margin" of the railroad corridor. The plain language in the deed conveying property to the Schroeders indicates that the centerline presumption is rebutted, as there is a metes and bounds description providing that the Schroeders' property extends up to, but does not appear to include, land underlying the railroad corridor. <u>See</u> <u>Roeder Co. v. Burlington N., Inc.</u>, 716 P.2d at 861. <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder, however, argue that the "metes and bounds description for the Schroeder's [sic] deed does not extend up to the edge of the right of way, but rather *beyond* its edge" and have submitted to the court a 2003 land survey of the Schroeders' property that concluded that the Schroeders' property extends approximately twenty-four feet into the one-hundred foot wide railroad corridor. (emphasis in original). Defendant, however, contends that "Washington state law is clear that 'When there is a call . . . along the boundary line of adjoining land, this boundary, if marked, is a kind of monument that will control inconsistent courses or distances.'" (capitalization and omission in original) (quoting 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE SERIES: REAL ESTATE § 13.7 (2d ed. 2004 & Supp. 2018)).

In <u>Bullock v. Yakima Valley Transportation Co.</u>, the State of Washington Supreme Court analyzed a deed, which included a metes and bounds description, conveying land

located near a road. See Bullock v. Yakima Valley Transp. Co., 184 P. 641, 642 (Wash. 1919), adhered to on reh'g en banc, 187 P. 410 (Wash. 1920) (per curiam). "[A]s so described," the legal description in the deed in Bullock

> would carry the description into the road, and would give title to the transportation company to that portion of the roadway covered by the crossing and the sidewalk here involved. But that deed further recites that the land conveyed 'runs to the south line of the road now used and traveled as a public road.'

Id. The State of Washington Supreme Court stated:

> This south line of the road had a fence on it. It is a well-established rule of law that description by monuments will control over description by metes and bounds, consequently we are of the opinion, and hold, that the transportation company's ownership went only to the south line of the road, and did not include the crossing involved in this suit.

Id. Subsequently, in Matthews v. Parker, the State of Washington Supreme Court further stated that:

> It seems to us to be too well settled to call for citation of authorities that, in a conveyance of interest in land, whether by ordinary deed or by dedication, if the description of the land be fixed by ascertainable monuments and by courses and distances, the well-settled general rule is that the monuments will control the courses and distances if they be inconsistent with the monument calls.

Matthews v. Parker, 299 P. 354, 355 (Wash. 1931); see also Staaf v. Bilder, 415 P.2d 650, 652 (Wash. 1966); Fagan v. Walters, 197 P. 635, 638 (Wash. 1921); Ray v. King Cty., 86 P.3d 183, 197 (Wash. Ct. App. 2004) ("Because the location of this monument conflicts with the distance calls in the deed, and because the monument controls over the distance calls, we hold that the strip of land conveyed in this deed is centered on the railroad tracks, as constructed."); DD & L, Inc. v. Burgess, 753 P.2d 561, 564 (Wash. Ct. App. 1988) (stating that monuments are given priority over courses and distances "[i]n cases of conflicting calls"). Under Washington State law, a railroad line is considered to be a monument. See Ray v. King Cty., 86 P.3d at 196 (stating that railroad tracks constitute a monument); DD & L, Inc. v. Burgess, 753 P.2d at 564 (determining that the centerline of railroad line constituted a monument).[27]

In the specifically-named cases, the deed conveying parcel number 322506-9144 to Schroeder plaintiffs Clifford and Kathy Schroeder identifies the railroad corridor, which is a monument under Washington State law, as a boundary and states that the Schroeders' parcel runs "along" the railroad corridor. Consequently, even if the metes

---

[27] In plaintiffs' reply, plaintiffs state that the "railroad right of way" is a monument under Washington State law.

and bounds description in the Schroeders' deed extends into the railroad corridor, as plaintiffs allege, the language in the Schroeders' deed identifying the railroad corridor, a monument under Washington State law, as a boundary controls and indicates that the railroad corridor is the boundary for the Schroeders' parcel, notwithstanding that there allegedly is an inconsistent description in the Schroeders' deed. See Matthews v. Parker, 299 P. at 355; see also Ray v. King Cty., 86 P.3d at 197; DD & L, Inc. v. Burgess, 753 P.2d at 565. Because the Schroeders' deed contains a metes and bounds description and specifically identifies the railroad corridor as a boundary, the Schroeders' deed contains a legal description that "describe[s] property that extends up to, but does not include, a railroad right of way," and the centerline presumption is rebutted for Schroeder plaintiffs Clifford and Kathy Schroeder. See Roeder Co. v. Burlington N., Inc., 716 P.2d at 861.

Regarding Spencer plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, the deeds conveying land to those Spencer plaintiffs each identify the railroad corridor as a boundary and provide a metes and bounds description of those Spencer plaintiffs' parcels. The metes and bounds descriptions in the Spencer plaintiffs' deeds indicate that the plaintiffs' parcels extend up to and run along the edge of the railroad corridor, thereby rebutting the centerline presumption for Spencer plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway. See Roeder Co. v. Burlington N., Inc., 716 P.2d at 861. The "more or less" language in the deeds of Spencer plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway appears to acknowledge that the western border of the plaintiffs' parcels is Lake Sammamish, and that the plaintiffs' western boundary line may fluctuate with Lake Sammamish over time, in the same manner as the court previously discussed regarding the deed conveying property to Peterson plaintiff Donna Marie Raab Matrinez.

That the centerline presumption is rebutted for the Spencer plaintiffs[28] currently before the court is reinforced by the presence in each of the deeds conveying land to Spencer plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway of a reference to a tract of land on the 1927 unrecorded plat map of a subdivision created by Willis J. Connell.  Under Washington State law, "where a deed describes land as a lot laid out on and designated on a certain plat or survey, the plat becomes as much a part of the deed as if it were copied into it." Cook v. Hensler, 107 P. 178, 180 (Wash. 1910)); see also Haggart v. United States, 108 Fed. Cl. at 84 ("Washington law further dictates that 'the general rule is that reference to a plat or map in a deed of conveyance makes it a part thereof.'" (quoting Cook v. Hensler, 107 P. at 180)); Greenblum v. Gregory, 294 P. 971, 973 (Wash. 1930); Saterlie v. Lineberry, 962 P.2d 863, 864 (Wash. Ct. App. 1998) ("Where a deed references a map of the land conveyed, the map and the deed are to be construed together, and the map becomes, 'in legal effect, a part of the description.'" (quoting Moore v. Clark, 289 P. 520, 523 (Wash. 1930))). As with the interpretation of deeds, when interpreting a plat map, under

---

[28] In plaintiffs' cross-motion for summary judgment, plaintiffs refer to Spencer plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway as "the Spencer Plaintiffs."

Washington State law, the intent of the parties who made the plat governs the interpretation of the plat. See Gwinn v. Cleaver, 354 P.2d 913, 915 (Wash. 1960); see also Tsubota v. Gunkel, 364 P.2d 549, 551 (Wash. 1961); Ditty v. Freeman, 347 P.2d 870, 872 (Wash. 1959) (quoting Mueller v. City of Seattle, 8 P.2d 994, 996 (Wash. 1932)); Selby v. Knudson, 890 P.2d 514, 517 (Wash. Ct. App. 1995) ("It is well settled law that the intention of the dedicator controls in construing a plat." (citing Roeder Co. v. Burlington N., Inc., 714 P.2d 1170 (Wash. 1986) (en banc); and Frye v. King Cty., 275 P. 547 (Wash. 1929))). "That intention is to be determined from all the marks and lines appearing on the plat." Roeder Co. v. Burlington N., Inc., 714 P.2d at 1173 (citation omitted); see also Crystal Ridge Homeowners Ass'n v. City of Bothell, 343 P.3d 746, 750 (Wash. 2015) ("We determine intent from the marks and lines on the plat itself."); Gwinn v. Cleaver, 354 P.2d at 915 ("The platter's intention is gathered from the plat itself." (citing Osborne v. City of Seattle, 100 P. 850 (Wash. 1909))); Frye v. King Cty., 275 P. at 548 ("[T]his intention must be adduced from the plat itself, where possible, as that furnishes the best evidence thereof."). If, however, a plat is ambiguous, the court may consider extrinsic evidence when determining the intent of the parties. See Tsubota v. Gunkel, 364 P.2d at 551; Gwinn v. Cleaver, 354 P.2d at 915; Frye v. King Cty., 275 P. at 548; see also Roeder Co. v. Burlington N., Inc., 714 P.2d at 1173 ("[W]here the plat is ambiguous, surrounding circumstances may be considered to determine intention." (citations omitted)); Selby v. Knudson, 77 Wash. App. at 194.

In the cases currently before the court, the 1927 unrecorded plat map of a subdivision created by Willis J. Connell identifies thirty-one parcels, the centerline of the railroad corridor, and a "County Road Margin." The 1927 unrecorded plat map indicates that there is 50 feet between the centerline of the railroad corridor and the edge of the thirty-one parcels, as well as 50 feet between the centerline of the railroad and the "County Road Margin." The 1927 unrecorded plat map provides a metes and bounds description for all of the thirty-one parcels on the plat map and identifies the railroad corridor as a boundary, which, again, rebuts the centerline presumption as applicable to Spencer plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway. Plaintiffs, however, argue that the centerline presumption is not rebutted because

the reference to a metes and bounds description for the Spencer Plaintiffs has a different purpose than what the Court concluded in Roeder. The deeds to the Spencer Plaintiffs' properties include a distance to the right of way arising from an unrecorded plat. Unlike the situation in Roeder, the reason metes and bounds are placed on the *unrecorded* plat and carried into deeds is that the County Treasurer demanded metes and bounds descriptions for unrecorded plats in order to assess property and enforce assessments. Unrecorded plats have a history of being deemed sufficient for describing property for purposes of conveyance. Sengfelder v. Hill, 58 P. 250 (Wash. 1899). However, reference to a lot number in an unrecorded plat was insufficient to confer jurisdiction in a tax foreclosure unless there were metes and bounds to properly identify to the world the property being foreclosed upon. Napier v. Runkel, 114 P.2d 534 (Wash. 1941).

> Accordingly, the metes and bounds were intended to satisfy County rules, not to withhold the right of way in the grant, a fact absent from <u>Roeder</u>.

(emphasis in original) (internal references omitted). Plaintiffs have not provided any evidence to the court specifically indicating that Willis J. Connell, when creating the 1927 unrecorded plat map, included the metes and bounds descriptions for the tracts of land in the 1927 unrecorded plat map in order to "satisfy County rules," but merely speculate that the intention of Willis J. Connell when creating the 1927 unrecorded plat map was to "satisfy County rules." Thus, the metes and bounds description in the deeds conveying land to <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, as well as the descriptions in the 1927 unrecorded plat map, under Washington State law, each indicate that the centerline presumption is rebutted for <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway. <u>See</u> <u>Roeder Co. v. Burlington N., Inc.</u>, 716 P.2d at 861.

With the centerline presumption rebutted for <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder, and <u>Peterson</u> plaintiff Donna Marie Raab Matrinez, the court must now determine whether, based on the evidence before the court, <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder, and <u>Peterson</u> plaintiff Donna Marie Raab Matrinez possess an interest in the land underlying the railroad corridor. Defendant argues that the centerline presumption is rebutted for those plaintiffs, and that "Plaintiffs have produced no documentary evidence in this case that they obtained land underlying the right-of-way through other means." According to defendant, "the plain language of the Plaintiffs' deeds and their predecessor's conveyances do not show intent to convey the ROW to these Plaintiffs," and none of plaintiffs' extrinsic evidence "shows that they obtained the land underlying the ROW, nor that anyone intended to convey the land underlying the ROW to them or their predecessors." Defendant also asserts that the 1927 unrecorded plat map "show[s] the intent of Mr. Connell to exclude the ROW from his conveyances of the adjoining lots."

<u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder, and <u>Peterson</u> plaintiff Donna Marie Raab Matrinez, however, argue that they own the land underlying the railroad corridor, and that, while a metes and bounds in a deed may rebut the centerline presumption, "there is no corresponding presumption that the right of way was excluded." <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder, and <u>Peterson</u> plaintiff Donna Marie Raab Matrinez argue that none of plaintiffs' predecessors-in-interest ever conveyed the land underlying the railroad corridor and that "the Grantor's subsequent actions, which are consistent with an intent not to retain the right of way, supports Plaintiffs' ownership." Plaintiffs also submitted to the court a declaration signed by Ray Spencer, a declaration signed by Carolyn Rossi, a declaration signed by Reid Brockway, a declaration signed by Clifford Schroeder, and a declaration signed by Donna Marie Raab Matrinez, in each of which the declarant states that, prior to 1998, when the

NITU in the specifically-named cases was issued, no other party ever asserted ownership of the land underlying the railroad. Additionally, <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, whose deeds reference tracts of land on the 1927 unrecorded plat map created by Willis J. Connell, argue that Willis J. Connell

> likely intended to grant the full right of way, not half, to the properties in the Spencer Group because the county road was immediately east of the railroad right of way. It would be nonsensical for a grantor to deed only half of the right of way to the grantee while the other half was burdened by a county road easement and had no other land to which it could attach.

As discussed above, when interpreting a deed, "the intent of the parties is of paramount importance and the court's duty to ascertain and enforce." <u>See Brown v. State</u>, 924 P.2d at 911; <u>see also Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Lines Ass'n</u>, 126 P.3d at 25-26; <u>Kitsap Cty. v. Kitsap Rifle & Revolver Club</u>, 337 P.3d at 345 (citing <u>Harris v. Ski Park Farms, Inc.</u>, 844 P.2d 1006). "[W]hen interpreting contracts, the subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used," but the court may consider extrinsic if "relevant for determining mutual intent," which may include "(1) the subject matter and objective of the contract, (2) all the circumstances surrounding the making of the contract, (3) the subsequent acts and conduct of the parties, and (4) the reasonableness of respective interpretations urged by the parties." <u>See Hearst Commc'ns, Inc. v. Seattle Times Co.</u>, 115 P.3d at 266-67; <u>see also Hollis v. Garwall, Inc.</u>, 974 P.2d at 843; <u>William G. Hulbert, Jr. & Clare Mumford Hulbert Revocable Living Tr. v. Port of Everett</u>, 245 P.3d at 784. When interpreting a plat map, such as the 1927 unrecorded plat map, the intent of the party who made the plat governs the interpretation of the plat, which is to be determined from the marks and lines on the plat map, and the court may only consider extrinsic evidence if the plat map is ambiguous. <u>See Gwinn v. Cleaver</u>, 354 P.2d at 915; <u>see also Tsubota v. Gunkel</u>, 364 P.2d at 551; <u>Ditty v. Freeman</u>, 347 P.2d at 872 (quoting <u>Mueller v. City of Seattle</u>, 8 P.2d at 996); <u>Selby v. Knudson</u>, 890 P.2d at 517.

Regarding the interests of <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway in the land underlying the railroad corridor, whose deeds reference tracts of land on the 1927 unrecorded plat map of a subdivision created by Willis J. Connell, the 1927 unrecorded plat map does not contain any language expressly excepting or reserving an interest in the land underlying the railroad corridor to Willis J. Connell. The 1927 unrecorded plat map does contain metes and bounds identifying the railroad corridor as a boundary for the tracts of land on the plat map, which is sufficient to rebut the centerline presumption and is evidence of an intent to retain an interest in the railroad corridor. <u>See Roeder Co. v. Burlington N., Inc.</u>, 716 P.2d at 862. In <u>Roeder Co. v. Burlington Northern, Inc.</u>, the State of Washington Supreme Court, however, did not state that a metes and bounds description was dispositive of intent or that a metes and bounds description unequivocally excludes a railroad right-of-way. Other than the metes and bounds in the plat map, the 1927 unrecorded plat map

does not contain any other language or markings indicating that Willis J. Connell intended to retain an interest in the land underlying the railroad corridor. On the 1927 unrecorded plat map, the railroad corridor only is labeled as "NOR. PAC. RY." The legal descriptions in the deeds of <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway also do not contain any language conclusively demonstrating that the grantors conveying land to those plaintiffs intended to retain or otherwise not convey an interest in the land underlying the railroad corridor. Other than the mention of the railroad corridor as a boundary and the metes and bounds descriptions, which is some evidence of an intent to retain the land underlying the railroad corridor, see <u>Roeder Co. v. Burlington Northern, Inc.</u>, 716 P.2d at 862, the deeds conveying land to <u>Spencer</u> plaintiffs John and Carolyn Rossi and Reid and Susan Brockway do not specifically state who owns the land underlying the railroad corridor. The deed conveying land to <u>Spencer</u> plaintiffs Raymond and Lael Spencer only states that the Spencers' property is "SUBJECT TO" a "Railroad right of way separating our property from E. Lake Sammamish Parkway NE." (capitalization in original).

<u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, however, argue that Willis J. Connell never conveyed the land underlying the railroad corridor to a third party or took any actions indicating that Willis J. Connell retained an interest in the land after creating the subdivision. Neither plaintiffs nor defendant has identified any subsequent transaction involving the land underlying the railroad corridor relevant to the <u>Spencer</u> plaintiffs. In the declaration signed by Ray Spencer, Ray Spencer states that Lael Spencer and he have "used on a regular basis the area within the railroad right of way" since the Spencers purchased their property in 1992, and that "no one ever told me that we did not own the railroad right of way or that someone else owned it." In the declaration signed by Carolyn Rossi, Carolyn Rossi states that, since John Rossi and she purchased their property in 1983, "we have used the area of the railroad right of way that lies west of the railroad tracks 'rail bed' as if it were our own," and that "[n]o one has ever indicated that we did not own the railroad right of way or that someone else owned it." According to the declaration signed by Reid Brockway, Susan Brockway and he purchased their property in 1973. Mr. Brockway states Susan Brockway and he have used the land to the west of the railroad right of way since 1973, and "[a]t no time has anyone ever suggested that we did not own the western half of the railroad right of way." Defendant has not submitted to the court evidence refuting the statements made in the declarations signed Ray Spencer, Carolyn Rossi, or Reid Brockway or indicating that a predecessor-in-title in plaintiffs' chains of title took actions consistent with having an interest in the land underlying the railroad corridor. Given the metes and bounds description in the plaintiffs' deeds and in the 1927 unrecorded plat map, the lack of language in the 1927 unrecorded plat map explicitly indicating that Willis J. Connell intended to retain an interest in the land underlying the railroad corridor, the lack of language in the plaintiffs' deeds explicitly addressing ownership of the land underlying the railroad corridor, and the undisputed statements in the declarations signed Ray Spencer, Carolyn Rossi, or Reid Brockway, there is a genuine issue of material fact as to who owns the land underlying the railroad corridor. The court, therefore, denies defendant's motion for partial summary judgment and plaintiffs' cross-motion for partial summary judgment

regarding whether <u>Spencer</u> plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway own the land underlying the railroad corridor.

Regarding <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder and <u>Peterson</u> plaintiff Donna Marie Raab Matrinez, whose deeds do not reference tracts on the 1927 unrecorded plat map, the deeds conveying land to <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder and <u>Peterson</u> plaintiff Donna Marie Raab Matrinez use metes and bounds and identify the railroad corridor as a boundary, which is some evidence of the grantor's intent to withhold any interest in the abutting right of way.  See <u>Roeder Co. v. Burlington N., Inc.</u>, 716 P.2d at 862. The deeds conveying land to <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder and <u>Peterson</u> plaintiff Donna Marie Raab Matrinez, however, do not contain any additional statements unambiguously excluding the railroad corridor from the land being conveyed to <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder and <u>Peterson</u> plaintiff Donna Marie Raab Matrinez. Nor do the deeds of <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder and <u>Peterson</u> plaintiff Donna Marie Raab Matrinez contain language conclusively demonstrating that the grantors in the deeds intended to retain or otherwise exclude an interest in the land underlying the railroad corridor.

<u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder and <u>Peterson</u> plaintiff Donna Marie Raab Matrinez contend that they were unable to locate any transactions involving the land underlying the railroad corridor adjacent to the parcels owned by <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder and <u>Peterson</u> plaintiff Donna Marie Raab Matrinez. According to the declaration signed by Clifford Schroeder, the <u>Schroeder</u> plaintiffs purchased their property in 1974 and have been consistently using the land on both sides of the railroad corridor since 1974. In his declaration, Clifford Schroeder states that, "[p]rior to 1998, no one has ever approached me [Clifford Schroeder] to suggest that they are really the owner of the railroad right of way adjoining our property. Only King County has made that claim and only after 1998." In the declaration signed by Donna Marie Raab Matrinez, Donna Marie Raab Matrinez states that her family purchased the property in 1967, that "[o]ur family used the entire railroad right of way," that "[a]t no time did anyone challenge my family's ownership of the right of way that we used," and that "[n]o one ever claimed ownership until King County acquired rights to the right of way in 1998 and then, only the County claimed ownership." The statements in the declarations signed by Clifford Schroeder and Donna Marie Raab Matrinez indicate that no other party has acted in a manner indicating ownership of the land underlying the railroad corridor. Defendant has not submitted any evidence to the court refuting the statements in the declarations signed by Clifford Schroeder and Donna Marie Raab Matrinez or demonstrating that a predecessor-in-title in plaintiffs' chains of title took actions consistent with possessing an interest in the land underlying the railroad corridor. The evidence submitted by <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder and <u>Peterson</u> plaintiff Donna Marie Raab Matrinez, the metes and bounds in the deeds conveying land to those two plaintiffs, and the lack of a definite statement in the deeds related to ownership of the land underlying the railroad corridor creates a genuine issue of material fact as to whether <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder and <u>Peterson</u> plaintiff Donna Marie Raab Matrinez acquired an interest in the land underlying the railroad corridor through their deeds. Consequently, the court denies defendant's motion for partial summary judgment and plaintiffs' cross-motion

for partial summary judgment regarding whether <u>Schroeder</u> plaintiffs Clifford and Kathy Schroeder and <u>Peterson</u> plaintiff Donna Marie Raab Matrinez own the land underlying the railroad corridor through their deeds.

### The "Shorelands" Conveyances and Collins plaintiffs D. Michael and Vanessa Collins, Donald Barrett, and Howard and Pam Freedman and Nelson plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes

The parties also dispute whether <u>Collins</u> plaintiffs D. Michael and Vanessa Collins, Donald Barrett, and Howard and Pam Freedman and <u>Nelson</u> plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes own the land underlying the railroad corridor. The parcels owned by <u>Collins</u> plaintiffs D. Michael and Vanessa Collins, Donald Barrett, and Howard and Pam Freedman and <u>Nelson</u> plaintiffs Robert and Beth Nelson all are located in Government Lot 2. <u>Nelson</u> plaintiff the Estate of William F. Hughes owns two parcels, parcel number 202506-9071, which is located in Government Lot 1, and parcel number 202506-9085, which is located in Government Lot 2.

Defendant asserts that the deeds conveying land to the five "shorelands" plaintiffs describe the property owned by plaintiffs as second-class shorelands that are adjacent to an "uplands" property. According to defendant, "[a]s a factual matter, it is not clear how these shorelands became the dry lands that these Plaintiffs' homes sit on today, but the Court does not need to resolve that issue to find that Plaintiffs whose deed only gives them title to 'shorelands' do not have title to land underlying the right-of-way." Defendant argues that the "'shorelands' conveyances did not convey property underlying the right-of-way," and that "Plaintiffs' title to 'shorelands' could not grant them any interest in land underlying the right-of-way, and their claims that are based on ownership of these properties must be dismissed."

Defendant argues that the "only basis for their [plaintiffs'] claim to land underlying the ROW [right-of-way] is their assertion that the term [second-class shorelands] was used in a manner contrary to its normal definition," and that the "undisputed facts before this Court show that the land underlying the ROW was never 'shorelands.'" Defendant contends that the 1945 partition action in the Superior Court of the State of Washington for King County did not include the land underlying the railroad corridor. According to defendant, the 1945 partition action only partitioned second-class shorelands located outside of the railroad corridor, as well as land located to the east of the railroad corridor. Defendant argues that, because the land underlying the railroad corridor was not included in the 1945 partition action, the "state court that oversaw the partition proceeding did not have jurisdiction over property that was not before it, and thus this Court cannot assume that it acted to partition it, even though the omission may have been inadvertent." Defendant also argues that the court must reject plaintiffs' position that the term second-class shorelands, as used in the 1945 partition action, was a misnomer and included the land underlying the railroad corridor because "it contradicts the clear language of the property described in the partition proceeding as well as the clear language of deeds following that proceeding."

Collins plaintiffs D. Michael and Vanessa Collins, Donald Barrett, and Howard and Pam Freedman and Nelson plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes, however, argue that the "origins of the phrase 'second class shorelines' [sic] which appears in the remaining Shorelands Plaintiffs' deeds overwhelmingly establish that these Plaintiffs and their predecessors received all lands between the lake and the right of way, as well as fee title underlying the full right of way itself." Those five plaintiffs contend that the purpose of the 1945 partition action "was to allocate to the six Palmberg heirs the property owned by Bertha Palmberg." Plaintiffs argue that Parcel A in the 1945 partition action "must have included all the land Palmberg owned in Government Lot 1, including the fee underlying the right of way," because, "at the time of the partition, there was not yet any ownership by Palmberg or the heirs in the shorelands, and the sale to J.J. Simpson was intended to dispose of all the estate in Government Lot 1 (which included the right of way)." Regarding the land in Government Lot 2, plaintiffs argue that the 1945 partition action resulted in the land underlying the railroad corridor in Government Lot 2 being deeded to J.A. Earley because, "if the partition action did not include the right of way in the deed to Earley, then the Court [in the partition action] failed to accomplish the whole purpose of the partition action—to divide assets among heirs." Additionally, plaintiffs assert that the subsequent events confirm that "title in the right of way had transferred to Plaintiffs' predecessors and to Plaintiffs themselves."

Prior to the 1945 partition action at the center of the parties' dispute involving the "shorelands" plaintiffs, Alfred Palmberg, the father, executed a June 13, 1887 deed conveying a 100-foot wide easement to the Seattle, Lake Shore and Eastern Railway Company, on which the railroad corridor was subsequently constructed. See Beres IV, 97 Fed. Cl. at 781-92. In 1908, Alfred Palmberg died and Bertha Palmberg, Alfred Palmberg's wife, acquired Alfred Palmberg's property. In 1918, Bertha Palmberg died and, according to Bertha Palmberg's probate document, Bertha Palmberg left her property in undivided one-sixth shares to her six children, who were Maude Palmberg, Annie Stangroom, Bessie Zengel, Gertie Gorman, Bert Stares, and Alfred W. Palmberg, the son of Alfred Palmberg and Bertha Palmberg.

In 1928, Alfred W. Palmberg, the son, applied to purchase the second-class shorelands adjacent to Government Lot 2 from the State of Washington. The July 19, 1928 title report created in connection with Alfred W. Palmberg's application states that the "records do not disclose the location of the railroad right of way with reference to the meander line or the high water line, however, the deed to the railroad company of the right of way expressly reserves all riparian and water front rights on Lake Sammamish." According to the August 3, 1928 report created by Edward C. Dohm, a Washington "State Field Engineer," Alfred W. Palmberg's application

together with App. No. 8710 covering the balance of the frontage bordering on said lot 2 have been given considerable study owing to the peculiar descriptions which have been used in describing the upland tracts. We have secured 3 maps from the Northern Pacific Railway Company and a plat from the Engineer of King County. These plats show the railway right of way and the county road right of way mentioned in the descriptions and also show

that the line of high water is located outside of the west line of the Northern Pacific right of way, and also outside the government meander line.

From our study of the records, the following description is submitted:

> All shore lands of the second class owned by the State of Washington, situate in front of, adjacent to or abutting upon the following described uplands:
>
> In front of all of lot 2, section 20, township 25 north, range 6 east W. M., except the following described tract:
>
> [legal description appearing to match the legal description of the A. Stares tract]
>
> The above portion of said lot 2, not thus excepted. [sic] have a frontage of 15.81 lineal chains, more or less, measured along government meander line.

Mr. Dohm's August 3, 1928 report indicates that, as of 1928, there was dry land located to the west of the railroad corridor and to the east of Lake Sammamish.

Subsequently, the State of Washington appears to have approved Alfred W. Palmberg's application, and Alfred W. Palmberg appears to have made installment payments to the State of Washington in connection with Alfred W. Palmberg's application to purchase the second-class shorelands in Government Lot 2. On February 27, 1940, the State of Washington executed a deed conveying, in exchange for $395.25, to Alfred W. Palmberg, Maude Palmberg, Annie Stangroom, Bessie Zengel, Gertie Gorman, and Bert Stares, the following land:

> All shore lands of the second class, owned by the State of Washington, situate in front of, adjacent to or abutting upon the following described uplands:
>
> In front of all of lot 2, section 20, township 25 north, range 6 east, W.M., except the following described tract:
>
> [legal description appearing to match the legal description of the A. Stares tract]
>
> The above portions of said lot 2, not thus excepted, have a frontage of 15.81 lineal chains, more or less, measured along the government meander line.

The parties have not identified any other conveyances involving the relevant land underlying the railroad corridor prior to 1945.

Defendant states that, "[a]s of 1945, at the outset of the partition proceeding, it is undisputed that the Palmberg heirs owned certain land to the east of the ROW, land underlying the ROW itself, and second-class shorelands adjacent to Government Lot 2." On June 22, 1945, the partition action was filed in the Superior Court of the State of Washington for King County, which stated that all of the parties, including Bert Stares, Gertie Gorman Hughes, Maude Palmberg, Annie Stangroom, the heirs of Bessie Zengel, and the heirs of Alfred W. Palmberg, were "joint owners of the following described property in King County, Washington." The June 22, 1945 complaint identified the jointly owned property as:

Those portions of Government Lots 1, 2 and 3 of Section 20, Township 25 North, Range 6 E.W.M., Described as follows:

PARCEL "A"
Beginning at a point on the North line of said Government Lot 1, 630 feet East of the Northwest corner thereof; then South 900 feet; thence Southwesterly, at right angles to the right-of-way of the Northern Pacific Railway Company (formerly the Seattle and International Railway) to the Northeasterly line of said right-of-way; thence Southeasterly, along said Northeasterly line to the South line of said Government Lot 1; thence East, along said South line to the Southeast corner thereof; thence North, along the East line thereof, to the Northeast corner thereof; thence West, along the North line, to the point of beginning, EXCEPT County Road.

PARCEL "B"
Beginning at the Northeast corner of said Government Lot 2; thence South, along the East line thereof, 569.04 feet; thence 221.58 feet; thence Southwesterly, at right angles, to the right-of-way of the Northern Pacific Railway Company (formerly the Seattle and International Railway), 15.3 feet, to the Northeasterly line of said right-of-way; thence Northwesterly, along said Northeasterly line, to the North line of said Government Lot 2; thence East, along said North line, to the point of beginning, TOGETHER WITH second class shore lands adjoining, EXCEPT County Road.

PARCEL "C"
Beginning at the Southeast corner of said Government Lot 2; thence North, along the East line thereof, 110 feet; thence West 87 feet to the Northeasterly line of the right-of-way of the Northern Pacific Railway Company (formerly the Seattle and International Railway); thence Southeasterly, along said Northeasterly line, to the point of beginning, TOGETHER WITH second class shore lands adjoining, EXCEPT County Road.

(capitalization in original). Neither Parcel A, Parcel B, nor Parcel C in the June 22, 1945 complaint directly discussed the land underlying the railroad corridor, but, rather, described land lying east of the railroad corridor, as well as "second class shore lands

adjoining." The June 22, 1945 complaint requested that the Superior Court partition the interests of the parties in the land identified in the June 22, 1945 complaint. In the answers to the June 22, 1945 complaint, Gertie Gorman Hughes, Maude Palmberg, and the heirs of Bessie Zengel all state that "the property involved in this proceeding is property owned by the parents of the parties hereto." Although plaintiffs argue that this statement indicates that the "parties understood that the property included all the land owned by their parents," the statement by Gertie Gorman Hughes, Maude Palmberg, and the heirs of Bessie Zengel only indicates that the property listed in the June 22, 1945 complaint was property owned by Alfred and Bertha Palmberg, not that "all property" previously owned by Alfred and Bertha Palmberg was included in the June 22, 1945 complaint.

On April 14, 1948, Gertie Gorman Hughes filed with the Superior Court of the State of Washington for King County a document titled "BILL OF PARTICULARS," attached to which was the November 19, 1946 title report. (capitalization in original). On January 21, 1949, the Superior Court of the State of Washington for King County issued its Findings of Fact and Conclusions of Law. The Superior Court's Findings of Fact and Conclusions of Law described the property at issue in the partition action as:

In the County of King, State of Washington, those portions of Government Lots 1 and 2 of Section 20, Township 25 North, Range 6 E.W.M. described as follows:

PARCEL A:

Beginning at a point on the north line of Government Lot 1, 630 feet east of the northwest corner thereof; thence South 900 feet; thence southwesterly at right angles to the right-of-way of the Northern Pacific Railway Company (formerly the Seattle and International Railway) to the northeasterly line of said right-of-way; thence southeasterly along said northeasterly line to the south line of said Government Lot 1; thence east along said south line to the southeast corner thereof; thence north along the east line thereof to the northeast corner thereof; thence west along the north line to point of beginning; ~~thence west along the north line to point of beginning;~~ EXCEPT County Road;

PARCEL B:

Beginning at the northeast corner of said Government Lot 2; thence south, along the east line thereof 569.64 feet; thence west 221.58 feet; thence southwesterly at right angles to the right-of-way of the Northern Pacific Railway Company (formerly the Seattle and International Railway) 15.3 feet to the northeasterly line of said right-of-way; thence northwesterly along said northeasterly line to the north line of said Government Lot 2; thence east along said North line to the point of beginning; EXCEPT County Road; TOGETHER with second class shore lands adjoining, EXCEPT portion if any, in said railroad right of way.

PARCEL C:

> The second class shorelands adjoining that certain parcel of land
> particularly described as "Beginning at the Southeast corner of said
> Government Lot 2; thence North, along the East line thereof, 110 feet;
> thence West 87 feet to the Northeasterly line of the right of way of the
> Northern Pacific Railway Company (formerly the Seattle and International
> Railway); thence Southeasterly, along said Northeasterly line, to the point
> of beginning, EXCEPT County Road." [illegible] any, in said [illegible] right
> of way.

(strike-through and capitalization in original). The Superior Court's Findings of Fact and Conclusions of Law did not explicitly mention the land underlying the railroad corridor, but did indicate that the property at issue included land lying east of the railroad corridor, as well as "second class shore lands adjoining" the property lying east of the railroad corridor, notwithstanding that, as early as 1928, there appears to have been land in between the railroad corridor and Lake Sammamish. The Superior Court determined, in its Findings of Fact and Conclusions of Law, that S. L. Stangroom and Annie Stangroom had previously acquired title to Parcel B, "exclusive of second class shorelands," "beneficially and not as redemption subject to claims of other heirs of the decedent Alfred Palmberg and Bertha Palmberg." The Superior Court determined that the Palmberg heirs, excluding Maude Palmberg, jointly owned Parcel A, and that the Palmberg heirs, including Maude Palmberg, jointly owned "PARCEL B SHORELANDS" and Parcel C which, as noted above, was described as "second class shorelands." (capitalization in original).

The Superior Court's January 21, 1949 Findings of Fact and Conclusions of Law states that Parcel B, which is defined as extending to the eastern border of the railroad corridor, is "TOGETHER with second class shore lands adjoining." Likewise, the Superior Court's January 21, 1949 Findings of Fact and Conclusions of Law defines Parcel C as the "second class shorelands adjoining that certain parcel of land," which is defined as extending to the eastern border of the railroad corridor. In defendant's reply, defendant argues:

> To the extent that Plaintiffs argue that the term "adjoining" means that the
> second-class shorelands referred to in the partition proceeding must be
> immediately next to the land east of the ROW, including land underlying the
> ROW, the term "adjoining" does create some ambiguity. The United States
> does not dispute that at the time of the partition proceeding, the second-
> class shorelands adjacent to Government Lots 1 and 2 were separated from
> the land east of the ROW that was described in the property descriptions by
> the ROW itself. Thus, the shorelands did not "adjoin" land to the east of the
> ROW. Thus, the description's use of the term "adjoining" seems to be
> inaccurate. This inaccuracy, however, is not sufficient reason to jump to the
> conclusion that the Court intended to include land underlying the ROW in
> the partition proceeding despite failing to explicitly reference it.

Similarly, plaintiffs state that the "adjoining" language in the partition action is ambiguous, but, in plaintiffs' reply, plaintiffs argue:

> Defendant concedes the language "shorelands" and "adjoining" is ambiguous. But Plaintiffs contend that while ambiguous, the language itself strongly suggests the very usage that Plaintiffs have described. Moreover, Plaintiffs' claim is supported by scores of documents and uncontroverted facts where the only reasonable inference is that "shorelands" was a moniker used by the heirs and their successors for all lands west of the easterly boundary of the railroad right of way.

When describing Parcels A, B, and C, the Superior Court used metes and bounds to describe land that extended up to the eastern border of the railroad corridor. The descriptions of the three parcels in the Superior Court's January 21, 1949 Findings of Fact and Conclusions of Law do not appear to explicitly include the land underlying the railroad corridor and indicate that the railroad corridor may not have been included in the partition action. The Findings of Fact and Conclusions of Law, however, did not define second-class shorelands. Regarding the second-class shorelands described in Parcels B and C, when the Washington State legislature first defined "second class shorelands" in the Washington State Code, the Washington State legislature stated:

> [T]he term "second class shorelands" shall mean public lands belonging to the state bordering on the shores of a navigable lake or river not subject to tidal flow, between the line of ordinary high water and the line of navigability and more than two miles from the corporate limits of any city.

See WASH. REV. CODE § 79.01.032 (1959) (repealed 1983).[29] Based on the above-quoted definition of "second class shorelands," the term "second class shorelands" does not appear to encompass land underlying the railroad corridor, but, rather, only included land located beneath the water of Lake Sammamish.

The legal descriptions of the three parcels, however, do not expressly or unambiguously exclude the land underlying the railroad corridor from the partition action. The Superior Court of the State of Washington for King County described the second-class shorelands in Parcels B and C as "adjoining" the easterly line of the railroad corridor. The statements that the second-class shorelands adjoined the eastern border of the

---

[29] The Washington State legislature defined first class shorelands as

> public lands belonging to the state bordering on the shores of a navigable lake or river not subject to tidal flow, between the line of ordinary high water and the line of navigability and within or in front of the corporate limits of any city or within two miles thereof upon either side.

See WASH. REV. CODE § 79.01.028 (1959) (repealed 1983).

railroad corridor creates an ambiguity in the partition action, and Mr. Edward Dohm's August 3, 1928 report indicates that, as early as 1928, there was land between the western border of the railroad corridor and Lake Sammamish. Therefore, second-class shorelands, which are lands located underwater, would not adjoin the eastern border of the railroad corridor because the railroad corridor was established well before 1928, and there appears to have been land underlying the railroad corridor, as well as land located to the west of the railroad corridor. If the second-class shorelands actually adjoined the eastern border of the railroad corridor, the second-class shorelands would have included the land underlying the railroad corridor, which was located to the west of the railroad corridor's eastern border. The Superior Court's descriptions of Parcels A, B, and C, however, are ambiguous, as both parties have stated, and the record before the court does not clearly indicate whether the Superior Court incorrectly used "second class shorelands" or "adjoining" in its January 21, 1949 Findings of Fact and Conclusions of Law.

Both plaintiffs and defendant argue that this court may use subsequent, extrinsic evidence to determine whether the land underlying the railroad corridor was included in the partition action. In order for the net proceeds to be partitioned among the parties to the partition action before the Superior Court, the Superior Court appointed Charles Bovee as referee and instructed Mr. Bovee to sell Parcel A, the "shorelands in Parcel B," and the Parcel C shorelands. On April 30, 1949, in accordance with the Superior Court's directive to sell Parcels A, B, and C, Mr. Bovee held a public auction. Mr. Bovee sold Parcel A to J.J. Simpson for $7,500.00 and sold both the Parcel B second-class shorelands and Parcel C second-class shorelands to J.A. Earley for $6,600.00. On June 8, 1949, Mr. Bovee executed a deed conveying Parcel A to J.J. Simpson, which contained a legal description that was substantially similar to the legal description of Parcel A in the Superior Court's January 21, 1949 Findings of Fact and Conclusions of Law.

## Land Located in Government Lot 1

Nelson plaintiff the Estate of William F. Hughes owns two parcels, one of which parcel number 202506-9071 and is located in Government Lot 1. After executing the June 8, 1949 deed with Charles Bovee, J.J. Simpson and Gertie Gorman Hughes executed a real estate contract conveying land to Gertie Gorman Hughes, the legal description of which appears to match the legal description of Parcel A in the Superior Court's Findings of Fact and Conclusions of Law. The legal description in the real estate contract also identifies the eastern border of the railroad corridor as a boundary and does not appear to include the land underlying the railroad corridor. On July 30, 1951, however, the Department of Public Lands for the State of Washington issued an order conveying second-class shorelands in Government Lot 1 to Gertie Gorman Hughes. The July 30, 1951 order stated that Gertie Gorman Hughes had "purchased the abutting uplands," and that "by virtue of such upland ownership the said Gertie Gorman Hughes is entitled to the preference right to purchase shore lands abutting upon her upland." The Department of Public Lands for the State of Washington's July 30, 1951 order, therefore, indicates that, in the Department's opinion, when Gertie Gorman Hughes purchased Parcel A in Government Lot 1 from J.J. Simpson, Gertie Gorman Hughes purchased the land that

abutted Lake Sammamish. Because the second-class shorelands were to the west of the eastern border of the railroad corridor identified as the boundary of Ms. Gorman Hughes' property and separated by dry land lying in between the railroad corridor and Lake Sammamish, the Department of Public Lands for the State of Washington's July 30, 1951 order indicates that the legal description of Parcel A may not have been accurate and may have included land extending beyond the eastern border of the railroad corridor. The July 30, 1951 order, however, does not conclusively demonstrate that Parcel A, as partitioned to J.J. Simpson and sold to Gertie Gorman Hughes, included the land underlying the railroad corridor, given the language used by the Superior Court to define the boundaries of Parcel A.

**Land Located in Government Lot 2**

Collins plaintiffs D. Michael and Vanessa Collins, Donald Barrett, and Howard and Pam Freedman and Nelson plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes, parcel number 202506-9085, own parcels located in Government Lot 2, where the Parcel B second-class shorelands and Parcel C second-class shorelands that Charles Bovee sold to J.A. Early were located. Regarding the Parcel B second-class shorelands and Parcel C second-class shorelands, on June 8, 1949, Mr. Bovee and J.A. Earley executed a deed conveying second-class shorelands that were "adjoining" land in Government Lot 2. On August 11, 1949, Mr. Bovee filed a petition to correct the deed executed with J.A. Earley because the legal description in the June 8, 1949 deed was "ambiguous." Also on August 11, 1949, at the instruction of the Superior Court, Mr. Bovee executed a corrected deed to J.A. Earley that conveyed:

> All shore lands of the second class formerly owned by the State of Washington situated in front of, adjacent to or abutting upon government lot 2, section 20, township 25 north, range 6 east, W. M., except the shore lands in front of the following described tract:
>
> * * *
>
> The shorelands hereby conveyed are all the shore lands of the second class conveyed by that certain deed from the State of Washington to Alfred Palmberg, Maude Palmberg, Annie Stangroom, Bessie Zengel, Gertie Gorman and Bert States by deed dated February 27, 1940 . . . .

The legal description in the August 11, 1949 corrected deed does appear to describe only second-class shorelands, but the legal description appears to differ from the legal description of Parcels B and C in the Superior Court of the State of Washington for King County's January 21, 1949 Findings of Fact and Conclusions of Law, which described second-class shorelands that were "adjoining" the eastern line of the railroad corridor. Moreover, in 1949, J.A. Earley paid $6,600.00 for Parcels B and C with a "frontage of 15.81 lineal chains," which resulted in J.A. Earley paying $417.46 per lineal chain. When originally purchasing the second-class shorelands in Government Lot 2 in 1940, the six heirs of Bertha Palmberg had paid $395.25 for 15.81 lineal chains of second-class

shorelands abutting Government Lot 2, which resulted in the six Palmberg heirs paying $25.00 per lineal chain.[30] That J.A. Earley paid $370.25 more per lineal chain in 1949 than the six heirs of Bertha Palmberg paid in 1940 does indicate that J.A. Earley may have been purchasing more than just second-class shorelands under the waters of Lake Sammamish in Government Lot 2, as the greatly increased price per lineal chain is unexplained in the record before the court. Given the conflicting evidence before the court, including the unclear legal descriptions in the partition action before the Superior Court of the State of Washington for King County, however, the price differential does not definitively establish that J.A. Earley purchased the land underlying the railroad corridor.

Plaintiffs also argue that, "in 1982, the King County Assessor caught the misnomer 'shorelands' and corrected it for the purposes of assessing property taxes." In 1982, Harley Hoppe of the King County Assessor sent a letter to William F. Hughes' attorney stating:

As we explained to Mr. Hughes, we had done some map update of the section in which his property is located and discovered that the dry beach area between the present location of the shore of Lake Sammamish and the railroad right-of-way was unaccounted for from an assessment standpoint.

Until the change, Mr. Hughes [sic] property was described only as shore lands adjoining a tract of land in gov't [government] lot 2 of the section. The westerly line of the tract ran a course that was probably once the easterly line of the right-of-way. His portion of the shore line, as it is now shown on the map, is well over a hundred feet south-westerly of this right-of-way line. Even after subtracting the right-of-way there is still an unassessed 50 to 55 foot strip that appears to be above the high water line of the lake.

Judging from similar descriptions in the area, our <u>feeling</u> was that the shore line and the railroad right-of-way was <u>assumed</u> to be the same during the early years of property development along the shore of the lake. With that assumption in mind, we changed the adjoining property owner's tax description to describe the strip when it appeared that assumption best described the situation.

(emphasis added). The King County Assessor's letter indicates that, based on its records, as well as its "feeling" based on its review of other "descriptions in the area" and assumptions made, William F. Hughes may have owned the land underlying the railroad corridor. The King County Assessor's letter, however, does not analyze whether the land underlying the railroad corridor was included in the partition action before the Superior Court of the State of Washington for King County or in the subsequent deeds issued to J.J. Simpson or J.A. Earley.

---

[30] In 1951, when Gertie Gorman Hughes bought second-class shorelands in Government Lot 1, Gertie Gorman Hughes paid $50.00 per lineal chain.

The chains of title for <u>Collins</u> plaintiffs D. Michael and Vanessa Collins, Donald Barrett, and Howard and Pam Freedman and <u>Nelson</u> plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes all include deeds from either J.J. Simpson or J.A. Earley. Based on the evidence before the court, it still is unclear whether the partition action before the Superior Court included the land underlying the railroad corridor for the land in both Government Lot 1 and Government Lot 2, and it still is unclear whether J.J. Simpson and J.A. Earley acquired title to the land underlying the railroad corridor. Additionally, neither party has identified a transaction involving the land underlying the railroad corridor that is allegedly adjacent to <u>Collins</u> plaintiffs D. Michael and Vanessa Collins, Donald Barrett, and Howard and Pam Freedman and <u>Nelson</u> plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes. The court, therefore, finds that there are conflicting issues of material fact as to whether <u>Collins</u> plaintiffs D. Michael and Vanessa Collins, Donald Barrett, and Howard and Pam Freedman and <u>Nelson</u> plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes own the land underlying the railroad corridor.[31] Plaintiffs' motion for partial summary judgment and defendant's motion for partial summary judgment addressing whether <u>Collins</u> plaintiffs D. Michael and Vanessa Collins, Donald Barrett, and Howard and Pam Freedman and <u>Nelson</u> plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes acquired interests in the land underlying the railroad corridor through their deeds are both denied.

## Plaintiffs' Alternative Adverse Possession Theory

Alternatively, all of the plaintiffs contend that, if plaintiffs did not acquire fee title to the land underlying the railroad corridor, then plaintiffs adversely possessed the land underlying the railroad corridor prior to the issuance of the September 18, 1998 NITU. Defendant argues that plaintiffs cannot adversely possess a reversionary interest in the land underlying the railroad corridor under Washington State law, and that plaintiffs' adverse possession claims are preempted under the ICCTA. Defendant requests that, if the court "allows Plaintiffs' adverse possession claims to proceed," the court should allow time for discovery related to plaintiffs' adverse possession claims under RCFC 56(d). As discussed above, under Washington State law, adverse possession requires "possession that is: (1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile." <u>ITT Rayonier, Inc. v. Bell</u>, 774 P.2d at 8 (citing <u>Chaplin v. Sanders</u>, 676 P.2d 431); <u>see also</u> <u>LeBleu v. Aalgaard</u>, 371 P.3d 76, 78 (Wash. Ct. App. 2016) (citing <u>Chaplin v. Sanders</u>, 676 P.2d 431).

---

[31] <u>Nelson</u> plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes argue, "[i]f the right of way was never conveyed as a result of the partition proceeding, then the Hughes Estate (and Nelsons as heirs) are the owners of a significant portion of the right of way." According to <u>Nelson</u> plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes, "the Court can conclude that the Hughes Estate owns at least 38.23% of the right of way" based on alleged transfers made through the alleged wills of Alfred W. Palmberg, Gertie Gorman Hughes, Maude Palmberg, and Minnie Hughes. As discussed above, however, there is an issue of fact as to whether the land underlying the railroad corridor was included in the partition action before the Superior Court of the State of Washington for King County, and the court need not resolve the <u>Nelson</u> plaintiffs' alternative argument at this time.

**Is Adverse Possession of the Land Underlying the Railroad Corridor Barred Under Washington State Law**

According to defendant, "Plaintiffs are barred by state law from adversely possessing against the reversionary interest in the right-of-way before the reversionary interest becomes a present possessory interest in the right-of-way; in other words, before the right-of-way is abandoned." Defendant argues that, in Kiely v. Graves, 271 P.3d 226, 233 (Wash. 2012) (en banc), the State of Washington Supreme Court "unambiguously held" that an adverse possession claim cannot be asserted against a reversionary interest or a remainder interest until the reversionary interest or remainder interest becomes a vested interest. Defendant contends that Washington State courts "consistently refer to the interest held by the fee owner of land underlying a railroad ROW easement as a 'reversionary interest.'"

All ten plaintiffs, however, contend that there "is no bar under Washington law to adversely possessing the servient estate of a property burdened by a railroad easement." Plaintiffs assert that "the interest in the fee underlying the railroad easement is not a reversionary interest in the classical sense" because "[r]eversionary interests are those which include no present rights to use the property (such as in Kiely), but rather rights that may come into existence based on future events." Plaintiffs contend that the fee interest in the land underlying the railroad corridor, to which the plaintiffs are attempting to prove that they had adversely possessed, is a fee interest "burdened by a common law easement," and that the burdened fee interest is not a reversionary interest. Citing to Veach v. Culp, 599 P.2d 526, 528 (Wash. 1979) (en banc), plaintiffs argue that, "[i]n the case of a railroad easement the fee owner retains right to use, which makes it different from a reversionary interest." The ten plaintiffs in the specifically-named cases also contend that defendant "misunderstands" the State of Washington Supreme Court's decision in Kiely v. Graves, and that a "complete reading" of Kiely v. Graves demonstrates that defendant's "argument is erroneous both on the law and the premise on which its argument is made."

Regarding defendant's argument that "the owner of the fee underlying the ROW retained a reversionary interest in the ROW," a reversionary interest is a future interest "that will or may become possessory in the grantor or devisor (or that person's heirs), i.e., not in a third person," such as a reverter or a right of entry. See 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE SERIES: REAL ESTATE § 1.15 (2d ed. 2004 & Supp. 2018) (emphasis in original) (discussing reversionary interests under Washington State law). The Washington State courts in Brown v. State, 924 P.2d at 916; Lawson v. State, 730 P.2d 1308, 1315 (Wash. 1986) (en banc); and King City v. Squire Inv. Co., 801 P.2d 1022, 1025-26 (Wash. Ct. App. 1990), did "refer to the interest held by the fee owner of land underlying a railroad ROW easement as a 'reversionary interest,'" as defendant contends. In Lawson v. State, the State of Washington Supreme Court stated:

At common law, where a deed is construed to convey a right of way for railroad purposes only, upon abandonment by the railroad of the right of

way the land over which the right of way passes reverts to the reversionary interest holder free of the easement. See generally Roeder Co. v. Burlington Northern, Inc., 105 Wash.2d at 571, 716 P.2d 855; Swan v. O'Leary, supra; Morsbach v. Thurston Cy., supra [278 P. 686 (Wash. 1929)]. In addition to outright abandonment of a right of way, there may be a change in use of the right of way which is inconsistent with the purpose for which the right of way was granted. Where the particular use of an easement for the purpose for which it was established ceases, the land is discharged of the burden of the easement and right to possession reverts to the original land owner or to that landowner's successor in interest. Roeder Co. v. Burlington Northern, Inc., 105 Wash.2d at 571, 716 P.2d 855. Cf. 3 J. Sackman, Nichols on Eminent Domain § 9.35, at 9-113 (3d rev. ed. 1985) (imposition of a new easement of a nature different from the old one, and wholly inconsistent with it, amounts to abandonment of the old easement).

Lawson v. State, 730 P.2d at 1311-12; see also Brown v. State, 924 P.2d at 916 ("Under the 1875 Act, railroads acquired less than fee simple estates, leaving the federal government with a reversionary interest."); King Cty. v. Squire Inv. Co., 801 P.2d at 1025-26 (stating that, when a railroad company "formally abandoned" a railroad easement, the railroad easement "was extinguished at that moment and its interest reverted to the Squires' heirs").

In Veach v. Culp, however, the State of Washington Supreme Court discussed a factual situation in which a railroad company's predecessor-in-interest had executed a deed with an unidentified party in 1901 involving the conveyance of a one-hundred-foot-wide right-of-way. See Veach v. Culp, 599 P.2d at 526. The State of Washington Supreme Court determined that the 1901 deed conveyed an easement, rather than fee simple, to the railroad company's predecessor-in-interest in the right-of-way identified in the 1901 deed. See id. at 528. The railroad company in Veach v. Culp argued that it was entitled to "exclusive possession" of the railroad right-of-way, regardless of whether the 1901 deed conveyed an easement or fee simple. See id. The State of Washington Supreme Court stated:

> The railroad contends, nonetheless, that it is immaterial whether it owns an easement or a fee simple title. Its premise for this contention is that a railroad right-of-way, whether in fee or an easement, is entitled to exclusive possession. . . . Certainly it is true that in most instances the very nature of a railroad will require it to enjoy a substantial right regardless of the nature of its title.

> However, we must look to the actual use being made of this easement in light of the rule that the servient owner retains the use of an easement so long as that use does not materially interfere with the use by the holder of the easement. That principle is well established. Seattle v. Nazarenus, 60 Wash.2d 657, 666, 374 P.2d 1014 (1962); Broadacres, Inc. v. Nelsen, 21 Wash. App. 11, 15-16, 583 P.2d 651 (1978).

Here this railroad had been reduced to operation as an excursion operation. It has never made any freight deliveries. It has no paid employees. It has a very limited amount of equipment. Its single locomotive is owned by approximately 30 persons. It makes three round trips on Saturdays and two on Sundays. It is at the disputed site approximately only 15 minutes each trip. This regular usage is only on weekends during the summer for approximately 3 months. The other 9 months of the year it operates only on charter, admitting that in some months it has no charters at all.

Thus the average use by the railroad of this disputed track area would be approximately 1 hour and 15 minutes during the weekends and then only during the summer.

As holders of the subservient estate, the plaintiffs are entitled to use the right-of-way in such a manner as does not materially interfere with the railroad's use thereof. Plaintiffs concede that their use is so restricted.

Veach v. Culp, 599 P.2d at 528. The State of Washington Supreme Court in Veach v. Culp, therefore, indicated that the "servient owner" of the land underlying a railroad easement retains fee title to the land burdened by railroad easement, as well as the right to use the burdened land, "so long as that use does not materially interfere with the use by the holder of the easement." See id.

Moreover, in a seminal rails-to-trails case, but involving Vermont State law, the United States Court of Appeals for the Federal Circuit discussed, in the rails-to-trails context, how some courts and parties have referred to the interest of the individual owning the land burdened by a railroad easement as a reversionary interest. See Preseault II, 100 F.3d at 1533-34. In Preseault II, the United States Court of Appeals for the Federal Circuit stated:

Before addressing these several issues, a preliminary matter. There is an alternative way, frequently used today including by the parties here, to describe property transactions involving easements. Instead of calling the property owner's retained interest a fee simple burdened by the easement, this alternative labels the property owner's retained interest following the creation of an easement as a "reversion" in fee. Upon the termination, however achieved, of the easement, the "reversion" is said to become fully possessory; it is sometimes loosely said that the estate "reverts" to the owner.

Under traditional common law estates terminology, a "reversion" is a future interest remaining in the transferor following the conveyance of certain lesser estates to a transferee, typically when the transferee takes a possessory estate of freehold, for example a life estate. An easement is not such a possessory estate of freehold. Traditional characterization describes

an easement as a "use" interest, sometimes an "incorporeal hereditament," but not a "possessory" interest in the land. Therefore labeling the retained interest a "reversion" is not consistent with the traditional classification scheme, which views the retained interest as a present estate in fee simple, subject to the burden of the easement.

Be that as it may, whether the property owner's retained interest following the conveyance of an easement is denominated a fee simple estate or a reversion, it is uniformly treated at common law as a vested estate in fee. Under either characterization the result upon termination of the easement is the same. For consistency we use the traditional terminology which recognizes that the transferor remains seised of the freehold estate, and thus labels the owner's estate as a fee simple, burdened, during the life of the easement, by the easement-holder's rights.

Id. (footnotes omitted).

Similarly, commentators have discussed the State of Washington Supreme Court's use of the term "reversionary interest" to describe land burdened by a railroad easement, stating:

In Lawson [v. State, 730 P.2d 1308] the [State of Washington Supreme] court, as it has done in earlier decisions, unfortunately spoke of the owner of the land that was subject to the railroad easement as having a "reversionary interest." It was this "reversionary interest" that the statute [in Lawson] was said to have attempted to take. The owner of land that is subject to an easement does not thereby have a reversion; he has a fee simple absolute, subject to, or burdened by, an easement. A reversionary interest is an estate that follows another presently possessory estate, such as a reversion following a life estate, a possibility of reverter following a determinable fee, or a right of entry following a fee upon condition subsequent. The railroad, or the holder of any easement, does not have a presently possessory estate; thus, there can be no reversionary estate in the landowner. When the easement is terminated, one should simply say that the fee simple, which the owner had all along, is unburdened.

17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE SERIES: REAL ESTATE § 2.9 (2d ed. 2004 & Supp. 2018); see also Marc A. Sennewald, Note, The Nexus of Federal and State Law in Railroad Abandonments, 51 VAND. L. REV. 1399, 1410 (1998) (citing to the State of Washington Supreme Court's decision in Lawson v. State and stating, "contrary to the language used in many decisions on rails-to-trails conversions, there is no 'reversionary' interest in an easement"). The statements quoted above are consistent with the State of Washington Supreme Court's decision in Veach v. Culp, as well as with decisions of Washington State courts in non rails-to-trails cases involving adverse possession, which indicate that the party granting the easement retains fee interest in the land burdened by the easement, rather than a reversionary interest, and

may use the burdened land in a manner that does not unreasonably interfere with the easement. See, e.g., Zonnebloem, LLC v. Blue Bay Holdings, LLC, 401 P.3d 468, 471 (Wash. Ct. App. 2017) (stating that an easement is a "nonpossessory right to use the land of another" and "the owner of a servient estate may use his or her property in any reasonable manner that does not interfere with the easement holder's use of the easement"); Kave v. McIntosh Ridge Primary Rd. Ass'n, 394 P.3d 446, 452 (Wash. Ct. App. 2017) ("Although the dominant estate has a right to use the servient estate, the land remains the property of the servient estate. . . . Therefore, an easement cannot be considered the 'land' of the dominant estate owner." (citations omitted)).

In all of the specifically-named cases, this court previously determined that the original conveyances to the Seattle, Lake Shore and Eastern Railway Company only conveyed an easement to the Seattle, Lake Shore and Eastern Railway Company in the railroad corridor. See Beres IV, 97 Fed. Cl. at 803. Notwithstanding the terminology in Lawson v. State and other cases cited by defendant, as explained above, the parties executing the deeds that conveyed the easements to the Seattle, Lake Shore and Eastern Railway Company retained fee interest in the land underlying the railroad corridor, subject to the Seattle, Lake Shore and Eastern Railway Company's use of its railroad easement. See Veach v. Culp, 599 P.2d at 526. As indicated by the State of Washington Supreme Court in Veach v. Culp, the fee owners of the land burdened by the railroad easement, and the fee owner's successors-in-title, were entitled to use the land underlying the railroad corridor "in such a manner as does not materially interfere with the railroad's use" of its railroad easement. See id.

Moreover, defendant's reliance on Kiely v. Graves, 271 P.3d 226, is misplaced. In Kiely v. Graves, the State of Washington Supreme Court analyzed whether the Graves owned an alley, which had been dedicated for public use by the city of Port Townsend, or whether the Kielys had adversely possessed the alley. See id. at 228. The State of Washington Supreme Court determined that the city of Port Townsend only possessed an easement in the alley at issue. The State of Washington Supreme Court stated:

The Kielys contend that because the city possessed only an easement, the Graveses may not rely on RCW [Revised Code of Washington] 7.28.090 to defeat their claim to the alley through adverse possession. RCW 7.28.090 states:

RCW 7.28.070 [establishing the standard for adverse possession under claim and color of title] and 7.28.080 [establishing the standard for adverse possession of vacant and unoccupied land] shall not extend to lands or tenements owned by the United States or this state, nor to school lands, *nor to lands held for any public purpose.*

(Emphasis added.) RCW 7.28.090 has remained unchanged during all times relevant to this case. See Brace & Hergert Mill Co. v. State, 49 Wash. 326, 95 P. 278 (1908). A party may not claim adverse possession of

property held or controlled by a municipality for public use. <u>Gustaveson v. Dwyer</u>, 83 Wash. 303, 304-05, 145 P. 458 (1915).

<u>Kiely v. Graves</u>, 271 P.3d at 231-32 (second and third alterations in original). The State of Washington Supreme Court stated that "[t]his case hinges on whether an easement dedicated for a public thoroughfare constitutes 'lands held for any public purpose' under RCW 7.28.090." <u>Kiely v. Graves</u>, 271 P.3d at 232.

In analyzing the phrase "lands held for any public purpose" in RCW § 7.28.090, the State of Washington Supreme Court stated:

> [W]e must give meaning to the "lands held for any public purpose" clause distinct from ownership. The legislature must have intended the clause to refer to land held by the government in something less than fee simple. An easement logically would be such a property interest. . . .
>
> An easement provides the right to use real property of another without owning it. <u>City of Olympia v. Palzer</u>, 107 Wash.2d 225, 229, 728 P.2d 135 (1986). The recipient of an easement is often called an "easement holder." <u>E.g.</u>, <u>State v. Newcomb</u>, 160 Wash. App. 184, 191, 246 P.3d 1286 (2011). Presumably then, "lands held for any public purpose" is property in which the government holds some but not all rights. When the public holds an easement, the "lands held for any public purpose" prong of RCW 7.28.090 is satisfied, barring adverse possession claims against that property.

<u>Kiely v. Graves</u>, 271 P.3d at 232. In discussing whether land is held by a city or municipality for "public use," the State of Washington Supreme Court drew a distinction between property held by a city or municipality "as trustee for the public" and property that is not held in trust for public use, but, rather, held "as the property of the municipality" or city. <u>See id.</u> The <u>Kiely v. Graves</u> court stated that, "[h]ere, as in <u>Rapp[ v. Stratton</u>, 83 P. 182 (Wash. 1905)], the city held the alley in trust for the public until it was vacated, thus precluding adverse possession prior to vacation by the city." <u>See Kiely v. Graves</u>, 271 P.3d at 232. According to the State of Washington Supreme Court, fee interests subject to public easements are "mere future expectancies, bereft of enjoyment and incapable of pecuniary advantage," and that, consequently, a landowner owning property abutting a dedicated alley only has a reversionary fee in the dedicated alley. <u>Id.</u> at 233 (internal quotation marks and citations omitted). The State of Washington Supreme Court asserted that "[a]n adverse possession claim cannot be asserted against a reversionary interest or a remainder interest until the future interest becomes a vested interest." <u>Id.</u> (citations omitted). Thus, "[b]ecause the city of Port Townsend held an easement interest until its vacation in 2009, RCW 7.28.090 prohibited the Kielys from obtaining title to the alley through adverse possession." <u>Kiely v. Graves</u>, 271 P.3d at 234.

In all of the specifically-named cases, defendant argues that the court should apply the bar in RCW § 7.28.090 to plaintiffs' alternative adverse possession claims because Washington State courts have stated that a "railroad is a public highway, created for public

purposes." See Lawson v. State, 730 P.2d at 1311 (citation omitted); see also Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Lines Ass'n, 126 P.3d at 34 (quoting Lawson v. State, 730 P.2d at 1311). The reasoning in Kiely v. Graves, as well as the prohibition against adverse possession in RCW § 7.28.090, however, does not apply to plaintiffs' alternative claims of acquiring an interest in the land underlying the railroad corridor through adverse possession because, as indicated in Kiely v. Graves, "lands held for any public purpose" refers to "property in which the government holds some but not all rights." See Kiely v. Graves, 271 P.3d at 232. The State of Washington Supreme Court asserted that the Washington State "legislature must have intended the clause ["nor to lands held for any public purpose"] to refer to land held by the government in something less than fee simple." Id.; see also Gustaveson v. Dwyer, 145 P. 458, 459 (Wash. 1915) (en banc) (stating that adverse possession cannot be asserted against property if the "property is held by the municipality, or rather controlled by it, in a governmental capacity for public purposes"); Pioneer Nat. Title Ins. Co. v. State, 695 P.2d 996, 998 (Wash. Ct. App. 1985) (quoting RCW 7.28.090 and stating that RCW § 7.28.090 is "underscored by well settled case law establishing the rule that property cannot be acquired by adverse possession against the State" (citations omitted)).

The railroad easements in the specifically-named cases, however, originally were granted to the Seattle, Lake Shore & Eastern Railway Company, not to a governmental entity of the State of Washington or the United States. Defendant correctly notes that Washington State courts have referred to railroad lines as "public highway[s], created for public purposes," but defendant has not cited to any cases indicating that a railroad company is considered to be a governmental entity under Washington State law. Nor has defendant cited to any cases applying RCW § 7.28.090 to an easement owned by a railroad company, notwithstanding that, since at least 1893, Washington State law has stated that adverse possession claims "shall not extend to lands or tenements owned by the United States or this state, nor to school lands, nor to lands held for any public purpose." See WASH. REV. CODE § 830 (1893). Indeed, Washington State courts have permitted adverse possession claims against property held by railroad companies. See N. Pac. Ry. Co. v. Ely, 65 P. 555, 558-59 (Wash. 1901) (stating a "railroad is not a public highway in the sense that it belongs to the people" and that, "[i]f one occupies adversely for 20 years land owned by a railway company, the statute of limitations should raise the presumption of a grant; for the company holds its lands for private gain, as a private proprietor" (internal quotation marks and citation omitted)), rev'd, 197 U.S. 1 (1905) (reversing the State of Washington Supreme Court's judgment because individuals could not acquire title by adverse possession to land that was granted to a railroad company under a federal statute); see also Netherlands Am. Mortg. Bank v. E. Ry. & Lumber Co., 252 P. 916, 917 (Wash. 1927) ("Adverse title can be gained to land granted and conveyed as a railroad right of way, but the adverse possession must be such as is inconsistent with the exercise of the right of way easement." (citing N. Pac. Ry. Co. v. Spokane, 88 P. 135 (Wash. 1907))); N. Pac. Ry. Co. v. Spokane, 88 P. at 136-37; N. Ctys. Inv. Tr. v. Enyard, 64 P. 516, 516-17 (Wash. 1901).

Additionally, the interests of the individuals allegedly owning the land underlying the railroad corridor in the specifically-named cases differ from the interests at issue in

Kiely v. Graves. In Kiely v. Graves, the State of Washington Supreme Court described the interests in land underlying the public easement alley as reversionary interests that were "mere future expectancies, bereft of enjoyment." See Kiely v. Graves, 271 P.3d at 233 (internal quotation marks and citation omitted). As discussed above, if plaintiffs in the specifically-named cases did not own the land underlying the railroad corridor through the deeds in their chains of title, then the individuals who owned the land underlying the railroad corridor would have owned the land in fee, subject to a railroad easement, with the right to use the land in a manner that did not unreasonably interfere with the railroad company's use of its railroad easement. By having the ability to use the burdened land in a manner that did not unreasonably interfere with the railroad easement, the landowners owning the land burdened by the railroad easement would not be prevented from using the land underlying the railroad in the manner discussed in Kiely v. Graves, as their interests would not be "bereft of enjoyment." Moreover, the statement in Kiely v. Graves that "[a]n adverse possession claim cannot be asserted against a reversionary interest or a remainder interest until the future interest becomes a vested interest" is inapplicable to the specifically-named cases because, as discussed above, the landowners owning fee simple title to the land burdened by the railroad easement do not have reversionary interests. Thus, neither RCW § 7.28.090 nor the State of Washington Supreme Court's decision in Kiely v. Graves would bar plaintiffs' alternative claims of acquiring an interest in the land underlying the railroad corridor through adverse possession, and Washington State law does not appear to bar plaintiffs' alternative adverse possession claims related to the fee simple title in the land underlying the railroad corridor.

## Preemption Under the I.C.C. Termination Act of 1995

Defendant also argues that plaintiffs' alternative claims of acquiring an interest in the land underlying the railroad corridor through State law adverse possession are "categorically preempted" and "barred as a matter of law" under the ICCTA. Specifically, defendant cites to the statute at 49 U.S.C. § 10501(b), which defendant asserts confers exclusive jurisdiction to the STB over railroad activities. According to defendant, the STB and other courts, albeit not this court or the United States Court of Appeals for the Federal Circuit, have "found that state law condemnation or adverse possession claims falls within the ICCTA's preemptive scope," even if a railroad is railbanked. Defendant argues that plaintiffs' adverse possession claims of "portions of the railroad" would interfere with Burlington Northern reactivating the railroad corridor and restoring service on the railroad corridor under the Trails Act.

Plaintiffs contend that their alternative adverse possession allegations are not preempted because "Plaintiffs' ownership of the fee title underlying the right-of-way easement—whether by title or through adverse possession—manifestly has not, does not, and will not interfere with the federal government's control over this right of way." According to plaintiffs, adversely possessing the fee simple title will not interfere with a potential reactivation of the railroad corridor because "the property," i.e. fee simple title burdened by the railroad easement, "remains subject to preexisting easements and their ownership presents no impediment to federal control." Specifically, plaintiffs argue that, "[i]f Plaintiffs acquired title to land via adverse possession, that title remained subject to a

railroad easement, remains subject to an easement for trail use, and remains subject to reinstitution of railroad use," which plaintiffs assert "in no way" will interfere with rail transportation. Additionally, plaintiffs assert that plaintiffs "and their predecessors have occupied the right of way thirty years or longer, and that occupation has not interfered with railroad operations (regardless of whether they owned it by title or not)."

The Supremacy Clause of the United States Constitution "states a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" Amgen Inc. v. Sandoz Inc., 877 F.3d 1315, 1326 (Fed. Cir. 2017) (capitalization in original) (quoting U.S. Const. art. VI, cl. 2). Preemption of State law is a question of congressional intent. Id. (quoting English v. Gen. Elec. Co., 496 U.S. 72, 78 (1990)); see also Wyeth v. Levine, 555 U.S. 555, 565 (2009) ("'[T]he purpose of Congress is the ultimate touchstone in every pre-emption case.'" (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996))). The United States Supreme Court has stated:

> In the interest of avoiding unintended encroachment on the authority of the States, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption. Thus, pre-emption will not lie unless it is "the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue. Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95, 103 S.Ct. 2890, 2898, 77 L.Ed.2d 490 (1983).

CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 663-64 (1993).

The ICCTA at 49 U.S.C. § 10501 (2018) provides:

(b) The jurisdiction of the Board over—

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

> is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b). The ICCTA broadly defines "transportation" to include "a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use," as well as "services related to movement." 49 U.S.C. § 10102(9) (2018). Citing to cases from several of the United States Court of Appeals, the United States Court of Appeals for the District of Columbia Circuit has stated that "all of the circuits have concluded that it [the ICCTA's definition of transportation] 'does not encompass everything touching on railroads.'" Delaware v. Surface Transp. Bd., 859 F.3d 16, 18 (D.C. Cir. 2017) (quoting Emerson v. Kan. City S. Ry. Co., 503 F.3d 1126, 1129 (10th Cir. 2007)) (citing Wedemeyer v. CSX Transp., Inc., 850 F.3d 889, 894-95 (7th Cir. 2017); City of Ozark, Ark. v. Union Pac. R.R. Co., 843 F.3d 1167, 1171 (8th Cir. 2016); Grosso v. Surface Transp. Bd., 804 F.3d 110, 118 (1st Cir. 2015); and Fayus Enters. v. BNSF Ry. Co., 602 F.3d 444, 451 (D.C. Cir. 2010)). Nevertheless, "[w]here the Board has such jurisdiction, it is exclusive." Grosso v. Surface Transp. Bd., 804 F.3d 110, 113-14 (1st Cir. 2015), reh'g denied, 811 F.3d 83 (1st Cir. 2016).

The STB and other federal courts have distinguished between two types of preemption under 49 U.S.C. § 10501(b), which are referred to as "categorical preemption" and "as applied preemption." See, e.g., New Orleans & Gulf Coast Ry. Co. v. Barrois, 533 F.3d 321, 332 (5th Cir. 2008); Soo Line R. Co. v. City of St. Paul, 827 F. Supp. 2d 1017, 1021 (D. Minn. 2010); Jie Ao & Xin Zhouf-Petition for Declaratory Order, STB Finance Docket No. 35539, 2012 WL 2047726, at *3 (S.T.B. June 4, 2012). The first type of preemption, categorical preemption, "occurs when a state or local action is preempted on its face despite its context or rationale" because the action would conflict with exclusive federal regulation of railroads. See Union Pac. R. Co. v. Chicago Transit Auth., 647 F.3d 675, 679 (7th Cir. 2011) (citing CSX Transp., Inc.-Petition for Declaratory Order, STB Finance Docket No. 34662, 2005 WL 1024490, at *2 (S.T.B. May 3, 2005)). The United States Court of Appeals for the Fifth Circuit has stated:

> Regulations falling within this first category are "facially preempted" or "categorically preempted" and come in two types:
>
> The first is any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized . . . .
>
> Second, there can be no state or local regulation of matters directly regulated by the Board—such as the construction, operation, and abandonment of rail lines (see 49 U.S.C. [§§] 10901-10907); railroad mergers, line acquisitions, and other forms of consolidation (see 49 U.S.C. [§§] 11321-11328); and railroad rates and service (see 49 U.S.C. [§§] 10501(b), 10701-10747, 11101-11124).

> Id. [CSX Transp., Inc.-Petition for Declaratory Order, 2005 WL 1024490,] at
> *2 (citations and footnote omitted). State actions such as these constitute
> "per se unreasonable interference with interstate commerce." Id. at *3. As
> such, the preemption analysis for state regulations in this first category is
> addressed to "the act of regulation itself" and "not to the reasonableness of
> the particular state or local action." Id.

New Orleans & Gulf Coast Ry. Co. v. Barrois, 533 F.3d at 332; see also Delaware v.
Surface Transportation Bd., 859 F.3d at 19.

The second type of preemption under the ICCTA, "as applied preemption," is a
"fact-based test," which provides that "state law actions can be preempted as applied if
they have the effect of unreasonably burdening or interfering with rail transportation." See
Franks Inv. Co. LLC v. Union Pac. R. Co., 593 F.3d 404, 414 (5th Cir. 2010); see also
Soo Line R. Co. v. City of St. Paul, 827 F. Supp. 2d at 1021 (stating that "as applied
preemption" requires "a factual assessment of whether the action would have the effect
of preventing or unreasonably interfering with railroad transportation" (internal quotation
marks and citation omitted)). "As applied preemption" is "based on the degree of
interference that the particular action has on railroad transportation—this occurs when
the facts show that the action 'would have the effect of preventing or unreasonably
interfering with railroad transportation.'" Union Pac. R. Co. v. Chicago Transit Auth., 647
F.3d at 679 (quoting CSX Transp., Inc.-Petition for Declaratory Order, 2005 WL 1024490,
at *2-3); see also New Orleans & Gulf Coast Ry. Co. v. Barrois, 533 F.3d at 332. The STB
has stated that "it is well settled that states cannot take an action that would have the
effect of foreclosing or unduly restricting a railroad's ability to conduct any part of
its operations or otherwise unreasonably burdening interstate commerce." CSX
Transportation, Inc.-Petition for Declaratory Order, 2005 WL 1024490, at *4 (citations
omitted).

In the specifically-named cases, defendant cites to several cases in which the STB
or courts have found that state law condemnation actions or adverse possession claims
asserted in an attempt to acquire an interest in land owned by a railroad company were
preempted. For example, defendant cites to Union Pacific Railroad. v. Chicago Transit
Authority, 647 F.3d 675, in which the United States Court of Appeals for the Seventh
Circuit found that the Chicago Transit Authority's attempted condemnation of a perpetual
easement on railroad property was as applied preempted because the perpetual
easement, which was to be located on the railroad company's property, would have a
significant impact on railroad transportation. See id. at 682; see also B & S Holdings, LLC
v. BNSF Ry. Co., 889 F. Supp. 2d 1252, 1258 (E.D. Wash. 2012) (finding that the ICCTA
preempted state law adverse possession action of property a railroad owned in fee simple
because the adverse possession action sought to acquire railroad property, which would
divest the railroad of it property, and would interfere with railroad operations); Buffalo S.
R.R. Inc. v. Vill. of Croton-on Hudson, 434 F. Supp. 2d 241, 249 (S.D.N.Y. 2006)
(determining that an eminent domain action seeking to acquire fee simple title to land
owned by a railroad was preempted); Wis. Cent. Ltd. v. City of Marshfield, 160 F. Supp.

2d 1009, 1015 (W.D. Wis. 2000) (concluding that a city's attempt "under Wisconsin law to condemn property used in rail transportation" as a passing track was preempted).

Defendant also cites a decision issued by the STB, in which the STB found that the petitioners' State law adverse possession claim seeking "exclusive control of a 35-foot by 135-foot strip of railroad ROW in the national rail network, over the objections of the entities that are maintaining the ROW, that hold the right to reactivate freight rail service over it, and that assert that continued access to the entire ROW is required for rail-related activities." See Jie Ao & Xin Zhouf-Petition for Declaratory Order, 2012 WL 2047726, at *1. According to the STB, the petitioners' state law adverse possession claims were preempted "regardless of whether this case is analyzed as 'categorical' preemption (preemption that occurs when a state or local regulation is preempted on its face), or as 'as applied' preemption (based on the degree of interference that a particular action would have on railroad transportation)." Id. The STB stated that "the record here shows that transferring ownership of Parcel D [which included land in a railbanked right-of-way] would directly affect the amount and type of maintenance that could be performed on this railroad ROW, and limit future options for reactivation." Id. at *7. The STB asserted that allowing landowners to obtain "exclusive control" of land used as part of a railroad right-of-way through adverse possession would impermissibly allow "landowners to carve off strips of railroad ROW all over the country for non-rail use, even though the Board has not authorized the ROW to be permanently removed from the nation's rail system under Title 49." Id.

In the specifically-named cases, however, none of the plaintiffs are asserting adverse possession claims against land owned by a railroad company. Rather, all of the plaintiffs contend that, prior to 1998, they had adversely possessed the fee interests, which allegedly were owned by non-railroad parties, in the land underlying the railroad corridor, which was burdened by Burlington Northern's railroad easement.[32] Plaintiffs have not claimed that they adversely possessed the railroad easement that permitted Burlington Northern to operate the railroad corridor. The concerns in Jie Ao, 2012 WL 2047726, at *7, in which the adverse possession claim "would permit landowners to carve off strips of railroad ROW all over the country for non-rail use," and the other cases cited by defendant in which plaintiffs sought to obtain an interest in railroad property, therefore, are not applicable to the specifically-named cases, as plaintiffs are not seeking to acquire railroad property.[33]

---

[32] Plaintiffs assert that they have not located transactions involving the land underlying the railroad corridor. Defendant, however, argues that "the United States need not demonstrate, and the Court need not determine, who actually owns the land underlying the ROW."

[33] In an undeveloped footnote, defendant briefly argues that the court "should also follow the STB's decision in Jie Ao because the STB's interpretations of the ICCTA are generally afforded deference under the standards set out in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-844 (1984)." The adverse possession allegations in all of the specifically-named cases, however, differ from the facts and legal issues in Jie Ao because none of the plaintiffs in the specifically-named

Moreover, as discussed above, under Washington State law, "[t]itle vests automatically in the adverse possessor if all the elements are fulfilled throughout the statutory period." See Gorman v. City of Woodinville, 283 P.3d at 1083 (citing El Cerrito, Inc. v. Ryndak, 376 P.2d at 532). "Divestment of title does not occur differently or more easily to the person who acquires title passively by adverse possession than to the person who acquires title by deed." Nickell v. Southview Homeowners Ass'n, 271 P.3d at 978 (citing El Cerrito, Inc. v. Rydnak, 271 P.2d at 978). "[T]he adverse possessor obtains a new title that is the same as that held by the person who owned the present possessory estate when the adverse possession began." 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE SERIES: REAL ESTATE § 8.6 (2d ed. 2004 & Supp. 2018). Washington State courts have determined that an adverse possessor that adversely possesses title to land that is subject to an easement takes title subject to that same easement. See Van Sant v. City of Seattle, 287 P.2d 130, 131 (Wash. 1955) (affirming a decision in which "[t]itle to the abutting portions of the streets was quieted in respondent, subject to an easement in favor of the city of Seattle"); see also Harding v. Olympic Pipe Line Co., 1999 WL 409468, at *4 (Wash. Ct. App. June 18, 1999) ("We see no reason why a subsequent adverse possessor of a servient estate should be able to obtain better title than a bona fide purchaser of the same property; either one takes title subject to an existing prescriptive easement."); Earnheart v. Carlson, 736 P.2d 1106, 1107 (Wash. Ct. App. 1987) (affirming a trial court's decision to quiet "title in Parcel A in the Olsens, subject to an easement in favor of Bell for the existing utility lines and sewer drain fields").

In the specifically-named cases, plaintiffs alternatively are seeking compensation from the United States based on the government's alleged taking, and plaintiffs allege that they acquired through adverse possession interests in the allegedly taken property prior to the taking. Plaintiffs' alleged adverse possession of the fee interest in the land underlying the railroad corridor, which allegedly was not owned by the railroad company or its predecessors, under Washington State law does not, "by its nature," deny the railroad company its ability to conduct railroad operations. If, for example, fee interest in the land underlying the railroad corridor had passed through plaintiffs' chains of title, title to the land burdened by the railroad corridor would have passed without impacting the railroad's ability to operate its operations on the railroad corridor. Under Washington State law, the passing of title to land burdened by the railroad easement does not alter the rights of the railroad company as the dominant estate, and the railroad company would continue to maintain a right to use its railroad easement. Nor would plaintiffs' interests have differed whether acquired by deed or adverse possession, as plaintiffs only would have had a

_____

cases are asserting adverse possession of railroad property, as was the situation in Jie Ao. See Jie Ao & Xin Zhouf-Petition for Declaratory Order, 2012 WL 2047726, at *1 (stating that "[p]etitioners here exclusive control of a 35-foot by 135-foot strip of railroad ROW in the national rail network, over the objections of the entities that are maintaining the ROW, that hold the right to reactivate freight rail service over it, and that assert that continued access to the entire ROW is required for rail-related activities"). Moreover, defendant's undeveloped argument concerning Chevron deference overlooks whether the reasoning in Jie Ao is applicable to the claims at issue in this Opinion.

right to use their burdened land in a manner that does unreasonably interfere with the railroad company's railroad easement. Moreover, the statute at 49 U.S.C. § 10501, which grants exclusive jurisdiction over "regulation of rail transportation" to the STB, does not evidence an intent to grant exclusive jurisdiction to the STB over the ability of an individual to adversely possess land owned by another individual or a non-railroad entity under State law. The plaintiffs' claims, therefore, are not categorically preempted under the ICCTA.

As noted above, the second type of preemption under the ICCTA, "as applied preemption," is a fact-intensive "test" that examines whether "the facts show that the action 'would have the effect of preventing or unreasonably interfering with railroad transportation.'" Union Pac. R. Co. v. Chicago Transit Auth., 647 F.3d at 679 (quoting CSX Transp., Inc.-Petition for Declaratory Order, 2005 WL 1024490, at *2-3). In the specifically-named cases, however, the parties have not conducted discovery into plaintiffs' alternative claims of acquiring title to the land underlying the railroad corridor through adverse possession. In its reply in support of its motion for partial summary judgment, defendant has requested relief under RCFC 56(d), "in order to allow adequate time for discovery" related to plaintiffs' alternative adverse possession assertions. According to defendant's reply, "[t]he current posture of the litigation is such that the parties have not engaged in intensive factual or expert discovery on the issue of adverse possession," as "the United States understood that the parties were to focus solely on the threshold legal issues in this briefing." Defendant argues that, "[w]ithout adequate time for discovery, the United States cannot gather and present facts essential to its defense," and that the court should not address plaintiffs' claims of acquiring interests through adverse possession without a full factual record.

In plaintiffs' reply, plaintiffs state that, "[i]n fairness, however, Defendant assumed that the briefing would be limited to the merits of the legal issues and it did have grounds for that belief. Initially, that was Plaintiffs' plan, too. But Plaintiffs changed their minds . . . ." Therefore, plaintiffs "do not oppose Defendant's request for a delay pursuant to RCFC 56(d), but request the scope and time for discovery not be open-ended."

Under RCFC 56(d), if a non-moving party "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." RCFC 56(d). "Rule 56(d) 'provides for comparatively limited discovery for the purpose of showing facts sufficient to withstand a summary judgment motion.'" RQ Squared, LLC v. United States, 129 Fed. Cl. 742, 748 (2017) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 265 (1968)), aff'd, 708 F. App'x 685 (Fed. Cir. 2018). When analyzing motions for relief under RCFC 56(d), judges on the United States Court of Federal Claims, as well as the parties in the specifically-named cases, have applied a five-factor test originally utilized in Theisen Vending Co. v. United States, 58 Fed. Cl. 194 (2003), which provides that:

the non-movant must by affidavit and supporting papers: (1) specify the particular factual discovery being sought, (2) explain how the results of the discovery are reasonably expected to engender a genuine issue of material fact, (3) provide an adequate factual predicate for the belief that there are discoverable facts sufficient to raise a genuine and material issue, (4) recite the efforts previously made to obtain those facts, and (5) show good grounds for the failure to have discovered the essential facts sooner.

See Theisen Vending Co. v. United States, 58 Fed. Cl. at 198; see also Confidential Informant 59-05071 v. United States, 134 Fed. Cl. 698, 721-22 (2017) (utilizing the five-factor test established in Theisen Vending Co.), aff'd, 745 F. App'x 166 (Fed. Cir. 2018); Anham FZCO v. United States, 123 Fed. Cl. 386, 389 (2015) (utilizing the five-factor test established in Theisen Vending Co.); Alta Wind I Owner-Lessor C v. United States, 117 Fed. Cl. 369, 372 (2014) (utilizing the five-factor test established in Theisen Vending Co.); Clear Creek Cmty. Servs. Dist. v. United States, 100 Fed. Cl. 78, 83 (2011) (utilizing the five-factor test established in Theisen Vending Co.); Chevron U.S.A. Inc. v. United States, 72 Fed. Cl. 817, 819 (2006) (utilizing the five-factor test established in Theisen Vending Co.). The court then determines "whether the 'parties would be better served by pursuing discovery and deferring any dispositive motions until further development of the record.'" Anham FZCO v. United States, 123 Fed. Cl. at 389 (quoting Jade Trading, LLC v. United States, 60 Fed. Cl. 558, 566 (2004)). Moreover, even when not applying the five-factor test articulated in Theisen Vending Co. v. United States, judges on the United States Court of Federal Claims have stated that a "nonmoving party will not be allowed to conduct discovery that has no chance of leading to the denial of summary judgment for the movant." RQ Squared, LLC v. United States, 129 Fed. Cl. at 748 (citing Simmons Oil Corp. v. Tesoro Petroleum Corp., 86 F.3d 1138, 1144 (Fed. Cir. 1996)); see also Zhou v. United States, 133 Fed. Cl. 322, 326 (2017) ("When the material facts are not in doubt, a Rule 56(d) request for discovery should be denied." (citing RQ Squared, LLC v. United States, 119 Fed. Cl. at 758)), aff'd, 727 F. App'x 651 (Fed. Cir. 2018).

The issue of whether "as applied preemption" under the ICCTA bars plaintiffs' claims of acquiring interests through State law adverse possession will require this court to examine whether or not allowing adverse possession of the fee simple title to the land underlying the railroad corridor has improperly restricted railroad operations or could improperly restrict potential, future railroad operations. Plaintiffs contend that this fact-intensive test is not met because:

Plaintiffs and their predecessors have occupied the right of way thirty years or longer, and that occupation has not interfered with railroad operations (regardless of whether they owned it by title or not), as is apparent from their declarations describing their use and occupation as well as from the lack of any evidence or allegations to the contrary.

Permitting the parties to conduct discovery into plaintiffs' claims that they acquired an interest in the railroad corridor through adverse possession, however, would provide the court with a fully-developed record on which to base a position regarding "as applied

preemption" under the ICCTA, as well as a fully-developed record on which to evaluate whether plaintiffs actually acquired interests in the land underlying the railroad corridor through adverse possession. As currently developed, the factual record before the court regarding adverse possession primarily consists of declarations signed by individual plaintiffs, which were submitted to the court by plaintiffs' counsels of record. Although there does not appear to be contrary evidence in the record calling into question the veracity of the plaintiffs' declarations, by not allowing defendant time to conduct discovery into the factual circumstances underlying plaintiffs' assertions of acquiring interests in the land underlying the railroad corridor through adverse possession, the court would be reaching a conclusion only based on declarations submitted by individual plaintiffs.

To support its request for relief under RCFC 56(d), defendant has submitted to the court a declaration signed by Rachel Roberts, who states that "I, along with my colleague Tanya Nesbitt, represent the United States in this action."[34] In the declaration signed by Rachel Roberts, Ms. Roberts asserts that, "because summary judgment briefing was to address potentially dispositive legal issues, the United States deferred further factual discovery on Plaintiffs' adverse possession claims, which would be costly, time-intensive, and unnecessary given the United States' understanding of Washington property law." Rachel Roberts asserts that plaintiffs, however, have not limited their cross-motion for partial summary to threshold legal issues, and have asked the court to find as a matter of law that plaintiffs acquired interests through adverse possession, which Ms. Roberts argues is "an inherently fact-intensive and complex inquiry." Rachel Roberts' declaration also describes the discovery the United States would undertake if the court granted defendant's request for relief under RCFC 56(d), including written discovery, depositions, and expert testimony. Plaintiffs do not dispute that their cross-motion for partial summary judgment goes beyond "threshold legal issues," as apparently originally contemplated by the parties, and addresses the merits of plaintiffs' claims of acquiring interests through adverse possession. Moreover, plaintiffs do not oppose defendant's requested relief under RCFC 56(d).

Based on the parties' representations to the court, it appears that defendant reasonably thought, and, therefore, did not fully address, that the parties' cross-motions for partial summary judgment would not encompass the merits and factual circumstances of plaintiffs' alternative argument involving adverse possession. The facts relating to whether plaintiffs had adversely possessed the land underlying the railroad corridor are interrelated to the facts relating to whether plaintiffs' adverse possession argument is barred by "as applied preemption" under the ICCTA and further discovery will allow development of the record as to both issues. The court, therefore, will grant a limited time for the parties to conduct discovery into whether "as applied preemption" under the ICCTA bars plaintiffs assertions of State law adverse possession, as well as whether plaintiffs had acquired interests in the land underlying the railroad corridor prior to the alleged taking in these specifically-named cases. This portion of defendant's discovery shall be limited to the facts concerning application of the factors for Washington State law adverse possession and facts related to "as applied preemption" under the ICCTA. The court, therefore, defers ruling on defendant's argument related to "as applied preemption" under

---

[34] Tanya Nesbitt currently is listed as counsel of record for defendant, the United States.

the ICCTA and also defers ruling on whether plaintiffs had acquired interests in the land underlying the railroad corridor through adverse possession.[35]

## CONCLUSION

Defendant's motion to dismiss the claims of the plaintiffs who are currently before the court asserting that they had acquired interests in the land underlying the railroad corridor through adverse possession is **DENIED**. Defendant's motion to strike the declarations is **GRANTED**, and the court **STRIKES** from the record before the court the declarations submitted and signed by Charles Klinge, Vicki Orrico, and Jerry Broadus. Defendant's and plaintiffs' cross-motions for partial summary judgment are **DENIED IN PART** and **DEFERRED IN PART**. Specifically, the court concludes: 1) there are issues of material facts as to whether Spencer plaintiffs Raymond and Lael Spencer, John and Carolyn Rossi, and Reid and Susan Brockway, Schroeder plaintiffs Clifford and Kathy Schroeder, Peterson plaintiff Donna Marie Raab Matrinez, Collins plaintiffs D. Michael and Vanessa Collins, Donald Barrett, Howard and Pam Freedman, and Nelson plaintiffs Robert and Beth Nelson and the Estate of William F. Hughes acquired interests in the land underlying the railroad corridor through their deeds; 2) all of the ten plaintiffs' alternative claims that they acquired interests in the land underlying the railroad corridor are not barred under Washington State law; 3) all of the ten plaintiffs' alternative claims that they acquired interests in the land underlying the railroad corridor are not categorically preempted under the ICCTA; 4) the court **DEFERS** ruling on whether all of the ten plaintiffs' alternative claims that they acquired interests in the land underlying the railroad corridor are barred by "as applied preemption" under the ICCTA; and 5) the court **DEFERS** ruling on the merits of whether plaintiffs acquired interests in the land underlying the railroad corridor through adverse possession. Further proceedings will be scheduled by separate Order.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

---

[35] Defendant also argues that, "[e]ven if some private use of a railroad ROW is permissible, and is not preempted under the ICCTA, that use is not sufficiently hostile to establish adverse possession." Whether plaintiffs' use of the land burdened by the railroad easement was sufficiently hostile to establish adverse possession, however, goes to the merits of whether plaintiffs had adversely possessed the land underlying the railroad corridor and will be addressed after the parties have conducted discovery under RCFC 56(d).